1   FOLGER LEVIN & KAHN LLP
    Michael A. Kahn (CSB No. 057432, mkahn@flk.com)
2   Douglas W. Sullivan (CSB No. 088136, dsullivan@flk.com)
    David P. Barton (CSB No. 221549, dbarton@flk.com)
3   Embarcadero Center West
    275 Battery Street, 23rd Floor
4   San Francisco, CA  94111
    Telephone: (415) 986-2800
5   Facsimile: (415) 986-2827

6   Attorneys for Plaintiffs ENTERCOM
    SACRAMENTO, LLC, ENTERCOM
7   COMMUNICATIONS CORP. and
    JOHN GEARY

8

9                  UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11                   SAN FRANCISCO DIVISION

12

13  ENTERCOM SACRAMENTO, LLC, a          Case No.
    Delaware Limited Liability Corporation;
14  ENTERCOM COMMUNICATIONS              **COMPLAINT FOR BREACH OF
    CORP., a Pennsylvania Corporation; and   INSURANCE CONTRACT; FOR BREACH
15  JOHN GEARY, an individual,           OF THE COVENANT OF GOOD FAITH
                                         AND FAIR DEALING; FOR
16                    Plaintiffs,        DECLARATORY RELIEF; AND FOR
                                         INJUNCTIVE RELIEF**
17       v.
                                         **and**
18  AMERICAN HOME ASSURANCE
    COMPANY, a New York Corporation,     **DEMAND FOR JURY TRIAL**
19
                      Defendant.
20

21

22       Plaintiffs Entercom Sacramento, LLC, Entercom Communications Corp. and John Geary,

23  for their claims against Defendant American Home Assurance Company allege as follows:

24                    **I.    THE PARTIES**

25       1.    Plaintiff Entercom Sacramento, LLC (hereinafter "Entercom Sacramento") was

26  and is a limited liability company duly organized, existing and incorporated in the State of

27  Delaware, with its principal place of business in Sacramento, California.  Entercom Sacramento is

28  the owner of six radio stations in Sacramento, California, including KDND, FM 107.9 ("The

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

1    End") and duly authorized to conduct business in the State of California.

2        2.    Plaintiff Entercom Communications Corp. (hereinafter "Entercom

3    Communications") was and is a corporation duly organized, existing and incorporated in

4    Pennsylvania, with its principal place of business in Bala Cynwyd, Pennsylvania.  Entercom

5    Communications was and is the parent corporation of Entercom Sacramento.

6        3.    Plaintiff John Geary (hereinafter "Geary") is an individual who is a citizen of the

7    State of California, residing in Granite Bay, California.  At all times mentioned herein, Geary was

8    and is an employee of Entercom Sacramento and one of its managers.

9        4.    Hereinafter, the Plaintiffs are collectively referred to as "Plaintiffs" or the

10   "Entercom Parties."  The Entercom Parties were and are insureds under an excess Commercial

11   Umbrella Liability Policy issued by Defendant American Home Assurance Company, the insurer.

12       5.    Defendant American Home Assurance Company (hereinafter "Defendant" or

13   "American Home") was and is a corporation organized and existing under the laws of the State of

14   New York, with its principal place of business in New York, New York.  Plaintiffs are informed

15   and believe, and on that basis allege, that at all times material to this lawsuit, American Home

16   was authorized to transact and was transacting business in the State of California, including in the

17   Northern District of California.  American Home is an insurance company and a member of the

18   American International Group ("AIG"), one of the world's largest group of insurance companies.

19                    **II.    JURISDICTION**

20       6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because

21   there is complete diversity of citizenship between the Plaintiffs and the Defendant, and the

22   amount in controversy exceeds $75,000.00, exclusive of interest and costs.

23                     **III.    VENUE**

24       7.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(a) and (c).

25   Venue is proper in this Court because, among other things, Defendant American Home is a

26   corporation that is subject to personal jurisdiction in the United States District Court for the

27   Northern District of California.

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-2-                     COMPLAINT FOR BREACH OF INSURANCE
                         CONTRACT, ETC.; CASE NO.

#### IV.    INTRA-DISTRICT ASSIGNMENT

8.    Assignment of this action to the San Francisco Division is proper under Local Rule 3-2 because a substantial part of the events giving rise to the claims alleged herein occurred in San Francisco, where there were meetings and communications giving rise to this action.

#### V.    SUMMARY OF THE DISPUTES

9.    The Chubb Group of Insurance Companies ("Chubb"), as an insurer, issued a primary commercial liability policy ("the Chubb Primary Policy") to the Entercom Parties, as the insureds, with policy limits of $1,000,000.  Defendant American Home, as an insurer with the AIG Group, issued an excess Commercial Umbrella Liability Policy ("the AIG Excess Policy") to the Entercom Parties, as the insureds, with policy limits of $25,000,000.  The Chubb Primary Policy and the AIG Excess Policy both provided for the same coverage, including insurance for bodily injury caused by an occurrence.

10.    On January 25, 2007, the Entercom Parties were sued in a lawsuit entitled, "William Strange, individually and Guardian ad Litem for Ryland Strange and Jorie Strange, minors, et al. v. Entercom Sacramento, LLC, et al." (the "*Strange* lawsuit").  The *Strange* lawsuit followed the death of Jennifer Strange after she participated in a contest run by one of the radio stations owned by Entercom Sacramento (a Plaintiff herein).  The Entercom Parties promptly tendered the *Strange* lawsuit to the insurance carriers, Chubb and Defendant American Home.  As the primary carrier, Chubb accepted the tender and began defending the Entercom Parties without a reservation of rights.  Despite the fact that the AIG Excess Policy provided for the same coverage, American Home simply acknowledged that there "may" be coverage, assigning counsel to assist in the defense of the lawsuit, as part of a reservation of rights letter.

11.    This case involves Defendant American Home's bad faith refusal to take action to settle the *Strange* lawsuit, while at the same time preventing the Entercom Parties from taking action to settle the lawsuit on their own.  Based on its erroneous position that the AIG Excess Policy somehow does not afford coverage for the *Strange* lawsuit (contrary to the position of the primary carrier, Chubb), American Home refused to respond to a Settlement Demand that was open for thirty (30) days.  Not only was American Home's coverage position legally incorrect,

1  but, in addition, American Home failed to notify the Entercom Parties of its position until <u>after</u>

2  the Settlement Demand had expired. Worse yet, when the Entercom Parties thereafter sought to

3  take action on their own to settle the case, American Home refused to waive the provisions in the

4  AIG Excess Policy allegedly entitling American Home to control settlement. Instead, American

5  Home claimed that if the Entercom Parties settled the *Strange* lawsuit on their own, they would

6  lose the right to seek reimbursement from American Home by reason of a "no voluntary

7  payments" provision in the AIG Excess Policy. American Home's bad faith conduct has placed

8  the Entercom Parties in a "Catch 22" position: American Home refuses to take action to try to

9  settle the *Strange* lawsuit, while at the same time refusing to allow the Entercom Parties to do so.

10      12.    Specifically, on July 12, 2007, after significant discovery in the *Strange* lawsuit,

11  counsel for the Strange family made a Settlement Demand that was open for thirty (30) days. The

12  Entercom Parties promptly forwarded the Settlement Demand to both Chubb and Defendant

13  American Home, requesting that they take immediate action in response. Chubb promptly

14  responded. Defendant <u>American Home</u> <u>failed</u> to <u>respond</u> at <u>all</u>, let alone take proper action to

15  attempt to settle the *Strange* lawsuit.

16      13.    Despite repeated demands from its insureds, it was not until August 17, 2007, well

17  <u>after</u> the Settlement Demand in the *Strange* lawsuit had expired, that American Home even

18  acknowledged receipt of the Settlement Demand. Then, by letter of August 17, 2007, American

19  Home contended that, although the Entercom parties clearly did not intend any harm, the death of

20  Jennifer Strange was allegedly not an "occurrence" (as that term is used in the AIG Excess

21  Policy) so as to trigger coverage under the AIG Excess Policy, and that, therefore, American

22  Home did not have to respond to the settlement demand. These positions were contrary to the

23  law and numerous, prior representations made by American Home.

24      14.    Given that it was handling the *Strange* lawsuit under a reservation of rights,

25  American Home was <u>not</u> entitled to take into account coverage in deciding whether to settle the

26  *Strange* lawsuit because "the existence of a coverage dispute, however meritorious the insurer's

27  position, is simply not a proper consideration in deciding whether to accept an offer to settle the

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

COMPLAINT FOR BREACH OF INSURANCE
CONTRACT, ETC.; CASE NO.

1    claim against the insured," as American Home was specifically advised.  In violating this

2    principle and others, American Home acted in bad faith.

3         15.    Moreover, the "no coverage" position in the August 17 letter and in follow-up

4    communications was simply wrong.  American Home incorrectly concluded that because

5    Entercom Sacramento personnel "intended" that the contestants drink water in the Contest

6    (although, as acknowledged by American Home, they clearly did not intend any harm), any death

7    stemming from the Contest was allegedly not an "occurrence" (as that term is used in the AIG

8    Excess Policy) so as to trigger coverage.  In reaching this conclusion, among other things:

9         a.    American Home ignored the fact that Chubb, with the same policy terms,

10   had concluded that the death was a covered "occurrence," having accepted the tender of defense

11   without a reservation of rights.

12        b.    American Home failed to take into account the fact that, under the law,

13   there is an "occurrence" under a commercial liability policy (such as the AIG Excess Policy) if

14   "any aspect in the causal series of events leading to the injury was unintended by the insured."

15   American Home then ignored many allegations in the Complaint concerning the "causal series of

16   events" to reach its faulty conclusion, including numerous allegations of the Entercom Parties'

17   negligence  in the *Strange* lawsuit.

18        c.    American Home ignored discovery that had taken place in the case,

19   rebutting American Home's "no coverage" position.

20        d.    American Home ignored the fact that when American Home previously

21   read the Compliant, American Home determined that there "may" be coverage, assigning counsel

22   to participate in the defense of the Entercom Parties.  American Home offered no explanation for

23   why it had previously concluded there "may" be coverage, but now had determined there was no

24   coverage, and offered no explanation for American Home's reversal of position.

25        e.    American Home ignored the fact that the act of having the contestants

26   drink water, at a minimum, was not inherently wrongful as required under California law to

27   potentially avoid coverage, and ignored the fact that the cases relied upon by American Home for

28   disavowing coverage involved situations where it was apparent that the intended act was

1    inherently wrongful, such that it would inevitably lead to injury.

2          f.    American Home ignored the fact that two of the insureds of the Entercom

3    Parties – Geary and Entercom Communications – had no involvement in the Contest and, thus,

4    indisputably had coverage.

5          g.    American Home representatives responsible for taking the "no coverage"

6    position failed to do a proper investigation, including, among other things, failing to consult with

7    Entercom representatives or with counsel representing the Entercom Parties in the *Strange*

8    lawsuit, failing to review correspondence from counsel for the Entercom Parties, and failing to

9    review pleadings, depositions and written discovery in the *Strange* lawsuit.

10          h.    American Home "failed to give at least as much consideration to the

11    interests of the insured[s] as it gave to its own interests" and failed "to diligently search for

12    evidence which supports its insured's claim," as required by California law.  Indeed, American

13    Home gave no consideration to its insureds' interests and even failed to take into account the

14    different roles of the insureds.  Had American Home given proper consideration to the insureds'

15    interests, American Home would quickly have concluded (like Chubb with the same policy

16    terms) that under the law, there is coverage under the AIG Excess Policy for the *Strange* lawsuit.

17    16.    Having received American Home's letter of August 17, 2007 <u>after</u> the *Strange*

18    Settlement Demand expired, the Entercom Parties promptly requested that American Home

19    confirm (a) that American Home was in fact denying coverage, and (b) that, therefore, the

20    Entercom Parties could take steps to attempt to settle the *Strange* lawsuit on their own, despite a

21    "no voluntary payment" provision in the American Home Policy otherwise precluding the

22    Entercom Parties from settling a claim on their own.

23    17.    Thereafter, American Home refused to confirm that it was denying coverage;

24    however, at the same time, American Home claimed that its position remained the same –

25    namely, that there was no "occurrence" (as that term is used in the AIG Excess Policy) so as to

26    trigger any coverage.  American Home also claimed that if the Entercom Parties attempted to

27    settle the *Strange* lawsuit on their own, that would constitute a violation of the "no voluntary

28    payment" provision in the policy (which American Home was not waiving), such that American

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-6-                    COMPLAINT FOR BREACH OF INSURANCE
CONTRACT, ETC.; CASE NO.

1    Home would not have to reimburse the Entercom Parties if they funded a settlement even if there

2    were coverage; however, at the same time, American Home took no action to attempt to settle the

3    *Strange* lawsuit.

4         18.    By this action, the Entercom Parties seek:

5              a.    Declarations from this Court that the *Strange* lawsuit is covered under the

6    AIG Excess Policy and that the Entercom Parties are entitled to try to settle the *Strange* lawsuit

7    on their own (with contribution from Chubb), given American Home's bad faith and its refusal to

8    take action to try to settle the case.

9              b.    Damages stemming from the breaches by American Home of its

10    obligations under the AIG Excess Policy and breaches of the covenant of good faith and fair

11    dealing, including, but not limited to:  Any amounts that the Entercom Parties incur in entering

12    into a reasonable settlement of the *Strange* lawsuit or as a result of any judgment; legal fees that

13    the Entercom Parties have incurred and continue to incur in defending the *Strange* lawsuit above

14    the amounts reimbursed by Chubb; costs incurred by Entercom in continuing to defend the

15    *Strange* lawsuit; consequential damages of Entercom; and all attorneys' fees and costs incurred in

16    pursuing their rights under the AIG Excess Policy and in this litigation.

17              c.    Based on the tortious breach of the covenant of good faith and fair dealing,

18    and based upon the oppressive, fraudulent and malicious conduct of American Home which acted

19    solely in its own selfish economic interests, the Entercom Parties also seek exemplary damages.

20              d.    Preliminary and permanent injunctive relief against American Home

21    precluding American Home from objecting to the Entercom Parties attempting to settle the

22    *Strange* lawsuit on their own (with contribution from Chubb) and from subsequently raising the

23    "no voluntary payment" and "cooperation" provisions (or any other related provisions) in the AIG

24    Excess Policy as a basis for not providing any benefits under the policy with respect to the

25    *Strange* lawsuit.

26         19.    By this action, the Entercom Parties are not waiving any attorney-client privilege

27    or confidential work product related to any communications between counsel for the Entercom

28    Parties (the insured) and the insurers of the Entercom Parties (Chubb and American Home)

concerning the underlying *Strange* lawsuit.  Under the law, the insurers should maintain the confidentiality of the attorney-client communications and attorney work product.

## VI.    FACTUAL BACKGROUND

### A.    The Entercom Parties' Insurance Policies

#### 1.    The Chubb Primary Policy

20.    Vigilant Insurance Company (hereinafter "Chubb") is an insurance company and a member of the Chubb Group of Insurance Companies.  Chubb issued a primary policy, Policy No. 3579-67-25 PHL, effective from March 7, 2006 to March 7, 2007 to Entercom Communications ("the Chubb Primary Policy").  Each of the Entercom Parties (including the Plaintiffs herein) is an insured under the Chubb Primary Policy.  Primary Policy, pp. 6 and 8.

21.    The Chubb Primary Policy provides that Chubb "will pay damages that the **insured** becomes legally obligated to pay by reason of liability . . . for **bodily injury** . . . caused by an **occurrence**."  *Id.*, p. 3.  The Chubb Primary Policy further provides:  "**Occurrence** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  *Id.*, p. 29.  The Chubb Primary Policy provides coverage with a limit of $1,000,000. *Id.*, p. 1.

22.    The Chubb Primary Policy also requires Chubb to defend the insureds against a "**suit**."  *Id.*, p. 4.  "**Suit** means a civil proceeding in which damages, to which this insurance applies, are sought."  *Id.*, p. 31.  The fees and expenses that Chubb incurs in defending insureds (such as the Entercom Parties) do not reduce the Chubb Primary Policy limits.  *Id.*, p. 5.  Rather, the costs of defense are in addition to the Chubb Primary Policy limits.

#### 2.    The AIG Excess Policy

23.    American Home is an insurance company and a member of AIG.  American Home issued the AIG Excess Policy, No. BE 6849213, effective from March 7, 2006 to March 7, 2007, to Entercom Communications ("the AIG Excess Policy").  A true and correct copy of the AIG Excess Policy is attached hereto as **Exhibit 1** (exclusive of the declarations page) and incorporated by reference.  Each of the Entercom Parties is an insured under the AIG Excess Policy.  Exh. 1, Endorsement No. 7 at p. 5, Section R.2; Exh. 1 at p. 18, Section M.2.d.

24.     The AIG Excess Policy provides that American Home "will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages...because of **Bodily Injury** to which the insurance applies." Exh. 1, p. 1. ("**Retained Limit**" means the $1,000,000 applicable limits of the underlying Chubb Primary Policy. Exh. 1, p. 22.) Similar to the Chubb Primary Policy, the AIG Excess Policy further provides that, "This policy applies, only if: 1. the **Bodily Injury** is caused by an **Occurrence**...." Like the Chubb Primary Policy, "**Occurrence**" is defined in the AIG Excess Policy as respects **Bodily Injury** as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The AIG Excess Policy provides coverage with policy limits of $25,000,000. Exh. 1, p. 1, Item 3.

25.     To make it clear that the AIG Excess Policy is excess of the Chubb Primary Policy but provides the same coverage as the Chubb Primary Policy, the AIG Excess Policy provides: "Coverage under this policy for **Bodily Injury**...will follow the terms, definitions, conditions and exclusions of [the Chubb Primary Policy], subject to the Policy Period, Limits of Insurance, premium and all other terms, definitions, conditions and exclusions of this policy." Endorsement No. 7, p. 2.

26.     The AIG Excess Policy also provides: "No **Insured** will, except at that **Insured's** own cost, voluntarily make a payment...without our consent." Exh. 1, p. 14, §G.4. This provision is referred to as the "no voluntary payment" provision.

27.     Under the AIG Excess Policy, the insureds are also to "cooperate with [American Home] in the investigation, settlement or defense of the...**Suit**." Exh. 1, p. 14. This provision is referred to as "the cooperation provision."

**B.      The Entercom Parties Honored Their Obligations Under the Policies**

28.     The Entercom Parties have performed all terms, conditions, promises and agreements required of them under the Chubb Primary Policy and the AIG Excess Policy.

