1    FOLGER LEVIN & KAHN LLP
Michael A. Kahn (CSB No. 057432, mkahn@flk.com)
2    Douglas W. Sullivan (CSB No. 088136, dsullivan@flk.com)
David P. Barton (CSB No. 221549, dbarton@flk.com)
3    Embarcadero Center West
275 Battery Street, 23rd Floor
4    San Francisco, CA  94111
Telephone: (415) 986-2800
5    Facsimile: (415) 986-2827

6    Attorneys for Plaintiffs ENTERCOM
SACRAMENTO, LLC, ENTERCOM
7    COMMUNICATIONS CORP. and
JOHN GEARY

8

9                 UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12

13    ENTERCOM SACRAMENTO, LLC, a    Case No.  CV 07 6493 JSW
California Limited Liability Corporation;
14    ENTERCOM COMMUNICATIONS    **NOTICE OF MOTION AND MOTION OF**
CORP., a Pennsylvania Corporation; and    **PLAINTIFFS FOR SUMMARY**
15    JOHN GEARY, an individual,    **ADJUDICATION OF ISSUES WITHOUT**
**CONTROVERSY IN THE FIRST, SECOND**
16              Plaintiffs,    **AND THIRD CLAIMS FOR RELIEF AND**
**SUPPORTING MEMORANDUM OF**
17        v.    **POINTS AND AUTHORITIES**

18    AMERICAN HOME ASSURANCE    Date:    April 11, 2008
COMPANY, a New York Corporation,    Time:    9:00 a.m.
19                  Courtroom: 2, 17th Flr.
            Defendant.    Judge:    Honorable Jeffrey S. White
20

21                   Complaint Filed:    December 28, 2007

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION AND SUMMARY OF ISSUES TO BE DECIDED | 2 |
| II. | | FACTUAL BACKGROUND | 5 |
| | A. | The Entercom Parties' Insurance Policies | 5 |
| | | 1. The Chubb Primary Policy | 5 |
| | | 2. The Excess Policy | 6 |
| | B. | The Entercom Parties Honored Their Obligations Under the Policies | 7 |
| | C. | Entercom's Guidelines For Contests | 7 |
| | D. | The Contest | 8 |
| | E. | The Strange Lawsuit | 10 |
| | F. | Tender of the Strange Lawsuit and Chubb's Acceptance Without a Reservation of Rights | 11 |
| | G. | Tender of the Strange Lawsuit to American Home, and Its Responses | 11 |
| | H. | Discovery in the Strange Lawsuit | 12 |
| | I. | The July 12, 2007 Settlement Demand | 12 |
| | | 1. Chubb's Response to Plaintiffs' Demand | 13 |
| | | 2. American Home's Belated Response in Bad Faith | 13 |
| | J. | Further Demands on American Home to Honor Its Responsibilities | 14 |
| III. | | ARGUMENT | 15 |
| | A. | As A Matter Of Law, The Death Of Jennifer Strange Was An "Accident" And, Thus, An "Occurrence" (As Those Terms Are Used In The Policies) So As To Afford The Entercom Parties Coverage For The Strange Lawsuit | 15 |
| | | 1. Under California Law, There Is An "Accident" Where Any Aspect In The Chain Of Events Causing The Injury Was Unintended By The Insured | 15 |
| | | 2. Under California Law, Only Where The Allegedly Intentional Acts Are "Inherently Wrongful" is Recovery Barred | 19 |
| | | 3. Unlike American Home, Chubb (The Primary Carrier) Properly Acknowledged Coverage | 20 |
| | | 4. Reasonable Expectations of the Insured Should be Taken Into Account in Determining Whether There is Coverage and Any Ambiguities Should be Resolved Against American Home | 20 |
| | | 5. Two Of The Insureds – Mr. Geary And Entercom Communications Corp. – Had No Involvement With The Contest Itself And Are Indisputably Insured Under The Excess Policy | 21 |
| | B. | Under California Law, Given American Home's Conduct, The Entercom Parties Are Entitled To A Declaration That They May Control Settlement | 22 |

-i-

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

## TABLE OF CONTENTS
### (continued)

Page

1. Given That American Home Has Refused To Take Action On Its Own To Settle The Strange Lawsuit And, Instead, Contended That There Was No "Occurrence" Under The Policy, The Entercom Parties Are Entitled To Control Settlement .............................................. 22

2. American Home Having Indisputably Breached Its Obligations (Including The Implied Covenant Of Good Faith) Under The Excess Policy, The Entercom Parties Are Entitled To Control Settlement ................................................................................................................. 23

IV.  CONCLUSION ................................................................................................................. 25

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO.  CV 07 6493 JSW

1

## TABLE OF AUTHORITIES

2

**Page**

3

### CASES

4
*Allstate Ins. Co. v. Morgan,*
   806 F. Supp. 1460, 1462 (N.D. Cal. 1992) .................................................................... 20

5
*Archdale v. American International Specialty Lines Ins. Co.,*
6
   154 Cal. App. 4th 449, 464 (2007) ........................................................... 4, 16, 22, 24

*Arquilla v. Int'l Ins. Co.,*
7
   1988 U.S. Dist. LEXIS 17576, 23-4 AT 23-12 (N.D. Cal., July 15, 1988) ............. 23

8
*Collin v. American Empire Ins. Co.,*
   21 Cal. App. 4th 787, 810 (1994) ...................................................................... 16, 19

9
*Communale v. Traders General Ins. Co.,*
   50 Cal. 2d 654, 659 (1958) ................................................................................... 25
10

11
*Crisci v. Security Ins. Co.,*
   66 Cal. 2d 425, 429-430 (1967) ..................................................................... 22, 24

*Critz v. Farmers Ins. Group,*
12
   230 Cal. App. 2d 788, 801 (1964) ........................................................................ 5

13
*Cruz v. Homebase,*
   83 Cal. App. 4th 160 (2000) ............................................................................... 18

14
*Dalyrymple v. United Servs. Auto Assn'n,*
   40 Cal. App. 4th 497, 522 (1995) ....................................................................... 20

15
*Dyer v. Northbrook Property & Casualty Ins. Co.,*
16
   210 Cal. App. 3d 1540, 1548 (1989) ................................................................... 20

*Egan v. Mutual Omaha Ins. Co.,*
17
   24 Cal. 3d 809, 817 (1979) .................................................................................. 24

18
*Garcia v. Superior Court,*
   42 Cal. App. 4th 177 (1996) ................................................................................ 18

19
*Gray v. Zurich Ins. Co.,*
   65 Cal. 2d 263, 270 f.n. 7 (1966) ........................................................................ 21

20
*Jafari v. EMC Ins. Cos.,*
21
   155 Cal. App. 4th 855, 898-899 (2007) ...................................................... 4, 16, 19

*Jamestown Builders, Inc. v. General Star Indem. Co.,*
22
   77 Cal. App. 4th 341, 348 (1999) ................................................................... 5, 24

23
*Kershaw v. Maryland Cas. Co.,*
   172 Cal. App. 2d 248, 255 (1959): ...................................................................... 23

24
*Kinder v. Western Pioneer Ins. Co.,*
   231 Cal. App. 2d 894 (1965) ............................................................................... 25

25
*Mariscal v. Old Republic Life Ins. Co.,*
26
   42 Cal. App. 4th 1617, 1620 (1996); ............................................................. 24, 25

*Merced Mutual Ins. Co. v. Mendez,*
27
   213 Cal. App. 3d 41, 50 (1989) ................................................................... 4, 16, 19

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

1

### TABLE OF AUTHORITIES
(continued)

2

**Page**

3

*Prunyn v. Agricultural Ins. Co.,*
 36 Cal. App. 4th 500, 515 (1995) ................................................................. 5, 22

4

*Quan v. Truck Ins. Exchange,*
 67 Cal. App. 4th 583 (1998).......................................................................... 19

5

*Safeco Ins. Co. of Am. v. Robert S.,*
 26 Cal. 4th 758 (2001) ............................................................................... 4, 16

6

*Samson v. Transamerica Insurance Company,*
 30 Cal. 3d 220, 238 (1981)............................................................................. 23

7

8

*Scheffler v. Allstate Ins. Co.,*
 196 F. Supp. 2d 1003, 1006-7 (C.D. Cal. 2002) ............................................. 20

9

*VanderLind v. Superior Court,*
 146 Cal. App. 358 (1983).............................................................................. 18

10

*White v. Ultramar, Inc.,*
 21 Cal. 4th 563 (1999) ................................................................................... 19

