# EXHIBIT 7

Jan. 29. 2007 10:38AM                                      No.3230   P. 3/17

FILED
ENDORSED

07 JAN 25 AM 10: 42

LEGAL PROCESS #6

1  ROGER A. DREYER, ESQ. / SBN: 095462
   **DREYER, BABICH, BUCCOLA & CALLAHAM, LLP**
2  20 Bicentennial Circle
   Sacramento, CA 95826
3  Telephone:  (916) 379-3500
   Facsimile:  (916) 379-3599
4

5  Attorneys for Plaintiffs

6

7

8              SUPERIOR COURT OF CALIFORNIA

9                  COUNTY OF SACRAMENTO

10

11  WILLIAM A. STRANGE, individually,          Case No.: **07AS00377**
    and as Guardian ad Litem for RYLAND
12  STRANGE and JORIE STRANGE, minors;
    RONALD E. SIMS, as Guardian ad Litem
13  for KEEGAN SIMS, a minor,

14          Plaintiffs,                         **COMPLAINT FOR WRONGFUL DEATH**

15  v.

16  ENTERCOM SACRAMENTO, LLC,
    ENTERCOM COMMUNICATIONS,
17  CORP., JOHN GEARY, STEVE WEED,
    ROBIN PECHOTA, LIZ DIAZ, ADAM
18  COX, STEVE MANEY, PATRICIA SWEET,
    MATT CARTER and DOES 1 through 40,
19  inclusive,

20          Defendants.

21  _____

22      Plaintiffs complain against Defendants and allege:

23                  **FIRST CAUSE OF ACTION**

24              **(WRONGFUL DEATH:  NEGLIGENCE)**

25      1.      The true names and capacities, whether individual, corporate, associate or

26  otherwise of Defendants, DOES 1 through 40, are unknown to Plaintiffs, who therefore

27  sue Defendants by such fictitious names, and Plaintiffs will amend this Complaint to show

28  their true names and capacities when the same have been ascertained.   Plaintiffs are

---

-1-

**Complaint for Wrongful Death**

1   informed and believe and thereon allege that each of the Defendants, and DOES 1

2   through 40, are responsible under law in some manner -- negligently, in warranty, strictly,

3   or otherwise, for the events and happenings referred to herein. Said Defendants thereby

4   caused injuries and damages to Plaintiffs as herein alleged.

5       2.    Plaintiffs are now, and at all times herein mentioned were, California

6   citizens and residents. Plaintiffs are the sole surviving heirs of Jennifer Strange, deceased.

7   Plaintiff WILLIAM A. STRANGE is the decedent's surviving spouse. RYLAND STRANGE,

8   JORIE STRANGE, and KEEGAN SIMS are the decedent's only children. Plaintiff RONALD

9   E. SIMS is the natural father of minor Keegan Sims. Defendants ENTERCOM

10   SACRAMENTO, LLC, ENTERCOM COMMUNICATIONS, CORP. and DOES 11 through

11   20 (hereinafter "ENTERCOM") are corporations, limited liability corporations,

12   partnerships, and/or business entities of some other form licensed to do business, and

13   actually doing business, in California. Defendants, JOHN GEARY, STEVE WEED, ROBIN

14   PECHOTA, LIZ DIAZ, and DOES 21 through 30 (hereinafter "MANAGING AGENTS"), at

15   all relevant times were employed by and officers, directors or managing agents of

16   ENTERCOM and DOES 11 through 20. Defendants ADAM COX, STEVE MANEY,

17   PATRICIA SWEET, MATT CARTER, and DOES 1 through 10 (hereinafter, "THE TALENT"),

18   were at all times employees of Defendants ENTERCOM, and DOES 11 through 20, and

19   acting in the course and scope of their employment. THE TALENT are all citizens of the

20   State of California, and reside in Sacramento County. All of the events described herein

21   occurred in Sacramento.

22       3.    ENTERCOM and MANAGING AGENTS at all times owned, operated,

23   managed, marketed and controlled a radio station identified as KDND 107.9 The End,

24   broadcasting in the greater Sacramento area. ENTERCOM and MANAGING AGENTS at

25   all relevant times employed THE TALENT to perform on Defendants' radio program called

26   The Morning Rave, which was broadcast during the hours typically described as "the

27   morning drive." The Morning Rave specialized in playing "Today's Hit Music" combined

28   with juvenile, irreverent comedic routines.

---

Complaint for Wrongful Death

-2-

Jan.29. 2037 10:38AM                                          No.3230   P. 5/17

1    4.    Leading up to January 12, 2007, THE TALENT on The Morning Rave
2   promoted and advertised an on-air radio contest known as "Hold your Wee for a Wii."
3   THE TALENT solicited listeners to apply to participate in this contest.  Defendants, and
4   each of them, created, devised, orchestrated, organized, arranged and publicized each
5   element of this contest, including marketing the contest to various sponsors and
6   advertisers.  Defendants and each of them determined the rules of the contest, the criteria
7   for contest participants, the duration of the contest, and the contest prizes.  Defendants
8   and each of them accepted applications for the contest, and screened and selected the
9   final contestants, including decedent Jennifer Strange.

10    5.    The contestants, including decedent, competed for the right to receive a
11  Nintendo Wii video gaming system that has been in high demand since its release to the
12  public late in 2006.  The decedent ardently wished to win the Nintendo Wii system for
13  her children, and applied for the contest.  The winner of the contest was selected based on
14  which contestant could consume the most water in a three-hour period without urinating.
15  Defendants provided the location and all facilities (including the drinking water) for the
16  contest, which was conducted on-air and in-studio at KDND 107.9 in Sacramento.

17    6.    At no time before the contest did the decedent sign a release of liability
18  contractually relieving any Defendants of their duty of care in organizing and running the
19  contest.

20    7.    At all times, it was foreseeable to Defendants and each of them that the
21  contestants were at risk for serious illness and/or death as the result of consuming
22  extensive amounts of water in a relatively short period of time.  At all relevant times
23  preceding the contest, Defendants were aware that consumption of water to such an
24  extent could result in physical injury or death.  Defendants had specific knowledge of a
25  relatively recent fraternity hazing incident in Northern California as a result of which a
26  young man died from over-consumption of water.  Defendants had specific knowledge of
27  similar contests at other radio stations in California during which contestants required
28  medical attention as a result of their participation.  Defendants were specifically informed

-3-

Complaint for Wrongful Death

1  before and/or during the contest that the contestants were subject to the risk of serious

2  illness and/or death as a result of their participation.

3        8.    Prior to commencement of the contest, Defendants and each of them failed

4  to conduct a reasonable investigation to determine the relative health risks to prospective

5  contest participants.   Defendants negligently failed to consult with appropriate health

6  authorities regarding the relative health risks posed by such an enterprise.   Defendants

7  negligently failed to identify specific health risks or inform contest participants, including

8  decedent, of any such risks. Defendants negligently failed to post any health advisories for

9  contest participants, and failed to take any steps to identify prospective participants who

10  might be at risk of injury.   Defendants negligently failed to secure any medical

11  professional or para-professional services during the contest, even after the contestants

12  begin feeling ill, and similarly failed to require an examination by a competent physician

13  of each contest participant prior to commencement of the contest.   Defendants

14  individually and collectively knew or should have known of the health risks of such a

15  contest, but took no reasonable steps to advise, warn, supervise or otherwise protect

16  contest participants including decedent.

17        9.    The decedent complained of feeling ill while in-studio and before claiming

18  her second place prize on-air.  Defendants negligently failed to provide any assistance,

19  medical or otherwise, to any of the contestants, including decedent.

20        10.    The negligence of Defendants caused the death of Jennifer Strange.  Had the

21  decedent been properly informed of the health risks associated with the contest, she

22  would not have participated.  Had medical professional or para-professional services been

23  provided, the decedent would not have consumed the fatal doses of water, and would

24  have had immediate access to life-saving medical care and treatment as she began to

25  exhibit symptoms consistent with over-consumption of water.

26        11.    Defendants and DOES 31 through 40 otherwise negligently caused or were

27  a substantial factor in causing the death of Jennifer Strange.

28  ///

-4-

Complaint for Wrongful Death

1    12.    As a direct result of Defendants' negligence and the death of Jennifer

2 Strange, Plaintiffs have sustained economic damages consisting of (1) the value of lost

3 financial and other support from the decedent, (2) the value of gifts or benefits that the

4 decedent would have provided, (3) the value of funeral and burial expenses, and (4) the

5 reasonable value of household services that the decedent would have provided.

6    13.    As a direct result of Defendants' negligence, and the death of Jennifer

7 Strange, Plaintiffs have also sustained non-economic damages consisting of loss of the

8 decedent's love, companionship, comfort, care, assistance, protection, affection, society,

9 and moral support.

10    Plaintiffs pray for judgment against Defendants for:

11         a.    Non-economic damages in excess of the minimum jurisdictional

12               requirements of this Court;

13         b.    All funeral, burial and other expenses according to proof;

14         c.    Interest to the extent allowed by law;

15         d.    All loss of the decedent's care and support, according to proof;

16         e.    All costs of suit; and

17         f.    Such other and further relief as this Court may deem just and proper.

18    As a separate second cause of action, Plaintiffs complain against Defendants and

19 allege:

### SECOND CAUSE OF ACTION

### (SURVIVOR'S ACTION: NEGLIGENCE)

22    14.    Plaintiffs incorporate herein by reference all allegations of the first cause of

23 action as though fully set forth.

24    15.    Plaintiff WILLIAM A. STRANGE, as the surviving spouse of Jennifer Strange,

25 is her Successor in Interest for purposes of bringing an action under CCP Section 377.30,

26 et. seq. Plaintiff has and/or will comply with CCP Section 377.32.

27    16.    Prior to her death, Jennifer Strange was required to and did employ

28 physicians and surgeons to examine, treat, and care for her as a result of the injuries and

-5-

Complaint for Wrongful Death

1   illness sustained as a result of participating in Defendants' contest.  Plaintiffs and/or the

2   decedent incurred medical and incidental expenses in connection therewith.  The exact

3   amount of such expense is unknown to Plaintiffs at this time.