**C.      The Strange Lawsuit**

29.     On January 25, 2007, the Entercom Parties and others were sued in the Superior Court of the State of California, Sacramento County, in a case entitled "William Strange,

1   individually and Guardian ad Litem for Ryland Strange and Jorie Strange, minors, et al. v.

2   Entercom Sacramento, LLC, et al," Case No. 07A S00377 ("the *Strange* lawsuit").

3        30.    The *Strange* lawsuit arises from the death of Jennifer Strange, the wife of Plaintiff

4   William Strange and the mother of three children.  Jennifer Strange died following her

5   participation in a Contest entitled "Hold Your Wee for a Wii."  The Contest was run at The End

6   (KDND, FM Radio 107.9), one of six Sacramento stations owned by Defendant Entercom

7   Sacramento.  The Contest involved approximately eighteen contestants drinking water at

8   intervals.  Any contestant who voluntarily dropped out or who went to the bathroom would be

9   eliminated.  The winner of the Contest won a Nintendo Wii, a console for computer games.  The

10  Contest was held in the morning on January 12, 2007.

11       31.    Jennifer Strange was asked if she wanted to drop out of the Contest before it

12  ended, with an offer of concert tickets and she ultimately agreed to do so, finishing second.  Some

13  time after driving home, as alleged in the *Strange* lawsuit, Jennifer Strange later apparently died

14  from hyponatremia, a complicated medical condition.

15       32.    On January 25, 2007, counsel for the Plaintiffs filed the *Strange* lawsuit, with

16  claims for damages under wrongful death and survivor's causes of actions.  A true and correct

17  copy of that Complaint in the *Strange* lawsuit is attached hereto as **Exhibit 2**.

18      **D.**    **Tender of the *Strange* Lawsuit and Chubb's Acceptance**

19       33.    The Entercom Parties promptly notified and tendered the *Strange* lawsuit to

20  Chubb, who had issued a primary policy with policy limits of $1,000,000.  Chubb promptly

21  confirmed its acceptance of the tender and duty to defend, without any reservation of rights

22  relating to coverage.

23      **E.**    **Tender of the *Strange* Lawsuit to American Home, and Its Responses**

24       34.    The Entercom Parties also promptly tendered the *Strange* lawsuit to American

25  Home.  Thereafter, American Home appointed an AIG excess claims representative as the claims

26  representative for American Home in the *Strange* lawsuit.

27       35.    On March 7, 2007, American Home's claims representative advised Entercom that

28  while American Home would soon issue a reservation of rights letter, that was not a sign that

1   American Home was taking an adversarial position over coverage and that American Home itself

2   would seek to settle the *Strange* lawsuit with the Stranges' counsel. Then, by letter of March 22,

3   2007, American Home formally acknowledged the Entercom Parties' tender and advised the

4   Entercom parties that it was handling the *Strange* matter under a reservation of rights.

5        36.    In its March 22, 2007 letter, American Home acknowledged that there "may" be

6   coverage for the *Strange* lawsuit by notifying Entercom of its intention to associate a second law

7   firm to assist in the defense of the *Strange* lawsuit along with counsel previously retained to

8   defend the Entercom Parties. American Home advised that it was entitled under the AIG Excess

9   Policy to retain associate counsel to "participate in the defense of any suit...to which this policy

10  may apply." (Emphasis added.)

11       37.    At various times, American Home's claims representative met with the Stranges'

12  counsel privately without the presence of the Entercom Parties to discuss settlement.

13       38.    At a meeting on July 11, 2007 – just the day before the Stranges' counsel served

14  the Settlement Demand – American Home's claims representative represented that any settlement

15  would be with "my [American Home's] money," that American Home would pay "100% of any

16  settlement," and American Home "would not be asking Entercom for any money to settle the

17  case." On July 11, 2007, the day before receipt of the Settlement Demand, the American Home

18  claims representative also advised that it was not his practice or the practice of AIG (including

19  American Home) to consult with defense counsel concerning the reasonableness of any

20  settlements.

21       **F.    Discovery in the *Strange* Lawsuit**

22       39.    Prior to July 12, 2007, there was significant discovery in the *Strange* lawsuit,

23  including productions of documents by the Entercom Parties and the Strange Plaintiffs, responses

24  to numerous interrogatories by the Entercom Parties, and over thirty (30) depositions. Counsel

25  for the Entercom Parties kept American Home apprised of the discovery, and provided or made

26  available all documents produced and depositions in the *Strange* lawsuit.

27       **G.    The July 12, 2007 Settlement Demand**

28       40.    On July 12, 2007, the Stranges' counsel sent the Entercom Parties a Settlement

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-11-

COMPLAINT FOR BREACH OF INSURANCE
CONTRACT, ETC.; CASE NO.

1    Demand. On its face, the Settlement Demand stated that it would expire in thirty (30) days.

2        41.    The following day, July 13, 2007, the Entercom Parties' counsel forwarded the

3    Settlement Demand to both Chubb and American Home.

4        42.    The next week, the Entercom Parties again reminded both Chubb and American

5    Home of the Settlement Demand, and sought a prompt response by the insurers.

6            **1.    Chubb's Response to Plaintiffs' Demand**

7        43.    On July 24, 2007, Chubb responded to the Settlement Demand consistent with

8    coverage for the *Strange* lawsuit under the Chubb Primary Policy.

9            **2.    American Home's Belated Response in Bad Faith**

10        44.    Not having obtained a response from American Home, in early August, the

11    Entercom Parties again requested American Home to respond. The Entercom Parties also

12    specifically requested a meeting or conference. Based on the AIG Excess Policy and based on

13    American Home's prior actions, the Entercom Parties reasonably relied on American Home

14    timely responding to the Settlement Demand.

15        45.    The Entercom Parties never received an oral or written communication from

16    American Home prior to the August 10 expiration of the Settlement Demand.

17        46.    After five weeks of silence, and a week after the Settlement Demand expired, by

18    letter of August 17, 2007, American Home responded, suggesting for the first time that American

19    Home was not just reserving rights, but denying coverage.

20        47.    American Home did not offer an explanation for not responding to the Entercom

21    Parties prior to the expiration of the Settlement Demand. Nor did American Home offer an

22    explanation for refusing to meet with the Entercom Parties. Nor did American Home describe

23    any investigation that American Home had conducted in reaching its new position.

24        48.    American Home reached its apparent conclusion that there was no "coverage" by

25    simply looking at some of the allegations in the Complaint and nothing more. The superficial

26    conclusion was simply wrong, as explained above. Also, by its actions, American Home was and

27    is equitably estoppel from denying coverage.

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

COMPLAINT FOR BREACH OF INSURANCE
CONTRACT, ETC.; CASE NO.

**H.     Further Demands on _American Home_ to Honor Its Responsibility**

49.     Given American Home's evasion of its responsibilities, and its evasive statements regarding its position on coverage, the Entercom Parties asked American Home to confirm (a) that American Home was disclaiming coverage, and (b) that the Entercom Parties could attempt to take control of settlement negotiations and seek to settle the _Strange_ lawsuit on their own.

50.     American Home responded, advising that American Home had not declined coverage (which appeared contrary to American Home's position of August 17) but was proceeding under a reservation of rights and that American Home would not waive any provision under the policy, including the voluntary payments provision.  Thus, American Home asserted that the Entercom Parties could not resolve the _Strange_ lawsuit on their own without running the risk that American Home would not have to reimburse the Entercom Parties because of the "no voluntary payment" provision.  However, thereafter, American Home again advised that it disagreed with the Entercom parties' position that Ms. Strange's death was an "occurrence" (as the term is used in the AIG Excess Policy) so as to trigger coverage under the AIG Excess Policy.  And, American Home refused to take any action to try to settle the _Strange_ lawsuit.

51.     American Home's assertion of the "no voluntary payment" provision, while at the same time contending there was no coverage, put the Entercom Parties in a "Catch-22": American Home was refusing to take action to resolve the _Strange_ lawsuit and at the same time preventing the Entercom Parties from doing so either.

**FIRST CLAIM FOR RELIEF**

**(The Entercom Parties Against Defendant
For Damages For Breach Of The Insurance Contract )**

52.     The Entercom Parties incorporate herein by reference each and every allegation contained in paragraphs 1 through 51 above, as though set forth in full.

53.     As alleged above, the Entercom Parties are insured under a written policy of insurance with Defendant American Home (the AIG Excess Policy).

54.     The Entercom Parties have performed all terms, conditions, obligations and

1    agreements required to be performed by them under the AIG Excess Policy.

2        55.    American Home has materially breached its obligations to the Entercom Parties

3    under the AIG Excess Policy by, among other things:

4            a.    Asserting that the death of Jennifer Strange was not an "occurrence" under

5    the AIG Excess Policy and refusing to acknowledge and provide coverage to each of the

6    Entercom Parties.

7            b.    Failing and refusing to acknowledge or respond in a timely manner to the

8    Settlement Demand in the *Strange* lawsuit.

9            c.    Failing and refusing to take actions to negotiate, enter into, and fund a

10    reasonable settlement of the *Strange* lawsuit.

11            d.    Failing and refusing to cooperate with the Entercom Parties in attempting

12    to settle the *Strange* lawsuit.

13        56.    As a direct and proximate result of American Home's material breaches, the

14    Entercom Parties have been damaged in an amount to be proven at trial, including, among other

15    items of damage, fees and costs the Entercom Parties are being forced to pay for the continuing

16    defense of the *Strange* lawsuit in excess of the amounts reimbursed by Chubb (and in excess of

17    the jurisdictional amount), hundreds of thousands of dollars of consequential damages of

18    Entercom Communications, and the amount of any settlement or judgment in the *Strange* lawsuit

19    that the Entercom Parties are forced to pay.

20                    **SECOND CLAIM FOR RELIEF**

21              **(The Entercom Parties Against Defendant**
22    **For Breach Of The Covenant Of Good Faith And Fair Dealing)**

23        57.    The Entercom Parties incorporate herein by reference each and every allegation

24    contained in paragraphs 1 through 56 above, as though set forth in full.

25        58.    Implied in the AIG Excess Policy is American Home's duty to act fairly and in

26    good faith with the Entercom Parties.

27        59.    American Home has materially, tortiously and contractually breached its

28    obligations to act fairly and in good faith toward the Entercom Parties by, among other things:

1           a.     Asserting that the death of Jennifer Strange was not an "occurrence" under

2  the AIG Excess Policy and refusing to acknowledge and provide coverage to each of the

3  Entercom Parties.

4           b.     Failing and refusing to acknowledge or respond in a timely manner to the

5  Settlement Demand in the *Strange* lawsuit.

6           c.     Failing and refusing to take actions to negotiate, enter into, and fund a

7  reasonable settlement of the *Strange* lawsuit.

8           d.     Failing and refusing to cooperate with the Entercom Parties in attempting

9  to settle the *Strange* lawsuit.

10          e.     Failing and refusing to conduct a reasonable investigation of the facts so as

11  to determine that there is in fact coverage for the *Strange* lawsuit, and failing and refusing to give

12  proper consideration to the interests of all insureds.

13          f.     Failing and refusing to consult with the Entercom Parties and their counsel

14  concerning the Settlement Demand.

15          g.     Failing to acknowledge coverage and agree to fund any judgment in the

16  *Strange* lawsuit to the maximum extent permitted under the law.

17      60.     As a direct and proximate result of American Home's material breaches of the

18  covenant of good faith, the Entercom Parties have been damaged in an amount to be proven at

19  trial, including, among other items of damage, fees and costs the Entercom Parties are being

20  forced to pay for the continuing defense of the *Strange* lawsuit in excess of the amounts

21  reimbursed by Chubb (and in excess of the jurisdictional amount), attorneys' fees and expenses in

22  connection with pursuing their rights under the AIG Excess Policy and prosecuting this action,

23  hundreds of thousands of dollars of consequential damages of Entercom Communications, and

24  the amount of any settlement or judgment in the *Strange* lawsuit that the Entercom Parties are

25  forced to pay.

26      61.     In addition, the bad faith conduct of American Home was malicious, fraudulent

27  and/or oppressive, entitling the Entercom Parties to exemplary damages in an amount to be

28  proven at trial.

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

COMPLAINT FOR BREACH OF INSURANCE
CONTRACT, ETC.; CASE NO.

## THIRD CLAIM FOR RELIEF

### (The Entercom Parties Against Defendant For Declaratory Relief)

62.    The Entercom Parties incorporate herein by reference each and every allegation contained in paragraphs 1 through 61 above, as though set forth in full.

63.    There is a dispute between the Entercom Parties and American Home regarding whether the Entercom Parties have coverage for the *Strange* lawsuit under the AIG Excess Policy. American Home contends that there was no "occurrence" (as that term is used in the AIG Excess Policy) alleged or involved in the *Strange* lawsuit so as to trigger coverage under the AIG Excess Policy. The Entercom Parties contend that they are covered for the *Strange* lawsuit under the AIG Excess Policy with the exception of alleged (but not cognizable) claims for punitive damages.

64.    There is also a dispute between the Entercom Parties and American Home regarding the Entercom Parties' right to enter into a reasonable settlement of the *Strange* lawsuit on their own, without regard to the "no voluntary payment," "cooperation" or other provisions of the AIG Excess Policy, given the actions of American Home, as alleged above. The Entercom Parties contend they are entitled to do so under the law; whereas, American Home disputes this contention.

65.    The Entercom Parties seek declarations concerning their right to try to settle the *Strange* lawsuit and coverage under the AIG Excess Policy.

66.    Such declaratory relief is appropriate, because an actual controversy has arisen and now exists between the Entercom Parties and American Home.

## FOURTH CLAIM FOR RELIEF

### (The Entercom Parties Against Defendant For Preliminary and Permanent Injunctive Relief)

67.    The Entercom Parties incorporate herein by reference each and every allegation contained in paragraphs 1 through 66 above, as though set forth in full.

68.    American Home has failed and refused to take proper action to try to settle the

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

COMPLAINT FOR BREACH OF INSURANCE
CONTRACT, ETC.; CASE NO.

1   *Strange* lawsuit, instead asserting that there is no coverage under the AIG Excess Policy for the

2   claims alleged in the *Strange* Complaint. Despite having taken that position, American Home

3   improperly contends that the Entercom Parties may not try to enter into a reasonable settlement

4   on their own and, thereafter, pursue American Home for coverage without violating, at least, the

5   "no voluntary payment" provision in the AIG Excess Policy.

6       69.    To enable the Entercom Parties to attempt to try to enter into a reasonable

7   settlement of the *Strange* lawsuit with the heirs of Jennifer Strange (the Plaintiffs in that lawsuit),

8   the Entercom Parties seek a preliminary and permanent injunction as follows:

9           a.    That American Home may not object to the Entercom Parties (with

10  contributions from Chubb) attempting to enter into a reasonable settlement with the Plaintiffs in

11  the *Strange* lawsuit, without regard to the "no voluntary payment" and "cooperation" provisions

12  (or any other related provisions) of the AIG Excess Policy.

13          b.    That American Home may not object to reimbursing the Entercom Parties

14  for all or any portion of any reasonable settlement that the Entercom Parties may potentially enter

15  into in the *Strange* lawsuit based on alleged failures to comply with the "no voluntary payment"

16  or "cooperation" provisions (or any other related provisions) of the AIG Excess Policy.

17      70.    Absent such injunctive relief, there will be irreparable harm in that the Entercom

18  Parties will lose unique opportunities to reach a reasonable settlement with the Strange family and

19  the reputations of the Entercom Parties will be further damaged in the community.

20                          **PRAYER FOR RELIEF**

21      WHEREFORE, the Entercom Parties pray for judgment against Defendant American

22  Home as follows:

23      1.    On the first claim for relief, for compensatory damages for breach of the insurance

24  policy issued by American Home in an amount to be determined at trial;

25      2.    On the second claim for relief, for compensatory damages in an amount to be

26  determined at trial, for exemplary damages, and for attorneys' fees and costs in obtaining the

27  benefits under the American Home Policy and in bringing and maintaining this action;

28      3.    On the third claim for relief, for declarations of this Court that the Entercom

1    Parties may attempt to settle the *Strange* lawsuit on their own (with contribution from Chubb)

2    without regard to the "no voluntary payment" and "cooperation" provisions (or any other related

3    provisions) in the AIG Excess Policy and that they are covered under the AIG Excess Policy for

4    the *Strange* lawsuit;

5        4.    On the fourth claim for relief, for a preliminary and permanent injunction against

6    American Home and its agents, enjoining them from objecting to the Entercom Parties attempting

7    to enter into a reasonable settlement of the *Strange* lawsuit on their own (with contribution from

8    Chubb) and from seeking to enforce the "no voluntary payment" or "cooperation" provisions (or

9    any other related provisions) in the AIG Excess Policy with respect to any settlement of the

10   *Strange* lawsuit;

11       5.    For reasonable attorneys' fees;

12       6.    For costs incurred in this action; and

13       7.    For such other and further relief as the Court may deem just and proper.

14   Dated: December 26, 2007                    FOLGER LEVIN & KAHN LLP

15

16                                              Douglas W. Sullivan
                                                Attorneys for Plaintiffs
17                                              ENTERCOM SACRAMENTO, LLC, ENTERCOM
                                                COMMUNICATIONS CORP. and JOHN GEARY
18

19

20                              **DEMAND FOR JURY TRIAL**

21       Plaintiffs hereby demand a trial by jury on all issues triable by jury.

22   Dated: December 26, 2007                    FOLGER LEVIN & KAHN LLP

23

24                                              Douglas W. Sullivan
                                                Attorneys for Plaintiffs
25                                              ENTERCOM SACRAMENTO, LLC, ENTERCOM
                                                COMMUNICATIONS CORP. and JOHN GEARY
26

27   54007\2009\581064.1

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW                        -18-                COMPLAINT FOR BREACH OF INSURANCE
                                                            CONTRACT, ETC.; CASE NO.

# EXHIBIT 1

# Umbrella Prime®
## Commercial Umbrella Liability Policy With CrisisResponse ®

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the **Named Insured** shown in the Declarations and any other person or organization qualifying as a **Named Insured** under this policy. The words "we," "us" and "our" refer to the company providing this insurance.

The word **Insured** means any person or organization qualifying as such under Section VII. Definitions.

Except for headings, words that appear in bold print have special meaning. See Section VII. Definitions.