11

12

### STATUTES

13

California Civil Code § 3294(b) ............................................................................ 18

California Code of Civil Procedure § 998.......................................................... 12, 13

14

54007\2009\589623.1

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

## NOTICE OF MOTION AND MOTION

**TO:   DEFENDANT AMERICAN HOME ASSURANCE COMPANY AND ITS
ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on April 11, 2008, at 9:00 a.m., or such other time as may be determined by the Court, in Courtroom 2 of the above-entitled Court, located at U.S. Courthouse, 450 Golden Gate Avenue, San Francisco, California, Plaintiffs Entercom Sacramento, LLC, Entercom Communications Corp. and John Geary ("Plaintiffs" or "the Entercom Parties") will and hereby do move this Court for an order summarily adjudicating issues without controversy in the First, Second and Third Claims for Relief in their Complaint. Specifically, Plaintiffs seek the following orders:

1.     For an order with respect to the First Claim for Relief (For Breach of Insurance Contract), the Second Claim for Relief (For Breach of the Covenant of Good faith) and the Third Claim for Relief (For Declaratory Relief), declaring that the death of Jennifer Strange, which is the subject of a lawsuit ("the *Strange* lawsuit") brought against the Entercom Parties, was an "accident" and, thus, an "occurrence" (as those terms are used in Defendant American Home Assurance Company's Excess Policy), and that the Entercom Parties, as insureds under the Excess Policy, are covered under the Excess Policy for the *Strange* lawsuit (exclusive of any alleged punitive damages).

2.     For an order with respect to the Second and Third Claims for Relief, declaring that the Entercom Parties may take action to attempt to settle the *Strange* lawsuit on their own (with contribution from the primary carrier) and that Defendant American Home Assurance Company may not raise the "no voluntary payment" or "cooperation" provisions in its Excess Policy as a basis for not reimbursing the Entercom Parties for any reasonable settlement the Entercom Parties might enter into in the *Strange* lawsuit.

This Motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that there is no genuine issue of disputed material fact related to the above issues. This motion is based upon this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the supporting Declarations of Michael E. Dash, Jr., Douglas W. Sullivan, Juan

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-1-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO.  CV 07 6493 JSW

1    Carlos Ayus, M.D. and Carmela Masi, the supporting exhibits and evidence, the pleadings, and

2    such other and further oral and/or documentary evidence as may be presented to and allowed by

3    the Court.

4    Dated: February **2/**, 2008                    FOLGER LEVIN & KAHN LLP

5

6                                                    Douglas W. Sullivan
                                                     Attorneys for Plaintiffs ENTERCOM
7                                                    SACRAMENTO, LLC, ENTERCOM
                                                     COMMUNICATIONS CORP. and
8                                                    JOHN GEARY

9                   **MEMORANDUM OF POINTS AND AUTHORITIES**

10   **I.       INTRODUCTION AND SUMMARY OF ISSUES TO BE DECIDED**

11           This case stems from the death of Jennifer Strange (a wife and mother of three children),

12   who died following her participation in a Contest run by a radio station (KDND, FM Radio

13   107.9) owned by Entercom Sacramento, LLC (a Plaintiff herein). The Contest was named "Hold

14   Your Wee for a Wii" and involved approximately eighteen (18) contestants drinking water at

15   intervals until they either voluntarily dropped out or went to the bathroom. The Contest prize was

16   a Nintendo Wii, a console for computer games. Jennifer Strange came in second in the Contest,

17   voluntarily dropping out of the Contest in exchange for tickets to a Justin Timberlake concert for

18   that evening. Some time after driving home from the station, Ms. Strange died. Following her

19   death, a lawsuit (the *Strange* lawsuit) was instituted by the heirs of Jennifer Strange against the

20   Plaintiffs herein, Entercom Sacramento, LLC, Entercom Communications Corp. and John Geary

21   ("the Entercom Parties"), among others.

22           The Entercom Parties tendered the *Strange* lawsuit to their insurance carriers – Chubb

23   (that issued a primary insurance policy with policy limits of $1 million) and Defendant American

24   Home Assurance Company ("American Home") (that issued an excess insurance policy with

25   policy limits of $25 million). As the primary carrier, Chubb accepted the tender and began

26   defending the Entercom Parties without a reservation of rights, in recognition of coverage.

27   Despite the fact that its Excess Policy provided for the identical coverage, American Home

28   simply acknowledged that there "may" be coverage, assigning counsel to assist in the defense of

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW                                   -2-              PLAINTIFFS' MOTION FOR SUMMARY
                                                                   ADJUDICATION OF ISSUES WITHOUT
                                                                   CONTROVERSY; CASE NO. CV 07 6493 JSW

1  the lawsuit, as part of a reservation of rights letter.

2      This case involves Defendant American Home's bad faith refusal to take action to attempt

3  to settle the *Strange* lawsuit, while at the same time preventing the Entercom Parties from taking

4  action to attempt to settle the lawsuit on their own. Based on its erroneous position that its Excess

5  Policy somehow does not afford coverage for the *Strange* lawsuit (contrary to the position of the

6  primary carrier, Chubb), American Home refused to respond to a Settlement Demand from the

7  *Strange* Plaintiffs that was open for thirty (30) days, and then refused to take any other action on

8  its own to settle the lawsuit. Not only was American Home's coverage position legally incorrect,

9  but, in addition, American Home failed to notify the Entercom Parties of its position until <u>after</u>

10  the Settlement Demand had expired. (This belatedly raised position contradicted representations

11  made by American Home's claims representative, some just one day before the Settlement

12  Demand was made that any settlement would be with American Home's money, without any

13  contribution from the Entercom Parties.) Worse yet, when the Entercom Parties thereafter sought

14  to take action on their own to try to settle the *Strange* lawsuit, American Home refused to waive

15  the provisions in its Excess Policy allegedly entitling American Home to control settlement.

16  Instead, American Home claimed that if the Entercom Parties settled the *Strange* lawsuit on their

17  own, they would lose the right to seek reimbursement from American Home by reason of a "no

18  voluntary payment" provision or a "cooperation provision" in the Excess Policy. American

19  Home's bad faith conduct has placed the Entercom Parties in a "Catch 22" position: American

20  Home refuses to take action to attempt to settle the *Strange* lawsuit, while at the same time

21  refusing to allow the Entercom Parties to do so.

22      After refusing to respond to the Settlement Demand in a timely manner, American Home

23  belatedly contended that there was no "accident" and, thus, no "occurrence" (as those terms are

24  used in the primary and excess policies) so as to trigger coverage. American Home based this

25  contention on its selective and inaccurate reading of the allegations in the *Strange* Complaint, and

26  the fact that Entercom Sacramento personnel "intended" that the contestants drink water in the

27  Contest (although, as acknowledged by American Home, the Entercom Parties "clearly did not

28  intend any harm" to the contestants). However, American Home was <u>not</u> even entitled to take

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-3-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1    into account coverage in deciding whether to settle the *Strange* lawsuit because "the existence of

2    a coverage dispute, however meritorious the insurer's position, is simply not a proper

3    consideration in deciding whether to accept an offer to settle the claim against the insured" where

4    an insurer is handling a matter under a reservation of rights. *Archdale v. American International*

5    *Specialty Lines Ins. Co.*, 154 Cal. App. 4th 449, 464 (2007). Moreover, the "no coverage"

6    position of American Home is simply wrong as a matter of law.

7        By this motion, the Entercom Parties seek summary adjudication pursuant to the

8    declaratory relief claim (the Third Claim for Relief) in their Complaint. Specifically, the

9    Entercom Parties seek orders declaring the following:

10       1.    That the death of Jennifer Strange, which is the subject of the *Strange* lawsuit, was

11   an "accident" and, thus, an "occurrence" (as those terms are used in the American Home Excess

12   Policy) and that the Entercom Parties are covered under the Excess Policy for the *Strange* lawsuit

13   (exclusive of any alleged punitive damages). The Entercom Parties are entitled to such a

14   declaration for three reasons. First, under well-established law, there is an "accident" (and, thus,

15   an "occurrence") under a commercial liability policy if "any aspect in the causal series of events

16   leading to the injury or damage was unintended by the insured and a matter of fortuity." *See, e.g.,*

17   *Merced Mutual Ins. Co. v. Mendez*, 213 Cal. App. 3d 41, 50 (1989) (emphasis added). American

18   Home ignored this principle and ignored numerous undisputed facts, as well as the allegations in

19   the underlying *Strange* Complaint, concerning the "causal series of events" leading to the death of

20   Ms. Strange. American Home also ignored numerous cases where the courts found coverage

21   based on "accidents" in analogous situations. *See, e.g., Safeco Ins. Co. of Am. v. Robert S.*, 26

22   Cal. 4th 758 (2001) (holding that a death was an "accident" where an insured intentionally fired a

23   gun directly at a victim, mistakenly believing it to empty). Second, the act of having contestants

24   drink water was not "inherently wrongful" as required under California law to potentially avoid

25   coverage on the ground that there was no "accident." *Jafari v. EMC Ins. Cos.*, 155 Cal. App. 4th

26   855, 898-899 (2007). Unlike the *Strange* lawsuit, the cases relied upon by American Home for

27   disavowing coverage involved situations in which it was apparent that the intended act was

28   inherently wrongful such that it would automatically lead to injury. Third, American Home also

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-4-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1  ignored the fact that two of the insureds of the Entercom Parties – Entercom Communications and

2  Mr. Geary – had no involvement in the Contest, did not "intend" that any of the contestants

3  perform any act and, thus, indisputably had coverage.