4         17.   Plaintiffs are entitled to punitive damages against Defendants and each of

5   them.  By cooperating in the orchestration, direction, promotion and marketing of the

6   contest, THE TALENT, at all relevant times acting in the course and scope of their

7   employment by ENTERCOM, MANAGING AGENTS and DOES 11 through 40, engaged

8   in conduct that evidenced a willful and knowing disregard of decedent's safety, while

9   ignoring the probable dangerous consequences of such a contest and deliberately failing

10   to avoid those consequences, despite THE TALENTS' individual and collective awareness

11   of the risks of such conduct.  Such conduct was despicable and so vile, base or

12   contemptible that it would be looked down upon and despised by reasonable people.

13   Specifically, Defendants and each of them deliberately failed to undertake sufficient

14   research or investigation to be able to recognize the onset of a medical problem relative to

15   the consumption of vast quantities of water, despite their independent and collective

16   knowledge that such consumption could lead to injury and death.  THE TALENT admitted

17   during the broadcast that they should have done more research once various participants,

18   including decedent, began to report medical symptoms.  Despite this admission,

19   Defendants, and each of them, failed to act upon clear reports of medical symptoms from

20   decedent that were consistent with the onset of hyponatremia.  At no time did Defendants

21   advise decedent to seek medical attention.  At no time did Defendants advise decedent to

22   drop out of the contest in response to her symptoms.  Instead of offering to provide

23   medical assistance after decedent reported feeling ill, THE TALENT verbally chastised and

24   otherwise coerced her, exhorting her to remain in the contest by threatening that she

25   would be disqualified if she "puked."  THE TALENT similarly chastised other contest

26   participants, instructing other personnel to make sure that a participant who appeared to

27   be dead had "signed a release," and emphasizing on numerous occasions those

28   contestants who vomited or urinated would be eliminated.

-6-

Complaint for Wrongful Death

1    18.    At all relevant times ENTERCOM, MANAGING AGENTS and DOES 11
2    through 40 were officers, directors or managing agents of said Defendants, empowered to
3    exercise substantial independent authority and judgment in corporate decision capable of
4    determining corporate policy.  In that capacity, ENTERCOM, MANAGING AGENTS and
5    DOES 11 through 40 planned, orchestrated, managed, promoted, controlled, supervised,
6    marketed and authorized the despicable conduct of THE TALENT, and otherwise ratified,
7    adopted or approved that conduct, both before and after it occurred.  Specifically, said
8    Defendants further ratified the following conduct and on-air comments made by THE
9    TALENT on January 12, 2007:

10          a.    it is possible to die from "water poisoning";

11          b.    references to the Chico hazing incident;

12          c.    admissions that THE TALENT should have "researched" water
13                intoxication before conducting the contest;

14          d.    contestants would be "out of the contest" if they vomited, which
15                would occur "if this gets dangerous."

16          e.    when a nurse called in to complain on-air that drinking excess water
17                would result in illness and possible, death, THE TALENT responded
18                "Yeah, we're aware of that," and "Yeah, they signed releases so
19                we're not responsible so it's okay," and "if they get to the point
20                where they have to throw up then they are out of the game before
21                they die so that's good, right?"  THE TALENT then sarcastically
22                thanked the nurse for "looking out for us";

23          f.    joking references to whether anyone was dying in the contestants'
24                room;

25          g.    joking / laughing references to "we've got a guy just about to die,"
26                and that THE TALENT should "make sure he signs a release";

27          h.    joking / sarcastic references to bringing in a stretcher for one of the
28                contestants;

---

Complaint for Wrongful Death

-7-

i.    joking / sarcastic references to insurance in the context of reports that contestants were feeling ill;

j.    mocking references to the decedent's distended abdomen from excess water consumption, making her look pregnant, which THE TALENT declared was amusing;

k.    sardonic expressions of mock sympathy with the decedent, when she complained on-air that she was feeling ill;

l.    comments to the decedent that "This is what it feels like when you're drowning"; and

m.    mocking comments to decedent to "get you out of your misery" by offering her a second prize of tickets to a Justin Timberlake concert.

Plaintiffs pray for judgment against Defendants for:

a.    All past medical expenses incurred by the decedent, according to proof;

b.    Punitive damages, according to proof;

c.    Any and all other damages and/or penalties that the decedent would have been able to recover from Defendants, had she lived;

d.    All prejudgment interest;

e.    Costs of suit incurred herein; and

f.    Such other and further relief as the Court may deem just and proper.

As a separate third cause of action, Plaintiffs complain against Defendants and allege:

## THIRD CAUSE OF ACTION

## (WRONGFUL DEATH: INTENTIONAL / RECKLESS CONDUCT)

19.    Plaintiffs incorporate herein by reference all allegations of the first and second causes of action as though fully set forth.

///

///

-8-

Complaint for Wrongful Death

20.    Alternatively, if it is determined that Defendants had no legal duty of care to the decedent, Defendants acted recklessly and/or intentionally in causing the death of Jennifer Strange, based on the facts alleged herein above.

Plaintiffs pray for judgment against Defendants for:

    a.    Non-economic damages in excess of the minimum jurisdictional requirements of this Court;

    b.    All funeral, burial and other expenses according to proof;

    c.    Interest to the extent allowed by law;

    d.    All loss of the decedent's care and support, according to proof;

    e.    All costs of suit; and

    f.    Such other and further relief as this Court may deem just and proper.

As a separate fourth cause of action, Plaintiffs complain against Defendants and allege:

## FOURTH CAUSE OF ACTION

## (SURVIVOR'S ACTION: INTENTIONAL / RECKLESS COMNDUCT)

21.    Plaintiffs incorporate herein by reference all allegations of the first, second, and third causes of action as though fully set forth.

Plaintiffs pray for judgment against Defendants for:

    a.    All past medical expenses incurred by the decedent, according to proof;

    b.    Punitive damages, according to proof;

    c.    Any and all other damages and/or penalties that the decedent would have been able to recover from Defendants, had she lived;

    d.    All prejudgment interest;

///

///

///

///

-9-

Complaint for Wrongful Death

1          e.      Costs of suit incurred herein; and

2          f.      Such other and further relief as the Court may deem just and proper.

3    DATED:   1-25-07                        DREYER, BABICH, BUCCOLA & CALLAHAM, LLP

4

5                                            By:

6                                                 ROGER A. DREYER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-10-

Complaint for Wrongful Death

# EXHIBIT 8

WITNESS M H S F
EXHIBIT NO. 30
DATE 9-6-07
MAUREEN A. COURNOYER

**From:** Carmela Masi [cmasi@entercom.com]
**Sent:** Thursday, August 31, 2006 9:20 AM
**To:** Jim Rising; Joseph Level; Brad Carson; Tias Schuster; Andrews Harris; Chase Murphy; Lizann Hunt; Amy Caplan; Andrea Cappelletti; Alicia Cleese; Allan Davis; Amy Dillon; Andrea Glinski; Amy Griesheimer-Mandeau; Andy Holt; Alan Kirshbom; Anne Leadford; Ann Marie Mulholland; Adam Ralston; Andre Riley; Andy Roth; Arthur Volpe; Bill Alfano; Beth Anthony; Bob Boyd; Bruce Cherry; Brian Douglas; Bob Edwards; Brad Horning; Brian Johnston; Brian Kelly; Ben Kulis; Brian Lee; Bobby Martinez; Barry McKay; Brent Millar; Butch Mitchell; Drop Box - GM List; Bill Pasha; Beau Raines; Barry Smith; Cathy Cangiano; Curtiss Johnson; Claire Jordan; Chris Moline; Charlsie Moore; Carlson Mozdlez; Christine Neenan; Clark Ryan; Cindy Schloss; Cory Van Pelt; Charlie Weiss; Chris Wilson; Darlene Adams; John Compton; Dustin Boehm; Danielle D'Aconti; Dave Dexter; Dave Dillon; Debra Jones; Dennis Glasgow; Dick O'Neil; David Lichtman; Don London; Dick Loughney; Darryl Miner; Diane Newman; Dan Oshea; Dana Panepinto; Divina Meyer; Danyelle Peiffer; Dan Persigehl; Della Pizzati; Dan Prendiville; Dave Pridemore; Donald St. Sauveur; Dave Symonds; Don Tomasulo; Deanna Wukovits; Doug Zanger; Erin Casey; Erin Hubert; Ethan Kelly; Fred Hormell; Fletcher Keyes; Greg Carpenter; Greg Ried; Greg Spencer; Gillian Trimboli; Greg Williams; Hope Angelone; Helen Centanni; Hank Dole; Heather Rainey; Iris Karasick; Janna Harrington; Jeff Brown; John Burkavage; Jerome La Chance; Jimmy Clarke; Judy Combs; Jerry Dean; Joe DeAngelis; Jim Donohue; Jerry McKenna; Jessica Farias; James Fitzgerald; Jamie Foehner; Jim Fox; John Geary; Jane Graber; Jackie Guenther; Jeffrey Havis; John Henis; Jim Scott; Jack Hutchison; Jeff Jeanpierre; JJ Morgan; Julie Kahn; John Karpinski; Joby Koren; Jill Kowalski; Jerome La Chance; Jeff White; Jeff McHugh; Jim Morales; Jennifer Morton; John Nelson; Joe Nicholson; Jack Oliver; Jamie Olsen; Jim Robinson; Jim Rushton; Jeff Silver; Jon Spinder; Joey Stokes; Jennifer Wisbey; Jackie Wise; Ken Beck; Kevin Klein; Kyle Dachsel; Kati Daniels; Kevin Johnson; Kelli Gowan; Kevin Scales; Karin Shipley; Kelly Sulton-Hargraves; Kent Van Arnam; Keevin Wagner; Kristin Kelleher-Wong; Lazlo; Lisa Crider; Lindi Glasgow; Lee Hansen; Liz Kay; Lisa Mettlen; Lisa Powell; Larry Robb; Linda Smith; Mike Bongiovanni; Mark Boudreaux; Michael Bryan; Marcy Caldwell; Melissa Capuano; Michelle Cody; Megan Cole; Mike Donovan; Michael Doyle; Melissa Forrest; Michael G. Davis; Mark Hamilton; Mark Hamlin; Mark Hendrix; Michelle Green; Michael Ignatz; Mike Johnson; Mark Jorgensen; Mike Kaplan; Michael Keck; Mark Leopold; Michael McKeel; Marijane Milton; Mike Moore; Mike Morgan; Mike Nelson; Malcolm Pelham; Maureen Pulicella; Mike Rockwell; Mark Yearout; Natalie DiPietro; Neil Larrimore; Paul Cooper; Pat Gallagher; Pat Galloway; Phil Hoover; Paul Meade; Patrick Neas; Pat Paxton; Randall Bliss; Rick Crandall; Rich Deutsch; Ryan Flynn; Roxanne Marati; Robin Pechota; Ray Quinn; Ron Raybourne; Ray Schey; Ron Steinman; Shel Bailey; Sharon Day; Sean Dyer; Steve Forsyth; Steve Fortunato; Steve Hartley; Sam Hicks; Steve Jonsen; Scott Maenner; Scott Mahalick; Sara McClure; Sue Munn; Sue O'Neil; Stefanie Porolniczak; Sara Reifschneider; Scott Rogers; Stefan Rosenberg; Shannon Rovak; Steve Sandman; Skip Schmidt; Stephanie Starr; Scott Tom; Steve Weed; Tom Clendening; Terri Couch; Tami Davenport; Tony Duesing; Traci Gregory; Tim Holly; T J Hart; Thom McGinty; Toni Williams; Tim Thompson; Tom Watson; Tim Wenger; Vince Tortorich; Wendy Duhon; Wes Matejka; Wayne Partello; Wayne Walker; Doc Medek; Tony Bartocci; Dave Richards; Jennifer Orr; Shawn Stewart; Greg Bergen; Billy Kidd; Joe Harrington; Jason Wolfe; Nancy Kman; Shilynne Cole; Scott Sands
**Cc:** Anna Kordan; Andrew Sutor; Jack Donlevie; Michael Dash; Mike Milsom
**Subject:** IMPORTANT REMINDER ABOUT CONTEST RULES