---

In consideration of the payment of the premium and in reliance upon the statements in the Declarations, we agree to provide coverage as follows:

### I. INSURING AGREEMENT - COMMERCIAL UMBRELLA LIABILITY

A. We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** to which this insurance applies or because of **Bodily Injury** or **Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured Contract**.

The amount we will pay for damages is limited as described in Section IV. Limits of Insurance.

B. This policy applies, only if:

1. the **Bodily Injury** or **Property Damage** is caused by an **Occurrence** that takes place anywhere, and the **Bodily Injury** or **Property Damage** occurs during the **Policy Period**; and

2. the **Personal Injury and Advertising Injury** is caused by an **Occurrence** that takes place anywhere arising out of your business, but only if the **Occurrence** was committed during the **Policy Period**.

C. This policy applies to **Bodily Injury, Property Damage**, and **Personal Injury and Advertising Injury** only if prior to the **Policy Period**, no **Insured** shown in Paragraph M2 of Section VII, no officer, no manager in your risk management, insurance or legal department and no employee who was authorized by you to give or receive notice of an **Occurrence**, claim or **Suit**, knew that the **Bodily Injury** or **Property Damage** had occurred, in whole or in part, or that an **Occurrence** had been committed that caused **Personal Injury and Advertising Injury**. If such an **Insured**, manager or authorized employee knew, prior to the **Policy Period**, that the **Bodily Injury** or **Property Damage** had occurred or that an **Occurrence** had been committed that caused **Personal Injury and Advertising Injury**, then any continuation, change or resumption of such **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** during or after the **Policy Period** will be deemed to have been known prior to the **Policy Period**.

D. **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** will be deemed to have been known to have occurred at the earliest time when any **Insured** shown under Paragraph M2 of Section VII, any manager in your risk management, insurance or legal department or any employee who was authorized by you to give or receive notice of an **Occurrence**, claim or **Suit**:

1. reports all, or any part, of the **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** to us or any other insurer;

2. receives a written or verbal demand or claim for damages because of the **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** ; or

© 2001 American International Group, Inc.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

3. becomes aware by any other means that **Bodily Injury** or **Property Damage** has occurred or has begun to occur or an **Occurrence** has been committed that has caused or may cause **Personal Injury and Advertising Injury**.

E. Damages because of **Bodily Injury** include damages claimed by any person or organization for care, loss of services or death resulting at any time from the **Bodily Injury**.

F. If we are prevented by law or statute from paying damages covered by this policy on behalf of the **Insured**, then we will indemnify the **Insured** for those sums in excess of the **Retained Limit**.

## II.  INSURING AGREEMENT - CRISISRESPONSE ® AND EXCESS CASUALTY CRISISFUND ®

A. **CrisisResponse**

We will advance **CrisisResponse Costs** directly to third parties on behalf of the **Named Insured**, regardless of fault, arising from a **Crisis Management Event** first commencing during the **Policy Period**, up to the amount of the **CrisisResponse Sublimit of Insurance**.

B. **Excess Casualty CrisisFund**

We will pay **Crisis Management Loss** on behalf of the **Named Insured** arising from a **Crisis Management Event** first commencing during the **Policy Period**, up to the amount of the **Excess Casualty CrisisFund Limit of Insurance**.

C. A **Crisis Management Event** will first commence at the time during the **Policy Period** when a **Key Executive** first becomes aware of an **Occurrence** that gives rise to a **Crisis Management Event** and will end when we determine that a crisis no longer exists or when the **CrisisResponse Sublimit of Insurance** has been exhausted, whichever occurs first.

D. There will be no **Retained Limit** applicable to **CrisisResponse Costs** or **Crisis Management Loss**.

E. Any advancement of **CrisisResponse Costs** or payment of **Crisis Management Loss** that we make under the coverage provided by this Section II will not be a determination of our obligations under this policy, nor create any duty to defend any **Suit** under any other part of this policy.

## III.  DEFENSE PROVISIONS

A. We will have the right and duty to defend any **Suit** against the **Insured** that seeks damages for **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** covered by this policy, even if the **Suit** is groundless, false or fraudulent when:

1. the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** have been exhausted by payment of **Loss** to which this policy applies; or

2. the damages sought because of **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** would not be covered by **Scheduled Underlying Insurance** or any applicable **Other Insurance**, even if the total applicable limits of either the **Scheduled Underlying Insurance** or any applicable **Other Insurance** had not been exhausted by the payment of **Loss**.

If we are prevented by law or statute from assuming the obligations specified under this provision, we will pay any expenses incurred with our consent.

B. We will have no duty to defend the **Insured** against any **Suit** seeking damages for **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** to which this insurance does not apply.

C. When we assume the defense of any **Suit** against the **Insured** that seeks damages covered by this policy, we will:

© 2001 American International Group, Inc.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

1. investigate, negotiate and settle the **Suit** as we deem expedient; and

2. pay the following supplementary payments to the extent that such payments are not covered by **Scheduled Underlying Insurance** or any applicable **Other Insurance**:

   a. premiums on bonds to release attachments for amounts not exceeding the applicable Limits of Insurance of this policy, but we are not obligated to apply for or furnish any such bond;

   b. premiums on appeal bonds required by law to appeal a judgement in a **Suit** for amounts not exceeding the applicable Limits of Insurance of this policy, but we are not obligated to apply for or furnish any such bond;

   c. all court costs taxed against the **Insured** in the **Suit**;

   d. pre-judgment interest awarded against the **Insured** on that part of the judgment within the applicable Limits of Insurance of this policy we pay.  If we make a settlement offer, we will not pay any pre-judgment interest accruing after we make such offer;

   e. post-judgment interest that accrues after entry of judgment on that part of the judgment within the applicable Limits of Insurance of this policy we pay and before we have paid, offered to pay or deposited in court that part of the judgment that is within the applicable Limits of Insurance of this policy; and

   f. the **Insured's** expenses incurred at our request or with our consent.

D. Except as provided in Paragraph A above, we will have no duty to defend any **Suit** against the **Insured**.  We will, however, have the right, but not the duty, to participate in the defense of any **Suit** and the investigation of any claim to which this policy may apply.  If we exercise this right, we will do so at our own expense.

E. We will not defend any **Suit**, or pay any attorney fees or litigation expenses including, without limitation, the expenses described in Paragraph C above that accrue after the applicable Limits of Insurance of this policy have been exhausted by the payment of **Loss** and we will have the right to withdraw from the further defense of such **Suit** by tendering control of said defense to the **Insured**.

## IV.  LIMITS OF INSURANCE

A. The Limits of Insurance shown in Item 3 of the Declarations and the rules below state the most we will pay for all damages under this policy regardless of the number of:

   1. **Insureds**;

   2. claims made or **Suits** brought;

   3. persons or organizations making claims or bringing **Suits**; or

   4. coverages provided under this policy.

B. The General Aggregate Limit stated in Item 3 of the Declarations is the most we will pay for all damages under this policy, except for:

   1. damages included within the **Products-Completed Operations Hazard** ; and

   2. damages because of **Bodily Injury** or **Property Damage** to which this policy applies, caused by an **Occurrence** and resulting from the ownership, maintenance or use of an **Auto** covered under **Scheduled Underlying Insurance**.

C. The Products-Completed Operations Aggregate Limit stated in Item 3C of the Declarations is the most we will pay for all damages included in the **Products-Completed Operations Hazard**.

© 2001 American International Group, Inc.
Includes copyrighted material of Insurance Services Office, Inc. with its

D. Subject to Paragraphs B and C above, the Each Occurrence Limit stated in Item 3A of the Declarations is the most we will pay for the sum of all damages arising out of any one **Occurrence**.

E. Subject to Paragraphs B and C above, the most we will pay for damages under this policy on behalf of any person or organization to whom you are obligated by written **Insured Contract** to provide insurance such as is afforded by this policy is the lesser of the Limits of Insurance shown in Item 3 of the Declarations or the minimum Limits of Insurance you agreed to procure in such written **Insured Contract**.

F. This policy applies only in excess of the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** whether or not such limits are collectible. If, however, a policy shown in the Schedule of Underlying Insurance forming a part of this policy has a limit of insurance:

 1. greater than the amount shown in such schedule, this policy will apply in excess of the greater amount; or

 2. less than the amount shown in such schedule, this policy will apply in excess of the amount shown in the Schedule of Underlying Insurance forming a part of this policy.

G. If the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** are reduced or exhausted by the payment of **Loss** to which this policy applies, we will:

 1. in the event of reduction, pay excess of the remaining total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance**; and

 2. in the event of exhaustion, continue in force as underlying insurance.

H. Expenses incurred to defend any **Suit** or to investigate any claim will be in addition to the applicable Limits of Insurance of this policy. Provided, however, that if such expenses reduce the applicable limits of **Scheduled Underlying Insurance**, then such expenses will reduce the applicable Limits of Insurance of this policy.

I. The **CrisisResponse Sublimit of Insurance** is the most we will pay for all **CrisisResponse Costs** under this policy, regardless of the number of **Crisis Management Events** first commencing during the **Policy Period**. This **CrisisResponse Sublimit of Insurance** will be part of, not in addition to, the applicable Limit of Insurance.

J. The **Excess Casualty CrisisFund Limit of Insurance** is the most we will pay for all **Crisis Management Loss** under this policy, regardless of the number of **Crisis Management Events** first commencing during the **Policy Period**. This **Excess Casualty CrisisFund Limit of Insurance** will be in addition to the applicable Limit of Insurance.

K. We will have no obligation to advance **CrisisResponse Costs** when we determine that a **Crisis Management Event** has ended or when the **CrisisResponse Sublimit of Insurance** has been exhausted, whichever occurs first.

L. The Limits of Insurance of this policy apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months, beginning with the inception date of the **Policy Period** shown in the Declarations, unless the **Policy Period** is extended after issuance for an additional period of less than twelve (12) months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance of this policy.

M. We will not make any payment under this policy unless and until:

 1. the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** have been exhausted by the payment of **Loss** to which this policy applies; or

 2. the total applicable **Self-Insured Retention** has been satisfied by the payment of **Loss** to which this policy applies.

© 2001 American International Group, Inc.

When the amount of **Loss** has been determined by an agreed settlement or a final judgment, we will promptly pay on behalf of the **Insured** the amount of such **Loss** falling within the terms of this policy. An agreed settlement means a settlement and release of liability signed by us, the **Insured** and the claimant or the claimant's legal representative.

---

## V.  EXCLUSIONS

### A.  Aircraft and Watercraft

This insurance does not apply to **Bodily Injury** or **Property Damage** arising out of the ownership, maintenance, use or entrustment to others of any aircraft or watercraft owned or operated by or rented or loaned to any **Insured**. Use includes operation and loading and unloading.

This exclusion applies even if the claims against any **Insured** allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that **Insured**, if the **Occurrence** which caused the **Bodily Injury** or **Property Damage** involved the ownership, maintenance, use or entrustment to others of any aircraft or watercraft that is owned or operated by or rented or loaned to any **Insured**.

This exclusion does not apply to a watercraft you do not own that is:

1. less than 26 feet long; and

2. not being used to carry persons or property for a charge.

### B.  Asbestos

This insurance does not apply to any liability arising out of:

1. the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos containing products or materials, asbestos fibers or asbestos dust;

2. any obligation of the **Insured** to indemnify any party because of damages arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust; or

3. any obligation to defend any **Suit** or claim against the **Insured** that seeks damages if such **Suit** or claim arises as the result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

### C.  Contractual Liability

This insurance does not apply to any liability for which the **Insured** is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

1. that the **Insured** would have in the absence of a contract or agreement; or

2. assumed in an **Insured Contract**, provided the **Bodily Injury** or **Property Damage** occurs subsequent to the execution and prior to the termination of the **Insured Contract**. Solely for the purposes of liability assumed in an **Insured Contract**, reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an **Insured** are deemed to be damages because of **Bodily Injury** or **Property Damage** and included in the Limits of Insurance of this policy, provided:

   a. liability to such party for, or for the cost of, that party's defense has also been assumed in the same **Insured Contract**; and

   b. such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this policy applies are alleged.

Page 5 of 23
© 2001 American International Group, Inc.
Includes copyrighted material of Insurance Services Office, Inc. with its

D. **Damage to Impaired Property or Property Not Physically Injured**

This insurance does not apply to **Property Damage** to **Impaired Property** or property that has not been physically injured, arising out of:

1. a defect, deficiency, inadequacy or dangerous condition in **Your Product** or **Your Work**; or

2. a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **Your Product** or **Your Work** after it has been put to its intended use.

E. **Damage to Property**

This insurance does not apply to **Property Damage** to:

1. property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

2. premises you sell, give away or abandon, if the **Property Damage** arises out of any part of those premises;

3. property loaned to you;

4. personal property in the care, custody or control of the **Insured**;

5. that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the **Property Damage** arises out of those operations; or

6. that particular part of any property that must be restored, repaired or replaced because **Your Work** was incorrectly performed on it.

Paragraph 2 of this exclusion does not apply if the premises are **Your Work** and were never occupied, rented or held for rental by you.

Paragraphs 3, 4, 5 and 6 of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph 6 of this exclusion does not apply to **Property Damage** included in the **Products-Completed Operations Hazard**.

F. **Damage to Your Product**

This insurance does not apply to **Property Damage** to **Your Product** arising out of it or any part of it.

G. **Damage to Your Work**

This insurance does not apply to **Property Damage** to **Your Work** arising out of it or any part of it and included in the **Products-Completed Operations Hazard**.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

H. **Electronic Chatrooms or Bulletin Boards**

This insurance does not apply to **Personal Injury and Advertising Injury** arising out of an electronic chatroom or bulletin board the **Insured** hosts, owns, or over which the **Insured** exercises control.

© 2001 American International Group, Inc.
Includes copyrighted material of Insurance

### I.  Employees and Volunteers

This insurance does not apply to liability of any employee or volunteer qualifying as an **Insured** under this policy arising out of **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury**:

1. to you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to an employee of yours while in the course of his or her employment or performing duties related to the conduct of your business, or to another volunteer of yours while performing duties related to the conduct of your business;

2. to the spouse, child, parent, brother or sister of such injured employee or volunteer as a consequence of subparagraph 1 above;

3. for which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in subparagraphs 1 or 2 above; or

4. arising out of his or her providing or failing to provide professional health care services.

### J.  Employment Practices

This insurance does not apply to any liability arising out of:

1. failure to hire any prospective employee or any applicant for employment;

2. dismissal, discharge or termination of any employee;

3. failure to promote or advance any employee; or

4. employment-related practices, policies, acts, omissions or misrepresentations directed at a present, past, future or prospective employee, including, but not limited to:

   a. coercion, harassment, humiliation or discrimination;
   b. demotion, evaluation, reassignment, discipline, or retaliation;
   c. libel, slander, humiliation, defamation, or invasion of privacy; or
   d. violation of civil rights.

This exclusion applies:

1. whether the **Insured** may be liable as an employer or in any other capacity; and

2. to any obligation to share damages with or repay someone else who must pay damages because of the injury.

### K.  Expected or Intended Injury

This insurance does not apply to **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** expected or intended from the standpoint of the **Insured**. However, this exclusion does not apply to **Bodily Injury** or **Property Damage** resulting from the use of reasonable force to protect persons or property.

### L.  Infringement of Copyright, Patent, Trademark or Trade Secret

This insurance does not apply to **Personal Injury and Advertising Injury** arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your **Advertisement**, of copyright, trade dress or slogan.

### M.  Liquor Liability

This insurance does not apply to **Bodily Injury** or **Property Damage** for which any **Insured** may be held liable by reason of:

© 2001 American International Group, Inc.

1. causing or contributing to the intoxication of any person;

2. the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

3. any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

However, this exclusion will not apply only if:

1. you are not in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages; and

2. coverage is provided for such **Bodily Injury** or **Property Damage** by **Scheduled Underlying Insurance.**

Coverage under this policy for such **Bodily Injury** or **Property Damage** will follow the terms, definitions, conditions and exclusions of **Scheduled Underlying Insurance**, subject to the **Policy Period**, Limits of Insurance, premium and all other terms, definitions, conditions and exclusions of this policy. Provided, however, that coverage provided by this policy will be no broader than the coverage provided by **Scheduled Underlying Insurance**.

N. **Media and Internet Type Businesses**

This insurance does not apply to **Personal Injury and Advertising Injury** committed by any **Insured** whose business is:

1. advertising, broadcasting, publishing or telecasting;

2. designing or determining content of web-sites for others; or

3. an Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs U1, U2 and U3 of Section VII.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

O. **"No-Fault," "Uninsured Motorist" or "Underinsured Motorist" Laws**

This insurance does not apply to any obligation of the **Insured** under any "No-Fault," "Uninsured Motorist" or "Underinsured Motorist" law, or any similar law.

P. **Nuclear Liability**

This insurance does not apply to:

1. any liability:

a. with respect to which the **Insured** is also an **Insured** under a nuclear energy liability policy issued by the Nuclear Energy Liability-Property Insurance Association, Mutual Atomic Energy Liability Underwriters or the Nuclear Insurance Association of Canada, or would be an **Insured** under any such policy but for its termination upon exhaustion of its limit of liability;

b. resulting from the hazardous properties of nuclear material and with respect to which (1) any person or any organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any amendment or revision thereto, or any similar law; (2) the **Insured** is, or had this policy not been available would be, entitled to indemnity from the United States of America or any agency thereof under any agreement entered into by the United States of America or an agency thereof with any person or organization;

c. resulting from the hazardous properties of nuclear material if:

    i) the nuclear material (1) is at any nuclear facility owned by the **Insured** or operated by the **Insured** or on the **Insured's** behalf or (2) has been discharged or dispensed therefrom;

    ii) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by the **Insured** or on the **Insured's** behalf; or

    iii) the injury or damage arises out of the furnishing by the **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility.

2. As used in this exclusion:

    a. "hazardous properties" includes radioactive, toxic or explosive properties;

    b. "nuclear material" means source material, special nuclear material or by-product material;

    c. "source material," "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any amendment or revision thereto;

    d. "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

    e. "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of a nuclear facility included within the definition of nuclear facility below;

    f. "nuclear facility" means:

      i) any nuclear reactor;

      ii) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel or (3) handling, processing or packaging wastes;

      iii) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the **Insured's** custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

      iv) any structure, basin, excavation, premises or place prepared or used for storage or disposal of waste, and

    includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

    g. "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

    h. **Property Damage** includes all forms of radioactive contamination of property.