4      2.      That the Entercom Parties may take action to attempt to settle the *Strange* lawsuit

5  on their own (with contribution from Chubb, the primary carrier) and that American Home may

6  not raise the "no voluntary payment" or "cooperation" provisions in the Excess Policy as a basis

7  for not reimbursing the Entercom Parties for any reasonable settlement the Entercom Parties

8  might enter into in the *Strange* lawsuit.  Given that American Home refused to take action to

9  settle the *Strange* lawsuit and, instead, contended that the *Strange* lawsuit was not covered by its

10  policy, under the law, the Entercom Parties are free to control the settlement discussions.  *See,*

11  *e.g., Prunyn v. Agricultural Ins. Co.*, 36 Cal. App. 4th 500, 515 (1995).  Also, having breached

12  the covenant of good faith in numerous respects (including failing to respond to the Settlement

13  Demand), compliance with the "no voluntary payment" and "cooperation" provisions is excused

14  and superseded by the antecedent breaches of the covenant of good faith by American Home.

15  *Critz v. Farmers Ins. Group*, 230 Cal. App. 2d 788, 801 (1964); *Jamestown Builders, Inc. v.*

16  *General Star Indem. Co.*, 77 Cal. App. 4th 341, 348 (1999).

17      **II.      FACTUAL BACKGROUND**

18      **A.      The Entercom Parties' Insurance Policies.**

19          **1.      The Chubb Primary Policy.**

20      Vigilant Insurance Company (hereinafter "Chubb") is an insurance company and a

21  member of the Chubb Group of Insurance Companies.  Chubb issued a primary policy, Policy

22  No. 3579-67-25 PHL, effective from March 7, 2006 to March 7, 2007 to Entercom

23  Communications ("the Chubb Primary Policy").  A true copy of the Chubb Primary Policy (with

24  the premium information redacted from the declarations page) is Exhibit 5.  Dash Decl., ¶ 4,

25  [Ex. 1].  Each of the Entercom Parties (including Entercom Communications Corp., the named

26  insured and parent company; Entercom Sacramento, LLC, a subsidiary; and Mr. Geary, an officer

27  of Entercom Sacramento, LLC) is an insured under the Chubb Primary Policy.  Ex. 5, pp. 6 and 8;

28  Dash Decl., ¶ 4 [Ex. 1].

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-5-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1    The Chubb Primary Policy provides that Chubb "will pay damages that the insured

2    becomes legally obligated to pay by reason of liability . . . for bodily injury . . . caused by an

3    **occurrence**." Ex. 5, p. 3. The Chubb Primary Policy further provides: "**Occurrence** means an

4    accident, including continuous or repeated exposure to substantially the same general harmful

5    conditions." *Id.*, p. 29. The Chubb Primary Policy provides coverage with a limit of $1,000,000.

6    *Id.*, p. 1.

7    The Chubb Primary Policy also requires Chubb to defend the insureds against a "suit."

8    *Id.*, p. 4. "Suit" means "a civil proceeding in which damages, to which this insurance applies, are

9    sought." *Id.*, p. 31. The fees and expenses that Chubb incurs in defending insureds (such as the

10    Entercom Parties) do not reduce the Chubb Primary Policy limits. *Id.*, p. 5. Rather, the costs of

11    defense are in addition to the Chubb Primary Policy limits.

12              **2.    The Excess Policy.**

13    American Home is an insurance company and a member of American International Group

14    ("AIG"), one of the world's largest group of insurance companies. American Home issued the

15    Excess Policy, No. BE 6849213, effective from March 7, 2006 to March 7, 2007, to Entercom

16    Communications Corp. ("the Excess Policy"). A true copy of the Excess Policy (with the

17    premium information redacted from the declarations page) is Exhibit 6. Dash Decl., ¶ 5 [Ex. 1].

18    Each of the Entercom Parties is an insured under the Excess Policy. Ex. 6, declarations page,

19    Endorsement No. 7 at p. 5, Section R.2; Ex. 1 at p. 18, Section M.2.d.; Dash Decl., ¶ 5 [Ex. 1].

20    Like the Chubb Primary Policy, the Excess Policy provides that American Home "will

21    pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes

22    legally obligated to pay as damages...because of Bodily Injury to which the insurance applies."

23    Ex. 6, p. 1. ("Retained Limit" means the $1,000,000 applicable limits of the underlying Chubb

24    Primary Policy. Ex. 6, p. 22.) Similar to the Chubb Primary Policy, the Excess Policy further

25    provides that, "This policy applies, only if: 1. the Bodily Injury is caused by an **Occurrence**...."

26    Like the Chubb Primary Policy, "**Occurrence**" is defined in the Excess Policy as respects Bodily

27    Injury as "an accident, including continuous or repeated exposure to substantially the same

28    general harmful conditions." The Excess Policy provides coverage with policy limits of

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-6-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1    $25,000,000. Ex. 6, declarations page.

2    To make it clear that the Excess Policy is excess of the Chubb Primary Policy but

3    provides the same coverage as the Chubb Primary Policy, the Excess Policy provides: "Coverage

4    under this policy for Bodily Injury...will follow the terms, definitions, conditions and exclusions

5    of [the Chubb Primary Policy], subject to the Policy Period, Limits of Insurance, premium and all

6    other terms, definitions, conditions and exclusions of this policy." Ex. 6, Endorsement 7, p. 2.

7    The Excess Policy also provides: "No Insured will, except at that Insured's own cost,

8    voluntarily make a payment...without our consent." Ex. 6, p. 14, §G.4. This provision is referred

9    to as the "no voluntary payment" provision. Under the Excess Policy, the insureds are also to

10    "cooperate with [American Home] in the investigation, settlement or defense of the...Suit." Ex. 6,

11    p. 14. This provision is referred to as "the cooperation provision."

12    **B.    The Entercom Parties Honored Their Obligations Under the Policies.**

13    The Entercom Parties have performed their obligations under the Chubb Primary Policy

14    and the Excess Policy, in particular paying the required premiums. Dash Decl., ¶ 6 [Ex. 1].

15    **C.    Entercom's Guidelines For Contests.**

16    Prior to the "Hold Your Wee for a Wii" Contest that was held on January 12, 2007,

17    Entercom Communications Corp. (the parent company) had developed written policies regarding

18    contests (also referred to as "promotions"). The policies were entitled "Entercom

19    Communications Corp. General Contest Guidelines." Depo Ex. 30, EC0001068-74 [Ex. 8]; Masi

20    Depo., 345:17-349:5 [Ex. 16]. The General Contest Guidelines were disseminated by Entercom

21    Communications' Legal Department to promotions directors for the radio stations of subsidiary

22    companies throughout the country. Masi Depo., 345:17-349:5 [Ex. 16].

23    Just a few months before the Hold Your Wee for a Wii Contest, Robin Pechota Ray, the

24    promotions director for KDND in Sacramento, received refresher training in the Contest

25    Guidelines. In this regard, she received an email, dated August 31, 2006, with General Contest

26    Guidelines attached. *Id.*; EC0001068-74 [Ex. 8]. The email stated that "[w]ith the exception of

27    simple contests, contest rules must be submitted for review by your Entercom Legal

28    representative." The email explains:

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-7-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

> A simple contest is one in which the form of rules have been approved before by Entercom Legal, that fall under the Station's generic contest rules (used only for simple one-off call-in, on-site or on-line simple random selection contests . . . ), and that do not include any unusual mode of entry/winning or large prize. When in doubt as to whether a giveaway fits into your generic contest rules, check with your Entercom Legal representative.