**Attachments:** EntercomContestGuidelines 7-05.pdf; Header

  

EntercomContestGu   Header (11 KB)
idelines 7-05...

        This is a reminder that under FCC rules, all listener contests
(including sales-contests) require official contest rules and on-air rules prior to the
start of any promotion of that contest.  Entercom's contest guidelines are attached below
for your reference.

With the exception of simple contests, contest rules must be submitted for review by your Entercom Legal representative. This is especially true for any unusual or complicated mode of entry, winning or any large prize (valued at more than $10,000). A simple contest is one in which the form of rules have been approved before by Entercom Legal, that fall under the Station's generic contest rules (used only for simple one-off call-in, on-site or on-line simple random selection contests...9th caller for a stereo system or concert tickets, entry to win CD at a station event, on-line entry to randomly select one winner of a TV, etc...) and that do not include any unusual mode of entry/winning or large prize. When in doubt as to whether a giveaway fits into your generic contest rules, check with your Entercom Legal representative.

Contest rules should be submitted to Entercom Legal 1-2 weeks before you start promoting the contest. PLEASE NOTE THAT CONTEST RULES FOR CONTESTS TO BE CONDUCTED IN NEW YORK STATE MUST BE SUBMITTED 6 WEEKS IN ADVANCE FOR ANY CONTEST IN WHICH THE AGGREGATE VALUE OF ALL PRIZE COMBINED IS $5,000 OR MORE (in order to get the bond and file 30 days in advance with the state as required) AND CONTESTS IN RHODE ISLAND THAT INVOLVE RETAILERS MUST BE SUBMITTED AT LEAST 3 WEEK IN ADVANCE (in order to file with the state). Failure to do so could result in a mandatory delay in the start of your contest.

To facilitate prompt review of rules by Entercom Legal, you must make sure that the rules are in the proper form and are complete before submitting them for review. Otherwise, you will lose time by having to redraft and resubmit them to us. We have hundreds of approved contest rules on-air and can always provide you with a "starting point" by providing approved rules from a similar contest conducted by another market - just email your Legal Representative with a request for sample rules by explaining how people enter, how they win and what the prize will be.

Requests made to the Entercom Legal Department to review last-minute contest rules may be escalated to the Market Manager and sometimes the Regional Vice President. IN NO EVENT SHOULD ANY CONTEST BE PROMOTED ON-AIR UNTIL THE CONTEST RULES ARE APPROVED BY LEGAL, POSTED ON-LINE, AVAILABLE AT YOUR FRONT DESK, AND YOUR ON-AIR RULES ARE RUNNING AT LEAST 1X PER DAY PER CONTEST. Failure to do so could result in significant FCC fines and legal fees that will be charged against your station's P&L - easily at least $20,000 and sometimes as high as $50,000. All it takes is one on-line complaint to the FCC about your contest and EVERYTHING you have done wrong in connection with that contest could be subject to a fine by the FCC. For example, a listener complains that they think they should have won a prize and even if the Station is right, you will be fined for failing to have proper rules disclosures and/or failing to run on-air rules.

Let us know if you have any questions. Thanks.


- Carmela Masi
  Associate Counsel
  Entercom
  20 Guest Street
  Boston, Massachusetts 02135
  Phone:  617-779-3508
  Fax:  617-779-5449
  Email:  cmasi@entercom.com


This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

## ENTERCOM COMMUNICATIONS CORP.

### GENERAL CONTEST GUIDELINES

**I.  FCC DISCLOSURE REQUIREMENTS**

The FCC requires that a station that broadcasts a station sponsored contest <u>on-the-air</u> *must* fully and accurately disclose the "material terms" of the contest on-air.  No contest description may be false, misleading or deceptive with respect to any "material term."  The FCC also requires that the Station then conduct the contest in accordance with the rules that have been broadcast on-air.

<u>NOTE</u>:  This means that if the Station's written rules differ in any material way from the rules that are actually read on-air, the on-air rules control for FCC purposes. If a contest is promoted and/or broadcast on-air, it is NOT sufficient to merely make written rules available to the public.  **For any station sponsored contest that is promoted on the air, the FCC requires that all material terms (essentially complete contest rules) be read on-air.  Contest rules should be aired once a day, seven days a week, in rotating day parts.  Posting the rules on the Station's website, <u>while it should be done</u>, does not satisfy the FCC on-air requirement.**

**The rule of thumb regarding when contest-specific rules are required is that you produce a promo specifically to promote a particular contest, you need to draft, post and air contest rules specific to that contest.  The Station's generic contest rules will not suffice.**

**II.  MATERIAL TERMS**

As noted above, the material terms of the contest must be disclosed on-air.

Material terms include:

(a)  how to enter the contest;
(b)  where to enter the contest;
(c)  eligibility restrictions (*e.g.*, who can enter; who cannot enter and win);
(d)  no purchase is necessary to enter or win;
(e)  the dates the contest begins and ends;
(f)  the date that entries must be received by;
(g)  a description of the prize(s);
(h)  the value of the prize(s) (*e.g.*, MSRP, Retail Price, etc.);
(i)  the number of prize(s) to be given away;
(j)  when and how prize(s) can and will be won;
(k)  time, date, and means of selection of winner(s); and
(l)  tie-breaking procedures.

**III.  CONTEST LIMITATIONS**

1

EC0001070

Contests which are illegal, dangerous, misleading, rigged or in bad taste must be avoided. Examples of such unacceptable contests would be any contest that: (a) encourages someone to break the law (*e.g.*, stealing, breaking and entering, trespassing, exposing themselves in public, etc.); (b) encourages people to act in an unreasonably dangerous manner or place themselves or others in extreme danger (*e.g.*, offering a prize to the first person who successfully goes over Niagara Falls in a barrel) (c) misrepresents the terms of the contest or overstates the amount that can be won; (d) broadcasts contest information where the outcome of the contest has been predetermined; or (e) would reflect poorly on the morals or ethics of the stations and the company.

**NOTE:** Contests that require anyone entering to either make a purchase or contribute something of value in order to enter should be avoided. *Such contests are generally deemed to be lotteries and are NOT legal in most states. If there are any questions as to whether a particular contest is an illegal lottery, you should consult with the Legal Department.*

## IV.  MEANS OF DISCLOSURE

The material terms of the contest must be disclosed <u>both</u> in writing and by on-air announcements. It is also recommended that contest rules be available for pick up from the Station and that the rules be posted on the Station's website

### A.  WRITTEN CONTEST RULES

Contest terms and conditions must be disclosed in written contest rules. Written contest rules should be made available at the Station to all members of the public. The hours that contest rules may be picked up at the Station, along with the Station's street address, should also be included. (<u>See</u> attached sample of General Rules.) Written rules should also be posted on the Station website where available.

### B.  ON-AIR ANNOUNCEMENT OF CONTEST RULES

The obligation to broadcast the material terms of a contest on-air arises once the contest is promoted on-air and/or potential contestants are asked to participate on-air in the contest. A station must broadcast the material terms of a contest (including instructions as to how one can obtain a complete set of the written rules) at least <u>once</u> each day while the contest is being promoted or conducted. The Station should adopt a strategy in which the full contest rules are broadcast once a day, seven days a week in rotating day parts to ensure that the morning, afternoon and evening audiences all become familiar with the rules.

For simple call-in contests, of which the Station may be running several at one time, it is sufficient to air a promotion or announcement explaining the prize and how to win and then simply add at the end of the promotion or announcement that: "The Station's General Contest

EC0001071

Rules apply." The Station should air its general contest rules at least once a day in varying day parts.

For more complex contests or contests/promotions that deviate in any significant way from the general contest rules, the Station should air the full contest rules (in an abbreviated form) once a day *in addition* to the Station's airing of its general contest rules.