### Q. Pollution

This insurance does not apply to:

1. Any **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** anywhere at any time;

2. Any loss, cost or expense arising out of any request, demand, order or statutory or regulatory requirement that the **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in

any way respond to, or assess the effects of **Pollutants**; or

3. Any loss, cost or expense arising out of any claim or **Suit** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of **Pollutants**.

However, Paragraph 1 of this exclusion will not apply if coverage for such **Bodily Injury** or **Property Damage** as is described in subparagraphs 1) through 6) below is provided by **Scheduled Underlying Insurance**:

1) **Products-Completed Operations Hazard**

   Paragraph 1 of this exclusion does not apply with respect to **Bodily Injury** or **Property Damage** included within the **Products-Completed Operations Hazard** provided that **Your Product** or **Your Work** has not at any time been:

   a) discarded, dumped, abandoned, thrown away; or

   b) transported, handled, stored, treated, disposed of or processed as waste;

   by anyone.

2) **Hostile Fire**

   Paragraph 1 of this exclusion does not apply with respect to **Bodily Injury** or **Property Damage** arising out of heat, smoke or fumes from a **Hostile Fire**.

3) **Equipment to Heat the Building and Contractor/Lessee Operations**

   Paragraph 1 of this exclusion does not apply to:

   a) **Bodily Injury** sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat the building; or

   b) **Bodily Injury** or **Property Damage** for which you may be held liable if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional **Insured** with respect to your ongoing operations performed for that additional **Insured** at such premises, site or location, and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any **Insured**, other than the additional **Insured**.

4) **Fuels, Lubricants and Other Operating Fluids - Mobile Equipment**

   Paragraph 1 of this exclusion does not apply to:

   a) **Bodily Injury** or **Property Damage** arising out of the escape of fuels, lubricants or other operating fluids that are needed to perform normal electrical, hydraulic or mechanical functions necessary for the operation of **Mobile Equipment** or its parts if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the **Bodily Injury** or **Property Damage** arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured contractor or subcontractor; or

   b) **Bodily Injury** or **Property Damage** sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor.

5) **Fuels, Lubricants, Fluids, etc. - Auto**

0517 (10/04)
H0877

© 2001 American International Group, Inc.

Paragraph 1 of this exclusion does not apply to fuels, lubricants, fluids, exhaust gases or other similar **Pollutants** that are needed for or result from the normal electrical, hydraulic or mechanical functioning of an **Auto** covered by **Scheduled Underlying Insurance** or its parts, if:

a) the **Pollutants** escape, seep, migrate, or are discharged, dispersed or released directly from an **Auto** part designed by its manufacturer to hold, store, receive or dispose of such **Pollutants**; and

b) the **Bodily Injury** or **Property Damage** does not arise out of the operation of any equipment shown in Paragraphs 6b and 6c of the definition of **Mobile Equipment**.

6) **Upset, Overturn or Damage of an Auto**

Paragraph 1 of this exclusion does not apply to **Occurrences** that take place away from premises owned by or rented to an **Insured** with respect to **Pollutants** not in or upon an **Auto** covered by **Scheduled Underlying Insurance** if:

a) the **Pollutants** or any property in which the **Pollutants** are contained are upset, overturned or damaged as a result of the maintenance or use of an **Auto** covered by **Scheduled Underlying Insurance**; and

b) the discharge, dispersal, seepage, migration, release or escape of the **Pollutants** is caused directly by such upset, overturn or damage.

Coverage under this policy for such **Bodily Injury** or **Property Damage** as is described in subparagraphs 1) through 6) above will follow the terms, definitions, conditions and exclusions of **Scheduled Underlying Insurance**, subject to the **Policy Period**, Limits of Insurance, premium and all other terms, definitions, conditions and exclusions of this policy. Provided, however, that coverage provided by this policy will be no broader than the coverage provided by **Scheduled Underlying Insurance**.

R.  **Recall of Your Product, Your Work or Impaired Property**

This insurance does not apply to damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

1.  **Your Product**;

2.  **Your Work**; or

3.  **Impaired Property**;

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

S.  **Securities**

This insurance does not apply to any liability arising out of:

1.  any violation of any securities law or similar law or any regulation promulgated thereunder;

2.  the purchase, sale, offer of sale or solicitation of any security, debt, insurance policy, bank deposit or financial interest or instrument;

3.  any representations made at any time in relation to the price or value of any security, debt, insurance policy, bank deposit or financial interest or instrument; or

4.  any depreciation or decline in price or value of any security, debt, insurance policy, bank deposit or financial interest or instrument.

T.  **Unauthorized Use of Another's Name or Product**

© 2001 American International Group, Inc.
Includes copyrighted material of

This insurance does not apply to **Personal Injury and Advertising Injury** arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

U. **Various Personal Injury and Advertising Injury**

This insurance does not apply to **Personal Injury and Advertising Injury** :

1. caused by or at the direction of the **Insured** with the knowledge that the act would violate the rights of another and would inflict **Personal Injury and Advertising Injury** ;

2. arising out of oral, written or electronic publication, in any manner, of material if done by or at the direction of any **Insured** with knowledge of its falsity;

3. arising out of oral, written or electronic publication, in any manner, of material whose first publication took place before the beginning of the **Policy Period**;

4. arising out of a criminal act committed by or at the direction of the **Insured**;

5. for which the **Insured** has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the **Insured** would have in the absence of the contract or agreement;

6. arising out of a breach of contract, except an implied contract to use another's advertising idea in your **Advertisement**;

7. arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your **Advertisement**; or

8. arising out of the wrong description of the price of goods, products or services stated in your **Advertisement**.

V. **Various Laws**

This insurance does not apply to any obligation of the **Insured** under any of the following:

1. the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985), or any amendment or revision thereto, or any similar law; or

2. any workers' compensation, disability benefits or unemployment compensation law, or any similar law.

W. **War**

This insurance does not apply to any liability arising directly or indirectly as a result of or in connection with war, whether declared or not, or any act or condition incident to war. War includes civil war, insurrection, act of foreign enemy, civil commotion, factional civil commotion, military or usurped power, rebellion or revolution.

## VI. CONDITIONS

A. **Appeals**

If the **Insured** or the **Insured's** underlying insurers do not appeal a judgment in excess of the total applicable limits of **Scheduled Underlying Insurance**, we may elect to do so. If we appeal, we will be liable for, in addition to the applicable Limits of Insurance of this policy, all court costs, expenses incurred and interest on that amount of any judgment which does not exceed the applicable Limits of Insurance of this policy incidental to such an appeal.

B. **Audit**

We may audit and examine your books and records as they relate to this policy at any time during the period of this policy and for up to three (3) years after the expiration or termination of this policy.

C.  **Bankruptcy or Insolvency**

Your bankruptcy, insolvency or inability to pay or the bankruptcy, insolvency or inability to pay of any of your underlying insurers will not relieve us from the payment of **Loss** covered by this policy. But under no circumstances will such bankruptcy, insolvency or inability to pay require us to drop down, replace or assume any obligation under **Scheduled Underlying Insurance**.

D.  **Cancellation**

1.  You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2.  We may cancel this policy. If we cancel because of non-payment of premium, we must mail or deliver to you not less than ten (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we must mail or deliver to you not less than thirty (30) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Declarations will be sufficient to prove notice.

3.  The **Policy Period** will end on the day and hour stated in the cancellation notice.

4.  If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final Premium will not be less than the pro rata share of the Minimum Premium shown in Item 6 of the Declarations.

5.  If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure. Final premium will not be less than the short rate share of the Minimum Premium shown in Item 6 of the Declarations.

6.  Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter, but the cancellation will be effective even if we have not made or offered any refund of unearned premium. Our check or our representative's check, mailed or delivered, will be sufficient tender of any refund due you.

7.  The first **Named Insured** in Item 1 of the Declarations will act on behalf of all other **Insureds** with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

8.  Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

E.  **Change In Control**

If during the **Policy Period**:

1.  the first **Named Insured** designated in Item 1 of the Declarations consolidates with or merges into, or sells all or substantially all of its assets to any person or entity; or

2.  any person or entity acquires an amount of the outstanding ownership interests representing more than 50% of the voting or designation power for the election of directors of the first **Named Insured** designated in Item 1 of the Declarations, or acquires the voting or designation rights of such an amount of ownership interests;

this policy will continue in full force and effect as to **Bodily Injury** and **Property Damage** that occur prior to the effective date of such transaction and **Personal Injury and Advertising Injury** caused by an **Occurrence** that takes place prior to the effective date of such transaction. There will be no coverage afforded by this policy for **Bodily Injury** or **Property Damage** that occurs on or after the effective date of such transaction and **Personal Injury and Advertising Injury** caused by an **Occurrence** that takes place on or after the effective date of such transaction.

© 2001 American International Group, Inc.

F. **Changes**

Notice to any agent or knowledge possessed by any agent or any other person will not effect a waiver or change in any part of this policy. This policy can be changed only by a written endorsement that we make to this policy.

G. **Duties in the Event of an Occurrence, Claim or Suit**

1. You must see to it that we are notified as soon as practicable of an **Occurrence** that may result in a claim or **Suit** under this policy. To the extent possible, notice should include:

    a. how, when and where the **Occurrence** took place;

    b. the names and addresses of any injured persons and any witnesses; and

    c. the nature and location of any injury or damage arising out of the **Occurrence**.

2. If a claim is made or **Suit** is brought against any **Insured** which is reasonably likely to involve this policy, you must notify us in writing as soon as practicable.

    Written notice should be mailed or delivered to:

    AIG Technical Services, Inc.
    Excess Casualty Claims Department
    175 Water Street
    New York, NY 10038

3. You and any other involved **Insured** must:

    a. immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or **Suit**;

    b. authorize us to obtain records and other information;

    c. cooperate with us in the investigation, settlement or defense of the claim or **Suit**; and

    d. assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the **Insured** because of injury or damage to which this insurance may also apply.

4. No **Insured** will, except at that **Insured's** own cost, voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our consent.

H. **Headings**

The descriptions in the headings of this policy are solely for convenience and form no part of the terms and conditions of coverage.

I. **Inspection**

We have the right, but are not obligated, to inspect your premises and operations at any time. Our inspections are not safety inspections. They relate only to the insurability of your premises and operations and the premiums to be charged. We may give you reports on the conditions that we find. We may also recommend changes. We do not, however, undertake to perform the duty of any person or organization to provide for the health or safety of your employees or the public. We do not warrant the health and safety conditions of your premises or operations or represent that your premises or operations comply with laws, regulations, codes or standards.

J. **Legal Actions Against Us**

No person or organization has a right under this policy:

1. to join us as a party or otherwise bring us into a **Suit** asking for damages from an **Insured**; or

2. to sue us under this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an **Insured**; but we will not be liable for damages that are not payable under this policy or that are in excess of the applicable Limits of Insurance of this policy. An agreed settlement means a settlement and release of liability signed by us, the **Insured** and the claimant or the claimant's legal representative.

K. **Maintenance of Scheduled Underlying Insurance**

You agree that during the **Policy Period**:

1. you will keep **Scheduled Underlying Insurance** in full force and effect;

2. the terms, definitions, conditions and exclusions of **Scheduled Underlying Insurance** will not materially change;

3. the total applicable limits of **Scheduled Underlying Insurance** will not decrease, except for any reduction or exhaustion of aggregate limits by payment of **Loss** to which this policy applies; and

4. any renewals or replacements of **Scheduled Underlying Insurance** will provide equivalent coverage to and afford limits of insurance equal to or greater than the policy being renewed or replaced.

If you fail to comply with these requirements, we will be liable only to the same extent that we would have, had you fully complied with these requirements.

L. **Other Insurance**

If other valid and collectible insurance applies to damages that are also covered by this policy, this policy will apply excess of the **Other Insurance**. However, this provision will not apply if the **Other Insurance** is specifically written to be excess of this policy.

M. **Premium**

The first **Named Insured** designated in Item 1 of the Declarations will be responsible for payment of all premiums when due.

The premium for this policy will be computed on the basis set forth in Item 6 of the Declarations. At the beginning of the **Policy Period**, you must pay us the Advance Premium shown in Item 6 of the Declarations.

When this policy expires or if it is cancelled, we will compute the earned premium for the time this policy was in force. If this policy is subject to audit adjustment, the actual exposure base will be used to compute the earned premium. If the earned premium is greater than the Advance Premium, you will promptly pay us the difference. If the earned premium is less than the Advance Premium, we will return the difference to you. But in any event, we will retain the Minimum Premium as shown in Item 6 of the Declarations for each twelve months of the **Policy Period**.

N. **Separation of Insureds**

Except with respect to the Limits of Insurance of this policy and rights or duties specifically assigned to the first **Named Insured** designated in Item 1 of the Declarations, this insurance applies:

1. as if each **Named Insured** were the only **Named Insured**; and

2. separately to each **Insured** against whom claim is made or **Suit** is brought.

O. **Transfer of Rights of Recovery**

1. If any **Insured** has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The **Insured** must do nothing after loss to impair these rights and must help us enforce them.

2. Any recoveries will be applied as follows:

   a. any person or organization, including the **Insured**, that has paid an amount in excess of the applicable Limits of Insurance of this policy will be reimbursed first;

   b. we then will be reimbursed up to the amount we have paid; and

   c. lastly, any person or organization, including the **Insured** that has paid an amount over which this policy is excess is entitled to claim the remainder.

   Expenses incurred in the exercise of rights of recovery will be apportioned among the persons or organizations, including the **Insured**, in the ratio of their respective recoveries as finally settled.

3. If, prior to the time of an **Occurrence**, you and the insurer of **Scheduled Underlying Insurance** waive any right of recovery against a specific person or organization for injury or damage as required under an **Insured Contract**, we will also waive any rights we may have against such person or organization.

**P. Transfer of Your Rights and Duties**

Your rights and duties under this policy may not be transferred without our written consent.

If you die or are legally declared bankrupt, your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. However, notice of cancellation sent to the first **Named Insured** designated in Item 1 of the Declarations and mailed to the address shown in this policy will be sufficient notice to effect cancellation of this policy.

**Q. Unintentional Failure to Disclose**

Your failure to disclose all hazards existing as of the inception date of the policy will not prejudice you with respect to the coverage afforded by this policy, provided that any such failure or omission is not intentional.

## VII. DEFINITIONS

A. **Advertisement** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   1. notices that are published include material placed on the Internet or on similar electronic means of communication; and

   2. regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

B. **Auto** means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. **Auto** does not include **Mobile Equipment**.

C. **Bodily Injury** means bodily injury, sickness or disease sustained by any person, including death or mental anguish resulting from any of these at any time.

D. **Crisis Management Event** means an **Occurrence** that in the good faith opinion of a **Key Named Insured**, in the absence of **Crisis Management Services**, has or may result in:

   1. damages covered by this policy that are in excess of the total applicable limits of **Sch** Insurance or the **Self-Insured Retention**; and

2.  significant adverse regional or national media coverage.

Crisis Management Event will include, without limitation, man-made disasters such as explosions, major crashes, multiple deaths, burns, dismemberment, traumatic brain injury, permanent paralysis, or contamination of food, drink or pharmaceuticals, provided that any damages arising out of any of the aforementioned must be covered under this policy.

E.  Crisis Management Firm means any firm that is shown in Schedule A, Approved Crisis Management Firms attached to and forming part of this policy, which is hired by you to perform Crisis Management Services in connection with a Crisis Management Event.

F.  Crisis Management Loss means the following amounts incurred during a Crisis Management Event:

1.  amounts for the reasonable and necessary fees and expenses incurred by a Crisis Management Firm in the performance of Crisis Management Services for the Named Insured solely arising from a covered Crisis Management Event; and

2.  amounts for reasonable and necessary printing, advertising, mailing of materials, or travel by directors, officers, employees or agents of the Named Insured or a Crisis Management Firm incurred at the direction of a Crisis Management Firm, solely arising from a covered Crisis Management Event.

G.  Crisis Management Services means those services performed by a Crisis Management Firm in advising the Named Insured on minimizing potential harm to the Named Insured from a covered Crisis Management Event by maintaining and restoring public confidence in the Named Insured.

H.  CrisisResponse Costs means the following reasonable and necessary expenses incurred during a Crisis Management Event directly caused by a Crisis Management Event, provided that such expenses have been pre-approved by us and may be associated with damages that would be covered by this policy:

1.  medical expenses;

2.  funeral expenses;

3.  psychological counseling;

4.  travel expenses;

5.  temporary living expenses;

6.  expenses to secure the scene of a Crisis Management Event; and

7.  any other expenses pre-approved by the Company.

CrisisResponse Costs does not include defense costs or Crisis Management Loss.

I.  CrisisResponse Sublimit of Insurance means the CrisisResponse Sublimit of Insurance shown in Item 3D of the Declarations.

J.  Excess Casualty CrisisFund Limit of Insurance means the Excess Casualty CrisisFund Limit of Insurance shown in Item 3E of the Declarations.

K.  Hostile Fire means a fire that becomes uncontrollable or breaks out from where it was intended to be.

L.  Impaired Property means tangible property, other than Your Product or Your Work, that cannot be used or is less useful because:

1.  it incorporates Your Product or Your Work that is known or thought to be defective, deficient, inadequate or dangerous; or

2.  you have failed to fulfill the terms of a contract or agreement;

30517 (10/04)
IH0877
© 2001 American International Group, Inc.
Includes copyrighted material of Insurance Services Office,

if such property can be restored to use by:

1. the repair, replacement, adjustment or removal of **Your Product** or **Your Work**; or

2. your fulfilling the terms of the contract or agreement.

M. **Insured** means:

1. the **Named Insured**;

2. if you are designated in the declarations as:

    a. an individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner;

    b. a partnership or joint venture, you are an insured. Your members and your partners are also insureds, but only with respect to the conduct of your business;

    c. a limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers;

    d. an organization other than a partnership, joint venture or limited liability company, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders;

    e. a trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees;

3. your employees other than your executive officers (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business;

4. your volunteer workers only while performing duties related to the conduct of your business;

5. any person (other than your employee or volunteer worker) or organization while acting as your real estate manager;

6. your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy;

7. any person or organization, other than the **Named Insured**, included as an additional insured under **Scheduled Underlying Insurance**, but not for broader coverage than would be afforded by such **Scheduled Underlying Insurance**.