Depo. Ex. 30 at EC0001069 [Ex. 8]; Masi Depo., 349:1-17, 355:4-12 [Ex. 16]. The General Contest Guidelines also precluded contests that were dangerous or in bad taste. *Id.* at EC0001071 [Ex. 8].

A 22-page "Contest Seminar Presentation" summarizing the General Contest Guidelines was also presented in October of 2006, just three months before the Contest. Depo. Ex. 5. [Ex. 9]; Masi Depo., 356:6-22 [Ex. 16]. Robin Pechota Ray attended the web seminar in which the "Contest Seminar Presentation" was reviewed. Pechota Depo., 78:4-79:24 [Ex. 17]; Masi Depo., 356:6-22 [Ex. 16]. The Presentation reiterates the policy that contests (including those involving an unusual manner of winning) are to be submitted for review to the Legal Department. Depo. Ex. 5 at EC0000635 [Ex. 9]. The Presentation also stated that "Contests which are illegal, dangerous, misleading, rigged or in bad taste must be avoided." *Id.* at EC0000631 [Ex. 9].

Robin Pechota Ray, in her capacity as promotions director, had primary responsibility at KDND for complying with Entercom's contest policies, as reflected in the Entercom Contest Guidelines and the Contest Seminar Presentation. Pechota Depo., 103:6-12, 106:15-21, 110:22-24, 133:3-8, 275:5-276:14, 283:10-284:23 [Ex. 17]. Mistakenly, she failed to submit the Contest to the Legal Department for review. Masi Depo., 349:1-17, 355:4-12, 362:19-363:8 [Ex. 16]; Pechota Depo., 106:15-21, 283:10-284:23 [Ex. 17].

**D.     The Contest.**

The Contest took place starting at approximately 6:00 a.m. on January 12, 2007. Mendoza Depo., 9:22-10:8, 15:13-21 [Ex. 19]. Contestants were advised that they would be drinking water approximately every ten minutes. *Id.* They were also advised that if they voluntarily dropped out or went to the bathroom, they would be eliminated from the Contest. Mendoza Depo., 15:22-17:1 [Ex. 19]. The Contest prize was a Nintendo Wii, a game console.

1   Mendoza Depo., 13:20-14:1 [Ex. 19]; Pechota Depo., 281:25-282:5 [Ex. 17].[1]

2        At about 9:00 a.m., Ms. Strange was offered a pair of tickets to a Justin Timberlake

3   concert that evening if she would withdraw from the Contest. Sweet Depo., 300:2-301:15,

4   314:19-315:17 [Ex. 20]. Ms. Strange declined the offer and then proceeded to drink two more

5   rounds of water. Sweet Depo., 307:1-5 [Ex. 20]. Later, with just two contestants remaining,

6   Ms. Strange was again offered concert tickets for that evening if she would drop out. Sweet

7   Depo., 314:19-315:17 [Ex. 20]. This time, Ms. Strange accepted and was awarded the tickets,

8   coming in second in the Contest. *Id.*

9        At the conclusion of the Contest, Trish Sweet (an on-air talent) and Ms. Strange talked

10   about the Justin Timberlake concert, and made arrangements to meet up that night at the concert.

11   Sweet Depo., 314:19-315:20 [Ex. 20]. Ms. Strange was excited about going to the concert. *Id.* at

12   315:10-316:11. At no point did Ms. Strange ask for medical attention. Sweet Depo., 315:14-

13   316:19 [Ex. 20]; Mendoza Depo., 33:23-34:12 [Ex. 19].

14        Ms. Strange drove home. On her way home, she called her husband, explaining that she

15   felt nauseated. Strange Depo., 128:20-129:5 [Ex. 21]. Some time after driving home, as alleged

16   in the *Strange* lawsuit, Ms. Strange died, apparently from hyponatremia, a complicated medical

17   condition. Coroner's Report, p. 3 [Ex. 10]; Ayus Decl., ¶¶ 9-12 [Ex. 4].

18        Robin Pechota Ray, who was in charge of the Contest as the promotions director for

19   KDND, did not believe that the Contest involved any risk of injury. She claimed that the Contest

20   was a "simple" one that was not potentially hazardous and that did not involve any risk of injury.

21   Pechota Depo., 26:24-27:4, 39:5-15, 110:15-21, 267:7-25 [Ex. 17]. Thinking that the Contest

22   was simple and safe, Pechota Ray did not research health risks, did not advise the contestants that

23   the Contest presented health risks, did not inquire as to whether any of the contestants felt sick,

24   did not give instructions regarding safety of the contestants in driving home, did not think about

25

26       [1] Both the contestants and the station staff involved in planning the Contest intended and
expected it to be fun and good-natured. *See, e.g.,* Mendoza Depo., 22:14-20 [Ex. 19]. Although

27   in retrospect it was anything but fun, the individuals involved in the Contest believed it to be a
harmless event when planning it. Sweet Depo., 322:20-25 [Ex. 20].

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-9-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1    having a nurse present during the Contest, and did not submit the Contest to the Legal

2    Department for review. *Id.*, 47:3-23, 142:16-143:2, 144:12-16, 145:3-8, 224:12-24, 268:20-24,

3    276:6-278:5, 283:10-284:23, 316:7-15 [Ex. 17].

4        **E.    The Strange Lawsuit.**

5        On January 25, 2007, the Entercom Parties and others were sued in the Superior Court of

6    the State of California, Sacramento County, in a case entitled "<u>William Strange, individually and</u>

7    <u>Guardian ad Litem for Ryland Strange and Jorie Strange, minors, et al. v. Entercom Sacramento,</u>

8    <u>LLC, et al.</u>," Case No. 07AS00377 ("the *Strange* lawsuit"). A true and correct copy of that

9    Complaint in the *Strange* lawsuit is Exhibit 7.

10        The Complaint lists a "causal series of events" leading to the death of Jennifer Strange,

11    including the following:

12    •    That "Defendants and each of them failed to conduct a reasonable investigation to

13        determine the relative health risk to prospective contest participants." (Compl., ¶ 8.

14        [Ex. 7])

15    •    That "Defendants negligently failed to consult with appropriate health authorities

16        regarding the relative health risks . . . ." (*Id.*)

17    •    That "Defendants negligently failed to identify specific health risks . . . ." (*Id.*)

18    •    That "Defendants negligently failed to inform contest participants, including decedent,

19        of any such risks." (*Id.*)

20    •    That "Defendants negligently failed to post any health advisories . . . ." (*Id.*)

21    •    That "Defendants negligently failed to . . . identify prospective participants who might

22        be at risk of injury." (*Id.*)

23    •    That "Defendants negligently failed to serve any medical professional . . . services

24        during the contest." (*Id.*)

25    •    That "Defendants negligently failed to . . . require an examination by a competent

26        physician . . . ." (*Id.*)

27    •    That after "decedent complained of feeling ill," Defendants "negligently failed to

28        provide any assistance, medical or otherwise . . . ." (*Id.*, ¶ 9.)

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-10-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

- That "had decedent been properly informed of the health risks . . ., she would not have participated" in the Contest. (*Id.*, ¶ 10.)

- That "had medical . . . services been provided, the decedent would not have consumed the fatal doses of water." (*Id.*)

The coroner's report reflects that Ms. Strange died from hyponatremia and resulting brain swelling and pulmonary edema. Ex. 10, p. 3; Dash Decl., ¶ 7 [Ex. 1]; Ayus Decl., ¶¶ 9-12 [Ex. 4]. This is a complicated medical condition, yet another unforeseen causal link in her death. *Id.*; Ayus Decl., ¶¶ 9-12 [Ex. 4].

### F.  Tender of the *Strange* Lawsuit and Chubb's Acceptance Without a Reservation of Rights.

The Entercom Parties promptly notified and tendered the *Strange* lawsuit to Chubb, who had issued a primary policy with policy limits of $1,000,000. Dash Decl., ¶ 8 [Ex. 1]. By letter of March 2, 2007, Chubb confirmed its acceptance of the tender and duty to defend, without any reservation of rights relating to coverage. In recognition of coverage, Chubb has never sent any reservation of rights letter. Ex. 11; Dash Decl., ¶ 9 [Ex. 1].

### G.  Tender of the *Strange* Lawsuit to American Home, and Its Responses.

The Entercom Parties also promptly tendered the *Strange* lawsuit to American Home. Dash Decl., ¶ 8 [Ex. 1]. Thereafter, American Home appointed an excess claims representative (Leonard Romeo) as the claims representative for American Home in the *Strange* lawsuit. *Id.*, ¶ 10.