### C. OTHER PROMOTION

If a station promotes a contest other than on its own on-air (*e.g.*, print) the material terms of the contest must also be included in such advertising.

NOTE: For contests that are <u>not</u> promoted or conducted on-air, the Station is not required to broadcast the contest rules on-air. For example, if a contest is exclusively conducted through the Station's website and the contest is not promoted on-air, then the Station is not required to broadcast on-air the contest rules. Written contest rules, however, should always be drafted and should be made available to the public at the Station and on the website.

### D. SALES PROMOTIONS/CONTEST

There often appears to be a misconception that contests conducted by the sales department for their clients are not subject to these guidelines. THAT IS NOT THE CASE. If a station is involved in administering the contest (drawing winners, collecting entries, promoting the contest, etc...), all of these Guidelines apply. The only exception is that if we have NO involvement in contest administration whatsoever (other than providing prizes) and the contest is promoted ONLY in paid commercial advertising, then we are not required to comply with the policies outlined in these Guidelines.

## V. PRIZE LIMITATIONS

Prizes which are illegal or which can be unusually hazardous or dangerous should not be awarded. For example, free sky-diving lessons or similar unusually hazardous prizes should be avoided.

*Any prize that a sponsor has agreed to provide and/or give to the Station should be confirmed by the Station in writing.* Have the sponsor counter-sign a confirmation letter indicating their agreement to provide and/or give the prize to the Station. In the confirmation letter, it is important to describe the prize in as much detail as possible so that there is no dispute as to what the sponsor promised to provide versus what the sponsor later delivers. (It is important to confirm in writing that the sponsor has agreed to provide the prize because if the sponsor fails to do so, the Station <u>must</u> purchase the prize to give away and then try to enforce its contractual right against the sponsor based upon the written confirmation letter.) Also, the letter should provide for who pays any taxes relating to the award of any prize and who is responsible for IRS 1099 notification to winner.

3

EC0001072

## VI.　PRIZE WINNER RELEASES

Each contest winner of a prize worth over $25.00 <u>must</u> sign a release form.　(<u>See</u> attached sample.) The Winner's Release gives the parties the right to use the contest winner's voice, name, likeness, and biographical information for advertising and promotional purposes.　It also releases the Station from liability in connection with the winner's receipt and use of the prize(s). Additionally, a social security number must be provided to the Station or the winner may not collect the prize.

Please note that if the contest winner is a minor (under 18 years of age), then the release <u>must</u> also be signed by the minor's parent or guardian.

## VII.　STATION CONTEST FILES

Stations must maintain a file for <u>each</u> contest that contains all the following materials: (a) the contest rules (including a print-out from the website); (b) the signed contest winner's release; (c) any letters of complaint; (d) copies of all material that has been broadcast with respect to the contest; (e) all advertising, promotion and publicity material; and (f) a record specifying the days and times that contest rules were broadcast.

## VIII.　FCC TAPING/RECORDING REQUIREMENTS

### A.　When a listener calls the station on a hotline or call-in line

When a listener calls the Station on a hot-line or on a call-in line to win a contest, answer a question, etc., it is presumed that the listener is aware that (a) the call is being taped or that it is very likely that the call is being recorded and (b) it may be broadcast on-air.　Therefore, the Station does <u>not</u> need to give listeners calling into the Station any notice that the call may be taped or broadcast.　Stations should periodically announce that callers to the call-in telephone number may be put on the air.

### B.　When the Station calls a listener or any member of the public

When the Station calls a listener or any member of the public to broadcast or record the telephone call (even in response to a contest entry sent into the Station by the listener), the FCC requires that the Station give the person being called "notice" that the telephone call will be broadcast or recorded for broadcast. The person calling from the Station should first identify that he/she is calling from a radio station and then inform the person that the phone call will be recorded for broadcast.　It is at this point -- *after giving notice that the call will be recorded* – that the Station may *begin* recording the call.　The Station may NOT record prior to this point.　Once the Station begins recording, the Station should simply repeat and confirm that the person being called has been given notice that the caller is from a radio station and that the call is being recorded.　**The Station may NOT <u>record</u> "blind" calls in which the recipient's consent to**

4

EC0001073

**record or tape the telephone call is later obtained. This does not comply with the FCC's rules! "After-the-fact" consent or notice is NOT sufficient.**

Use of a delay mechanism is not sufficient to avoid violating FCC rule, <u>unless</u> (a) the caller is told in explicit language during the delay interval that this is a radio station calling and unless they hang up now, they will be broadcast on the air and (b) then allow sufficient time for the person to hang up. Less explicit messages have resulted in fines by the FCC.

**Additionally, the FCC requires that you also give notice before recording and broadcasting anyone's answering machine message.** In reality, this means that the Station cannot record or broadcast an answering machine message until <u>after</u> a person at that number actually answers the phone so that he/she can be put on notice of recording. (It is <u>not</u> sufficient for the Station to merely leave a message on the answering machine that the message is or was recorded.)

At some point during the telephone call, the Station should obtain consent from the person who was called to broadcast the recording of the telephone call on-air. If the person being called refuses to consent or expressly states that they do not want the call broadcast on air, it is Entercom's policy NOT to air the call. Although the FCC does not require "consent" to air the call -- it is company policy to obtain this consent, unless extraordinary circumstances exist <u>and</u> PRIOR management approval is obtained.

IX.    **SAMPLE CONTEST RULES**

Attached for your reference and use are samples of the following:

A.    General Contest Rules

B.    Template for Specific Contest Rules (including attachments with sample drop-in language for "How to Enter", "How to Win" and "Prizes" sections.

C.    Rules for Call-in Contests

C.    Winner's Release

5

EC0001074

**CERTIFIED COPY**

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SACRAMENTO

WILLIAM A. STRANGE, Individually,
and as Guardian ad Litem for RYLAND STRANGE
and JORIE STRANGE, minors; RONALD E. SIMS,
Guardian ad Litem for KEEGAN SIMS, a minor

       Plaintiffs,

       VS                       CASE NUMBER:
                                07-AS-00377

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED, ROBIN PECHOTA,
LIZ DIAZ, ADAM COX, STEVE MANEY,
PATRICIA SWEET, MATT CARTER and
DOES 1 through 40, Inclusive.

       Defendants.

VIDEOTAPED DEPOSITION OF

CARMELA MASI

September 6, 2007
9:41 a.m.

Jack Daniel Court Reporting and Video Services, Inc.
100 Franklin Street
Boston, Massachusetts 02110

Maureen A. Cournoyer, Notary Public and Professional Shorthand Reporter
within and for the Commonwealth of Massachusetts and the State of Rhode
Island.

PAULSON

Carmela Masi                                        September 6, 2007

345

1          MR. GIBSON:  Andrew Gibson

2      for Patricia Sweet.  I, too, go along with

3      cocounsel and reserve all my rights with

4      regard to this deposition and returning

5      for questioning.

6          MR. THOMAS:  I'd like to

7      say it was nice to meet you.  Didn't get

8      much of a chance.

9          THE DEPONENT:  Nice to meet

10     you.

11         (Reporter interruption).

12         MR. SULLIVAN:  No, we stay

13     on.  Stay on.

14         (Reporter interruption).

15     EXAMINATION

16     BY-MR.SULLIVAN:

17     Q.   Ms. Masi, I'd just like to ask you

18     a few follow-up questions.

19         You have before you Exhibit 30?

20     A.   (Deponent viewing document).  Yes.

21     Q.   Okay.  This is an e-mail that you

22     sent to a variety of people at Entercom.

23     A.   (Deponent viewing document).  Yes.

24     Q.   And it's dated what?



Carmela Masi                                        September 6, 2007

346

1        A.    (Deponent viewing document).

2    August 31st, 2006.

3        Q.    So approximately four --

4    four-and-a-half months before the contest,

5    "Hold Your Wee for a Wii"?

6        A.    Yes.

7        Q.    Now, did you send this to Robin

8    Pechota Ray?

9        A.    (Deponent viewing document).   Yes.

10       Q.    You see her name listed, correct?

11       A.    (Deponent viewing document).   I do.

12       Q.    And did you send -- Let me back

13   up.

14             And Ms. Robin Pechota Ray, she was

15   the promotions director for The End at

16   Entercom Sacramento.

17       A.    Yes.

18       Q.    Did you send it to Steve Weed?

19       A.    (Deponent viewing document).   Yes.

20   And his name's here as well.

21       Q.    Okay.  And Mr. Weed was the

22   promotions director?

23       A.    Program director, but I believe his

24   title was station manager.

Carmela Masi

347

1    Q.    Okay.   I -- I misspoke.   Program

2    director and station manager.

3    A.    Yes.

4    Q.    Okay.   And can you just quickly

5    tell me what's the difference between a

6    program director and a promotions director?

7    A.    A program director is responsible

8    for the on-air content of the -- the

9    program non-advertising content of the

10   station and -- and is the direct

11   supervisor to, for example, disc jockeys

12   and on-air talent.

13        Promotion director is responsible

14   for different types of contests and

15   marketing of the radio station, station

16   events and sometimes has people who report

17   to him or her for doing, you know, station

18   promotional appearances and things like

19   that.

20   Q.    Okay.   All right.   Now, it says

21   that there's an attachment to Exhibit 30.

22   Do you see that?

23   A.    (Deponent viewing document).   Yes.

24   Q.    And is the attachment actually part



Carmela Masi                                    September 6, 2007

348

1      of Exhibit 30?

2          A.    (Deponent viewing document).   Yes,

3      it is.

4          Q.    Okay.  And what is the title of

5      the attachment?

6          A.    (Deponent viewing document).

7      "Entercom Communications Corp., General

8      Contest Guidelines."

9          Q.    Okay.  Now, did you actually --

10     Strike that.

11             Let's -- Let's look at the last

12     sentence on the first page.  Can you read

13     that?

14         A.    (Deponent viewing document).   "The

15     rule of thumb regarding when contests" --

16         Q.    On the -- Excuse me.  On the first

17     page of this e-mail.