Notwithstanding any of the above:

    a. no person or organization is an **Insured** with respect to the conduct of any current, past or newly formed partnership, joint venture or limited liability company that is not designated as a **Named Insured** in Item 1 of the Declarations; and

    b. no person or organization is an **Insured** under this policy who is not an **Insured** under **Scheduled Underlying Insurance**.

N. **Insured Contract** means that part of any contract or agreement pertaining to your business under which any **Insured** assumes the tort liability of another party to pay for **Bodily Injury** or **Property Damage** to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

© 2001 American International Group, Inc.

**Insured Contract** does not include that part of any contract or agreement:

1.  that indemnifies a railroad for **Bodily Injury** or **Property Damage** arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

2.  that indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    a.  preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    b.  giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

3.  under which the **Insured**, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the **Insured's** rendering or failure to render professional services, including those shown in subparagraph 2 above and supervisory, inspection, architectural or engineering activities.

O.  **Key Executive** means the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, General Counsel or general partner (if the **Named Insured** is a partnership) of the **Named Insured** or sole proprietor (if the **Named Insured** is a sole proprietorship). A **Key Executive** also means any other person holding a title designated by you and approved by us, which title is shown in Schedule B, Additional Key Executives attached to and forming part of this policy.

P.  **Loss** means those sums actually paid as judgments or settlements.

Q.  **Mobile Equipment** means any of the following types of land vehicles, including any attached machinery or equipment:

    1.  bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    2.  vehicles maintained for use solely on or next to premises you own or rent;

    3.  vehicles that travel on crawler treads;

    4.  vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        a.  power cranes, shovels, loaders, diggers or drills; or

        b.  road construction or resurfacing equipment such as graders, scrapers or rollers;

    5.  vehicles not described in Paragraph 1, 2, 3 or 4 above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        a.  air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

        b.  cherry pickers and similar devices used to raise or lower workers;

    6.  vehicles not described in Paragraph 1, 2, 3 or 4 above maintained primarily for purposes other than the transportation of persons or cargo.

    However, self-propelled vehicles with the following types of permanently attached equipment are not **Mobile Equipment**, but will be considered **Autos**:

    a.  equipment designed primarily for:

        i)  snow removal;

        ii)  road maintenance, but not construction or resurfacing; or

     iii)  street cleaning;

   b.  cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   c.  air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

R.  **Named Insured** means:

  1.  any person or organization designated in Item 1 of the Declarations;

  2.  any organization in which you maintain an interest of more than fifty percent (50%) and which is included as a named insured under **Scheduled Underlying Insurance**, as of the effective date of this policy and to which more specific insurance does not apply, provided that this policy does not apply to any **Bodily Injury** or **Property Damage** that occurred or any **Personal Injury and Advertising Injury** that was caused by an **Occurrence** that was committed before you acquired or formed such organization or after you ceased to maintain an interest of more than fifty percent (50%) in such organization; and

  3.  any organization, except for a partnership, joint venture or limited liability company, that you acquire or form during the **Policy Period** in which you maintain an interest of more than fifty percent (50%) and to which more specific insurance does not apply, provided that:

   a.  such organization is included as a named insured under **Scheduled Underlying Insurance**;

   b.  this policy does not apply to any **Bodily Injury** or **Property Damage** that occurred or any **Personal Injury and Advertising Injury** that was caused by an **Occurrence** that was committed before you acquired or formed such organization or after you ceased to maintain an interest of more than fifty percent (50%) in such organization; and

   c.  you give us prompt notice after you acquire or form such organization.

Subject to the provisions of Paragraphs 3a, 3b and 3c above, a partnership, joint venture or limited liability company that you acquire or form during the **Policy Period** may be added as an **Insured** only by a written endorsement that we make a part of this policy.

We may, at our option, make an additional premium charge for any organization that you acquire or form during the **Policy Period**.

S.  **Occurrence** means:

  1.  as respects **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one **Occurrence**.

  2.  as respects **Personal Injury and Advertising Injury**, an offense arising out of your business that causes **Personal Injury and Advertising Injury**. All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one **Occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

T.  **Other Insurance** means a policy of insurance providing coverage for damages covered in whole or in part by this policy.

However, **Other Insurance** does not include **Scheduled Underlying Insurance**, the Self-Insured Retention or any policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also affords.

U. **Personal Injury and Advertising Injury** means injury arising out of your business, including consequential **Bodily Injury**, arising out of one or more of the following offenses:

1. false arrest, detention or imprisonment;

2. malicious prosecution;

3. the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies committed by or on behalf of its owner, landlord or lessor;

4. oral or written publication, in any manner, of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products or services;

5. oral or written publication, in any manner, of material that violates a person's right of privacy;

6. the use of another's advertising idea in your **Advertisement**; or

7. infringement upon another's copyright, trade dress or slogan in your **Advertisement**.

V. **Policy Period** means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of termination of this policy.

W. **Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

X. **Products-Completed Operations Hazard** means all **Bodily Injury** and **Property Damage** occurring away from premises you own or rent and arising out of **Your Product** or **Your Work** except:

1. products that are still in your physical possession; or

2. work that has not yet been completed or abandoned. However, **Your Work** will be deemed completed at the earliest of the following times:

   a. when all of the work called for in your contract has been completed;

   b. when all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or

   c. when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   **Products-Completed Operations Hazard** does not include **Bodily Injury** or **Property Damage** arising out of:

1. the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you and that condition was created by the loading or unloading of that vehicle by any **Insured**; or

2. the existence of tools, uninstalled equipment or abandoned or unused materials.

Y. **Property Damage** means:

1. physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it; or

© 2001 American International Group, Inc.

2. loss of use of tangible property that is not physically injured. All such loss of use will be deemed to occur at the time of the **Occurrence** that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Z. **Retained Limit** means:

1. the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** providing coverage to the **Insured**; or

2. the **Self-Insured Retention** applicable to each **Occurrence** that results in damages not covered by **Scheduled Underlying Insurance** nor any applicable **Other Insurance** providing coverage to the **Insured**.

AA. **Scheduled Underlying Insurance** means:

1. the policy or policies of insurance and limits of insurance shown in the Schedule of Underlying Insurance forming a part of this policy; and

2. automatically any renewal or replacement of any policy in Paragraph 1 above, provided that such renewal or replacement provides equivalent coverage to and affords limits of insurance equal to or greater than the policy being renewed or replaced.

**Scheduled Underlying Insurance** does not include a policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also affords.

BB. **Self-Insured Retention** means the amount that is shown in Item 5 of the Declarations.

CC. **Suit** means a civil proceeding in which damages because of **Bodily Injury**, **Property Damage**, or **Personal Injury and Advertising Injury** to which this policy applies are alleged. **Suit** includes:

1. an arbitration proceeding in which such damages are claimed and to which the **Insured** must submit or does submit with our consent; or

2. any other alternative dispute resolution proceeding in which such damages are claimed and to which the **Insured** submits with our consent.

DD. **Your Product** means:

1. any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

   a. you;

   b. others trading under your name; or

   c. a person or organization whose business or assets you have acquired; and

2. containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**Your Product** includes:

1. warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **Your Product**; and

2.  the providing of or failure to provide warnings or instructions.

**Your Product** does not include vending machines or other property rented to or located for the use of others but not sold.

**EE. Your Work** means:

1.  work or operations performed by you or on your behalf; and

2.  materials, parts or equipment furnished in connection with such work or operations.

**Your Work** includes:

1.  warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **Your Work**; and

2.  the providing of or failure to provide warnings or instructions.

**IN WITNESS WHEREOF,** we have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by one of our duly authorized representatives.

By signing below, the President and Secretary of the Company agree on our behalf to all the terms of this policy.

_Elizabeth M. Tuck_
_____
Secretary

_[signature]_
_____
President

This policy shall not be valid unless signed at the time of issuance by our authorized representative, either below or on the Declarations page of the policy.

_[signature]_
_____
Authorized Representative

## FORMS SCHEDULE

**Named Insured:**    ENTERCOM COMMUNICATIONS CORP

**Policy Number:**    BE    6849213
**Effective 12:01 AM:**    March 7, 2006

| End't. No. | Form Name | Form Number/ Edition Date | |
|---|---|---|---|
| | UMB PRIME DEC | 80518 | (10/04) |
| | UMB PRIME JACKET | 80517 | (10/04) |
| | PREM INCL TERRORISM NOTICE | 81249 | (03/03) |
| 1 | PROFESSIONAL LIABILITY EXCLUSION ENDORSEMENT | 83093 | (05/05) |
| 2 | VIOL. OF INFO. OR COMM. LAW EXCL. ENDT. | 87241 | (12/04) |
| 3 | FOR. LIAB. LMT. ENDT.(APP. TO SPEC. CTYS) | 83078 | (12/05) |
| 4 | ECONOMIC OR TRADE SANCTIONS COND. ENDT | 87068 | (11/04) |
| 5 | PRIME SCHEDULE A - APPROVED CRISIS MGMT FIRMS | 83687 | (12/03) |
| 6 | CROSS SUITS EXCLUSION PRIME | 80411 | (01/04) |
| 7 | PRIME MISCELLANEOUS CHANGES ENDORSEMENT | 83864 | (02/04) |
| 8 | RADIOACTIVE MATTER EXCL | 83094 | (09/03) |
| 9 | EMPLOYEE BENEFITS LIAB LIMIT (CM) | 83073 | (09/03) |
| 10 | ADVRTSING, BRDCSTING, PBLSHING, TLCSTING | 83050 | (09/03) |
| 11 | ACT OF TERRORISM SIR ENDT | 83049 | (09/03) |
| 12 | PENNSYLVANIA AMENDATORY ENDT | 52165 | (11/96) |
| 13 | LEAD EXCLUSION ENDT | 80441 | (02/03) |
| 14 | TOTAL POLLUTION EXCLUSION | 80514 | (07/02) |
| 15 | ELECTROMAGNETIC FIELDS EXCLUSION | 80418 | (07/02) |

Commercial Umbrella Liability Policy with CrisisResponse ℠
## SCHEDULE OF UNDERLYING INSURANCE

Issued to: ENTERCOM COMMUNICATIONS CORP

Policy Number: BE    6849213

by: AMERICAN HOME ASSURANCE COMPANY

| TYPE OF POLICY OR COVERAGE | LIMITS |
|---|---|
| GENERAL LIABILITY | $1,000,000 EACH OCCURRENCE $2,000,000 GENERAL AGGREGATE $2,000,000 PRODUCTS/C. OPS. AGGREGATE |
| | Defense Expenses are in addition to the limit |
| FOREIGN GL LIABILITY | $1,000,000 EACH OCCURRENCE $2,000,000 GENERAL AGGREGATE $2,000,000 PRODUCTS/C. OPS. AGGREGATE |
| | Defense Expenses are in addition to the limit |
| LIQUOR LIABILITY | $1,000,000 EACH COMMON CAUSE $1,000,000 AGGREGATE |
| | Defense Expenses are in addition to the limit |
| AUTO LIABILITY | $1,000,000 COMBINED SINGLE LIMIT |
| | Defense Expenses are in addition to the limit |
| FOREIGN AL LIABILITY | $1,000,000 COMBINED SINGLE LIMIT |
| | Defense Expenses are in addition to the limit |

JNDSCH (5/99)

## SCHEDULE OF UNDERLYING INSURANCE

Issued to: ENTERCOM COMMUNICATIONS CORP

Policy Number: BE    6849213

y: AMERICAN HOME ASSURANCE COMPANY

**TYPE OF POLICY
OR COVERAGE**

**LIMITS**

EMPLOYERS LIABILITY

$1,000,000
EACH ACCIDENT
$1,000,000
DISEASE EACH EMPLOYEE
$1,000,000
DISEASE POLICY LIMIT

Defense Expenses are in addition to the limit

FOREIGN EMPLOYERS LIABILITY

$1,000,000
EACH ACCIDENT
$1,000,000
DISEASE EACH EMPLOYEE
$1,000,000
DISEASE POLICY LIMIT

Defense Expenses are in addition to the limit

STOP GAP EL

$1,000,000
EACH ACCIDENT
$1,000,000
DISEASE EACH EMPLOYEE
$1,000,000
DISEASE POLICY LIMIT

Defense Expenses are in addition to the limit

EMPLOYEE BENEFITS LIABILITY

$1,000,000
EACH CLAIM
$1,000,000
AGGREGATE

Defense Expenses are in addition to the limit

_____
AUTHORIZED REPRESENTATIVE

UNDSCH (5/99)

POLICYHOLDER DISCLOSURE STATEMENT
UNDER
TERRORISM RISK INSURANCE ACT OF 2002

You are hereby notified that under the federal Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, you now have a right to purchase insurance coverage for losses arising out of an Act of Terrorism, which is defined in the Act as an act certified by the Secretary of the Treasury (i) to be an act of terrorism, (ii) to be a violent act or an act that is dangerous to (A) human life; (B) property or (C) infrastructure, (iii) to have resulted in damage within the United States, or outside of the United States in case of an air carrier or vessel or the premises of a U.S. mission and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. You should read the Act for a complete description of its coverage. The Secretary's decision to certify or not to certify an event as an Act of Terrorism and thus covered by this law is final and not subject to review. There is a $100 billion dollar annual cap on all losses resulting from Acts of Terrorism above which no coverage will be provided under this policy and under the Act unless Congress makes some other determination.

For your information, coverage provided by this policy for losses caused by an Act of Terrorism may be partially reimbursed by the United States under a formula established by the Act. Under this formula the United States pays 90% of terrorism losses covered by this law exceeding a statutorily established deductible that must be met by the insurer, and which deductible is based on a percentage of the insurer s direct earned premiums for the year preceeding the Act of Terrorism.

Coverage for Acts of Terrorism for losses is already included in your current policy. The portion of your annual premium that is attributable to coverage for Acts of Terrorism covered by the Act is $2,079.00.

ENTERCOM COMMUNICATIONS CORP
Insured Name

BE 6849213
Policy #

0081
Division #

AMERICAN HOME ASSURANCE COMPANY
Insurance Carrier

## ENDORSEMENT No. 1

This endorsement, effective 12:01 AM:   March 7, 2006

Forms a part of policy no:  BE    6849213

Issued to:   ENTERCOM COMMUNICATIONS CORP

By:   AMERICAN HOME ASSURANCE COMPANY

### Commercial Umbrella Liability Policy with CrisisResponse ®

### Professional Liability Exclusion Endorsement

This policy is amended as follows:

**Section V. EXCLUSIONS** is amended to include the following additional exclusion:

**Professional Liability**

This insurance does not apply to any liability arising out of any act, error, omission, malpractice or mistake of a professional nature committed by the **Insured** or any person for whom the **Insured** is legally responsible.

It is understood this exclusion applies even if the claims against any **Insured** allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that **Insured**.

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

_____

**Authorized Representative**
or Countersignature (in States Where Applicable)

83093 (05/05)

ENDORSEMENT No. 2

**This endorsement, effective 12:01 AM:**   March 7, 2006

**Forms a part of policy no:**  BE    6849213

**Issued to:**   ENTERCOM COMMUNICATIONS CORP

**By:**  AMERICAN HOME ASSURANCE COMPANY

### Commercial Umbrella Liability Policy with CrisisResponse ®

### Violation of Communication or Information Law Exclusion Endorsement

This policy is amended as follows:

**Section V. EXCLUSIONS** is amended to include the following additional exclusion:

**Violation of Communication or Information Law**

This insurance does not apply to any liability arising out of any act that violates any statute, ordinance or regulation of any federal, state or local government, including any amendment of or addition to such laws, that prohibits or limits the sending, transmitting or communicating of material or information.

It is understood that to the extent any coverage may otherwise be available under this policy or any of its endorsements, the provisions of this exclusion will supercede.

All other terms, definitions, conditions and exclusions remain unchanged.

_____
**Authorized Representative**
or Countersignature (in States Where Applicable)

87241 (12/04)
AH1509

ENDORSEMENT No. 3

This endorsement, effective 12:01 AM:    March 7, 2006

Forms a part of policy no:  BE    6849213

Issued to:  ENTERCOM COMMUNICATIONS CORP

By:  AMERICAN HOME ASSURANCE COMPANY

**Commercial Umbrella Liability Policy with CrisisResponse ®**

**Foreign Liability Limitation Endorsement**
**(With Total Terrorism Exclusion Applicable To Specified Countries)**

This policy is amended as follows:

Section V. EXCLUSIONS is amended to include the following additional exclusion:

**Foreign Liability**

This insurance does not apply to **Bodily Injury, Property Damage,** or **Personal Injury and Advertising Injury** that occurs outside the United States of America, its territories and possessions, Puerto Rico and Canada.

However, if insurance for such **Bodily Injury, Property Damage,** or **Personal Injury and Advertising Injury** is provided by a policy listed in the **Scheduled Underlying Insurance**:

1.  This exclusion shall not apply; and

2.  Coverage under this policy for such **Bodily Injury, Property Damage,** or **Personal Injury and Advertising Injury** will follow the terms, definitions, conditions and exclusions of **Scheduled Underlying Insurance,** subject to the **Policy Period,** Limits of Insurance, premium and all other terms, definitions, conditions and exclusions of this policy. Provided, however, that coverage provided by this policy will be no broader than the coverage provided by **Scheduled Underlying Insurance.**

Notwithstanding 1. and 2. above, this insurance does not apply to **Loss,** injury, damage, claim or **Suit,** arising directly or indirectly as a result of or in connection with **Terrorism** that occurs in the following countries:

Afghanistan, Algeria, Bahrain, Bangladesh, Bosnia-Herzegovina, Burma, Burundi, Central African Republic, Colombia, Comoros, Congo (Brazzaville), Congo (DRC), Cote d Ivoire, Cuba, Egypt, Georgia, Guinea-Bissau, Haiti, India, Indonesia, Iran, Iraq, Israel, Jordan, Kenya, Kuwait, Kyrgyzstan, North Korea, Lebanon, Liberia, Libya, Macedonia, Morocco, Nepal, Niger, Nigeria, Pakistan, Palestinian Authority, Peru, Philippines, Qatar, Russia, Saudi Arabia, Serbia-Montenegro, Somalia, Spain, Sri Lanka, Sudan, Syria, Thailand, Turkey, Uganda, United Kingdom, Uzbekistan, Venezuela, Yemen or Zimbabwe.

It is understood that to the extent any coverage may otherwise be provided for these above listed countries under this policy or any of its endorsements, the provisions of this exclusion will supercede.