On March 7, 2007, American Home's claims representative advised corporate counsel for Entercom that American Home would soon issue a reservation of rights letter, but that the letter was not a sign that American Home was taking an adversarial position over coverage. *Id.*, ¶ 10. The American Home claims representative further advised that he would seek to settle the *Strange* lawsuit with the Stranges' counsel. *Id.*, ¶ 10. Then, by letter of March 22, 2007 (Ex. 12, Dash Decl. ¶ 10 [Ex. 1]), American Home formally acknowledged the Entercom Parties' tender and advised the Entercom parties that it was handling the *Strange* matter under a reservation of rights.

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-11-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1    In its March 22, 2007 letter (Ex. 12), American Home acknowledged that there "may" be

2    coverage for the *Strange* lawsuit by notifying Entercom of its intention to associate a second law

3    firm to assist in the defense of the *Strange* lawsuit along with counsel previously retained to

4    defend the Entercom Parties. American Home advised that it was entitled under the Excess

5    Policy to retain associate counsel to "participate in the defense of any suit...to which this policy

6    may apply." (emphasis added) *Id.*, p 5.

7    Between March 2007 and July 2007, American Home's claims representative

8    (Mr. Romeo) advised that he would be meeting with the Stranges' counsel, and that he in fact met

9    with the Stranges' counsel, to discuss settlement. Dash Decl., ¶ 11 [Ex. 1]. These settlement

10   discussions (including a meeting in Las Vegas) occurred without the presence of the Entercom

11   Parties. *Id.*, ¶ 11.

12   On July 11, 2007 – just one day before the Stranges' counsel served a Settlement Demand

13   – American Home's claims representative (Mr. Romeo) represented to counsel for the Entercom

14   Parties that any settlement would be with "my [American Home's] money," and that American

15   Home would pay "100% of any settlement." Dash Decl., ¶ 12 [Ex. 1]. On July 11, 2007, the day

16   before receipt of the Settlement Demand, the American Home claims representative also advised

17   that it was not his practice or the practice of AIG (including American Home) to consult with

18   defense counsel concerning the reasonableness of any settlements. *Id.*, ¶ 12.

19   **H.    Discovery in the *Strange* Lawsuit.**

20   Prior to July 12, 2007, there was significant discovery in the *Strange* lawsuit, including

21   productions of documents by the Entercom Parties and the Strange Plaintiffs, responses to

22   numerous interrogatories by the Entercom Parties, and over thirty (30) depositions. *Id.*, ¶ 13.

23   Counsel for the Entercom Parties kept American Home apprised of the discovery, and provided or

24   made available all documents produced and transcripts of depositions in the *Strange* lawsuit. *Id.*,

25   ¶ 13.

26   **I.    The July 12, 2007 Settlement Demand.**

27   On July 12, 2007, the Stranges' counsel served the Entercom Parties a Settlement Demand

28   of $13 million, pursuant to California Code of Civil Procedure § 998. Ex. 13. The Settlement

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-12-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1    Demand stated that it would expire in thirty (30) days. The cover letter to the Settlement Demand

2    stated that, rather than stipulating to a judgment for $13 million, the parties could enter into a

3    settlement agreement. *Id*

4        The following day, July 13, 2007, the Entercom Parties' counsel forwarded the Settlement

5    Demand to both Chubb and American Home. Dash Decl., ¶ 14[Ex. 1]. The next week, the

6    Entercom Parties again reminded both Chubb and American Home of the Settlement Demand,

7    and sought a prompt response by the insurers. *Id.*, ¶ 14.

8            **1.    Chubb's Response to Plaintiffs' Demand.**

9        On July 24, 2007, Chubb responded to the Settlement Demand consistent with coverage

10   for the *Strange* lawsuit under the Chubb Primary Policy, agreeing to contribute its policy limits of

11   $1 million toward settlement. *Id.*, ¶ 15.

12           **2.    American Home's Belated Response in Bad Faith.**

13       Not having obtained a response from American Home, on August 6, 2007, the Entercom

14   Parties again requested American Home to respond. *Id.*, ¶ 16. The Entercom Parties also

15   specifically requested a meeting or conference if American Home had any concerns about

16   responding to the Settlement Demand. *Id.*, ¶ 16. Based on the Excess Policy and based on

17   American Home's prior actions, the Entercom Parties relied on American Home to timely

18   respond to the Settlement Demand. *Id.*, ¶ 16.

19       Despite the fact that the failure to accept the Settlement Demand (which was made

20   pursuant to California Code of Civil Procedure § 998) could have adverse economic

21   consequences, the Entercom Parties did not receive a substantive oral or written response to the

22   Settlement Demand from American Home prior to the August 10 expiration of the Settlement

23   Demand. *Id.*, ¶ 17. After the Settlement Demand expired, by letter of August 17, 2007,

24   American Home responded, suggesting for the first time that American Home was not just

25   reserving rights, but contending that there was no "occurrence" (as that term is used in the

26   Policies) so as to trigger coverage. A true copy of the August 17, 2007 letter (redacted to

27   eliminate privileged information related to the *Strange* lawsuit) is Exhibit 14.

28       American Home did not offer an explanation for not responding to the Entercom Parties

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-13-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1    prior to the expiration of the Settlement Demand.  Nor did American Home offer an explanation

2    for refusing to meet or discuss the Settlement Demand with the Entercom Parties.  Nor did

3    American Home describe any investigation that American Home had conducted in reaching its

4    new position.  Dash Decl., ¶ 18 [Ex. 1].

5    American Home took the position that there was no "occurrence" so as to trigger coverage

6    by simply looking at some of the allegations in the Complaint and nothing more.  Ex. 14, pp. 2-3.

7    The superficial conclusion was simply wrong as a matter of law.

8    In August, 2007, American Home also advised the Entercom Parties that Mr. Romeo (the

9    prior claims representative for American Home, who had previously advised that he would take

10    action to settle the *Strange* lawsuit with American Home's money) would no longer be involved

11    with the *Strange* lawsuit.  Ex. 1, ¶ 17.

12    **J.      Further Demands on American Home to Honor Its Responsibilities.**

13    Given American Home's evasion of its responsibilities, the Entercom Parties asked

14    American Home to confirm (a) that American Home was disclaiming coverage, and (b) that the

15    Entercom Parties could take control of settlement negotiations and seek to settle the *Strange*

16    lawsuit on their own.  Dash Decl., ¶ 19 [Ex. 1].

17    American Home responded by letter of September 4, 2007 (Ex. 15), advising that

18    American Home had not declined coverage (which appeared contrary to American Home's

19    position of August 17) but was proceeding under a reservation of rights, and that American Home

20    would not waive any provision under the policy, including the " no voluntary payment"

21    provision.  (*Id.*)  Thus, American Home asserted that the Entercom Parties could not resolve the

22    *Strange* lawsuit on their own without running the risk that American Home would not have to

23    reimburse the Entercom Parties because of the "no voluntary payment" provision.  However,

24    thereafter, American Home again advised that it disagreed with the Entercom Parties' position

25    that Ms. Strange's death was an "occurrence" (as the term is used in the Excess Policy) so as to

26    trigger coverage under the Excess Policy.  Dash Decl., ¶ 20 [Ex. 1].  And, based on this position,

27    American Home refused to take any action on its own to try to settle the *Strange* lawsuit.  *Id.*,

28    ¶ 20.

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-14-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1    American Home's assertion of the "no voluntary payment" provision, while at the same

2    time contending there was no coverage, put the Entercom Parties in a "Catch-22": American

3    Home was refusing to take action to resolve the *Strange* lawsuit and at the same time preventing

4    the Entercom Parties from doing so either.

### III.    ARGUMENT

A.    **As A Matter Of Law, The Death Of Jennifer Strange Was An "Accident" And, Thus, An "Occurrence" (As Those Terms Are Used In The Policies) So As To Afford The Entercom Parties Coverage For The *Strange* Lawsuit.**

1.    **Under California Law, There Is An "Accident" Where Any Aspect In The Chain Of Events Causing The Injury Was Unintended By The Insured.**

10    In July and August, 2007, despite demand from the Entercom Parties, American Home

11    refused to respond to a Settlement Demand that was open for thirty (30) days. Dash Decl., ¶¶ 14-

12    17 [Ex. 1]. Instead, by letter of August 17, 2007 (Ex.), after the time for responding to the

13    Settlement Demand had expired, American Home contended that there was no "accident" or

14    "occurrence" (as those terms are used in the Excess Policy) because "the alleged contest caused

15    the harm, and as suggested by the term 'contest,' as well as the events relating to it, it appears

16    inherently non-accidental in nature." (*Id.*, p. 2.) (American Home did acknowledge, however,

17    that "Entercom clearly did not intend the harm that resulted from the 'Hold Your Wee for a Wii'

18    contest." Ex. 14, p. 2.)