18         A.    (Deponent viewing document).   What

19     did you ask me?

20         Q.    Could you read the last sentence on

21     the first page?

22         A.    (Deponent viewing document).

23     "Entercom's contest guidelines are attached

24     below for your reference."



Carmela Masi                                        September 6, 2007

349

1    Q.    Okay.  And did you provide that not

2    only to Ms. Pechota Ray as the promotions

3    director of The End, but also other

4    promotions directors?

5    A.    I did.

6    Q.    Okay.  Let's turn to the next page.

7    Can you read the first sentence?

8    A.    (Deponent viewing document).  "With

9    the exception of simple contests, contest

10   rules must be submitted for review by your

11   Entercom legal representative."

12   Q.    Okay.  So you were advising the

13   promotions directors and the program

14   directors that, except for simple contests,

15   contest rules had to be submitted to the

16   legal department.

17   A.    Yes.  That's correct.

18   Q.    Okay.  Now, in the next sentence,

19   do you describe what a simple contest is?

20   A.    (Deponent viewing document).  Two

21   sentences later.

22   Q.    Okay.  Can you read how you

23   describe the simple contest?

24   A.    (Deponent viewing document).  "A



Carmela Masi                                          September 6, 2007

368

COMMONWEALTH OF MASSACHUSETTS

1

2

3        I, Maureen A. Cournoyer, a Shorthand

4    Reporter and Notary Public in and for the

5    Commonwealth of Massachusetts, do hereby

6    certify that the witness whose deposition

7    is hereinbefore set forth, was duly sworn

8    and that such deposition is a true record

9    of the testimony given by the witness.

10       I further certify that I am neither

11    related to or employed by any of the

12    parties in or counsel to this action, nor

13    am I financially interested in the outcome

14    of this action.

15       In witness whereof, I have hereunto set

16    my hand and seal this 18THday of September

17    2007.

18

19

20

21    /s/ Maureen A. Cournoyer

22    Maureen A. Cournoyer

23    Notary Public

24    My commission expires March 31, 2011

# EXHIBIT 9



© 2006 Entercom Communications Corp. All rights reserved.

EXHIBIT

EC0000626



Entercom Communications Corp.

# CONTEST SEMINAR PRESENTATION

EC0000627

# I. FCC DISCLOSURE REQUIREMENTS

- FCC requires that for a station sponsored contest all "material terms" of the contest be broadcast on-air.

- No contest description may be false, misleading or deceptive with respect to any "material term."

- If a contest is promoted and/or broadcast on-air, it is NOT sufficient to merely make written rules available to the public. The rules must be read on-air.

EC0000628

- Contest rules should be aired once a day, seven days a week, in rotating day parts.

- The written contest rules do NOT need to read verbatim on-air; they can be shortened so long as all material elements are covered.

- The contest must be conducted in accordance with the rules as they have been broadcast on-air. EVEN IF THE RULES STATE THAT THE CONTEST CAN BE CHANGED OR STOPPED – YOU CAN NOT DO SO UNDER FCC RULES.

NOTE: If the Station's written rules differ in any material way from the rules broadcast on-air, the on-air rules control for FCC purposes.

EC0000629

# II. MATERIAL TERMS

Material terms of the contest must be disclosed on-air, including:

(a)   how and where to enter;

(b)   eligibility restrictions (*e.g.*, who can and cannot enter and win);

(c)   no purchase is necessary to enter or win;

(d)   dates the contest begins and ends;

(e)   other key dates (e.g., date entries must be received by);

(f)   a description of the prize(s), including value of the prize(s);

(g)   when and how prize(s) can and will be won;

(h)   time, date, and means of selection of winner(s); and

(i)   tie-breaking procedures.

# III. CONTEST LIMITATIONS



- Contests which are illegal, dangerous, misleading, rigged or in bad taste must be avoided.

- <u>Examples of UNACCEPTABLE contests:</u>

(a)  Contests that encourage someone to break the law (*e.g.*, stealing, breaking and entering, trespassing, exposing themselves or having sex! in public, etc.);

EC0000631

(b)  Contests that encourage people to act in an unreasonably dangerous manner or place themselves or others in extreme danger (*e.g.*, offering a prize to the first person who survives goes over Niagara Falls in a barrel, first person to successfully run across six lanes of traffic, etc.);

(c)  Contests that misrepresents the terms of the contest or overstate the amount that can be won;

(d)  Contests where the outcome has been predetermined; or

(e)  Contests that reflect poorly on the morals or ethics of the station and the Company.



EC0000632



Contests that require anyone entering to either make a purchase or contribute something of value (e.g., time) to enter should be avoided. Such contests are generally deemed to be lotteries and are NOT legal in most states.

- *A lottery consists of three elements:*

  (1) *prize;*

  (2) *chance; and*

  (3) *consideration.*



(Do NOT assume because money is going to a charity, it is legal.)

EG0000633



# IV.  CONTEST RULES

## A.  WRITTEN CONTEST RULES

- Written rules should be drafted for <u>all</u> contests other than simple "call in to win" contests.

- The material terms of the contest must be disclosed <u>both in writing and by on-air announcements.</u>

- Written contest rules should be made available at the Station to all members of the public and should also be posted on the Station's website.

EC0000634





## B. REVIEW BY LEGAL (YEA!!)

Written rules should be reviewed by your primary legal contact for the following:

(a) ANY contest where the prize is valued at $1,000 or more <u>and</u> where the contest involves <u>more than simple</u> "call-in" in to win;

(b) ANY contest (even simple call-in contests) where the prize is valued at $5,000 or more;

(c) any prize that is unique, one-of-a-kind;

(d) any contest that is complex in its structure, mode of entry, manner of selecting winner, etc.; and

(e) <u>any HIGH RISK, dangerous or borderline-acceptable contest.</u>

# Turn-Around Time

- Rules should be submitted to the Legal Department in a form that you reasonably believe they are complete and ready for posting/air at least two weeks in advance (more for very complicated contests). 6 weeks for NYS and 3 weeks for RI retail contests.

- **In no event** should any contest be promoted until AFTER the official contest rules are complete, posted and ready to air.

EC0000636

# C. ON-AIR ANNOUNCEMENT OF CONTEST RULES



- Station must start to broadcast the material terms once the contest is promoted on-air and/or potential contestants are asked to participate in the contest.

- If contest is promoted on-air, you need to broadcast contest rules, even if it is a web-based contest.

- Contest rules must be aired at least once each day while the contest is being promoted or conducted.

EC0000637

- For simple call-in contests (which the Station may be running several at one time), it is sufficient to air a promotion detailing the prize and how to win and then simply add at the end of the promotion that: "The Station's General Contest Rules apply."

The Station should air its General Contest Rules at least once a day in varying day parts <u>AND</u> also air contest specific rules once a day in varying day parts as well.

- If the Station broadcasts contest promos, the full contest rules do <u>not</u> need to be read each time the contest is promoted. The full contest rules need only air once a day.

- Station may air brief promotions for the contest and simply add: "Listen to this Station for complete rules or go to our website at www. _____."



## D. SALES PROMOTIONS/CONTEST

- There often appears to be a misconception that contests conducted by the sales department for their clients are not subject to these guidelines.   This is not true.

- ALL CONTESTS RUN BY THE STATION MUST MEET THESE GUIDELINES if the station is involved in administering the contest in any way (drawing winners, collecting entries, promoting the contest, etc.).

- If sales puts together a contest that the promotions department thinks it may be problematic, please CALL OR EMAIL YOUR PRIMARY LEGAL CONTACT.  We are here to help and will be happy to intervene.

  The earlier you call us …. the better!



EC0000630

# V. PRIZES

- Prizes that should **not** be awarded are:

  (1) prizes that are illegal; or

  (2) which are unusually hazardous or dangerous, such as sky-diving or hang gliding lessons; hot air balloon rides, swim with the sharks trips, or similar unusually hazardous prizes.

- *Any prize that a sponsor or client has agreed to provide to the Station should be confirmed by the Station in writing!! DO NOT ACCEPT A HANDSHAKE OR ORAL AGREEMENT.*



- It is important to confirm in writing that the sponsor has agreed to provide the prize because if the sponsor fails to do so, the Station must purchase the prize to give away.

The letter from the Sponsor/Client should include and specify:

(1) sponsor's agreement to provide and/or give the prize to the Station;

(2) details describe the prize in as much detail as possible so that there is no dispute as to what the sponsor promised to provide (e.g., for a car include the VIN #, model, make, year, color, and mileage, etc.);

(3) who is responsible for issuing an IRS 1099 notification to winner;

(4) when prize can be picked up by winner; and

(5) agreement that prize will only be awarded to winner as identified by the station in writing.

EC0000641

# VI. RELEASES

- Each contest winner who receives a prize worth over $100.00 must sign a release form.

- In any contest or promotional event where contestants are physically on-site to participate, it is recommended to have every participant sign a release.

- Releases are required to use contestants' photographs.

- The Winner's Release:

  (1) gives us the right to use the contest winner's voice, name, likeness, and biographical information for advertising and promotional purposes; and



The Winner's Release *(continued)*

(2) releases the Station from liability in connection with the winner's participation and receipt and use of the prize(s).



- A social security number must be provided on release or the winner may not collect the prize.





- If contest winner is a minor (under 18 years of age), then the release <u>must</u> be signed by the minor's parent or guardian.

EC0000643

# VII.  STATION CONTEST FILES

Stations must maintain the following materials for <u>each</u> contest for a <u>4-year period</u>:



(a)    A copy of the contest rules (including a print-out from the website);

(b)    the signed contest Winner's Release;

(c)    any letters of complaint;

(d)    copies of all material broadcast on-air and a record specifying the dates and times that complete contest rules were broadcast;

(e)    all advertising, promotion and publicity material; and

(f)    all contest entries must be kept for 6 months from the completion of the contest.