Section VII. DEFINITIONS is a amended to include the following additional definition:

**Terrorism** means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

1. A government;

2. The civilian population of a country, state or community; or

3. To disrupt the economy of a country, state or community.

All other terms, definitions, conditions and exclusions remain unchanged.

_____
Authorized Representative
or Countersignature (in States Where Applicable)

ENDORSEMENT No. 4

This endorsement, effective 12:01 AM:  March 7, 2006

Forms a part of policy no:  BE    6849213

Issued to:  ENTERCOM COMMUNICATIONS CORP

By:  AMERICAN HOME ASSURANCE COMPANY

Commercial Umbrella Liability Policy With CrisisResponse ®

Economic or Trade Sanctions Condition Endorsement

This policy is amended as follows:

Section VI. CONDITIONS is amended to include the following additional condition:

Economic or Trade Sanctions

If coverage for a claim or Suit  under this Policy is in violation of any United States of America economic or trade sanctions, including but not limited to, sanctions administered and enforced by the United States Treasury Department's Office of Foreign Assets Control ("OFAC"), then coverage for that claim or Suit will be null and void.

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

_____
Authorized Representative
or Countersignature (in States Where Applicable)

87068 (11/04)
AH1445

ENDORSEMENT No. 5

This endorsement, effective 12:01 AM:   March 7, 2006

Forms a part of policy no:  BE    6849213

Issued to:   ENTERCOM COMMUNICATIONS CORP

By:  AMERICAN HOME ASSURANCE COMPANY

### Commercial Umbrella Liability Policy with CrisisResponse ®

### Duties in the Event of an Occurrence, Claim or Suit and
### Schedule A – Approved Crisis Management Firms

Solely as respects coverage provided by **Section II INSURING AGREEMENT - CRISISRESPONSE**SM **AND EXCESS CASUALTY CRISIS FUND®**, the following conditions are added to Section VI. Conditions, Paragraph G. Duties in the Event of an Occurrence, Claim or Suit:

You must report any **Crisis Management Event** to us within twenty-four (24) hours of the time that a **Key Executive** first becomes aware of an **Occurrence** that gives rise to a **Crisis Management Event** or as soon as practicable to be eligible for the advancement of **CrisisResponse Costs** and the payment of **Crisis Management Loss**.

Notice of a **Crisis Management Event** may be given by calling 1-877-AIG-3100. If notice is given by telephone, written notice will be given as soon as practicable thereafter. Written notice should include:

1. how, when and where the **Crisis Management Event** is taking or took place;

2. the names and addresses of any injured persons and any witnesses; and

3. the nature and location of any injury or damage arising out of the **Crisis Management Event**.

Written notice should be mailed or delivered to:

    AIG Technical Services, Inc.
    Excess Casualty Claim Department
    175 Water Street
    New York, NY 10038

## SCHEDULE A

## APPROVED CRISIS MANAGEMENT FIRMS

The following firms are approved **Crisis Management Firms**:

## Crisis Communications Management Firms:

| FIRM/ADDRESS | CONTACT/TELEPHONE | EMERGENCY TELEPHONE |
|---|---|---|
| **Abernathy MacGregor Group** | | |
| **New York Office**<br>501 Madison Avenue<br>New York, NY 10022<br><br>ww.abmac.com | James T. MacGregor<br>Tel. (212) 371-5999<br>Cell (212) 593-1845<br>jtm@abmac.com | **Emergency Only**<br><br>Tel. (212) 343-0818<br>Cell (917) 449-9964 |
| | Rhonda Barnat, Managing Director<br>Tel. (212) 371-5999<br>Cell (212) 593-1845<br>rb@abmac.com | **Emergency Only**<br><br>Cell (917) 912-6378 |
| **Los Angeles Office**<br>311 West Sixth Street<br>Suite 1880<br>Los Angeles, CA 90017 | Ian D. Campbell<br>Tel. (213) 630-6550<br>Cell (213) 489-3443<br>idc@abmac.com | **Emergency Only**<br><br>Tel. (818) 957-5650<br>Cell (917) 940-3476 |
| **Citigate Sard Verbinnen** | | |
| **New York Office**<br>630 Third Avenue<br>New York, NY 10017<br><br>www.sardverb.com | George Sard<br>Tel. (212) 687-8080<br>Fax (212) 687-8344<br>gsard@sardverb.com | **Emergency Only**<br><br>Contact switchboard @<br>(212) 687-8080 |
| | Paul Verbinnen<br>Tel. (212) 687-8080<br>Fax (212) 687-8344<br>pv@sardverb.com | |
| **Hill and Knowlton** | | |
| **New York Office**<br>466 Lexington Avenue<br>3rd Floor<br>New York, NY 10017<br>www.hillandknowlton.com | Richard C. Hyde<br>Tel. (212) 885-0372<br>Cell (917) 816-2208<br>Fax: (212) 885-0570<br>dhyde@hillandknowlton.com | **Emergency Only**<br><br>H&K Crisis Pager<br>(888) 264-5193<br>24 Hours/7 Days |

83687 (12/03)

| FIRM/ADDRESS | CONTACT/TELEPHONE | EMERGENCY TELEPHONE |
|---|---|---|

### Hill and Knowlton Continued

Arthur Forster
Tel. (212) 885-0442
Pager: 888-614-8692
Fax: (212) 885-0570
aforster@hillandknowlton.com

### Lexicon Communications Corp.

**Los Angeles Office**
9200 Sunset Blvd.
Suite 1203
Los Angeles, CA 90069
www.crisismanagement.com

Steven B. Fink
Tel. (213) 346-1212
Cell (626) 253-1519
sfink.lexiconcorp.com

**Emergency Only**

Contact switchboard at
(213) 346-1200,ext. 225

### PR21 (A Division of Edelman Worldwide)

**New York Office**
79 Fifth Avenue, 17th Fl.
New York, NY 10003

www.pr21.com

Jon Goldberg
Tel. (212) 299-8952
Fax (212) 462-1026/7
jon.goldberg@pr21.com

**Emergency Only**

Cell (973) 699-7148
Pager (877) 386-8115

### Robinson Lerer & Montgomery

**New York Office**
75 Rockefeller Plaza
6th Floor
New York, NY 10019

www.rlmnet.com

Michael J. Gross
Tel. (212) 484-7721
Cell (917) 853-0620
Fax (212) 484-7411
Mgross52@aol.com

**Emergency Only**

Contact switchboard@
(212) 484-6100

### Sitrick and Company Inc.

**Los Angeles Office**
1840 Century Park East
Suite 800
Los Angeles, CA 90067

www.sitrick.com

Michael S. Sitrick
Tel. (310) 788-2850
Fax (310) 788-2855
mike.sitrick@sitrick.com

**Emergency Only**
(310) 358-1011

24 hours/7 days

**New York Office**
375 Third Ave
21st Floor
New York, NY 10017

Richard Wool
Tel. (212) 573-6100
Fax (212) 573-6165

83687 (12/03)

| FIRM/ADDRESS | CONTACT/TELEPHONE | EMERGENCY TELEPHONE |
|---|---|---|

**Investigative Firms:**

**Abernathy MacGregor Frank- contact numbers same as above**

New York Office
501 Madison Avenue
New York, NY 10022

Emergency
(212) 688-0926
(917) 593-1845

Los Angeles Office
611 West Sixth Street
Suite 1880
Los Angeles, CA 90017

Emergency
(818) 957-5650
(917) 940-3476

**Hill & Knowlton- Contact numbers same as above**

New York Office
466 Lexington Avenue
3rd Floor
New York, NY 10017

Emergency
Contact switchboard @
(212) 885-0300

Contact: Denise DeShane
Tel. (212) 885-0390
Fax. (212) 885-0570

Emergency
Contact switchboard @
(212) 885-0300

Contact: Alex Goldsmith
Tel. (212) 885-0467
Fax. (212) 885-0570

Emergency
1-800-GET-KROL
World Wide Crisis Division
24 hours/7days

**Kroll Associates**

New York Office
900 Third Avenue
New York, NY 10022

Contact: Mary Jo Phillips
Tel. (212) 833-3246
Fax. (212) 644-5794

**Lexicon Communications Corp.**

Los Angeles Office
333 South Grand Avenue
Suite 3560
Los Angeles, CA 90071

Contact: Steven B. Fink
Tel. (213) 346-1212
Fax. (213) 346-1210
sfink@lexiconcorp.com

Emergency
Contact Switchboard @
(213) 346-1200

**Robinson Lerer & Montgomery**

New York Office
75 Rockefeller Plaza
6th Floor
New York, NY 10019

Contact: Michael J. Gross
Tel. (212) 484-6100
Fax. (212) 484-7411

Emergency
Contact switchboard @
(212) 484-6100

83687 (12/03)

| FIRM/ADDRESS | CONTACT/TELEPHONE | EMERGENCY TELEPHONE |
|---|---|---|

**Sarb Verbinnen & Co. - contact numbers same as above for Citigate Sard Verbinnen**

New York Office
630 Third Avenue
New York, NY 10017

Contact: George Sard
Tel.(212) 687-8080
Fax (212) 687-8344

Emergency
Contact switchboard @
(212) 687-8080

**Sitrick and Company Inc. - contact numbers same as above**

Los Angeles Office
2029 Century Park East
Suite 1750
Los Angeles, CA 90067

Contact: Michael S. Sitrick
Tel. (310) 788-2850
Fax (310) 788-2855

Emergency
(310) 319-2786
24 hours/7days

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

_____
Authorized Representative
or Countersignature (in States Where Applicable)

ENDORSEMENT No. 6

**This endorsement,** effective 12:01 AM:   March 7, 2006

**Forms a part of policy no:**  BE    6849213

**Issued to:**  ENTERCOM COMMUNICATIONS CORP

**By:**  AMERICAN HOME ASSURANCE COMPANY

### Commercial Umbrella Liability Policy with CrisisResponse ®

### Cross Suits Exclusion Endorsement

This policy is amended as follows:

**Section V. EXCLUSIONS** is amended to include the following exclusion:

**Cross Suits**

This insurance does not apply to **Bodily Injury, Property Damage,** or **Personal Injury** and **Advertising Injury** to a **Named Insured** that is caused, in whole or in part, by any other **Named Insured**.

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

_____
**Authorized Representative**
or Countersignature (in States Where Applicable)

80411 (1/04)

ENDORSEMENT No. 7

**This endorsement, effective 12:01 AM:**  March 7, 2006

**Forms a part of policy no:**  BE    6849213

**Issued to:**  ENTERCOM COMMUNICATIONS CORP

**By:**  AMERICAN HOME ASSURANCE COMPANY

### Commercial Umbrella Liability Policy with CrisisResponse ®

### Miscellaneous Changes  Endorsement

·This policy is amended as follows:

**SECTION I. INSURING AGREEMENT - COMMERCIAL UMBRELLA LIABILITY,** Paragraphs C. and D. are deleted in their entireties and replaced by the following:

C. 1.   This policy applies to **Bodily Injury** or  **Property Damage**, only if prior to the **Policy Period**, no **Insured** listed under subparagraphs 2a., 2b., 2c. or 2e. of Paragraph M.. of Section VII, no executive officer or director listed under subparagraph 2d. of Paragraph M. of Section VII. and no employee authorized by you to give or receive notice of an **Occurrence**, claim or **Suit**, knew that the **Bodily Injury** or **Property Damage** had occurred, in whole or in part.  If such an **Insured**, or authorized employee knew, prior to the **Policy Period**, that the **Bodily Injury** or **Property Damage** had occurred, then any continuation, change or resumption of such **Bodily Injury** or **Property Damage** during or after the **Policy Period** will be deemed to have been known prior to the **Policy Period**.

2.   **Bodily Injury** or **Property Damage** which occurs during the **Policy Period** and was not, prior to the **Policy Period**, known to have occurred by any **Insured** listed under subparagraphs 2a., 2b., 2c. or 2e. of Paragraph M. of Section VII., any executive officer or director listed under subparagraph 2d. of Paragraph M. of Section VII. or any employee authorized by you to give or receive notice of an **Occurrence** or claim, includes any continuation, change or resumption of that **Bodily Injury** or **Property Damage** after the end of the **Policy Period**.

D.   **Bodily Injury** or **Property Damage** will be deemed to have been known to have occurred at the earliest time when any **Insured** listed under subparagraphs 2a., 2b., 2c. or 2e. of Paragraph M. of Section VII, any executive officer or director listed under subparagraph 2d. of Paragraph M. of Section VII. or any employee who was authorized by you to give or receive notice of an **Occurrence**, claim or **Suit**:

1.   reports all, or any part, of the **Bodily Injury** or **Property Damage** to us or any other insurer;

2.   receives a written or verbal demand or claim for damages because of the **Bodily Injury** or **Property Damage**; or

3.   becomes aware by any other means that **Bodily Injury** or **Property Damage** has occurred or has begun to occur.

**SECTION III. DEFENSE**, is amended as follows:

1

© 2004 American International Group, Inc.

Paragraph A.1. is deleted and replaced by the following:

1.  the total applicable limits of **Scheduled Underlying Insurance** have been exhausted by payment of **Loss** to which this policy applies and the total applicable limits of **Other Insurance** have been exhausted; or

Paragraph C. 2. d. is deleted and replaced by the following:

d.  pre-judgment interest awarded against the **Insured** on that part of the judgment within the applicable Limits of Insurance of this policy we pay. If we make an offer to pay the applicable Limits of Insurance, we will not pay any pre-judgment interest accruing after we make such offer;

## SECTION IV. LIMITS OF INSURANCE is amended as follows:

Paragraph F. is deleted and replaced by the following:

F.  This policy applies only in excess of the **Retained Limit**. If however, a policy shown in the Schedule of Underlying Insurance forming a part of this policy has a limit of insurance:

1.  greater than the amount shown in such schedule, this policy will apply in excess of the greater amount of valid and collectible insurance; or

2.  less than the amount shown in such schedule, this policy will apply in excess of the amount shown in the Schedule of Underlying Insurance forming a part of this policy.

Paragraph G. is deleted and replaced by the following:

G.  If the total applicable limits of **Scheduled Underlying Insurance** are reduced or exhausted by the payment of **Loss** to which this policy applies and the total applicable limits of applicable **Other Insurance** are reduced or exhausted, we will:

1.  in the event of reduction, pay excess of the remaining total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance**; and

2.  in the event of exhaustion, continue in force as underlying insurance.

Paragraph M.1. Is deleted and replaced by the following:

1.  the total applicable limits of **Scheduled Underlying Insurance** have been exhausted by the payment of **Loss** to which this policy applies and any applicable, **Other Insurance** have been exhausted by the payment of **Loss**; or

## SECTION V. EXCLUSIONS, is amended as follows:

Paragraph I. **Employees and Volunteers** is amended to include the following additional Paragraph:

Paragraphs 1., 2. and 3. shall not apply to any liability arising out of **Bodily Injury** or **Personal Injury and Advertising Injury** if such coverage is provided by **Scheduled Underlying Insurance**. Coverage under this policy for **Bodily Injury** or **Personal Injury and Advertising Injury** will follow the terms, definitions, conditions and exclusions of **Scheduled Underlying Insurance**, subject to the **Policy Period**, Limits of Insurance, premium and all other terms, definitions, conditions and exclusions of this policy. Provided, however, that coverage provided by this policy will be no broader than the coverage provided by **Scheduled Underlying Insurance**.

2

© 2004 American International Group, Inc.

Paragraph K. **Expected or Intended Injury** is deleted and replaced by the following:

K.  **Expected or Intended Injury**

This insurance does not apply to **Bodily Injury** and **Property Damage** expected or intended from the standpoint of the **Insured**. However, this exclusion does not apply to **Bodily Injury** or **Property Damage** resulting from the use of reasonable force to protect persons or property.

Paragraph M. **Liquor Liability** is deleted and replaced by the following:

M.  **Liquor Liability**

This insurance does not apply to **Bodily Injury** or **Property Damage** for which any **Insured** may be held liable by reason of:

1.  causing or contributing to the intoxication of any person;

2.  the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

3.  any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

However, this exclusion will not apply if coverage is provided for such **Bodily Injury** or **Property Damage** by **Scheduled Underlying Insurance**.

Coverage under this policy for such **Bodily Injury** or **Property Damage** will follow the terms, definitions, conditions and exclusions of **Scheduled Underlying Insurance**, subject to the **Policy Period**, Limits of Insurance, premium and all other terms, definitions, conditions and exclusions of this policy. Provided, however, that coverage provided by this policy will be no broader than the coverage provided by **Scheduled Underlying Insurance**.

Paragraph P. **Nuclear Liability** is amended as follows:

Subparagraph 1.c. is deleted and replaced by the following

c.  **Bodily Injury** or **Property Damage** resulting from the hazardous properties of nuclear material if:

i)  the nuclear material (1) is at any nuclear facility owned by the **Insured** or operated by the **Insured** or on the **Insured's** behalf or (2) has been discharged or dispensed therefrom;

ii)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by the **Insured** or on the **Insured's** behalf; or

iii)  the **Bodily Injury** or **Property Damage** arises out of the furnishing by the **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion c. applies only to **Property Damage** to such nuclear facility and any property thereat.

83864 (02/04)
AH1266

© 2004 American International Group, Inc.
Includes copyrighted material of Insurance Services

Paragraph **W. War** is deleted and replaced by the following:

**W. War.**

This insurance does not apply to **Loss**, costs, injury, damage, claim, dispute and/or or suit arising therefrom, caused directly or indirectly, in whole or in part, as a result of or in connection with war, whether declared or not, or any act or condition incident to war. War includes:

1. Civil war; or

2. Armed conflict between two or more nations, armed conflict between military forces of any origin, or warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**SECTION VI. CONDITIONS** is amended as follows:

Paragraph **D. Cancellation**, subparagraph 2. is deleted and replaced by the following:

2. We may cancel this policy. If we cancel because of non-payment of premium, we must mail or deliver to you not less than ten (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we must mail or deliver to you not less than ninety (90) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Declarations will be sufficient to prove notice.

Paragraph **E. Change in Control**, the last sentence is deleted and replaced with the following:

Coverage will be afforded by this policy for **Bodily Injury** or **Property Damage** that occurs on or after the effective date of such transaction and **Personal Injury and Advertising Injury** caused by an **Occurrence** that takes place on or after the effective date of such transaction if the **Named Insured** notifies us of the transaction no later than ninety (90) days after the effective date of the transaction.