19    Thereafter, when American Home refused to allow the Entercom Parties to try to settle the

20    *Strange* lawsuit on their own (contending that American Home was somehow still operating

21    under a reservation of rights and would not waive the "no voluntary payment" provision or other

22    provisions in the Excess Policy) (Ex. 15), the Entercom Parties again requested that American

23    Home itself take action to try to settle the lawsuit. However, American Home's representative

24    advised that American Home would not do so. Dash Decl., ¶ 20 [Ex. 1]. American Home

25    repeated its position that there was no "accident" or "occurrence" so as to trigger coverage, and

26    disagreed with the Entercom Parties' position to the contrary. *Id.*, ¶ 20. However, American

27    Home's position is simply wrong as a matter of law.

28    Under California law, coverage is not precluded "merely because the insured acted

1    intentionally and the victim was injured." *Merced Mutual Ins. Co. v. Mendez*, 213 Cal. App. 3d

2    41, 50 (1980). An "accident" can occur when the insured performs "some deliberate act" and

3    then "some additional, unexpected, independent, and unforeseen happening occurs that produces

4    the damage." *Id.*; *Collin v. American Empire Ins. Co.,* 21 Cal. App. 4th 787, 810 (1994) (defining

5    an "accident" as an "unexpected, unforeseen, or undesigned happening or consequence from

6    either a known or unknown cause" or "something out of the usual course of events . . . which

7    happens suddenly and unexpectedly and without design."), "[A]n 'accident' exists when <u>any</u>

8    <u>aspect in the causal series of events</u> leading to the injury or damage was <u>unintended</u> by the

9    insured and a matter of fortuity." *Jafari v. EMS Ins. Cos.*, 155 Cal. App. 4th 855, 899 (2007)

10    (emphasis added) (quoting *Merced*, 213 Cal. App. 3d at 50).

11        In *Merced*, the court explained:

12    
13    > When a driver intentionally speeds and, as a result, negligently hits
    > another car, the speeding would be an intentional act. However, the
    > act directly responsible for the injury – hitting the other car – was
14    > not intended by the driver and was fortuitous. Accordingly, the
    > occurrence resulting in injury would be deemed an accident. 213
    > Cal. App. 3d at 50.
15    

16    *See also, Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 761 (2001) (holding that a death

17    was an "accident" where an insured intentionally fired a gun at a victim mistakenly believing it to

18    be empty).

19        In this case, the act of conducting the contest was "deliberate." However, because the

20    Contest was believed to be safe and because the death was not foreseeable, there were a number

21    of <u>undisputed</u> "additional, unexpected, independent, and unforeseen happenings" that led to

22    Ms. Strange's death, including the following:

23        • As a lay person, believing the Contest to be safe, Robin Pechota Ray (the promotions

24          director in charge of contests) did not research whether there were potential health

25          risks associated with drinking water. Pechota Depo., 26:24-27:4, 39:5-15, 47:3-23,

26          110:15-21, 144:12-16, 224:12-24, 267:7-25, 268:20-24, 276:6-278:5 [Ex. 17].

27        • Again, believing the Contest to be safe, Robin Pechota Ray (as the promotions director

28          in charge of contests) did not take action to warn the contestants that the Contest was

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-16-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1   unsafe.  Pechota Depo., 224:12-24, 267:7-25 [Ex. 17].

2   • Robin Pechota Ray (as the promotions director in charge of contests) did not submit

3   the Contest to the Legal Department for review and for precautions, including having

4   a medical professional present during the Contest.  Pechota Depo., 283:10-284:23

5   [Ex. 17]; Masi Depo., 349:1-17, 355:4-12, 362:19-363:8, 359:11-360:16 [Ex. 16].

6   • No nurse or other professional was present during the Contest.  Pechota Depo., 316:7-

7   15 [Ex. 17].

8   • The Contest was voluntary, and it was anticipated that contestants would voluntarily

9   drop out or go to the bathroom, not drink such that they might die.  Sweet Depo.,

10  319:14-320:20, 322:20-25 [Ex. 20].

11  • Ms. Strange was encouraged to drop out before the Contest ended with an offer of

12  concert tickets, but chose not to do so until after drinking more water.  Sweet Depo.,

13  300:2-301:15, 307:1-5, 314:19-315:17 [Ex. 20].

14  • Ms. Strange did not request medical assistance.  Sweet Depo., 315:14-316:19 [Ex. 20];

15  Mendoza Depo., 33:23-34:12 [Ex. 19]  Even after Ms. Strange explained to her

16  husband that she was nauseous when driving home, she did not seek medical care.

17  Strange Depo., 128:20-129:5 [Ex. 21].

18  • The Coroner's report reflects that Ms. Strange (not other contestants) died from

19  hyponatremia resulting in brain swelling and pulmonary edema, a complicated

20  medical condition, because of her particular physical conditions and reactions.

21  Coroner's Report [Ex. 10]; Ayus Decl., ¶¶ 7-12 [Ex. 4].  In this regard, hyponatremia

22  is a medical condition that occurs in humans when the sodium concentration in the

23  blood plasma in the circulatory system falls below a threshold level that can lead to

24  cerebral and pulmonary edema.  Whether hyponatremia occurs in a particular

25  individual is dependent on a number of interrelated factors, including, among others, a

26  person's body mass and weight; a person's blood volume; a person's sodium content

27  in the circulatory system and blood plasma; whether a person has increased estrogen

28  levels resulting in increased anti-diuretic hormone (ADH) levels that can cause the

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-17-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1    retention of water in the blood plasma; the amount and timing of water (or other

2    liquids) intake; whether a person has increased ADH levels occurring as a result of

3    nausea or diarrhea that can also lead to water retention in the blood plasma; etc. *Id.*

4    In this case, American Home has ignored these <u>undisputed</u> facts which reflect numerous

5    <u>unintended</u> happenings leading to Ms. Strange's death. Indeed, despite the fact that over 30

6    depositions had been taken in the *Strange* lawsuit, American Home's letter of August 17 (which

7    sought to justify American Home's refusal to respond to the Settlement Demand) made no

8    mention of <u>any</u> facts or testimony. Instead, American Home's letter of August 17 relied <u>solely</u> on

9    American Home's inaccurate reading of the Complaint. Ex. 14. However, even the Complaint

10   itself repeatedly emphasized numerous independent "happenings" in the "causal series of events"

11   (Compl., ¶¶ 8-9; *see* Section IIE above), and noted that <u>but for</u> these other happenings,

12   Ms. Strange "would not have participated" in the Contest and "would not have consumed the fatal

13   doses of water." Compl., ¶ 10 [Ex. 7].

14   Accordingly, the Entercom Parties respectfully request that summary adjudication be

15   entered on their Declaratory Relief Claim declaring that the death of Jennifer Strange is an

16   "occurrence" under the American Home Excess Policy and that there is coverage for the *Strange*

17   lawsuit (other than for potential punitive damages).[2]

18   _____

     [2] In the *Strange* lawsuit, the Entercom Parties intend to move for summary adjudication

19   that the *Strange* Plaintiffs are not entitled to punitive damages for numerous reasons, including
     (1) punitive damages are not allowed under California law for wrongful death claims without a

20   criminal conviction (*VanderLind v. Superior Court*, 146 Cal. App. 358, 364 (1983)), and (2)
     under California law, punitive damages are not allowed on the survivor action claims (the only

21   other causes of action) because Ms. Strange did not incur any "economic damages" prior to her
     death. *Garcia v. Superior Court*, 42 Cal. App. 4th 177 (1996); Hulst Depo. 11:8-12:16, 82:19-

22   83:8, 83:14-25 [Ex. 23] (Ms. Strange's mother testifying that she was found dead before expenses
     could be incurred). Moreover, Mr. Geary and Entercom Communications Corp. (the parent

23   company) had no involvement with the Contest, and no officer, director or managing agent of
     Entercom Sacramento, LLC was involved in the Contest, a prerequisite for punitive damages.