# VIII. SAMPLES

- The following are available from corporate:

    A.  General Contest Guidelines

    B.  Sample General Contest Rules; and

    C.  Standard Winner's Release.

FC0000645

A.  Sample starting point rules for Specific Contest Rules (which vary by contest) – just email your legal contact how to enter, how to win and the prize.

B.  Troubleshooting list of key issues to address in the rules – depending on contest structure and/or prize

(e.g., for a car lease… need to address insurance, make prize subject to terms and conditions of dealer's lease agreement, what if winner cannot qualify under credit terms of leasing company, etc.)

EC0000646





EC0000647

**CERTIFIED COPY**

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SACRAMENTO

WILLIAM A. STRANGE, Individually,
and as Guardian ad Litem for RYLAND STRANGE
and JORIE STRANGE, minors; RONALD E. SIMS,
Guardian ad Litem for KEEGAN SIMS, a minor

       Plaintiffs,

    VS

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED, ROBIN PECHOTA,
LIZ DIAZ, ADAM COX, STEVE MANEY,
PATRICIA SWEET, MATT CARTER and
DOES 1 through 40, Inclusive.

      Defendants.

CASE NUMBER:
07-AS-00377

VIDEOTAPED DEPOSITION OF

CARMELA MASI

September 6, 2007
9:41 a.m.

Jack Daniel Court Reporting and Video Services, Inc.
100 Franklin Street
Boston, Massachusetts 02110

Maureen A. Cournoyer, Notary Public and Professional Shorthand Reporter
within and for the Commonwealth of Massachusetts and the State of Rhode
Island.

PAULSON

356

1    into your generic contest rules, check

2    with your Entercom legal representative."

3        Q.    Okay.   And that was something you

4    advised the promotions directors?

5        A.    Yes.

6        Q.    I'd like you to turn to Exhibit 5,

7    which is the PowerPoint presentation back

8    when -- Mr. Dreyer previously handed you a

9    copy of Exhibit 5.

10       A.    (Deponent viewing document).   Yes.

11       Q.    Okay.   Again, this was a PowerPoint

12   presentation that you actually gave to the

13   promotions coordinators and the program

14   directors, correct?

15       A.    (Deponent viewing document).   Yes.

16       Q.    In what time frame?

17       A.    (Deponent viewing document).   I did

18   this one in October of 2006.

19       Q.    Did Robin Ray participate in the --

20   in the presentation that you made in

21   October of 2006?

22       A.    I believe she did.

23       Q.    Okay.   Did Mr. Weed, as the program

24   director, also participate in one of the



368

COMMONWEALTH OF MASSACHUSETTS

I, Maureen A. Cournoyer, a Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the witness whose deposition is hereinbefore set forth, was duly sworn and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 18TH day of September 2007.

/s/ Maureen A. Cournoyer

Maureen A. Cournoyer

Notary Public

My commission expires March 31, 2011

# EXHIBIT 10



# SACRAMENTO COUNTY
# CORONER
## FINAL REPORT OF INVESTIGATION

**Robert Lyons**
**CORONER**

| CLASSIFICATION | 1 Final Classification ACCIDENT | 2 Case No. 07-00238 | 3 Deputy Assigned ALLYSON ROGERS | | 4a Date of Death 01/12/2007 | 4b Found? No |
|---|---|---|---|---|---|---|
| DECEDENT PERSONAL DATA | 5 Name First: JENNIFER | 6 Name Middle: LEA | 7 Name Last: STRANGE | | 8a Time of Death 14:21 | 8b Fnd/Est/Unk: DECLARED |
| | 9 Sex FEMALE | 10 Race CAUCASIAN | 11 Date of Birth 10/23/1978 | 12 Age 28 YEARS | | 13 Marital Status MARRIED |
| RESIDENCE | 14 Usual Address 3641 ASTRAL DRIVE | | | | | |
| | 15 City SACRAMENTO | | 16 County SACRAMENTO | | 16a State CA | 17 Zip Code 95827 |
| IDENTIFICATION | 18 Remains identified by or how identified A. ROGERS             PERSONAL PAPERS | | | | | |
| RELATIVES | 19 Name WILLIAM STRANGE | | | 20 Relation (HUSBAND) | | |
| PLACE OF DEATH | 21 Place of Death RESIDENCE - OWN | | | | | |
| | 22 Street Address 3641 ASTRAL DRIVE | | | | | |
| | 23 City SACRAMENTO | | 24 County SACRAMENTO | | | 25 Zip 95827 |
| REMAINS | 26 Death Reported By DISPATCH(RANCHO CORDOVA POLICE) | | | 27 Removed To Coroner Yes | 28 Type of Medical Examination FULL AUTOPSY | |
| CAUSE OF DEATH | 29 Cause    ACUTE WATER INTOXICATION due to: due to: due to: | | | | | |
| OTHER SIGNIFICANT CONDITIONS | 30 NONE | | | | | |
| INJURY INFORMATION | 31 Manner of Death ACCIDENT | 32 Place of Injury BUSINESS | | 33 At Work? No | 34a Date of Injury 01/12/2007 | 34b Fnd/Est/Unk |
| | 35 Address or Location 5345 MADISON AVENUE | | | | 36a Time of Injury 06:00 | 36b Fnd/Est/Unk |
| | 37 City SACRAMENTO | | 38 County SACRAMENTO | | | 39 Zip Code 95842 |
| | 40 Describe how injury occurred    THE DECEDENT INGESTED AN EXCESSIVE AMOUNT OF WATER | | | | | |
| CASE SUMMARY | *As required by Government Code, Section 27491, an inquiry was made into the death of the subject of this report. It was determined by an investigation that an autopsy would be necessary to establish the cause of death. An autopsy was performed and revealed the above cause of death. Based on the known circumstances and cause of death, the manner of death is accident.* | | | | | |

Deputy _Allyson Rogers_        Date    06/10/2007

ALLYSON ROGERS

This is a true and correct copy of the original Coroner's
Record consisting of _____ pages, the original of which
is on file at the Coroner's Office, 4800 Broadway, #100
Sacramento, California 95820-1593

By: _____
        Custodian of Records



# County Of Sacramento

Department of Coroner
4800 Broadway, Suite 100
Sacramento, CA 95820-1530

**Robert Lyons**
Coroner

---

☒ **Autopsy**                                                    ☐ **External Examination**

**NAME:**   STRANGE, JENNIFER LEA                    **CASE NO.**     07-00238

**POSTMORTEM DATE:**   01/13/07                             **TIME:**        08:50

**INVESTIGATOR:**      Allyson Rogers

**DATE OF DEATH:**     01/12/07                  **TIME OF DEATH:**        14:21

**AGE:** 28 yr   **SEX:** Female    **Ht:** 69"    **Wt:** 131 lbs.

**RACE/ ETHNICITY:** Caucasian

---

## AUTOPSY FINDINGS:

1. Acute water intoxication.
    a. Hyponatremia with normal urine osmolality
        i. See separate UCDMC lab results
    b. Mild brain swelling
        i. See separate neuropathology report
    c. Marked pulmonary edema
    d. Generalized visceral congestion
    e. Empty gastrointestinal tract with history of vomiting and diarrhea preceding death
2. Nephrocalcinosis
3. Status post remote bilateral tubal ligation
4. Postmortem toxicology negative for alcohol and drugs
    a. See separate toxicology report


## CAUSE OF DEATH:  Acute water intoxication


Stephany Fiore, M.D.
Forensic Pathologist
March 20, 2007

Mark A. Super, M.D.       3-20-07
Chief Forensic Pathologist

SEF/gab
D: 01/13/07
T: 01/21/07

**STRANGE, JENNIFER LEA**        07-00238

2

**AUTOPSY ASSISTANTS:**
Joann Morales, Nicole Coleman, and Kim Nelson

**WITNESSES:**
None.

**IDENTIFICATION:**
The body is identified by a Sacramento County Coroner's ID tag attached to the left great toe, labeled with the decedent's listed name and case number. There is a tattoo of a frog on the mid lower lumbar back. There is a fine linear scar running across the pelvic rim.

**EVIDENCE OF MEDICAL INTERVENTION:**
None.

**CLOTHING:**
Clothing was removed prior to examination.

## EXTERNAL EXAMINATION

The unclad, unembalmed body is that of a well-developed, slender, 69-inch, 131-pound, lightly pigmented, Caucasian, female, whose appearance is consistent with the reported age of 28 years. The torso and lower extremities have a yellowish-brown color that appears to be the result of a tanning process. The decedent is in full rigor mortis. Marked non-blanching lividity is posterior on the cold body. There is congestion to the right side of the face and mottled congestion of the anterior-superior chest. There are no other postmortem changes.

The atraumatic scalp is covered by thick, straight, brown hair of approximately 12 inches in length. The face is atraumatic. There are a number of freckles on the face. The eyes have clear corneae and brown irides. The bulbar and palpebral conjunctivae are mildly congested but without petechiae, icterus, or edema. The nose is normally formed. The external nares are patent and without hemorrhage or discharge. There is a thin layer of dried secretions on the upper lip. The vermilion borders of the lips are dried. The mucosa is pink, moist and without trauma. The natural dentition is in good repair. The lips and oral mucosa are free of foreign material. Each earlobe is remotely pierced one time. There is no hemorrhage or discharge in the external auditory canals.

The neck is symmetrical and atraumatic. There is no palpable crepitants or masses.

The atraumatic torso has a symmetric, stable chest and firm, flat abdomen. The superior border of the umbilicus has been remotely pierced. The breasts are small and atrophic. There are no palpable mass, skin retraction, or nipple discharge. The external genitalia are of a normally developed adult with closely cropped pubic hair. A large amount of fecal material is smeared over the mons pubis, perineum, medial aspect of the thighs and buttocks. There is no anal or genital trauma. The back is unremarkable.

The upper and lower extremities are symmetrical and without deformity or scars. There is a small amount of fecal material soiling the fingers on the right hand. There are no remote needle track marks. There are no ventral wrist scars. The fingernails are neatly trimmed flush with the tips. The lower extremities have a few small bruises predominantly along the medial aspect of the thighs and calves. There is no evidence of pedal edema. The toenails are trimmed flush with the tips. The soles of the feet are unremarkable.