If the **Named Insured** fails to notify us within ninety (90) days of the effective date of such transaction coverage afforded by this policy will cease on the ninetieth 90th day after the effective date of such transaction at 12:01 am standard time of the address of the **Named Insured** shown in Item 1 of the Declarations or the end of the **Policy Period**, whichever is earlier.

The provisions of paragraph E. shall only apply to transactions with third parties not under control or ownership of the **Named Insured** on the inception date of this policy.

Paragraph **O. Transfer of Rights of Recovery**, subparagraph 3. is deleted and replaced by the following:

3. If, prior to the time of an **Occurrence**, you waive any right of recovery against a specific person or organization for injury or damage as required under an **Insured Contract**, we will also waive any rights we may have against such person or organization

**SECTION VII. DEFINITIONS** is amended as follows:

Paragraph **C. Bodily Injury** is deleted and replaced by the following:

4

© 2004 American International Group, Inc.

C.  **Bodily Injury** means bodily injury, sickness or disease sustained by any person, including death, mental anguish, mental injury, shock or humiliation resulting from any of these at any time.

Paragraph M. **Insured**, is amended as follows:

Subparagraph 2b. is deleted and replaced by the following:

b.  a partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

The last paragraph is deleted and replaced by the following:

Notwithstanding any of the above:

a.  no person or organization is an **Insured** with respect to the conduct of any current, past or newly formed partnership, joint venture or limited liability company that is not designated as a **Named Insured** in Item 1 of the Declarations; and

b.  no person or organization is an **Insured** under this policy who is not an **Insured** under applicable **Scheduled Underlying Insurance**. This provision shall not apply to any organization set forth in the definition of **Named Insured** in Paragraph R. 2 and 3.

Paragraph P. **Loss** is deleted and replaced by the following:

P.  **Loss** means those sums actually paid as judgments or settlements, provided, however, that if expenses incurred to defend a **Suit** or to investigate a claim reduce the applicable limits of **Scheduled Underlying Insurance**, then Loss shall include such expenses.

Paragraph R. **Named Insured** is deleted and replaced by the following:

R.  **Named Insured** means:

1.  any person or organization designated in Item 1 of the Declarations;

2.  as of the inception date of this policy, any organization in which you maintain an interest of more than fifty percent (50%), provided that coverage provided to such organization under this paragraph does not apply to any **Bodily Injury** or **Property Damage** that occurred or any **Personal Injury and Advertising Injury** that was caused by an **Occurrence** that was committed before you acquired or formed such organization or after you ceased to maintain an interest of more than fifty percent (50%) in such organization; and

3.  after the inception date of this policy, any organization, except for a partnership, joint venture or limited liability company, that you acquire or form during the **Policy Period** in which you maintain an interest of more than fifty percent (50%), provided that:

a.  coverage provided to such organization under this paragraph does not apply to any **Bodily Injury** or **Property Damage** that occurred or any **Personal Injury and Advertising Injury** that was caused by an **Occurrence** that was committed before you acquired or formed such organization or after you ceased to maintain an interest of more than fifty percent (50%) in such organization; and

b.  you give us prompt notice after you acquire or form such organization.

Subject to the provisions of Paragraphs 3a. and 3b. above, a partnership, joint venture or limited liability company that you acquire or form during the **Policy Period** may be added as an **Insured** only by a written endorsement that we make a part of this policy.

5

© 2004 American International Group, Inc.

We may, at our option, make an additional premium charge for any organization that you acquire or form during the **Policy Period**.

You agree that any organization to which paragraphs 2. and 3. above apply, will be required to be included as an **Insured** under applicable **Scheduled Underlying Insurance**. If you fail to comply with this requirement, coverage under this policy will apply as though the organization was included as an **Insured**, under the highest applicable limit of **Scheduled Underlying Insurance**.

Paragraph T. **Other Insurance** is deleted and replaced by the following:

T. **Other Insurance** means a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy.

However, **Other Insurance** does not include **Scheduled Underlying Insurance**, the **Self-Insured Retention** or any policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also affords.

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

_____
**Authorized Representative**
or Countersignature (Where Applicable)

6

© 2004 American International Group, Inc.

ENDORSEMENT No. 8

This endorsement, effective 12:01 AM:  March 7, 2006

Forms a part of policy no.:  BE    6849213

Issued to:  ENTERCOM COMMUNICATIONS CORP

By:  AMERICAN HOME ASSURANCE COMPANY

### Commercial Umbrella Liability Policy with CrisisResponse ®

### Radioactive Matter Exclusion Endorsement

This policy is amended as follows:

**Section V. EXCLUSIONS** is amended to include the following additional exclusion:

**Radioactive Matter**

This insurance does not apply to any liability arising out of radioactive matter or any form of radiation.

It is understood that to the extent any coverage may otherwise be provided under this policy or any of its endorsements, the provisions of this exclusion will supercede.

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

_____
**Authorized Representative**
or Countersignature (in States Where Applicable)

83094 (09/03)

ENDORSEMENT No. 9

This endorsement, effective 12:01 AM:  March 7, 2006

Forms a part of policy no.:  BE    6849213

Issued to:  ENTERCOM COMMUNICATIONS CORP

By:  AMERICAN HOME ASSURANCE COMPANY

Commercial Umbrella Liability Policy with CrisisResponse ®

Employee Benefits Liability Limitation Claims Made Version Endorsement

**NOTICE:  Please read this endorsement carefully.  This endorsement provides coverage on a  claims made basis.  Except to the extent as may otherwise be provided herein, the coverage of this insurance is generally limited to liability for only those claims that are first made during the Policy Period and reported in writing to us.**

This policy is amended as follows:

Section V. EXCLUSIONS is amended to include the following additional exclusion:

**Employee Benefits Liability**

This insurance does not apply to any liability arising out of:

1. any violation of any of the responsibilities, obligations or duties imposed upon fiduciaries by **ERISA** or any similar law regarding workers' compensation, unemployment insurance, Social Security or any government-mandated disability benefits; or

2. any act, error or omission committed by or on behalf of the **Insured** solely in the performance of one or more of the following administrative duties or activities:

   a.  giving counsel to employees with respect to a **Plan**;

   b.  interpreting a **Plan**;

   c.  handling of records in connection with a **Plan**;

   d.  effecting enrollment, termination or cancellation of employees under a **Plan**; or

   e.  any claim against an **Insured** solely by reason of his, her or its status as an administrator, the **Plan** or you as sponsor of the **Plan**.

However, this exclusion will not apply only if and to the extent that coverage for such liability is provided by **Scheduled Underlying Insurance** .

Solely as respects this endorsement, this policy will only provide coverage for a **Claim** made against the **Insured** during the **Policy Period**:

   a)  If the insurance provided by **Scheduled Underlying Insurance** provides coverage for **Occurrences** occurring on or after a specified Retroactive Date for a claim for damages because of **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** first made in writing against any **Insured** in accordance with Paragraph b) below during the **Policy Period** or any Extended Reporting Period we provide and written notice is received by us during the Policy Period or Extended Reporting Period (if applicable).

83073 (09/03)

b) A **Claim** by any person or organization seeking damages will be deemed to have been made at the earlier of the following times:

1. When notice of such **Claim** is received and recorded by any **Insured** in writing and reported to us during the Policy Period or any applicable extended reporting period; or

2. When we make settlement in accordance with Paragraph a) above.

Notwithstanding the above, this insurance shall not apply to:

1. any **Claim** alleging or arising out of an **Occurrence** committed on or after the Retroactive Date set forth in the **Schedule Underlying Insurance**, if the **Insured**, an officer, manager in your risk management, insurance or legal department or an employee who was authorized by you to give or receive notice of an **Occurrence**, knew as of the Continuity Date shown above that such **Occurrence** could result in a **Claim**.

2. any **Claim** alleging or arising out the same **Occurrence** or series of continuous, repeated or related **Occurrences** or alleging the same or similar facts, alleged or contained in any **Claim** which has been reported, or any **Occurrence** of which notice has been given, under any policy of which this policy is a renewal, replacement or succeeds in time.

3. any **Claim** alleging or arising out of any **Claim** or **Suit** pending as of the Continuity Date; or alleging or arising out of or relating to any fact, circumstance, situation or **Occurrence** alleged in such **Claim** or **Suit**.

If **Scheduled Underlying Insurance** does not contain a Continuity Date, the Continuity Date will be the Retroactive Date.

Coverage under this policy for such liability will follow the terms, definitions, conditions and exclusions of **Scheduled Underlying Insurance**, subject to the **Policy Period**, Limits of Insurance, premium and all other terms, definitions, conditions and exclusions of this policy. Provided, however, that coverage provided by this policy will be no broader than the coverage provided by **Scheduled Underlying Insurance**.

**Section VII. DEFINITIONS** is amended to include the following additional definitions:

**Claim** means a written demand upon the **Insured** for compensatory damages or services and shall include the service of **Suit** or institution of arbitration proceedings against the **Insured**.

**ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985), and including any amendment or revisions thereto, or any similar common or statutory law of the United States, Canada or any state or jurisdiction anywhere in the world to which a **Plan** is subject.

**Plan** means any plan, fund or program established anywhere in the world, regardless of whether it is subject to regulation under Title 1 of **ERISA** or meets the requirements for qualification under Section 401 of the Internal Revenue Code of 1986, as amended and which is:

1. a welfare plan, as defined in **ERISA** or any similar law regarding workers' compensation, unemployment insurance, Social Security or any government-mandated disability benefits;

2. a pension plan as defined in **ERISA** or any similar law regarding workers' compensation, unemployment insurance, Social Security or any government-mandated disability benefits; or

3. a combination of 1. and 2. above.

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

Authorized Representative
or Countersignature (in States Where Applicable)

## ENDORSEMENT No. 10

This endorsement, effective 12:01 AM:  March 7, 2006

Forms a part of policy no.:  BE   6849213

Issued to:  ENTERCOM COMMUNICATIONS CORP

By:  AMERICAN HOME ASSURANCE COMPANY

### Commercial Umbrella Liability Policy with CrisisResponse ®

### Advertising, Broadcasting, Publishing and Telecasting Exclusion Endorsement

This policy is amended as follows:

**Section V. EXCLUSIONS** is amended to include the following additional exclusion:

**Advertising, Broadcasting, Publishing and Telecasting**

This insurance does not apply to **Personal Injury and Advertising Injury** committed or alleged to have been committed in any advertising, advertisement, publicity article, book, magazine, brochure, broadcast, written material or telecast in the conduct of the **Insured's** advertising, broadcasting, re-broadcasting, televising, re-televising, newspaper publishing or other publishing activities.

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

_____
**Authorized Representative**
or Countersignature (in States Where Applicable)

83050 (09/03)

ENDORSEMENT No. 11

This endorsement, effective 12:01 AM:  March 7, 2006

Forms a part of policy no.:  BE    6849213

Issued to:  ENTERCOM COMMUNICATIONS CORP

By:  AMERICAN HOME ASSURANCE COMPANY

## Commercial Umbrella Policy with CrisisResponse ®

## Act of Terrorism Self-Insured Retention Endorsement

Solely as respects **Act of Terrorism**, this policy is amended as follows:

1.  The Declarations, **ITEM 5. SELF-INSURED RETENTION** is amended to include the following additional Self-Insured Retention:

    **ACT OF TERRORISM SELF-INSURED RETENTION -** $1,000,000 **Each Occurrence**

2.  **ITEM 6. OF THE DECLARATIONS, PREMIUM AND PREMIUM COMPUTATION** is amended to include the following:

    **ACT OF TERRORISM PREMIUM**                 $2,079.00

3.  **Section IV. LIMITS OF INSURANCE**, Paragraph G. is deleted in its entirety and replaced by the following:

    G.  If the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** are reduced or exhausted by payment of **Loss** to which this policy applies, we will:

        1.  in the event of reduction, pay in excess of the remaining total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** or the **Act of Terrorism Self-Insured Retention**, whichever is greater; or

        2.  in the event of exhaustion of the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** or the **Act of Terrorism Self-Insured Retention**, whichever is greater; pay all sums covered herein.

4.  **Section IV. LIMITS OF INSURANCE** is amended to include the following additional provision:

    The **ACT OF TERRORISM SELF-INSURED RETENTION** will not be reduced or exhausted by **Defense Expenses**.

5.  **Section III. DEFENSE PROVISIONS**, Paragraphs A. 1. and A. 2., and D. are deleted in their entireties, and Paragraph A. is replaced by the following:

    A.  We will have no duty to defend any **Suit** against the **Insured**. We will, however, have the right, but not the duty, to participate in the defense of any **Suit** and the investigation of any claim to which this policy may apply. If we exercise this right, we will do so at our own expense.

6. **Section VII. DEFINITIONS**, Paragraph Z. is deleted in its entirety and replaced by the following:

Z. **Retained Limit** means, the greater of either:

   1. the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** providing coverage to the **Insured** or the **Act of Terrorism Self-Insured Retention**; or

   2. the **Act of Terrorism Self-Insured Retention** applicable to each **Occurrence** that results in damages not covered by **Scheduled Underlying Insurance** nor any applicable **Other Insurance** providing coverage to the **Insured**.

7. **Section VII. DEFINITIONS** is amended to include the following additional definition:

**Act of Terrorism** is defined as either:

   1. A certified "act of terrorism" defined by Section 102. Definitions., of the Terrorism Risk Insurance Act of 2002 and any revisions or amendments.

   The following Section 102 definition of "act of terrorism" from the Terrorism Risk Insurance Act of 2002 applies:

   (1) Act of Terrorism -

      (A) Certification. - The term "act of terrorism" means any act that is certified by the Secretary of the Treasury of the United States, in concurrence with the Secretary of State, and the Attorney General of the United States --
         (i) to be an act of terrorism;
         (ii) to be a violent act or an act that is dangerous to --
            (I) human life;
            (II) property; or
            (III) infrastructure;

         (iii) to have resulted in damage within the United States, or outside of the United States in the case of --
            (I) an air carrier or vessel described in paragraph (5)(B); (for the convenience of this endorsement, paragraph (5)(B) reads: occurs to an air carrier (as defined in Section 40102 of title 49, United States Code) to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs, or at the premises of any United States mission);
            (II) the premises of a United States mission; and

         (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.
      (B) Limitation. -- No act shall be certified by the Secretary as an act of terrorism if --
         (i) the act is committed as part of the course of a war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or
         (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000.

(C) Determinations Final. - Any certification of, or determination not to certify, an act as an act of terrorism under this paragraph shall be final, and shall not be subject to judicial review.

(D) Nondelegation. - The Secretary may not delegate or designate to any other officer, employee, or person, any determination under this paragraph of whether, during the effective period of the Program, an act of terrorism has occurred; or

2. the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm a government, the civilian population or any segment thereof, or to disrupt any segment of the economy.

**Act of Terrorism** will also include any act which is verified or recognized by the United States Government as an act of terrorism.

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

_____
**Authorized Representative**
or Countersignature (in States Where Applicable)

**ENDORSEMENT No. 12**

This endorsement, effective 12:01 AM:  March 7, 2006

Forms a part of policy no.:  BE    6849213

Issued to:  ENTERCOM COMMUNICATIONS CORP

By:  AMERICAN HOME ASSURANCE COMPANY

**PENNSYLVANIA**
**AMENDATORY ENDORSEMENT**

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

Cancellation/Nonrenewal

The cancellation provision of this policy is amended as follows:

Cancelling a policy midterm is prohibited except if:

1)      A condition material to insurability has changed substantially;

2)      Loss of reinsurance or a substantial decrease in reinsurance has occurred;

3)      Material misrepresentation by the Insured;

4)      Policy was obtained through fraud;

5)      The Insured has failed to pay a premium when due;

6)      The Insured has requested cancellation;

7)      Material failure to comply with terms;

8)      Other reasons that the commissioner may approve.

Notice Requirements for Midterm Cancellation and Nonrenewal

Notice shall be mailed by registered or first class mail by the Insurer directly to the named Insured.  Written notice will be forwarded directly to the named Insured at least sixty (60) days in advance of the termination date unless one or more of the following exists:

1)      The Insured has made a material misrepresentation which affects the insurability of the risk, in which case the prescribed written notice of  cancellation shall be forwarded directly to the named Insured at least fifteen (15) days in advance of the effective date of termination.

2)      The Insured has failed to pay a premium when due, whether the premium is payable directly to the Insurer or its agents or indirectly under a premium finance plan or extension of credit, in which case the prescribed written notice of cancellation shall be forwarded directly to the named insured at least fifteen (15) days in advance of the effective date of termination.

3)   The policy was cancelled by the named Insured, in which case written notice of cancellation shall not be required and coverage shall be terminated on the date requested by the Insured. Nothing in these three sections shall restrict the Insurer's right to rescind an insurance policy ab initio upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of fact material to the acceptance of the risk or to the hazard assumed by the Insurer.

The notice shall be clearly labeled "Notice of Cancellation" or "Notice of Nonrenewal". A midterm cancellation or nonrenewal notice shall state the specific reasons for the cancellation or nonrenewal. The reasons shall identify the condition or loss experience which caused the midterm cancellation or nonrenewal. The notice shall provide sufficient information or data for the Insured to correct the deficiency.

A midterm cancellation or nonrenewal notice shall state that, at the Insured's request, the Insurer shall provide loss information to the Insured for at least three years or the period of time during which the Insurer has provided coverage to the Insured, whichever is less. Loss information on the Insured shall consist of the following:

1)   Information on closed claims, including date and description or occurrence, and any amount of payments, if any;

2)   Information on open claims, including date and description of occurrence, amount of payment, if any, and amount of reserves, if any;

3)   Information on notices of occurrence, including date and description of occurrence and amount of reserves, if any.

The Insured's written request for loss information must be made within ten (10) days of the Insured's receipt of the midterm cancellation or nonrenewal notice. The Insurer shall have thirty (30) days from the date of receipt of the Insured's written request to provide the requested information.

Notice of Increase in Premium

The Insurer shall provide not less than sixty (60) days notice of intent to increase the Insured's renewal premium with thirty (30) days notice of an estimate of the renewal premium. The notice of renewal premium increase will be mailed or delivered to the Insured's last known address. If notice is mailed, it will be by registered or first class mail.

Return of Unearned Premium

Cancellation Initiated by Insurer - Unearned premium must be returned to the Insured not later than ten (10) business days after the effective date of termination.

Cancellation Initiated by Insured - Unearned premium must be returned to the Insured not later than thirty (30) days after the effective date of termination.