24   Cal. Civ. Code § 3294(b); Masi Decl., ¶ 3 [Ex. 3]; Geary Depo. 14:15-22, 64:18-24, 96:22-98:16,
     121:5-19 [Ex. 22]; Weed Depo., 54:15-18 [Ex. 18]. The highest ranking person at Entercom

25   Sacramento, LLC who had involvement with the Contest was Steve Weed, whose responsibilities
     related to the promotions and production departments of just one of the six stations owned by

26   Entercom Sacramento, LLC, and who did not set policy for the company. His job was to <u>follow</u>
     corporate policy, not to set it. Weed Depo., 142:5-11, 142:19-143:22, 203:3-20 [Ex. 18]; Geary

27   Depo., 16:6-7; 56:8-23 [Ex. 22]. Therefore, under California law, Mr. Weed was not a
     "managing agent." *Cruz v. Homebase*, 83 Cal. App. 4th 160, 167-8 (2000) (supervisor was not a

28   managing agent, where his discretionary power was limited to one area of a store's multifaceted
     (Continued...)

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-18-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

2.    **Under California Law, Only Where The Allegedly Intentional Acts Are "Inherently Wrongful" is Recovery Barred.**

American Home relies on a series of cases in which the courts denied coverage where the insureds admitted intentionally doing acts that inevitably and directly resulted in injury, but where the insureds also claimed that the incident was somehow "accidental." American Home's reliance on these cases is unavailing for two reasons: <u>First</u>, none of the cases cited by American Home involved a situation (like here) where there were other happenings in the "causal series of events" that led to the injury. <u>Second</u>, the cases cited by American Home involved situations (unlike here) where the "intended" act was "inherently wrongful" such that it would inevitably lead to injury. In reversing a trial court's denial of coverage, the court in *Jafari v. EMC Ins. Cos.* 155 Cal. App. 4th 885, 898-899 (2007) emphasized that the prior cases, in which the courts denied coverage based on the absence of an "accident," involved situations where the intended act was "inherently wrongful and harmful." Thus, in *Quan v. Truck Ins. Exchange*, 67 Cal. App. 4th 583 (1998), "the insured's inherently wrongful acts of sexual assault and rape" . . "could not be engaged in by 'accident.'" *Jafari v. EMC Ins. Cos.*, 155 Cal. App. 4th at 899 (discussing *Quan*, 57 Cal. App. 4th 583). Likewise, in *Merced*, the court "declined" to "construe the term 'accident' to include conduct constituting the crime of forcible oral copulation and/or assault with intent to commit forcible oral copulation." 213 Cal. App. 3d at 52. The *Merced* court stated that it was "unable to posit any factual construction where such conduct might be interpreted as accidentally occurring." *Id.*

The other cases cited by American Home also involve intentional and inherently wrongful conduct that would inevitably lead to injury, such that there was no "accident." *Collin v. American Empire Ins. Co.*, 21 Cal. App. 4th 787, 811 (1994) (the court simply held that the tort of conversion – which requires an intentional act of "dominion wrongfully exerted over another's personal property" – cannot be engaged in by accident); *Dyer v. Northbrook Property & Casualty*

---

operation); *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 573 (1999) (the term "managing agent" includes only "those employees who exercise substantial independent authority and judgment" sufficient to "determine corporate policy").

1    *Ins. Co.*, 210 Cal. App. 3d 1540, 1548 (1989) (the court held that an intentional tort of wrongful

2    termination was not an accident); *Allstate Ins. Co. v. Morgan*, 806 F. Supp. 1460, 1462 (N.D. Cal.

3    1992) (misrepresentations designed to "induce" a party to enter into a contract were held not to

4    constitute an "accident"); *Dalrymple v. United Servs. Auto Assn'n*, 40 Cal. App. 4th 497, 522

5    (1995) (the court held that where an insurer had reason to believe that a shooting was "calculated"

6    and "deliberate," it was not bad faith for the insurer to bring a declaratory relief action on

7    coverage, even though the insurer <u>lost</u> on the coverage issue); *Scheffler v. Allstate Ins. Co.*, 196 F.

8    Supp. 2d 1003, 1006-7 (C.D. Cal. 2002) (the intentional bulldozing of land intended to prevent

9    plaintiffs from accessing their property was not an "accident"). The rationale of these cases is

10   straightforward: where an intentional action is inherently harmful, the insured cannot prove the

11   occurrence of an accident simply by claiming he intended the action but not the harm.

12          Unlike the cases relied upon by American Home, the act of having contestants drink

13   water was not "inherently wrongful" and would not "inevitably lead to injury." There is nothing

14   inherently wrongful about a contest involving drinking water; it is analogous to the commonplace

15   and prevalent contests engaged in around the country where contestants eat the most hot dogs,

16   pies, ice cream, etc. Conducting a water drinking contest is not by itself either a crime, as is rape,

17   sexual assault or a shooting, which is the type of event for which coverage is denied in the cases

18   cited by American Home.

19          **3.    Unlike American Home, Chubb (The Primary Carrier) Properly
               Acknowledged Coverage.**

20

21          The Chubb Primary Policy and the American Home Excess Policy provide for the same

       coverage and have the exact same definition of "occurrence." *See* Section IIA. Chubb properly
22
       accepted coverage <u>without</u> a reservation of rights. Ex. 11; Dash Dec., ¶ 9 [Ex. 1]. In recognition
23
       of coverage, Chubb has paid hundreds of thousands of dollars in defense costs. *Id.*, ¶ 9. Chubb
24
       also agreed to contribute the policy limits of $1 million toward settlement. *Id.*, ¶ 15.
25

26          **4.    Reasonable Expectations of the Insured Should be Taken Into Account
               in Determining Whether There is Coverage and Any Ambiguities
               Should be Resolved Against American Home.**
27

28          It has long been the law in California that courts look to the "reasonable expectations of

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-20-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1   the insured" in interpreting insurance contracts. *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 270 f.n. 7

2   (1966). The policy must be construed "*so as to give the insured the protection which he*

3   *reasonably had a right to expect . . . .*" *Id.* (emphasis in original). To that end, "doubts,

4   ambiguities, and uncertainties arising out of the language used in the policy must be resolved" in

5   favor of the insured. *Id.* Here, American Home failed to define "accident" in its Excess Policy,

6   and any ambiguity in the term should be resolved against American Home and in favor of

7   coverage.

8              **5.**      **Two Of The Insureds – Mr. Geary And Entercom Communications**
                      **Corp. – Had No Involvement With The Contest Itself And Are**

9                      **Indisputably Insured Under The Excess Policy.**

10  Mr. Geary, as the Vice President and Market Manager of Entercom Sacramento, LLC (the

11  company that owned the radio station, KDND, along with five other stations), was sued in the

12  *Strange* lawsuit. Geary Depo., 18:25-19:15 [Ex. 22]. However, Mr. Geary had no involvement

13  with the planning, approval or execution of the Contest. Geary Depo., 96:22-98:16, 121:5-19

14  [Ex. 22]. It was not until after the station was advised of the death of Jennifer Strange, some six

15  hours after the Contest ended, that Mr. Geary was advised of any of the details of the Contest. *Id.*

16  Thus, Mr. Geary committed no "intentional" acts in connection with the Contest. *Id.*

17  Similarly, Entercom Communications Corp. (the ultimate parent company of Entercom

18  Sacramento, LLC) had no involvement with the Contest. While the Legal Department of

19  Entercom Communications Corp. would normally get involved in the review of contests (such as

20  the Hold Your Wee for a Wii Contest), that did not happen here because the Contest was not

21  submitted to the Legal Department. Masi Depo., 349:1-17, 355:4-12, 362:19-363:8 [Ex. 16].

22  Hence, no one from Entercom Communications Corp. was involved with the Contest. Masi

23  Decl., ¶ 3 [Ex. 3].

24  Thus, Mr. Geary and Entercom Communications Corp., who engaged in no acts relating to

25  the Contest – intentional or otherwise – clearly have coverage under the Excess Policy. American

26  Home failed to take these facts into account in failing to take actions to settle the *Strange* lawsuit

27  and in contending that there was no coverage for the Entercom Parties.