**STRANGE, JENNIFER LEA**     07-00238

3

**EXTERNAL EVIDENCE OF INJURY:**
None.

## INTERNAL EXAMINATION

**HEAD:** The scalp and galea are atraumatic. The calvarium and base of skull are of normal thickness and free of fractures. The dura is smooth and shiny. There is neither recent epidural or subdural hemorrhage nor evidence of a subdural neomembrane. The blood in the dural sinuses is not clotted. The brain weighs 1540 gm. The brain appears swollen and is fixed in formalin for further neuropathologic documentation.

**NECK:** The cervical vertebrae, hyoid bone, and laryngeal and tracheal cartilages are normally formed and without fracture. There is no hemorrhage in the paratracheal or prevertebral soft tissue. The posterior oropharynx, larynx, and trachea are free of foreign material or edema. The trachea is coated with a moderate amount of white frothy fluid. The underlying mucosa is congested. The tongue is without hemorrhage or masses.

**BODY CAVITIES:** The subcutaneous fat is 1/4 inch thick at mid-abdominal level. The pleural, pericardial, and peritoneal cavities are smooth and shiny and without blood or excess fluid accumulation. The organs are normally arranged. No organs are absent.

**CARDIOVASCULAR SYSTEM:** The 260 gm heart is normally formed with a right dominant circulation. The epicardial surface is smooth and shiny with the usual distribution of epicardial fat. The myocardium is firm and red-brown without focal softening, discoloration, or fibrosis. The left ventricular free wall measures 1.2 cm in thickness, the septal wall measures 1.0 cm, and the right ventricular wall measures 0.4 cm. The chambers are not dilated. The endocardial surfaces are without fibrosis or mural thrombus. The four cardiac valves are normally formed, thin, and pliable. The coronary ostia are patent with normal takeoff angles. The coronary arteries are free of atherosclerosis or thrombus. The heart is filled with liquid blood. The aorta is normally formed and free of atherosclerosis or aneurysm.

**RESPIRATORY SYSTEM:** The right lung weighs 640 gm and the left lung weighs 660 gm. Each lung is normally formed with a smooth and shiny pleural surface containing minimal anthracotic pigmentation. Each lung is fully inflated with minimally crepitant purple parenchyma that exudes a large amount of serosanguineous fluid. The bronchi are normally formed and unobstructed. A large amount of white frothy fluid exudes from the bronchi. The pulmonary arteries are free of thromboemboli.

**LIVER, GALLBLADDER, AND PANCREAS:** The liver weighs 1980 gm and is normally formed with a smooth and shiny capsule. The parenchyma is markedly congested, firm and red-brown without masses, fibrosis, or fatty change. The gallbladder contains approximately 11 ml of bile and no stones. The gallbladder mucosa is unremarkable. The bile ducts are patent and of normal caliber. The pancreas is normal in size and has a markedly congested, lobulate parenchyma without cysts, mass, or fibrosis.

**GASTROINTESTINAL SYSTEM:** The esophagus is normally formed and patent with a smooth, dusky purple mucosa. The gastroesophageal junction is unremarkable. The stomach contains approximately 40 ml of pink liquid. No residuals of medication are noted. The gastric mucosa is cyanotic and demonstrates a typical rugal pattern without hemorrhage, erosion, ulceration, or mass lesion. The mucosae of both the small and large intestines are largely evacuated with only a small amount of residual contents coating the mucosa. The underlying mucosa is pale and without lesions. The appendix is unremarkable.

STRANGE, JENNIFER LEA          07-00238                                    4

**THYMUS, SPLEEN AND LYMPH NODES:** The thymus is atrophic. The spleen weighs 230 gm and is normally formed with an intact smooth gray purple capsule. The parenchyma is firm and red-purple with a conspicuous white pulp but no evidence of fibrosis or mass lesion. The mediastinal, paratracheal, parabronchial, para-aortic, and mesenteric lymph nodes are not enlarged.

**ENDOCRINE SYSTEM:** The thyroid is symmetrical with uniform, red-brown parenchyma and no masses. The adrenals are normally formed and without masses or hemorrhage. The pituitary is of normal size.

**UROGENITAL SYSTEM:** The right kidney weighs 170 gm and the left kidney weighs 200 gm. Each kidney is normally formed with a smooth, dark purple subcapsular surface. The cortex is of normal thickness. The corticomedullary junctions are distinctly demarcated. There are no cysts or masses. The pelves and ureters are patent and of normal caliber. The ureters follow their usual course and empty into the bladder, which contains approximately 20 ml of pale yellow urine. The bladder mucosa is smooth, light pink-tan. The internal genitalia are of a normally developed, non-pregnant adult. There are no cysts or masses. The endometrium is smooth and hemorrhagic. The cervix is smooth with a 1.5 cm os. The ovaries are unremarkable. Each fallopian tube has undergone surgical ligation. The vagina is atraumatic.

**MUSCULOSKELETAL SYSTEM:** The skeletal muscle is dark red and firm with a mass appropriate for the decedent's age and sex. The clavicles, sternum, ribs, vertebrae, and pelvis are without fracture, degenerative changes, or lesions.

**TOXICOLOGY:**
Femoral blood is submitted for toxicology. Vitreous is submitted for electrolytes and glucose. Heart blood, gastric contents, bile, urine and liver are retained.

**HISTOLOGY:**
Representative sections of the major organs are submitted.

**PHOTOGRAPHS:**
Digital photos are taken.

**X-RAYS:**
None.

**EVIDENCE:**
None.

**MICROSCOPIC DESCRIPTIONS:**
Heart (x3) – no histopathology

Lungs (x5) – marked vascular congestion; focal mild mineralization of the bronchial cartilage; minimal evidence of chronic bronchial asthma with no acute changes; no other histopathology

Liver – intact architecture with normal sized portal areas containing minimal chronic inflammation; generalized prominent widening of the spaces of Disse; scattered cytoplasmic microvacuoles in the hepatocytes; no other histopathology

Kidney – vascular congestion; scattered foci of small mineral deposits in the medullary tubules; no vascular or cortical pathology

**STRANGE, JENNIFER LEA**        07-00238                                    5

**Pancreas** – mild autolysis; no histopathology

**Thyroid** – no histopathology

**Adrenal** – acute vascular congestion with focal extravasation of erythrocytes in the periadrenal adipose tissue; no other histopathology

**Pituitary** – no histopathology

**Spleen** – intact architecture with acute congestion of red pulp; no other histopathology

SEF/gab
D: 01/13/07
T: 01/21/07

# LABORATORY REPORT

## UC DAVIS MEDICAL CENTER CLINICAL LABORATORY
### Ralph Green, M.D. Director

PAGE 1

Patient: **STRANGE,JENNIFER L.**    Age/Sx: 28/F    Loc: CORONER'S OFFICE/SACTO.COUN
DOB: 10/23/78    Acct: RC0000282911

SPEC #: 0113:F00010R    COLL: 01/13/07-0850    PT ID: CASE#07-00238
RECD: 01/16/07-1431    PT PHONE: NOT PROVIDED
STATUS: COMPLETE    CLIENT: CORONER'S OFFICE/SACTO.COUNTY
ORDERED: BCP FLUID    STEPHANY FIORE M.D

| Test | Low | Normal | High | Flag | Reference |
|------|-----|--------|------|------|-----------|
| > FLUID TYPE | | VITREOUS | | | |
| *BCP FLUID* | | | | | |
| > CHLORIDE FLUID | | 114 | | | mEq/L |
| > CREATININE FLU | | 0.24 | | | mg/dL |
| > GLUCOSE FLUID | | 58 | | | mg/dL |
| > POTASSIUM FLUID | | 8.0 | | | mEq/L |
| > SODIUM FLUID | | 121 | | | mEq/L |
| > UN FLUID | | 9 | | | mg/dL |
| | *BY DILUTION* | | | | |

University of California, Davis, Medical Center
2315 Stockton Blvd. Sacramento, California 95817
(916) 734-7373 / FAX (916) 734-7371

Report: REFERENCE
Printed: 01/17/07-0402
For activity: 01/16/07

** END OF REPORT **

# LABORATORY REPORT

## UC DAVIS MEDICAL CENTER CLINICAL LABORATORY
### Ralph Green, M.D. Director

PAGE 1

| Patient: STRANGE,JENNIFER L. | Age/Sx: 28/F | Loc: CORONER'S OFFICE/SACTO.COUN |
|---|---|---|
| | DOB: 10/23/78 | Acct: RC0000287962 |

| SPEC #: 0113:UC00016R | COLL: 01/13/07-0850 | PT ID: CASE#07-00238 |
|---|---|---|
| | RECD: 03/05/07-1456 | PT PHONE: NOT PROVIDED |
| | STATUS: COMPLETE | CLIENT: CORONER'S OFFICE/SACTO.COUNTY |
| ORDERED: SPOT UR OSMO | | FIORE,STEPHANIE M.D |

| Test | Low | Normal | High | Flag Reference |
|---|---|---|---|---|
| > OSMOL URINE | | 467 | | 300-1400 mOsm/kg |

University of California, Davis, Medical Center
2315 Stockton Blvd. Sacramento, California 95817
(916) 734-7373 / FAX (916) 734-7371

Report: REFERENCE
Printed: 03/06/07-0401
For activity: 03/05/07

** END OF REPORT **



# County Of Sacramento
### Department of Coroner
4800 Broadway, Suite 100
Sacramento, CA 95820-1530

**Robert Lyon**
**Coroner**

| | |
|---|---|
| **NAME:** STRANGE, JENNIFER LEA | **CASE NO.** 07-00238 |
| **POSTMORTEM DATE:** 01/13/07 | **DATE OF DEATH:** 01/12/07 |
| **INVESTIGATOR:** A. Rogers | **PATHOLOGIST:** Dr. Fiore |
| **AGE:** 28 yr **SEX:** Female | **DATE BRAIN CUT:** 01/31/07 |

**GROSS EXAMINATION:** Unfixed brain weight: 1540 grams.
The specimen is the dura and brain of an adult.
The cerebral dura is not remarkable.
The brain appears swollen with broad flat gyri and narrowed sulci over the convexities. Each uncus has a deep groove 4 mm from its medial edge. The basal cistern is effaced. Each cerebellar tonsil has mild molding but no softening or necrosis. The leptomeninges are thin, delicate and transparent. The cerebral gyri are of normal configuration and consistency. The external aspects of the brainstem and cerebellum are otherwise not remarkable. The arteries at the base of the brain follow a normal distribution and are free of atherosclerosis.
Coronal sections of the cerebrum reveal no focal lesions in the cortex, white matter or deep nuclear structures. The ventricles are mildly compressed and there is slight elongation of the diencephalon but no other evidence of herniation. There is no overt blurring of the gray-white junctions. Sections of the brainstem and cerebellum show no focal abnormality. The ventricles are otherwise of normal size and configuration.