All other terms, conditions and exclusions shall remain the same.

_____
AUTHORIZED REPRESENTATIVE

52165 (11/96)

ENDORSEMENT No. 13

This endorsement, effective 12:01 AM:   March 7, 2006

Forms a part of policy no:   BE    6849213

Issued to:   ENTERCOM COMMUNICATIONS CORP

By:  AMERICAN HOME ASSURANCE COMPANY

Commercial Umbrella Liability Policy with CrisisResponse ®

**Lead Exclusion Endorsement**

This policy is amended as follows:

Section V. EXCLUSIONS is amended to include the following additional exclusion:

This insurance does not apply to:

Any liability arising out of **Lead** or any product(s) containing **Lead**.

Section VII. DEFINITIONS is amended to include the following additional definition:

**Lead** means:

1.  The substance commonly known as **Lead**; and

2.  Any substance or product which has the same or substantially similar chemical formulation, structure or function as **Lead**, by whatever name manufactured, formulated, structured, sold or distributed.

It is understood that to the extent any coverage may otherwise be provided under this policy or any of its endorsements, the provisions of this exclusion will supercede.

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

_____
Authorized Representative
or Countersignature (Where Applicable)

80441 (02/03)

ENDORSEMENT No. 14

**This endorsement, effective 12:01 AM:** March 7, 2006

**Forms a part of policy no:** BE · 6849213

**Issued to:** ENTERCOM COMMUNICATIONS CORP

**By:** AMERICAN HOME ASSURANCE COMPANY

Commercial Umbrella Liability Policy with CrisisResponse SM

**Total Pollution Exclusion**

This policy is amended as follows:

**Section V. EXCLUSIONS**, Paragraph Q. **Pollution** is deleted in its entirety and replaced by the following:

Pollution

This insurance does not apply to:

1. Any **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** anywhere at any time;

2. Any loss, cost or expense arising out of any request, demand, order or statutory or regulatory requirement that the **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **Pollutants**; or

3. Any loss, cost or expense arising out of any claim or **Suit** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of **Pollutants**.

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

_____
**Authorized Representative**
or Countersignature (in States Where Applicable)

ENDORSEMENT No. 15

This endorsement, effective 12:01 AM:   March 7, 2006

Forms a part of policy no:  BE    6849213

Issued to:  ENTERCOM COMMUNICATIONS CORP

By:  AMERICAN HOME ASSURANCE COMPANY

**Commercial Umbrella Liability Policy with CrisisResponse** SM

**Electromagnetic Fields Exclusion**

This policy is amended as follows:

**Section V. EXCLUSIONS** is amended to include the following additional exclusion:

**Electromagnetic Fields**

This insurance does not apply to any liability arising from **Electromagnetic Fields** generated by the **Insured's** transmission lines, distribution lines or other equipment or facilities, if such **Electromagnetic Fields** are a result of the **Insured's** normal operations of generation, transmission or distribution of electricity.

**Section VII. DEFINITIONS** is amended to include the following additional definition:

**Electromagnetic Fields** means electric and magnetic fields generated by a varying electrical current through any medium including but not limited to wires and whether or not intended for the purpose of conducting electricity.

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

_____
**Authorized Representative**
or Countersignature (in States Where Applicable)

80418 (07/02)
AH0905

# EXHIBIT 2

ROGER A. DREYER, ESQ. / SBN: 095462
**DREYER, BABICH, BUCCOLA & CALLAHAM, LLP**
20 Bicentennial Circle
Sacramento, CA 95826
Telephone: (916) 379-3500
Facsimile: (916) 379-3599

Attorneys for Plaintiffs

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SACRAMENTO

WILLIAM A. STRANGE, individually,
and as Guardian *ad Litem* for RYLAND
STRANGE and JORIE STRANGE, minors;
RONALD E. SIMS, as Guardian *ad Litem*
for KEEGAN SIMS, a minor,

          Plaintiffs,

v.

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS,
CORP., JOHN GEARY, STEVE WEED,
ROBIN PECHOTA, LIZ DIAZ, ADAM
COX, STEVE MANEY, PATRICIA SWEET,
MATT CARTER and DOES 1 through 40,
inclusive,

          Defendants.

Case No.:

**COMPLAINT FOR WRONGFUL DEATH**

Plaintiffs complain against Defendants and allege:

## FIRST CAUSE OF ACTION

## (WRONGFUL DEATH: NEGLIGENCE)

1.     The true names and capacities, whether individual, corporate, associate or otherwise of Defendants, DOES 1 through 40, are unknown to Plaintiffs, who therefore sue Defendants by such fictitious names, and Plaintiffs will amend this Complaint to show their true names and capacities when the same have been ascertained.   Plaintiffs are

-1-

**Complaint for Wrongful Death**

1   informed and believe and thereon allege that each of the Defendants, and DOES 1
2   through 40, are responsible under law in some manner — negligently, in warranty, strictly,
3   or otherwise, for the events and happenings referred to herein. Said Defendants thereby
4   caused injuries and damages to Plaintiffs as herein alleged.

5       2.     Plaintiffs are now, and at all times herein mentioned were, California
6   citizens and residents. Plaintiffs are the sole surviving heirs of Jennifer Strange, deceased.
7   Plaintiff WILLIAM A. STRANGE is the decedent's surviving spouse. RYLAND STRANGE,
8   JORIE STRANGE, and KEEGAN SIMS are the decedent's only children. Plaintiff RONALD
9   E. SIMS is the natural father of minor Keegan Sims. Defendants ENTERCOM
10   SACRAMENTO, LLC, ENTERCOM COMMUNICATIONS, CORP. and DOES 11 through
11   20 (hereinafter "ENTERCOM") are corporations, limited liability corporations,
12   partnerships, and/or business entities of some other form licensed to do business, and
13   actually doing business, in California. Defendants, JOHN GEARY, STEVE WEED, ROBIN
14   PECHOTA, LIZ DIAZ, and DOES 21 through 30 (hereinafter "MANAGING AGENTS"), at
15   all relevant times were employed by and officers, directors or managing agents of
16   ENTERCOM and DOES 11 through 20. Defendants ADAM COX, STEVE MANEY,
17   PATRICIA SWEET, MATT CARTER, and DOES 1 through 10 (hereinafter, "THE TALENT"),
18   were at all times employees of Defendants ENTERCOM, and DOES 11 through 20, and
19   acting in the course and scope of their employment. THE TALENT are all citizens of the
20   State of California, and reside in Sacramento County. All of the events described herein
21   occurred in Sacramento.

22       3.     ENTERCOM and MANAGING AGENTS at all times owned, operated,
23   managed, marketed and controlled a radio station identified as KDND 107.9 The End,
24   broadcasting in the greater Sacramento area. ENTERCOM and MANAGING AGENTS at
25   all relevant times employed THE TALENT to perform on Defendants' radio program called
26   The Morning Rave, which was broadcast during the hours typically described as "the
27   morning drive." The Morning Rave specialized in playing "Today's Hit Music" combined
28   with juvenile, irreverent comedic routines.

-2-

Complaint for Wrongful Death

1     4.     Leading up to January 12, 2007, THE TALENT on The Morning Rave
2  promoted and advertised an on-air radio contest known as "Hold your Wee for a Wii."
3  THE TALENT solicited listeners to apply to participate in this contest.  Defendants, and
4  each of them, created, devised, orchestrated, organized, arranged and publicized each
5  element of this contest, including marketing the contest to various sponsors and
6  advertisers. Defendants and each of them determined the rules of the contest, the criteria
7  for contest participants, the duration of the contest, and the contest prizes.  Defendants
8  and each of them accepted applications for the contest, and screened and selected the
9  final contestants, including decedent Jennifer Strange.

10     5.     The contestants, including decedent, competed for the right to receive a
11  Nintendo Wii video gaming system that has been in high demand since its release to the
12  public late in 2006.  The decedent ardently wished to win the Nintendo Wii system for
13  her children, and applied for the contest. The winner of the contest was selected based on
14  which contestant could consume the most water in a three-hour period without urinating.
15  Defendants provided the location and all facilities (including the drinking water) for the
16  contest, which was conducted on-air and in-studio at KDND 107.9 in Sacramento.

17     6.     At no time before the contest did the decedent sign a release of liability
18  contractually relieving any Defendants of their duty of care in organizing and running the
19  contest.

20     7.     At all times, it was foreseeable to Defendants and each of them that the
21  contestants were at risk for serious illness and/or death as the result of consuming
22  extensive amounts of water in a relatively short period of time.  At all relevant times
23  preceding the contest, Defendants were aware that consumption of water to such an
24  extent could result in physical injury or death. Defendants had specific knowledge of a
25  relatively recent fraternity hazing incident in Northern California as a result of which a
26  young man died from over-consumption of water. Defendants had specific knowledge of
27  similar contests at other radio stations in California during which contestants required
28  medical attention as a result of their participation. Defendants were specifically informed

-3-

**Complaint for Wrongful Death**

1    before and/or during the contest that the contestants were subject to the risk of serious

2    illness and/or death as a result of their participation.

3        8.    Prior to commencement of the contest, Defendants and each of them failed

4    to conduct a reasonable investigation to determine the relative health risks to prospective

5    contest participants. Defendants negligently failed to consult with appropriate health

6    authorities regarding the relative health risks posed by such an enterprise. Defendants

7    negligently failed to identify specific health risks or inform contest participants, including

8    decedent, of any such risks. Defendants negligently failed to post any health advisories for

9    contest participants, and failed to take any steps to identify prospective participants who

10    might be at risk of injury. Defendants negligently failed to secure any medical

11    professional or para-professional services during the contest, even after the contestants

12    begin feeling ill, and similarly failed to require an examination by a competent physician

13    of each contest participant prior to commencement of the contest. Defendants

14    individually and collectively knew or should have known of the health risks of such a

15    contest, but took no reasonable steps to advise, warn, supervise or otherwise protect

16    contest participants including decedent.

17        9.    The decedent complained of feeling ill while in-studio and before claiming

18    her second place prize on-air. Defendants negligently failed to provide any assistance,

19    medical or otherwise, to any of the contestants, including decedent.

20        10.    The negligence of Defendants caused the death of Jennifer Strange. Had the

21    decedent been properly informed of the health risks associated with the contest, she

22    would not have participated. Had medical professional or para-professional services been

23    provided, the decedent would not have consumed the fatal doses of water, and would

24    have had immediate access to life-saving medical care and treatment as she began to

25    exhibit symptoms consistent with over-consumption of water.

26        11.    Defendants and DOES 31 through 40 otherwise negligently caused or were

27    a substantial factor in causing the death of Jennifer Strange.

28    ///

-4-

Complaint for Wrongful Death

12.    As a direct result of Defendants' negligence and the death of Jennifer Strange, Plaintiffs have sustained economic damages consisting of (1) the value of lost financial and other support from the decedent, (2) the value of gifts or benefits that the decedent would have provided, (3) the value of funeral and burial expenses, and (4) the reasonable value of household services that the decedent would have provided.

13.    As a direct result of Defendants' negligence, and the death of Jennifer Strange, Plaintiffs have also sustained non-economic damages consisting of loss of the decedent's love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

Plaintiffs pray for judgment against Defendants for:

a.    Non-economic damages in excess of the minimum jurisdictional requirements of this Court;

b.    All funeral, burial and other expenses according to proof;

c.    Interest to the extent allowed by law;

d.    All loss of the decedent's care and support, according to proof;

e.    All costs of suit; and

f.    Such other and further relief as this Court may deem just and proper.

As a separate second cause of action, Plaintiffs complain against Defendants and allege:

## SECOND CAUSE OF ACTION

## (SURVIVOR'S ACTION: NEGLIGENCE)

14.    Plaintiffs incorporate herein by reference all allegations of the first cause of action as though fully set forth.

15.    Plaintiff WILLIAM A. STRANGE, as the surviving spouse of Jennifer Strange, is her Successor in Interest for purposes of bringing an action under CCP Section 377.30, et. seq. Plaintiff has and/or will comply with CCP Section 377.32.

16.    Prior to her death, Jennifer Strange was required to and did employ physicians and surgeons to examine, treat, and care for her as a result of the injuries and

-5-

Complaint for Wrongful Death

1  illness sustained as a result of participating in Defendants' contest. Plaintiffs and/or the

2  decedent incurred medical and incidental expenses in connection therewith. The exact

3  amount of such expense is unknown to Plaintiffs at this time.

4      17.    Plaintiffs are entitled to punitive damages against Defendants and each of

5  them. By cooperating in the orchestration, direction, promotion and marketing of the

6  contest, THE TALENT, at all relevant times acting in the course and scope of their

7  employment by ENTERCOM, MANAGING AGENTS and DOES 11 through 40, engaged

8  in conduct that evidenced a willful and knowing disregard of decedent's safety, while

9  ignoring the probable dangerous consequences of such a contest and deliberately failing

10  to avoid those consequences, despite THE TALENTS' individual and collective awareness

11  of the risks of such conduct. Such conduct was despicable and so vile, base or

12  contemptible that it would be looked down upon and despised by reasonable people.

13  Specifically, Defendants and each of them deliberately failed to undertake sufficient

14  research or investigation to be able to recognize the onset of a medical problem relative to

15  the consumption of vast quantities of water, despite their independent and collective

16  knowledge that such consumption could lead to injury and death. THE TALENT admitted

17  during the broadcast that they should have done more research once various participants,

18  including decedent, began to report medical symptoms. Despite this admission,

19  Defendants, and each of them, failed to act upon clear reports of medical symptoms from

20  decedent that were consistent with the onset of hyponatremia. At no time did Defendants

21  advise decedent to seek medical attention. At no time did Defendants advise decedent to

22  drop out of the contest in response to her symptoms. Instead of offering to provide

23  medical assistance after decedent reported feeling ill, THE TALENT verbally chastised and

24  otherwise coerced her, exhorting her to remain in the contest by threatening that she

25  would be disqualified if she "puked." THE TALENT similarly chastised other contest

26  participants, instructing other personnel to make sure that a participant who appeared to

27  be dead had "signed a release," and emphasizing on numerous occasions those

28  contestants who vomited or urinated would be eliminated.

-6-

Complaint for Wrongful Death

18.    At all relevant times ENTERCOM, MANAGING AGENTS and DOES 11 through 40 were officers, directors or managing agents of said Defendants, empowered to exercise substantial independent authority and judgment in corporate decision capable of determining corporate policy.  In that capacity, ENTERCOM, MANAGING AGENTS and DOES 11 through 40 planned, orchestrated, managed, promoted, controlled, supervised, marketed and authorized the despicable conduct of THE TALENT, and otherwise ratified, adopted or approved that conduct, both before and after it occurred.  Specifically, said Defendants further ratified the following conduct and on-air comments made by THE TALENT on January 12, 2007:

    a.    it is possible to die from "water poisoning";

    b.    references to the Chico hazing incident;

    c.    admissions that THE TALENT should have "researched" water intoxication before conducting the contest;

    d.    contestants would be "out of the contest" if they vomited, which would occur "if this gets dangerous."

    e.    when a nurse called in to complain on-air that drinking excess water would result in illness and possible, death, THE TALENT responded "Yeah, we're aware of that," and "Yeah, they signed releases so we're not responsible so it's okay," and "if they get to the point where they have to throw up then they are out of the game before they die so that's good, right?"  THE TALENT then sarcastically thanked the nurse for "looking out for us";

    f.    joking references to whether anyone was dying in the contestants' room;

    g.    joking / laughing references to "we've got a guy just about to die," and that THE TALENT should "make sure he signs a release";

    h.    joking / sarcastic references to bringing in a stretcher for one of the contestants;

-7-

Complaint for Wrongful Death

i.   joking / sarcastic references to insurance in the context of reports that contestants were feeling ill;

j.   mocking references to the decedent's distended abdomen from excess water consumption, making her look pregnant, which THE TALENT declared was amusing;

k.   sardonic expressions of mock sympathy with the decedent, when she complained on-air that she was feeling ill;

l.   comments to the decedent that "This is what it feels like when you're drowning"; and

m.   mocking comments to decedent to "get you out of your misery" by offering her a second prize of tickets to a Justin Timberlake concert.

Plaintiffs pray for judgment against Defendants for:

a.   All past medical expenses incurred by the decedent, according to proof;

b.   Punitive damages, according to proof;

c.   Any and all other damages and/or penalties that the decedent would have been able to recover from Defendants, had she lived;

d.   All prejudgment interest;

e.   Costs of suit incurred herein; and

f.   Such other and further relief as the Court may deem just and proper.

As a separate third cause of action, Plaintiffs complain against Defendants and allege:

## THIRD CAUSE OF ACTION

## (WRONGFUL DEATH: INTENTIONAL / RECKLESS CONDUCT)

19.   Plaintiffs incorporate herein by reference all allegations of the first and second causes of action as though fully set forth.

///

///

---

-8-

Complaint for Wrongful Death

20.     Alternatively, if it is determined that Defendants had no legal duty of care to the decedent, Defendants acted recklessly and/or intentionally in causing the death of Jennifer Strange, based on the facts alleged herein above.

Plaintiffs pray for judgment against Defendants for:

   a.     Non-economic damages in excess of the minimum jurisdictional requirements of this Court;

   b.     All funeral, burial and other expenses according to proof;

   c.     Interest to the extent allowed by law;

   d.     All loss of the decedent's care and support, according to proof;

   e.     All costs of suit; and

   f.     Such other and further relief as this Court may deem just and proper.

As a separate fourth cause of action, Plaintiffs complain against Defendants and allege:

## FOURTH CAUSE OF ACTION

## (SURVIVOR'S ACTION:  INTENTIONAL / RECKLESS COMNDUCT)

21.     Plaintiffs incorporate herein by reference all allegations of the first, second, and third causes of action as though fully set forth.

Plaintiffs pray for judgment against Defendants for:

   a.     All past medical expenses incurred by the decedent, according to proof;

   b.     Punitive damages, according to proof;

   c.     Any and all other damages and/or penalties that the decedent would have been able to recover from Defendants, had she lived;

   d.     All prejudgment interest;

///
///
///
///

-9-

**Complaint for Wrongful Death**

1      e.    Costs of suit incurred herein; and

2      f.    Such other and further relief as the Court may deem just and proper.

3  DATED:  1-25-07               **DREYER, BABICH, BUCCOLA & CALLAHAM, LLP**

4

5                        By:

6                            ROGER A. DREYER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Complaint for Wrongful Death**             -10-