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-21-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

**B.    Under California Law, Given American Home's Conduct, The Entercom Parties Are Entitled To A Declaration That They May Control Settlement.**

The Entercom Parties also seek a declaration, pursuant to the Third Claim for Relief in their Complaint, that they are entitled to try to settle the *Strange* lawsuit on their own without regard to the "no voluntary payment" or "cooperation" provisions in the Excess Policy. The Entercom Parties respectfully submit that they are entitled to such a declaration (which hopefully would enable them to enter into a reasonable settlement with the *Strange* Plaintiffs) for two independent reasons:

**1.    Given That American Home Has Refused To Take Action On Its Own To Settle The *Strange* Lawsuit And, Instead, Contended That There Was No "Occurrence" Under The Policy, The Entercom Parties Are Entitled To Control Settlement.**

In refusing to take action to settle the *Strange* lawsuit, while at the same contending that the Entercom Parties cannot do so either without violating the Excess Policy terms, American Home is seeking "to have it both ways." However, under California law, that is not permissible. American Home had two (2) mutually exclusive options available to it: First, under California law, if American Home was truly operating under a reservation of rights, then American Home was obligated to make good faith efforts to settle the case (including accepting reasonable settlement demands) and then subsequently seek reimbursement from the Entercom Parties. *Archdale v. American International Specialty Lines Ins. Co.*, 154 Cal. App. 4th 449, 465 (2007) (Under California law, "the existence of a coverage dispute, however meritorious the insurer's position, is simply not a proper consideration in deciding whether to accept an offer to settle the claim against the insured."); *Crisci v. Security Ins. Co.*, 66 Cal. 2d 425, 429-430 (1967) ("the duty to accept reasonable settlement [is] included within the implied covenant of good faith"). Second, and alternatively, American Home could deny coverage, in which case the Entercom Parties would be entitled to settle the lawsuit on their own and thereafter pursue coverage. *See, e.g., Pruyn v. Agricultural Ins. Co.*, 36 Cal. App. 4th 500, 515 (1995) ("If an insurer . . . wrongfully denies coverage . . ., then the insured is entitled to make a reasonable settlement of the claim in good faith . . . and then maintain an action against the insurer to recover the amount of the settlement.") (internal citations and quotation marks removed).

1    Here, despite demand from the Entercom Parties, American Home refused to respond to

2  the Settlement Demand (and instead contended that there was no "occurrence" under the Excess

3  Policy).  Later, American Home reiterated its coverage position, advising that American Home

4  would not take action on its own to try to settle the case.  Dash Decl., ¶ 20 [Ex. 1].  Thus,

5  American Home has effectively chosen the latter of the two alternatives discussed above, and, as

6  a result, the Entercom Parties are entitled to a declaration that they are entitled to attempt to settle

7  the case on their own with contribution from Chubb.

8    Given American Home's conduct, the Entercom Parties sought confirmation that they

9  could seek to settle the *Strange* lawsuit on their own.  American Home refused, contending that if

10  the Entercom Parties settled the *Strange* lawsuit, they would be barred from seeking recovery

11  from American Home because of the "no voluntary payment" provision and other provisions in

12  the Excess Policy.  The Entercom Parties seek a declaration that they may try to settle the *Strange*

13  lawsuit on reasonable terms without regard to the "no voluntary payment" or "cooperation"

14  provisions.

15    Such a declaration is warranted under California law and would promote the public policy

16  supporting settlements of disputes.  As stated in *Kershaw v. Maryland Cas. Co.*, 172 Cal. App. 2d

17  248, 255 (1959):

18      An insurer may not thus repudiate a policy, deny all liability
        thereon, and at the same time be permitted to stand on the failure to
19      comply with a provision inserted in the policy for its benefit.

20  *Id.*, at 255.  Accord, *Samson v. Transamerica Insurance Company*, 30 Cal. 3d 220, 238 (1981)

21  ("if an insurer denies coverage to the insured, the insured's contractual obligation to notify the

22  insurer ceases").  "Indeed, once an insurer has denied coverage, the insured is under no further

23  obligation to communicate offers of settlement.  *Arquilla v. Int'l Ins. Co.*, 1988 U.S. Dist. LEXIS

24  17576, 23-4 AT 23-12 (N.D. Cal., July 15, 1988).

25      **2.    American Home Having Indisputably Breached Its Obligations
            (Including The Implied Covenant Of Good Faith) Under The Excess
26          Policy, The Entercom Parties Are Entitled To Control Settlement.**

27    Under California law, when an insurance carrier breaches the policy (including the

28  covenant of good faith implied in the policy), the insured is excused from complying with the

1  related provisions in the policy, including the "cooperation" and the "no voluntary payment"

2  provisions. *Jamestown Builders, Inc. v. General Star Indemnity Co.*, 77 Cal. App. 4th 341, 348

3  (1999) (a "no-voluntary payments provision is superseded by an insurer's antecedent breach of its

4  coverage obligation"); *Critz v. Farmers Ins. Group*, 230 Cal. App. 2d 788, 801 (1964) ("The

5  requirement of cooperation by the policyholder assumes that the insurer has complied in good

6  faith with the conditions of the policy," including "its obligation of good faith settlement").

7  Here, American Home indisputably breached its obligations and acted in bad faith under

8  California law in at least the following respects:

9  First, despite demand by the Entercom Parties to respond to the Settlement Demand of

10  July 12 before it expired, American Home refused to do so and, instead, responded to the

11  Entercom Parties with the August 17 letter (after the expiration of the Settlement Demand),

12  advising that there was "no occurrence" so as to trigger coverage. However, under California

13  law, when handling a lawsuit pursuant to a reservation of rights "the existence of a coverage

14  dispute, however meritorious the insurer's position, is simply not a proper consideration in

15  deciding whether to accept an offer to settle the claim against the insured." *Archdale v. American*

16  *International Specialty Lines Ins. Co.*, 154 Cal. App. 4th 449, 465 (2007).

17  Second, American Home acted in bad faith in failing to conduct a proper investigation,

18  diligently searching for facts supporting coverage. Good faith requires that "when investigating a

19  claim, an insurance company has a duty to diligently search for evidence which supports its

20  insured's claim. If it [the insurer] seeks to discover only the evidence that defeats the claim it

21  holds its interest above that of the insured." *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App.

22  4th 1617, 1620 (1996); *Egan v. Mutual Omaha Ins. Co.*, 24 Cal. 3d 809, 817 (1979) (an insurer

23  breaches "the obligation of good faith and fair dealing when it fails to properly investigate its

24  insured's claim"). In bad faith, in its August 17 letter, American Home concluded that there was

25  "no occurrence" so as to trigger coverage and so as to require it to respond to the Settlement

26  Demand based solely on its interpretation of only certain allegations in the Complaint, and

27  nothing more.

28  Third, in refusing to take any action on its own to try to settle the *Strange* lawsuit and

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-24-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW

1  instead in contending that there was no "occurrence" so as to trigger coverage, American Home

2  acted in bad faith and failed to give appropriate consideration to the interests of its insureds.

3  *Communale v. Traders General Ins. Co.*, 50 Cal. 2d 654, 659 (1958) ("in deciding whether a

4  claim should be compromised, [the insurer] must take into account the interest of the insured and

5  give it at least as much consideration as it does to its own interest"); *Mariscal v. Old Republic*

6  *Life Ins. Co.*, 42 Cal. App. 4th 1617, 1623 (1996) ("The insurer may not just focus on those facts

7  which justify denial of the claim").

8       Fourth, American Home failed to properly consult with counsel who was defending the

9  Entercom Parties in the *Strange* lawsuit. *Kinder v. Western Pioneer Ins. Co.*, 231 Cal. App. 2d

10  894 (1965) (an insurer has "the duty of consulting qualified persons on the matter of settlement,"

11  including the attorney handling the litigation). Prior to the August 17 letter from American

12  Home's coverage counsel, the author of the letter was unknown to the Entercom Parties, and had

13  never communicated with the Entercom Parties or their counsel. Dash Decl., ¶ 17 [Ex. 1].

14  Moreover, the prior American Home claims representative (Mr. Romeo) had advised that it was

15  not his practice to consult with counsel regarding the reasonableness of settlements. *Id.*, ¶ 12.

16       Accordingly, based on American Home's bad faith conduct, the Entercom Parties

17  respectfully request a declaration that they may take action on their own to try to enter into a

18  reasonable, arms-length settlement without regard to the "no voluntary payment" or

19  "cooperation" provisions in the Excess Policy.

20                          **IV.   CONCLUSION**

21       The Entercom Parties respectfully request that this motion be granted so as to enable them

22  to try to reach a fair and equitable settlement with the Plaintiffs in the *Strange* lawsuit.

23  Dated: February 2(, 2008                    FOLGER LEVIN & KAHN LLP

24

25                                              Douglas W. Sullivan
                                                Attorneys for Plaintiffs ENTERCOM
26                                              SACRAMENTO, LLC, ENTERCOM
                                                COMMUNICATIONS CORP. and
27                                              JOHN GEARY

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-25-

PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF ISSUES WITHOUT
CONTROVERSY; CASE NO. CV 07 6493 JSW