**PHOTOGRAPHS:** Digital photos are taken.

**MICROSCOPIC EXAMINATION:**
H & E stained sections:
**Frontal lobe** – vascular congestion; cortical and white matter edema; no other histopathology
**Hippocampus** – vascular congestion; no other histopathology
**Thalamus** - vascular congestion; no other histopathology
**Cerebellum** - vascular congestion; no other histopathology
**Medulla** - vascular congestion; no other histopathology

**DIAGNOSIS: Mild brain swelling.**

Stephany Fiore, M.D.
March 7, 2007

SF/gab
D: 01/31/07
T: 02/02/07



**NMS Labs**
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, DABFT, DABCC, Laboratory Director

**CONFIDENTIAL**

January 26, 2007

**TO:**  117C
Sacramento County Coroner
Attn: Gregory Wyatt/Pathology
4800 Broadway, Suite 100
Sacramento, CA  95820

**TOXICOLOGY REPORT OF:**  **STRANGE, Jennifer L.**                    28/F
NMS Workorder No:          07014430
NMS Control No:            10698964
Client ID No:              07-00238

**SPECIMENS:**       Two gray top tubes each containing ~ 10 mL of femoral blood were received on 01/16/07.

**EXAMINATION:**     Analysis Requested - Panel 8092B - Autopsy Toxicology Therapeutic and Abused Drug Screen

**SUMMARY:**         **Examination of one blood specimen submitted did not reveal any data of toxicological significance
by procedures outlined in the accompanying Analysis Summary.**

**Incidental findings by GC/MS:  CAFFEINE.**

* * * * *   * * * * *   * * * * *

Respectfully,

Edward J. Barbieri, Ph.D.
Forensic Toxicologist

EJB/lmm

This analysis was performed under chain of custody.  The chain of custody documentation is on file at NMS Labs.

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded six (6) weeks from the
date of this report; and generated data will be discarded five (5) years from the date of this report.

**C O N F I D E N T I A L**

| | |
|---|---|
| NMS Workorder No: | 07014430 |
| NMS Control No: | 10698964 |
| Client ID No: | 07-00238 |
| Page 2 of 2 | |

**\*\*\*\*   \*\*\*\*   ANALYSIS SUMMARY   \*\*\*\*   \*\*\*\***

<u>8092B - Therapeutic and Abused Drug Screen</u>

Test No. 8092B – Drug Screen by Enzyme-Linked Immunosorbent Assay (ELISA) on Blood for:  Amphetamine, Barbiturates, Benzodiazepines, Benzoylecgonine (Cocaine), Cannabinoids (Marihuana), Methamphetamine, Opiates and Phencyclidine (PCP); Headspace Gas Chromatography for Ethanol, Methanol, Acetone and Isopropyl Alcohol.

Test No. 8092B - Drug Screen II- Gas Chromatography and Gas Chromatography/Mass Spectrometry Analysis on Blood:

The following is a general list of compound classes included in the Gas Chromatographic screen.  Other specific compounds outside these classes are also included.  Please note that not all known compounds included in each specified class or heading are included.  The detection of any particular compound is concentration-dependent.  For a detailed list of all compounds included in this screen, please contact NMS Labs.

Analgesics (opioid and non-opioid), Anesthetics, Antiasthmatic Agents, Anticholinergic Agents, Anticonvulsant Agents, Antidepressants, Antiemetic Agents, Antihistamines, Antiparkinsonian Agents, Antipsychotic Agents, Antitussive Agents, Anxiolytics (Benzodiazepine and others), Cardiovascular Agents (non-digitalis), Hallucinogens, Hypnosedatives (Barbiturate and others), Muscle Relaxants, Non-Steroidal Anti-Inflammatory Agents (excluding Salicylate) and Stimulants (Amphetamine-like and others).

Test No. 8092B – Colorimetric Analysis on Blood for:  Salicylates and Acetaminophen.

**\* \* \* \* \*     END OF REPORT     \* \* \* \* \***

JAN-27-07   09:45    FROM-NMS LABS                215 366 1501        T-081  P.005/008  F-617



**NMS Labs**
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2872
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, DABFT, DABCC, Laboratory Director

CONFIDENTIAL

DR. Fi Ol...

January 26, 2007

TO:    117C
       Sacramento County Coroner
       Attn: Gregory Wyatt/Pathology
       4800 Broadway, Suite 100
       Sacramento, CA 95820

**TOXICOLOGY REPORT OF:**        **STRANGE, Jennifer L.**                    28/F
       NMS Workorder No;         07014430
       NMS Control No:           10698964
       Client ID No:             07-00238

**SPECIMENS:**    Two gray top tubes each containing ~ 10 mL of femoral blood were received on 01/16/07.

**EXAMINATION:**  Analysis Requested - Panel 8092B - Autopsy Toxicology Therapeutic and Abused Drug Screen

**SUMMARY:**   Examination of one blood specimen submitted did not reveal any data of toxicological significance
       by procedures outlined in the accompanying Analysis Summary.

       Incidental findings by GC/MS:  **CAFFEINE.**

                    * * * * *    * * * * *    * * * * *

                                    Respectfully,

                                    Edward J. Barbieri, Ph.D.
                                    Forensic Toxicologist

EJB/lnm

This analysis was performed under chain of custody.  The chain of custody documentation is on file at NMS Labs.

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded six (6) weeks from the
date of this report; and generated data will be discarded five (5) years from the date of this report.

## CONFIDENTIAL

NMS Workorder No:   07014430
NMS Control No:     10698964
Client ID No:       07-00238
Page 2 of 2

**** **** ANALYSIS SUMMARY **** ****

### 8092B - Therapeutic and Abused Drug Screen

Test No. 8092B – Drug Screen by Enzyme-Linked Immunosorbent Assay (ELISA) on Blood for: Amphetamine, Barbiturates, Benzodiazepines, Benzoylecgonine (Cocaine), Cannabinoids (Marihuana), Methamphetamine, Opiates and Phencyclidine (PCP); Headspace Gas Chromatography for Ethanol, Methanol, Acetone and Isopropyl Alcohol.

Test No. 8092B - Drug Screen II- Gas Chromatography and Gas Chromatography/Mass Spectrometry Analysis on Blood:

The following is a general list of compound classes included in the Gas Chromatographic screen. Other specific compounds outside these classes are also included. Please note that not all known compounds included in each specified class or heading are included. The detection of any particular compound is concentration-dependent. For a detailed list of all compounds included in this screen, please contact NMS Labs.

Analgesics (opioid and non-opioid), Anesthetics, Antiasthmatic Agents, Anticholinergic Agents, Anticonvulsant Agents, Antidepressants, Antiemetic Agents, Antihistamines, Antiparkinsonian Agents, Antipsychotic Agents, Antitussive Agents, Anxiolytics (Benzodiazepine and others), Cardiovascular Agents (non-digitalis), Hallucinogens, Hypnosedatives (Barbiturate and others), Muscle Relaxants, Non-Steroidal Anti-Inflammatory Agents (excluding Salicylate) and Stimulants (Amphetamine-like and others).

Test No. 8092B – Colorimetric Analysis on Blood for: Salicylates and Acetaminophen.

***** END OF REPORT *****

# EXHIBIT 11



# CHUBB GROUP OF INSURANCE COMPANIES

**CHUBB**

5050 Hopyard Road #400, Pleasanton, CA 94588-3321
Phone: (925) 598-6000 • Facsimile: (925) 598-6098

March 2, 2007

Folger, Levin & Kahn LLP
Embarcadero Center West
275 Battery Street, 23rd floor
San Francisco, CA. 94111

Attention: Mr. Jim Goldberg, Esq.

RE:  INSURED:  Entercom Communications Corporation
POLICY:  3579 – 6725
CASE:  Strange vs Entercom et al, Sacramento Superior, #07AS00377
COMPANY: Vigilant Insurance Company

Dear Mr. Goldberg:

As you are aware, Vigilant has agreed to the defense of Entercom Communications Corporation and Mr. John Geary in the above entitled lawsuit. Attached is a copy of Vigilant's billing guidelines. We request that you provide us with a copy of your initial report and that these be provided in this case on a quarterly basis. Also, we would appreciate a litigation budget and a copy of all invoices generated by your office in the defense of the above entitled lawsuit.

Yesterday we received an email from your office that you will be preparing a response to the FCC investigation and indicating that this work is subject to insurance reimbursement. Please be advised that Vigilant Insurance Company will not be paying for the work related to the FCC investigation. Also, if your office is involved in any work relative to the investigation or defense of the criminal investigation, Vigilant will not be reimbursing this activity.

Should you have any questions regarding the content of this letter or the attached billing guidelines, feel free to contact me.

Regards,

*David Favre*

David Favre
Litigation Examiner

3-07/Entercom1.doc

CC Entercom Communications Corporation
   401 City Avenue Ste 409
   Bala Cynwyd, PA. 19004

   Attention: Jack Donlevie, General Counsel


CC Simkiss Insurance Agency
  Attention: Brian Block (email)


CC Maria Thackston Chubb Claims CBC (email)