# EXHIBIT 16

**CERTIFIED COPY**

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SACRAMENTO

WILLIAM A. STRANGE, Individually,
and as Guardian ad Litem for RYLAND STRANGE
and JORIE STRANGE, minors; RONALD E. SIMS,
Guardian ad Litem for KEEGAN SIMS, a minor

           Plaintiffs,

    VS                          CASE NUMBER:
                                    07-AS-00377

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED, ROBIN PECHOTA,
LIZ DIAZ, ADAM COX, STEVE MANEY,
PATRICIA SWEET, MATT CARTER and
DOES 1 through 40, Inclusive.

           Defendants.

VIDEOTAPED DEPOSITION OF

CARMELA MASI

September 6, 2007
9:41 a.m.

Jack Daniel Court Reporting and Video Services, Inc.
100 Franklin Street
Boston, Massachusetts 02110

Maureen A. Cournoyer, Notary Public and Professional Shorthand Reporter
within and for the Commonwealth of Massachusetts and the State of Rhode
Island.

Carmela Masi                                    September 6, 2007

18

1    Q.   All right.  Well, we're gonna talk

2    about you and your background and your

3    relationship with Entercom Sacramento, but

4    in terms of this process today, you knew

5    the deposition was gonna happen today,

6    obviously, right?

7    A.   Yes.

8    Q.   Had an opp -- You knew the nature

9    of the allegations in that -- You work for

10   whom?

11   A.   I work for Entercom Boston, LLC.

12   Q.   All right.  And who does Entercom

13   Boston, LLC respond to?

14   A.   I work for Entercom Boston because

15   I'm based out of Massachusetts, but I work

16   for Entercom corporate office and represent

17   -- in handling legal matters for all of

18   the markets I'm assigned to.

19   Q.   Okay.  Now, you understand that

20   Entercom corporate is a party to this case

21   sued as a defendant, right?

22   A.   I don't know.

23   Q.   All right.  Well, I'm gonna

24   represent to you that it is, all right,



Carmela Masi                                              September 6, 2007

345

1          MR. GIBSON:  Andrew Gibson

2     for Patricia Sweet.  I, too, go along with

3     cocounsel and reserve all my rights with

4     regard to this deposition and returning

5     for questioning.

6               MR. THOMAS:  I'd like to

7     say it was nice to meet you.  Didn't get

8     much of a chance.

9               THE DEPONENT:  Nice to meet

10    you.

11               (Reporter interruption).

12               MR. SULLIVAN:  No, we stay

13    on.  Stay on.

14               (Reporter interruption).

15         EXAMINATION

16         BY-MR.SULLIVAN:

17    Q.   Ms. Masi, I'd just like to ask you

18    a few follow-up questions.

19         You have before you Exhibit 30?

20    A.   (Deponent viewing document).  Yes.

21    Q.   Okay.  This is an e-mail that you

22    sent to a variety of people at Entercom.

23    A.   (Deponent viewing document).  Yes.

24    Q.   And it's dated what?



346

1          A.     (Deponent viewing document).

2     August 31st, 2006.

3          Q.     So approximately four --

4     four-and-a-half months before the contest,

5     "Hold Your Wee for a Wii"?

6          A.     Yes.

7          Q.     Now, did you send this to Robin

8     Pechota Ray?

9          A.     (Deponent viewing document).   Yes.

10         Q.     You see her name listed, correct?

11         A.     (Deponent viewing document).   I do.

12         Q.     And did you send -- Let me back

13    up.

14                And Ms. Robin Pechota Ray, she was

15    the promotions director for The End at

16    Entercom Sacramento.

17         A.     Yes.

18         Q.     Did you send it to Steve Weed?

19         A.     (Deponent viewing document).   Yes.

20    And his name's here as well.

21         Q.     Okay.   And Mr. Weed was the

22    promotions director?

23         A.     Program director, but I believe his

24    title was station manager.



347

1    Q.   Okay.  I -- I misspoke.  Program

2    director and station manager.

3    A.   Yes.

4    Q.   Okay.  And can you just quickly

5    tell me what's the difference between a

6    program director and a promotions director?

7    A.   A program director is responsible

8    for the on-air content of the -- the

9    program non-advertising content of the

10   station and -- and is the direct

11   supervisor to, for example, disc jockeys

12   and on-air talent.

13        Promotion director is responsible

14   for different types of contests and

15   marketing of the radio station, station

16   events and sometimes has people who report

17   to him or her for doing, you know, station

18   promotional appearances and things like

19   that.

20   Q.   Okay.  All right.  Now, it says

21   that there's an attachment to Exhibit 30.

22   Do you see that?

23   A.   (Deponent viewing document).  Yes.

24   Q.   And is the attachment actually part



Carmela Masi                                      September 6, 2007

348

1    of Exhibit 30?

2        A.    (Deponent viewing document).   Yes,

3    it is.

4        Q.    Okay.   And what is the title of

5    the attachment?

6        A.    (Deponent viewing document).

7    "Entercom Communications Corp., General

8    Contest Guidelines."

9        Q.    Okay.   Now, did you actually --

10   Strike that.

11           Let's -- Let's look at the last

12   sentence on the first page.   Can you read

13   that?

14       A.    (Deponent viewing document).   "The

15   rule of thumb regarding when contests" --

16       Q.    On the -- Excuse me.   On the first

17   page of this e-mail.

18       A.    (Deponent viewing document).   What

19   did you ask me?

20       Q.    Could you read the last sentence on

21   the first page?

22       A.    (Deponent viewing document).

23   "Entercom's contest guidelines are attached

24   below for your reference."



Carmela Masi

349

Q.   Okay.  And did you provide that not only to Ms. Pechota Ray as the promotions director of The End, but also other promotions directors?

A.   I did.

Q.   Okay.  Let's turn to the next page. Can you read the first sentence?

A.   (Deponent viewing document).  "With the exception of simple contests, contest rules must be submitted for review by your Entercom legal representative."

Q.   Okay.  So you were advising the promotions directors and the program directors that, except for simple contests, contest rules had to be submitted to the legal department.

A.   Yes.  That's correct.

Q.   Okay.  Now, in the next sentence, do you describe what a simple contest is?

A.   (Deponent viewing document).  Two sentences later.

Q.   Okay.  Can you read how you describe the simple contest?

A.   (Deponent viewing document).  "A



Carmela Masi                                    September 6, 2007

355

1    simple contests are to come to legal,

2    right?

3        A.    I'm sorry.

4        Q.    All contests other than simple

5    contests are to come to legal, correct?

6        A.    Yes.

7        Q.    And the "Hold Your Wee for a Wii"

8    contest is not a simple contest.

9        A.    No.  It should have come to the

10   legal department.

11       Q.    And it did not.

12       A.    It did not.

13       Q.    Now, if you look at your August 31,

14   2006, e-mail, and again, this is about

15   four to five months in advance of the

16   contest at issue, the "Hold Your Wee for a

17   Wii" contest, right?

18       A.    (Deponent viewing document).  Yes.

19       Q.    And the last sentence in the first

20   paragraph on Page .2, can you read that,

21   what you wrote to the program directors

22   and promotions directors?

23       A.    (Deponent viewing document).  "When

24   in doubt as to whether a giveaway fits



356

1      into your generic contest rules, check

2      with your Entercom legal representative."

3      Q.    Okay.  And that was something you

4      advised the promotions directors?

5      A.    Yes.

6      Q.    I'd like you to turn to Exhibit 5,

7      which is the PowerPoint presentation back

8      when -- Mr. Dreyer previously handed you a

9      copy of Exhibit 5.

10     A.    (Deponent viewing document).  Yes.

11     Q.    Okay.  Again, this was a PowerPoint

12     presentation that you actually gave to the

13     promotions coordinators and the program

14     directors, correct?

15     A.    (Deponent viewing document).  Yes.

16     Q.    In what time frame?

17     A.    (Deponent viewing document).  I did

18     this one in October of 2006.

19     Q.    Did Robin Ray participate in the --

20     in the presentation that you made in

21     October of 2006?

22     A.    I believe she did.

23     Q.    Okay.  Did Mr. Weed, as the program

24     director, also participate in one of the



Carmela Masi                                September 6, 2007

359

1     A.   (Deponent viewing document).

      That's correct.

3     Q.   Okay.  And we're -- I take it then

4     the promotions coordinators and the

5     promotions directors were so advised during

6     your -- your presentation --

7     A.   They were.

8     Q.   -- that anything reflecting poorly

9     on the morals or ethics was unacceptable.

10    A.   Correct.

11    Q.   Now, I believe you previously

12    testified in connection with questions that

13    Mr. Dreyer asked, that you had a practice

14    of requiring an EMT if there was anything

15    physical that involved ingestion; is that

16    right?

17    A.   Yes.

18    Q.   Okay.  Can you give me examples of

19    contests that went forward where, in fact,

20    you required an EMT to be present or to

21    be involved?

22    A.   A chicken finger or chicken wing

23    eating contest that we did; contests where

24    people had to sit on a block of ice to



360

1    melt it to get to a Justin Timberlake doll

2    that was frozen in the middle; a contest

3    where people swam -- dived into a swimming

4    pool to grab prizes out of the pool.

5        Q.    Did you ever have a hot dog eating

6    contest?

7        A.    We've done hot dog eating contests,

8    yes.

9        Q.    And did you have an EMT present for

10   those types of contest?

11       A.    Yeah.   Those type of contests, yes.

12       Q.    Okay.   Now, when I say "EMT," what

13   does that mean?

14       A.    Emergency medical technician,

15   paramedic or someone with medical training

16   and licensed medical experience.

17       Q.    Okay.   Now -- Well, strike that.

18           Robin Ray testified -- you know,

19   I'll try to paraphrase it, that she

20   recalled a conversation with you one to

21   two years ago, approximately, in which you

22   supposedly told her that she did not have

23   to run contests by legal if, using her

24   discretion, she could simply modify rules



Carmela Masi
September 6, 2007

362

1    knew specifically what they were doing and

2    I knew that I had specifically done rules

3    for the same contest and it was just a

4    matter of changing things, that I might

5    say for that particular contest, use the

6    rules from that contest.  But I would not

7    have -- definitely not have blanket said,

8    use your discretion on whether or not

9    you're gonna send the rules to the legal

10   department.

11   Q.   Okay.  Did you emphasize that

12   anything other than a simple contest had

13   to come to legal?

14   A.   I'm sorry?

15   Q.   Did you emphasize that anything

16   other than a simple contest had to come to

17   legal?

18   A.   Yes.  I emphasized it many times.

19   Q.   Okay.  Now, just so the record's

20   clear, you don't recall ever seeing -- the

21   rules that were prepared by Robin Ray that

22   we saw as Exhibit 9, you don't recall ever

23   seeing those before the "Hold Your Wee for

24   a Wii" contest went forward.



Carmela Masi                                          September 6, 2007

363

1    A.    No.

2    Q.    Okay.  And she never submitted them

3    to you at all, right?

4    A.    No.

5    Q.    Did you know anything about the

6    "Hold Your Wee for a Wii" contest prior to

7    it happening?

8    A.    No.

9    Q.    Now, you were asked questions, I

10   believe by Mr. Levine, regarding what you

11   did after you learned about the death of

12   Jennifer Strange and the fact that that

13   had resulted following the contest, "Hold

14   Your Wee for a Wii."

15         When you heard about the death of

16   Jennifer Strange, how did you feel?

17   A.    I was very upset.

18   Q.    And why?

19   A.    I couldn't believe that someone had

20   died in a radio contest.  We had -- And

21   that it was my company and one of my

22   markets.  And we certainly had trained

23   people as to when to bring things to the

24   legal department and I was very upset.



Carmela Masi                                          September 6, 2007

368

COMMONWEALTH OF MASSACHUSETTS

1

2

3      I, Maureen A. Cournoyer, a Shorthand

4    Reporter and Notary Public in and for the

5    Commonwealth of Massachusetts, do hereby

6    certify that the witness whose deposition

7    is hereinbefore set forth, was duly sworn

8    and that such deposition is a true record

9    of the testimony given by the witness.

10      I further certify that I am neither

11   related to or employed by any of the

12   parties in or counsel to this action, nor

13   am I financially interested in the outcome

14   of this action.

15      In witness whereof, I have hereunto set

16   my hand and seal this 18TH day of September

17   2007.

18

19

20

21   /s/ Maureen A. Cournoyer

22   Maureen A. Cournoyer

23   Notary Public

24   My commission expires March 31, 2011

# EXHIBIT 17

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

---oOo---

WILLIAM STRANGE, individually,
And as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
Minors; RONALD SIMS, as Guardian
Ad Litem for KEEGAN SIMS, a minor,

        Plaintiffs,

    v.                   No. 07AS00377

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED,
ROBIN PECHOTA, LIZ DIAZ,
ADAM COX, STEVE MANEY,
PATRICIA SWEET, MATT CARTER,
And DOES 1-40, inclusive,

        Defendants.
_____/



---oOo---

9:00 a.m.

July 6, 2007

**DEPOSITION OF ROBIN PECHOTA**
**aka ROBIN RAY**

Reported by:   SHERREE L. BLAKEMORE, CSR No. 7144

---

**Royal** REPORTING SERVICES

1333 Howe Avenue, Suite 228
Sacramento, California  95825
916.564.0100

09:37:17  1    potential contestants?

09:37:18  2    A      No.

09:37:19  3    Q      Did you understand yourself to have the

09:37:22  4    responsibility to do that research?

09:37:25  5    A      That would be part of my job.  But the research

09:37:30  6    could be done by anybody.

09:37:32  7    Q      When you say that would be part of your job, what

09:37:35  8    would be part of your job?

09:37:36  9    A      To research contests, or research --

09:37:43  10   Q      When you say research contests, would it be to

09:37:46  11   research the potential injury of a proposed contest, or

09:37:50  12   potential illness of a proposed contest?

09:37:55  13   A      That might be part of it.  But also, you know, the

09:38:00  14   mechanics of how a contest would work; how it -- if it had

09:38:01  15   been done by someone else, how it was done.

09:38:03  16   Q      Let's leave those on the side for a moment.  I'm

09:38:06  17   just talking about the researching of risks of proposed

09:38:10  18   contests.

09:38:10  19          Did you understand, in 2005, that part of your

09:38:13  20   responsibilities as marketing and promotion director at

09:38:19  21   Entercom included the researching of risks to potential

09:38:25  22   contestants of a proposed contest?

09:38:32  23   A      Can you repeat that, please?

09:38:34  24   Q      Did you have any understanding, in 2005, in your

09:38:37  25   capacity as marketing and promotion director at Entercom,

26

| | | |
|---|---|---|
| 09:38:43 | 1 | whether your job responsibilities did or did not include |
| 09:38:46 | 2 | researching potential health or injury risks to potential |
| 09:38:53 | 3 | contestants in any proposed contest? |
| 09:38:56 | 4 | A    Yes, that would be part of my job. |
| 09:39:03 | 5 | Q    What training, if any, did Entercom provide you with |
| 09:39:08 | 6 | in order to assume those responsibilities? |
| 09:39:13 | 7 | A    Can you be more specific? |
| 09:39:16 | 8 | MR. LEVINE:  I don't think so.  Let's have the |
| 09:39:17 | 9 | reporter read it. |
| 09:39:33 | 10 | |
| | 11 | (Record read as requested as follows:) |
| | 12 | BY MR. LEVINE: |
| 09:39:03 | 13 | Q    "What training, if any, did Entercom provide you |
| 09:39:06 | 14 | with in order to assume those responsibilities?" |
| | 15 | |
| 09:39:33 | 16 | THE WITNESS:  None. |
| 09:39:35 | 17 | Q    BY MR. LEVINE:  So let me be sure I understand this. |
| 09:39:38 | 18 | At no time do you recall Entercom providing you with any |
| 09:39:43 | 19 | training, as to either medical research or how to contact |
| 09:39:50 | 20 | someone who would be capable of doing medical research, in |
| 09:39:54 | 21 | order to analyze the risks that a contestant might have |
| 09:39:58 | 22 | with regard to -- the medical risks a contestant might |
| 09:40:02 | 23 | have with regard to a proposed contest. |
| 09:40:07 | 24 | Is that correct? |
| 09:40:07 | 25 | A    Yes. |

27

09:54:20  1  understand something, then I had the ability to correspond

09:54:27  2  with other promotion directors within Entercom, with other

09:54:33  3  people within the building, and also contact the legal

09:54:36  4  department, if I had any questions, ever.

09:54:40  5  Q     Did you have any questions about the Wii -- Hold

09:54:45  6  Your Wee for a Wii contest?

09:54:45  7  A     No, I had no concerns about it.

09:54:47  8  Q     No questions, no concerns?

09:54:49  9  A     No.

09:54:50  10  Q     Now, I want to go back to this question I'm asking

09:54:52  11  you.

09:54:53  12        Was it your job responsibilities to prevent injury,

09:54:59  13  illness or death to contestants?

09:55:04  14  A     It was part of my job to be concerned about that,

09:55:08  15  yes.

09:55:08  16  Q     Was it part of your job to stop a contest, or

09:55:11  17  prevent it from going forward, if, in fact, you identified

09:55:16  18  a risk of illness, injury, or potential death?

09:55:23  19  A     I could put input into the fact that I felt that it

09:55:26  20  wasn't an inappropriate contest, if I felt it wasn't an

09:55:31  21  appropriate contest.

09:55:31  22  Q     I'm not talking about appropriate, I'm talking about

09:55:38  23  safe.

09:55:38  24  A     If I felt that there was a risk for safety, then I

09:55:40  25  could say so.

| | | |
|---|---|---|
| 10:06:12 | 1 | discussions about it again until almost right before the |
| 10:06:14 | 2 | contest was happening, the week before. |
| 10:06:17 | 3 | Q    Do you have a computer in your office? |
| 10:06:23 | 4 | A    Yes. |
| 10:06:23 | 5 | Q    Do you know how to Google something? |
| 10:06:23 | 6 | A    Yes. |
| 10:06:23 | 7 | Q    Did you so much as Google "drinking too much water"? |
| 10:06:26 | 8 | A    No. |
| 10:06:26 | 9 | Q    No one requested you to do so? |
| 10:06:28 | 10 | A    No. |
| 10:06:28 | 11 | Q    And no one else did so? |
| 10:06:30 | 12 | A    Not to my knowledge.  I don't know. |
| 10:06:35 | 13 | Q    Did you ask anyone to do so? |
| 10:06:35 | 14 | A    No. |
| 10:06:35 | 15 | Q    Did Mr. Geary ask you to do so? |
| 10:06:36 | 16 | A    No. |
| 10:06:36 | 17 | Q    Did Mr. Weed ask you to do so? |
| 10:06:38 | 18 | A    No. |
| 10:06:39 | 19 | Q    You knew it was potentially hazardous.  Didn't you? |
| 10:06:42 | 20 | A    No. |
| 10:06:43 | 21 | Q    You'd never seen a written document suggesting that |
| 10:06:46 | 22 | this particular contest could be potentially hazardous? |
| 10:06:50 | 23 | A    No. |
| 10:06:53 | 24 | Q    And did anyone ever advise you it was potentially |
| 10:06:55 | 25 | hazardous? |

10:59:02  1    Q      Was there anyone else, to your knowledge, on the

10:59:05  2    other end of the line from legal besides Ms. Masi?

10:59:09  3    A      I don't know.

10:59:09  4    Q      Now, did you understand this to be an important

10:59:12  5    call?

10:59:19  6    A      I thought it was important to hear what was being

10:59:23  7    said.

10:59:24  8    Q      Now, Ms. Masi talked about contests during this

10:59:27  9    half-hour, you recall?

10:59:29  10   A      Yes.

10:59:30  11   Q      And did you take notes of the conversation that Ms.

10:59:36  12   Masi held during that period of time?

10:59:37  13   A      No.

10:59:38  14   Q      Why not?

10:59:39  15   A      Because there was a PowerPoint presentation.

10:59:43  16   Q      And how was the PowerPoint presentation shown to you

10:59:47  17   with reference to coordinating it with the phone call?

10:59:52  18   A      It was on the computer.

10:59:54  19   Q      So you're talking to her on the phone, and then

10:59:56  20   there was a PowerPoint presentation.

11:00:02  21   A      (Witness nodding.)

11:00:02  22   Q      Did you feel it was helpful to understand your role

11:00:03  23   in your job at the station?

11:00:04  24   A      Sure, yeah.

11:00:06  25   Q      And was it your intent to follow the

78

| | |
|---|---|
| 11:00:10 | 1 |
| 11:00:13 | 2 |
| 11:00:14 | 3 |
| 11:00:18 | 4 |
| 11:00:21 | 5 |
| 11:00:25 | 6 |
| 11:04:46 | 7 |
| | 8 |
| | 9 |
| 11:04:57 | 10 |
| 11:05:00 | 11 |
| 11:05:03 | 12 |
| 11:05:09 | 13 |
| 11:05:20 | 14 |
| 11:05:22 | 15 |
| 11:05:22 | 16 |
| | 17 |
| 11:05:31 | 18 |
| 11:05:37 | 19 |
| 11:05:38 | 20 |
| 11:05:40 | 21 |
| 11:05:43 | 22 |
| 11:05:48 | 23 |
| 11:05:50 | 24 |
| 11:05:51 | 25 |

1  recommendations, if there were any, during that PowerPoint

2  presentation?

3  A     To the best of my ability, yes.

4      THE VIDEOGRAPHER:  This ends tape number one of

5  today's deposition.  We're going off the record at eleven

6  o'clock a.m.

7

8              (Short pause in the proceedings.)

9

10     THE VIDEOGRAPHER:  We're on the record at 11:04 a.m.

11  This is the beginning of tape number two of the deposition

12  of Robin Pechota.

13  Q     BY MR. LEVINE:  So, Ms. Pechota -- am I pronouncing

14  the name right?

15  A     (Witness nodding.)

16  Q     Sorry if I mispronounced it this morning.

17  A     Okay.

18  Q     When you were presented with this PowerPoint by Ms.

19  Masi, it was on your computer.

20  A     Uh-huh.  Yes.

21  Q     And did you download it?

22  A     No.  We were told it would be sent to us.

23  Q     Was it ever sent to you?

24  A     Yes.

25  Q     And where -- did you receive it?

79

| | | |
|---|---|---|
| 11:31:50 | 1 | Q    Did you have any disagreement with this rule? |
| 11:31:55 | 2 | A    Do I have a any disagreements with this rule?  No. |
| 11:31:57 | 3 | Q    Did you have any disagreement with this rule at any |
| 11:32:01 | 4 | time before you were fired? |
| 11:32:02 | 5 | A    No. |
| 11:32:02 | 6 | Q    Who at KDND was responsible, if you know, after this |
| 11:32:08 | 7 | rule was presented, for writing the rules -- excuse me -- |
| 11:32:12 | 8 | for drafting the rules? |
| 11:32:13 | 9 | A    Me. |
| 11:32:14 | 10 | Q    Did you draft rules for the contest involving Hold |
| 11:32:20 | 11 | Your Wee for a Wii? |
| 11:32:20 | 12 | A    Yes, I did. |
| 11:32:21 | 13 | Q    And who trained you to write those rules, if anyone? |
| 11:32:32 | 14 | A    Trained me? |
| 11:32:32 | 15 | Q    I know that is a foreign term to you there.  But |
| 11:32:33 | 16 | some places do have training, yes. |
| | 17 | A    I know. |
| 11:32:36 | 18 | Q    It's a radio, right, no training? |
| 11:32:41 | 19 | A    Didn't you say you weren't trying to be mean? |
| 11:32:45 | 20 | Q    Not to you. |
| 11:32:46 | 21 | Talking about radio.  Don't take it personally. |
| 11:32:50 | 22 | A    Thanks. |
| 11:32:55 | 23 | MR. POST:  Did you receive training about this? |
| 11:32:56 | 24 | THE WITNESS:  Not specific training, no.  I mean -- |
| 11:33:01 | 25 | Q    BY MR. LEVINE:  I'm being the opposite of being |

11:35:21  1    there?

11:35:21  2        MR. SULLIVAN:  Do you mean yeah, y-e-a-h?

11:35:27  3        THE WITNESS:  Probably yea.

11:35:28  4    Q    BY MR. LAVINE:  Yeah.  You never asked why there

11:35:29  5    were two exclamation points to emphasize that was

11:35:34  6    important or something?

11:35:34  7    A    I honestly never noticed that they were there prior

11:35:36  8    to your showing them to me.

11:35:39  9    Q    It says, "Written rules should be reviewed by your

11:35:42  10   primary legal contact."

11:35:44  11       Do you see that?

11:35:45  12   A    Yes.

11:35:45  13   Q    Who was your primary legal contact?

11:35:51  14   A    Carmela Masi.

11:35:51  15   Q    And do you know if Ms. Masi reviewed -- well, first,

11:35:53  16   did you draft rules for the Hold Your Wee for a Wii?

11:35:55  17   A    Yes.

11:35:56  18   Q    Did you sent it to legal, to Ms. Masi, for approval?

11:36:01  19   A    No.

11:36:02  20   Q    And you never sent it to be reviewed.

11:36:05  21   A    No.

11:36:05  22   Q    Were you ever criticized for failing to forward the

11:36:09  23   rules before the contest itself?

11:36:11  24   A    No.

11:36:14  25   Q    To your knowledge, were you -- to your knowledge,

11:40:27  1      right?

11:40:27  2           MR. SULLIVAN:   Misstates the evidence; the

11:40:30  3      testimony.

11:40:32  4           THE WITNESS:  Yeah.  I mean --

11:40:33  5      Q     BY MR. LEVINE:  Mr. Weed and Mr. Geary never came in

11:40:36  6      and asked you to set forth, for example, a memo as to how

11:40:39  7      you were going to make these decisions.  Correct?

11:40:42  8      A     No.

11:40:42  9      Q     Is that correct?

11:40:43  10     A     Yes, that is correct.

11:40:44  11     Q     Would something potentially hazardous to someone's

11:40:49  12     health be considered by you to be high risk, dangerous or

11:40:55  13     borderline acceptable?

11:40:55  14     A     Yes.

11:40:55  15     Q     And, in fact, you determined that this contest was

11:40:57  16     potentially hazardous.  Isn't that true?

11:41:00  17     A     Which contest?

11:41:01  18     Q     The Hold Your Wee for a Wii.

11:41:03  19     A     I determined that it was potentially hazardous?

11:41:06  20     Q     Didn't you?

11:41:06  21     A     No.

11:41:07  22     Q     Who drafted the rules for this contest in accordance

11:41:11  23     with the mandates of the rules in the PowerPoint?

11:41:15  24     A     I did.

11:41:16  25     Q     And didn't you determine, when drafting those rules,

110

| | | |
|---|---|---|
| 12:04:39 | 1 | Q    What was Jessica's title? |
| 12:04:41 | 2 | A    She was one of my assistants. |
| 12:04:43 | 3 | Q    So did you place her in the room to monitor the |
| 12:04:50 | 4 | contest on your behalf? |
| 12:04:50 | 5 | A    Monitor the contest on my behalf? |
| 12:04:52 | 6 | Q    Well, was it not your job to monitor the contest? |
| 12:05:00 | 7 | You're Jessica's boss.  Right? |
| 12:05:00 | 8 | A    Yes. |
| 12:05:00 | 9 | Q    She goes to the room just because she wanted to go |
| 12:05:04 | 10 | there, or because you told her to? |
| 12:05:05 | 11 | A    She was scheduled to work that morning, because it |
| 12:05:08 | 12 | was requested by Steve Weed that I have a couple of my |
| 12:05:15 | 13 | assistants there to assist The Morning Rave. |
| 12:05:15 | 14 | Q    And where was Jessica's office? |
| 12:05:17 | 15 | A    Jessica doesn't have an office.  She has a cubbyhole |
| 12:05:26 | 16 | in the promotion office. |
| 12:05:27 | 17 | Q    What is her title? |
| 12:05:28 | 18 | A    Assistant. |
| 12:05:29 | 19 | Q    Assistant what? |
| 12:05:30 | 20 | A    Well, we call it a promotions tech. |
| 12:05:34 | 21 | Q    Promotions tech? |
| 12:05:35 | 22 | A    Yes. |
| 12:05:36 | 23 | Q    So you -- did you send Jessica to the room, or did |
| 12:05:39 | 24 | the promotions tech just decide on her own I'm going to go |
| 12:05:45 | 25 | to the break room? |

133

| | | |
|---|---|---|
| 12:14:18 | 1 | Q    BY MR. LEVINE:  The answer is yes?  That's correct? |
| 12:14:19 | 2 | A    Yes. |
| 12:14:20 | 3 | Q    And what time did you go down there the second time? |
| 12:14:30 | 4 | A    Probably -- |
| 12:14:31 | 5 | MR. POST:  Don't guess.  If you have an estimate, |
| 12:14:35 | 6 | that's fine.  Don't guess. |
| 12:14:38 | 7 | MR. LEVINE:  Just about. |
| 12:14:39 | 8 | THE WITNESS:  8:45. |
| 12:14:43 | 9 | Q    BY MR. LEVINE:  And after 8:45, how long were you |
| 12:14:45 | 10 | there? |
| 12:14:45 | 11 | A    Less than a minute. |
| 12:14:47 | 12 | Q    Did you tell them to keep the noise down? |
| 12:14:49 | 13 | A    Yes. |
| 12:14:49 | 14 | Q    Nothing else? |
| 12:14:50 | 15 | A    No. |
| 12:14:50 | 16 | Q    Didn't ask them how they were feeling? |
| 12:14:52 | 17 | A    No. |
| 12:14:53 | 18 | Q    Didn't ask if anyone felt sick? |
| 12:14:56 | 19 | A    No. |
| 12:14:56 | 20 | Q    Did you care if they felt sick or not? |
| 12:14:59 | 21 | A    I didn't have any reason to believe anybody felt |
| 12:15:01 | 22 | sick. |
| 12:15:02 | 23 | Q    Did you care to determine whether they felt sick or |
| 12:15:04 | 24 | not?  Or did you not even consider inquiring? |
| 12:15:08 | 25 | MR. POST:  Compound.  Asked and answered. |

142

12:15:10  1          THE WITNESS:  I didn't think that anybody would feel

12:15:15  2    sick, so I didn't ask anybody if they felt sick.

12:15:17  3          MR. POST:  Good time for lunch now?

12:15:20  4          MR. LEVINE:  Let's go another ten minutes.

          5          MR. POST:  Is that okay?

12:15:24  6          THE WITNESS:  That's fine.

12:15:24  7    Q    MR. LEVINE:  So you were in there less than a minute

12:15:27  8    the second time.  This is at about 8:45.  Right?

12:15:30  9    A    Uh-huh.

12:15:31 10    Q    Yes?

12:15:31 11    A    Yes. Sorry.

12:15:32 12    Q    No provision was made at this point for what to do

12:15:36 13    if anyone was sick?

12:15:37 14    A    No.

12:15:38 15    Q    And did you ask anyone if their bladders hurt?

12:15:44 16    A    No.

12:15:45 17    Q    Have you ever, and I don't mean to be too personal.

12:15:47 18    Have you ever experienced discomfort, if for some reason

12:15:53 19    you didn't urinate for a while, and were unable to do so?

12:15:55 20    A    Yes.

12:15:56 21    Q    Were you concerned that some of the people in the

12:16:03 22    contest might be experiencing that discomfort?

12:16:03 23    A    Was I concerned about that?

12:16:04 24    Q    That's the question.

12:16:06 25    A    I wasn't concerned.  I believed that once people

                                                                    143

12:16:18  1    were uncomfortable, and didn't want to continue with the

12:16:19  2    contest, they would drop out of the contest.

12:16:22  3    Q      Did you consider the extent to which someone who

12:16:24  4    really wanted this computer for their kid --

12:16:29  5          MR. SULLIVAN:  Assumes facts not in evidence.

12:16:34  6    Q      BY MR. LEVINE:  Did you consider the extent that

12:16:34  7    someone that really wanted this computer for their child

12:16:36  8    might incur so much discomfort that they would harm

12:16:45  9    themselves physically?

12:16:45  10          Was that ever a consideration of Ms. Pechota?

12:16:47  11   A      I didn't think anybody would -- that would happen.

12:16:55  12   Q      And you never considered the extent to which someone

12:16:57  13   might incur physical injury before they reach the point

12:17:00  14   where they couldn't stand the physical discomfort any

12:17:04  15   longer.   Correct?

12:17:05  16   A      I did not think that that was a possibility.

12:17:08  17   Q      Now, you went back up.  Where did you go after the

12:17:12  18   8:45 visit to the room?

12:17:12  19   A      My office.

12:17:13  20   Q      The door was still locked from the outside?

12:17:16  21   A      What door?

12:17:17  22   Q      To the break room.

12:17:18  23   A      Yes.

12:17:19  24   Q      Was someone able to leave if they wanted to leave?

12:17:23  25   A      Yes.

144

| | | |
|---|---|---|
| 12:17:23 | 1 | Q    So they could open it from the inside? |
| 12:17:25 | 2 | A    Yes. |
| 12:17:26 | 3 | Q    Now, what instructions were given to anybody that |
| 12:17:30 | 4 | you provided instructions to, or could have provided |
| 12:17:34 | 5 | instructions to, with regard to anyone, for example, |
| 12:17:41 | 6 | driving their car after the contest, if in fact they felt |
| 12:17:46 | 7 | ill? |
| 12:17:46 | 8 | A    I didn't give anyone any instruction. |
| 12:17:48 | 9 | Q    Now, where was the bathroom at this time? |
| 12:17:51 | 10 | A    Right here. |
| 12:17:53 | 11 | Q    So it's in a separate room? |
| 12:17:59 | 12 | A    Here's the hall; it's right there. |
| 12:17:59 | 13 | Q    It's not in the break room? |
| 12:17:59 | 14 | A    No. |
| 12:18:00 | 15 | MR. POST:  She's just put a B there. |
| 12:18:02 | 16 | MR. LEVINE:  Yes. |
| 12:18:04 | 17 | Q    Whose idea was it to check the contestants to see if |
| 12:18:11 | 18 | they were wearing diapers? |
| 12:18:15 | 19 | A    It was either Steve Maney or -- I think it might |
| 12:18:22 | 20 | have been Steve Maney. |
| 12:18:23 | 21 | Q    Now, did you receive a bonus as part of your pay |
| 12:18:29 | 22 | based on ratings? |
| 12:18:29 | 23 | A    No. |
| 12:18:29 | 24 | Q    Did you understand whether any others did? |
| 12:18:31 | 25 | A    The on-air personalities. |

145

15:08:12  1    Q    That wasn't my question.

15:08:13  2         Did you think that contestants, listeners, loyal

15:08:17  3    listeners, who drive up ratings so that you guys can

15:08:20  4    charge more for your advertising dollar, did you ever

15:08:22  5    think that they're relying upon the station in the same

15:08:28  6    way you're relying upon your colleagues that this is a

15:08:29  7    safe contest?

15:08:30  8    A    If you're asking me if I had that thought, that

15:08:33  9    specific thought --

15:08:34  10   Q    Uh-huh.

15:08:34  11   A    I did not have that specific thought.

15:08:36  12   Q    But you did think that it was safe to do the

15:08:39  13   contest.

15:08:39  14   A    Yes.

15:08:40  15   Q    You didn't think you were putting anybody at risk.

15:08:44  16   Right?

15:08:44  17   A    Right.

15:08:44  18   Q    And no one told you to the contrary.  True?

15:08:46  19   A    True.

15:08:47  20   Q    And you would never put a contest on that would put

15:08:49  21   people at risk of dying?

15:08:54  22   A    Correct.

15:08:54  23   Q    Never, not even think about doing that.  True?

15:08:54  24   A    True.

15:08:54  25   Q    But you did.  Right?

| 16:14:58 | 1 | A | I didn't put it in.  I left it in. |
| 16:15:00 | 2 | Q | Left it in.  Thank you. |
| 16:15:02 | 3 | A | Yes. |
| 16:15:02 | 4 | Q | That's why you left it in for Hold Your Wee for a |

16:15:07  5  Wii?

16:15:07  6  A    True.

16:15:08  7  Q    Because your state of mind was you didn't think

16:15:12  8  that consuming water, eight ounces, every 15 minutes, for

16:15:17  9  indefinitely never crossed your mind that it was

16:15:21  10  dangerous.  True?

16:15:21  11  A    True.

16:15:21  12  Q    Do you think you're unreasonable to have held that

16:15:25  13  belief?

16:15:25  14  A    Am I unreasonable to have believed that it was not

16:15:28  15  harmful?

16:15:30  16  Q    Yes.

16:15:30  17  A    I don't think I'm unreasonable to believe it was not

16:15:34  18  harmful.

16:15:34  19  Q    So I guess it would be fair to say, Ms. Pechota,

16:15:37  20  that you don't think that any of the staff who operated

16:15:39  21  under the belief that it wasn't harmful, you don't think

16:15:43  22  they were unreasonable.  True?

16:15:44  23  A    True.

16:15:45  24  Q    Same thing for the contestants.  Correct?

16:15:51  25  A    True.

267

16:15:51  1     Q      Now, in terms of responsibility for research.  We

16:15:53  2     have talked a little bit about that today.  I'm not going

16:15:56  3     to go back over that.  But I will represent to you that we

16:16:00  4     have asked -- I have taken the deposition of Mr. Maney,

16:16:03  5     and I've taken the deposition of Mr. Cox; and they both

16:16:06  6     said, under oath, that it was Robin's job to research the

16:16:10  7     contests; that was her job, her staff, her job, to

16:16:14  8     research whether a contest was potentially dangerous or

16:16:17  9     hazardous.  I will represent that to you.

16:16:19  10            Is that a true statement?

16:16:20  11    A      No.  It's part of my job.

16:16:24  12    Q      Do you believe it's part of their job?

16:16:26  13    A      Yes.

16:16:26  14    Q      One of those gentlemen, I can't frankly remember

16:16:33  15    which one, said that Mr. Weed told them, or that person,

16:16:35  16    that you had let them down; that you had not done the

16:16:40  17    research.

16:16:40  18            Do you believe that's a fair statement?

16:16:42  19    A      No.

16:16:42  20    Q      Do you believe that Mr. Weed let you down by not

16:16:45  21    doing the research?

16:16:49  22    A      No.  Because, again, no one thought that there was a

16:16:55  23    need to do any research.  We didn't think there was

16:16:59  24    anything wrong with drinking water.

16:17:01  25    Q      And you weren't -- you weren't just asking people to

268

16:23:14  1  Q      And what you had been told by Entercom about how to

16:23:18  2  do your job.  Right?

16:23:19  3  A      Yes.

16:23:19  4  Q      Okay.

16:23:20  5         Now, let's turn to the section that says Material

16:23:23  6  Terms on this PowerPoint that you would have had in 2006.

16:23:27  7         clearly before November, when you guys first hatched

16:23:30  8  the plan to do the Hold Your Wee for a Wii.  True?  You

16:23:35  9  had already had the PowerPoint?

16:23:37  10  A      Yes.

16:23:37  11  Q      Material Terms, item G, says, "Material terms of the

16:23:45  12  contest must be disclosed on-air, including," G, "when and

16:23:50  13  how the prize can and will be won."  True?

16:23:52  14  A      Yes.

16:23:53  15  Q      That would be item number -- the second part of item

16:23:59  16  number 10 on Exhibit 9, which is entitled "This is how the

16:24:01  17  contest will work."  True?

16:24:03  18  A      Yes.

16:24:04  19  Q      Now, let's go to the next page.  You would have seen

16:24:10  20  this.  Right?

16:24:10  21  A      Yes.

16:24:11  22  Q      It says "Contest Limitations," with a big stop sign.

16:24:14  23  Right?

16:24:14  24  A      Yes.

16:24:15  25  Q      It says, "Contests which are illegal, dangerous,

275

| | | |
|---|---|---|
| 16:24:20 | 1 | misleading, rigged or in bad taste must be avoided." |
| 16:24:23 | 2 | Right? |
| 16:24:23 | 3 | A       Yes. |
| 16:24:24 | 4 | Q       Was that -- did you take that to heart? |
| 16:24:29 | 5 | A       Yes. |
| 16:24:30 | 6 | Q       Did you take everything they told you in this |
| 16:24:32 | 7 | PowerPoint to heart, that this is really a rule they |
| 16:24:35 | 8 | wanted you to follow? |
| 16:24:35 | 9 | A       Yes. |
| 16:24:36 | 10 | Q       Now, let's go to the next page.  Item B, "Contests |
| 16:24:43 | 11 | to be avoided include:  Contests that encourage people to |
| 16:24:46 | 12 | act in an unreasonably dangerous manner or place |
| 16:24:50 | 13 | themselves or others in extreme danger."  True? |
| 16:24:53 | 14 | A       Yes. |
| 16:24:53 | 15 | Q       Now, today, you know having people drink water in |
| 16:25:02 | 16 | the fashion described in your set of -- the thing you |
| 16:25:05 | 17 | whipped up on the 9th -- you know now that this contest |
| 16:25:11 | 18 | did put people in a situation where they were putting |
| 16:25:14 | 19 | themselves in extreme danger.  Right? |
| 16:25:16 | 20 | A       I know that now. |
| 16:25:18 | 21 | Q       There is nothing more extreme than having them die. |
| 16:25:21 | 22 | True? |
| 16:25:21 | 23 | A       True. |
| 16:25:22 | 24 | Q       And you say you know that now.  But is it fair -- is |
| 16:25:28 | 25 | it a fair statement -- I want you to listen carefully to |

| 16:25:31 | 1 | my question here, Ms. Pechota: Is it fair to say you did |

16:25:31    1    my question here, Ms. Pechota: Is it fair to say you did

16:25:35    2    absolutely nothing to determine whether your gut feeling

16:25:40    3    that this contest was not dangerous, you did absolutely

16:25:46    4    nothing affirmatively in your capacity as a marketing and

16:25:47    5    promotions director to check out what you were asking

16:25:53    6    contestants to do?

16:26:03    7    A     I wouldn't say absolutely nothing.

16:26:06    8    Q     Tell us affirmatively, what did you affirmatively do

16:26:12    9    to determine whether your gut feeling, instinct, as you

16:26:15    10    described this morning, was accurate?

16:26:17    11    What did you do?

16:26:25    12    A     I guess I just trusted my gut.

16:26:28    13    Q     That doesn't strike me as being particularly

16:26:28    14    affirmative. By affirmative, I mean did you do something

16:26:31    15    other than say, "Oh, I think it will be safe."

16:26:33    16    I want to know what you did of a proactive nature,

16:26:38    17    in your capacity as a promotion and marketing director for

16:26:44    18    a major communications company, that was paying you to do

16:26:49    19    your job. Tell me what you did affirmatively to determine

16:26:54    20    whether your gut was correct.

16:27:13    21    A     I trusted my gut. Nothing else.

16:27:17    22    Q     So it's fair for me to say you did nothing

16:27:20    23    affirmative. True?

16:27:22    24    A     True.

16:27:22    25    Q     And as far as you know, no one did anything

| | | |
|---|---|---|
| 16:27:26 | 1 | affirmative to determine whether what was going to be |
| 16:27:33 | 2 | the -- how to win the Wii contest, the rules, no one with |
| 16:27:39 | 3 | the station ever did anything affirmative to determine |
| 16:27:46 | 4 | whether it was a safe contest.   True? |
| 16:27:46 | 5 | A     True. |
| 16:27:46 | 6 | Q     Did you believe that when you did what you were |
| 16:27:51 | 7 | doing that you were complying with the directions that |
| 16:27:57 | 8 | Carmela had given you? |
| 16:27:59 | 9 | A     I was doing my job; I believed I was doing my job. |
| 16:28:11 | 10 |     MR. SULLIVAN:  Good time for a break? |
| 16:28:13 | 11 |     MR. DREYER:  Another five minutes or ten minutes, |
| 16:28:18 | 12 | and we'll take a break. |
| 16:28:18 | 13 |     I want you to skip ahead to "Review By Legal," item |
| 16:28:21 | 14 | B, and it's page 635, says "Review By Legal," and has the |
| 16:28:31 | 15 | word "Yea" typed next to it.  And it says, "Written rules |
| 16:28:36 | 16 | should be reviewed by your primary legal contact for the |
| 16:28:39 | 17 | following." |
| 16:28:39 | 18 | Q     That would be Carmela.  Right?  True? |
| 16:28:44 | 19 | A     (Witness nodding.) |
| 16:28:44 | 20 | Q     True? |
| 16:28:45 | 21 | A     Yes.  Sorry. |
| 16:28:47 | 22 | Q     No problem. |
| 16:28:52 | 23 |     Did you believe -- and this last item Mr. Levine |
| 16:28:58 | 24 | read to you about any high risk, dangerous or borderline |
| 16:29:01 | 25 | acceptable contests, you would agree now that having |

16:46:42  1  A    Give me a second to get to it.

16:46:45  2  Q    You bet. I'm sorry.

16:46:47  3       MR. POST:  Exhibit 6?

16:46:49  4       MR. DREYER:  Roman numeral VI.  It's entitled

16:46:51  5  "Releases."

16:46:52  6       THE WITNESS:  Okay.

16:46:53  7  Q    BY MR. DREYER:  Now, we talked about, I think you

16:47:11  8  used the word "simple contest."  Are you familiar with

16:47:13  9  that term?

16:47:14  10 A    Yes.

16:47:14  11 Q    What is a simple contest?  Define that for me,

16:47:18  12 please.

16:47:23  13 A    A simple call-in to win something, something that --

16:47:29  14 it's just like a one-day thing.  Something that's -- the

16:47:35  15 prize is not very big in value.  That would be a simple

16:47:44  16 contest.

16:47:44  17 Q    So, by your definition, then, the Hold Your Wee for

16:47:52  18 a Wii was clearly not a simple contest.  True?

16:47:52  19 A    I felt it was.  I mean, are you asking what I feel

16:47:57  20 now, or what I felt at the time?

16:47:59  21 Q    Well, I want to know -- you're the person who says

16:48:04  22 she's a very experienced marketing promotions director.

16:48:08  23 You've run many contests.  True?

16:48:10  24 A    Yes.

16:48:10  25 Q    My question to you is:  When this contest was

16:48:15  1   discussed on November 27th for the first time, you

16:48:19  2   understood that it was going to be a Wii.  True?

16:48:21  3   A     Yes.

16:48:21  4   Q     That was not an inexpensive prize.  Correct?

16:48:26  5   A     It's not expensive.

16:48:31  6   Q     It's hard to get.  True?

16:48:31  7   A     Yes.

16:48:31  8   Q     In demand?

16:48:32  9   A     Yes.

16:48:32  10  Q     Someone at the station; the station paid for it.

16:48:36  11  Correct?

16:48:36  12  A     Yes.

16:48:36  13  Q     Do you know how much it's going to cost?

16:48:38  14  A     I believe it was $250.

16:48:40  15  Q     Assuming they could get one.

16:48:41  16  A     Assuming they could get one.

16:48:43  17  Q     And your view is $250 is not very expensive?

16:48:47  18  A     No.

16:48:48  19  Q     You understood that contestants were going to call

16:48:52  20  in to qualify.  Right?

16:48:54  21  A     Yes.

16:48:55  22  Q     And that once they qualified, they would be in with

16:48:59  23  a pool of contestants.  True?

16:49:00  24  A     Yes.

16:49:01  25  Q     And that they would be on premises to do the

282

16:49:05  1    contest?

16:49:05  2    A    Yes.

16:49:05  3    Q    And initially they talked about doing it outside?

16:49:08  4    A    Yes.

16:49:08  5    Q    Because of the number of people?

16:49:10  6    A    Yes.

16:49:11  7    Q    And you're telling us, based upon your experience,

16:49:21  8    that falls into the category of a simple contest?

16:49:22  9    A    In my world, yes.

16:49:23  10   Q    Now, let's look at Exhibit 4 really quickly.  It

16:49:35  11   says, the top paragraph, "With the exception of simple

16:49:42  12   contests, contest rules must be submitted for review by

16:49:47  13   your Entercom legal representative."

16:49:48  14        So you certainly knew that.  True?

16:49:49  15   A    Yes.

16:49:50  16   Q    Next line says, "This is especially true for any

16:49:53  17   unusual or complicated mode of entry, winning or any large

16:49:57  18   prize value."  Right?

16:49:59  19   A    Right.

16:49:59  20   Q    And then it says, "A simple contest is one in which

16:50:03  21   the form of rules have been approved before by Entercom

16:50:06  22   legal, that fall under the station's generic contest

16:50:12  23   rules, paren, (use only for simple one off --"

16:50:14  24   A    One off.

16:50:15  25   Q    "-- one-off, call-in, on-site or online simple

| | |
|---|---|
| 16:50:25 | 1 |
| 16:50:30 | 2 |
| 16:50:34 | 3 |
| 16:50:47 | 4 |
| 16:50:50 | 5 |
| 16:50:50 | 6 |
| 16:50:50 | 7 |
| 16:50:52 | 8 |
| 16:50:55 | 9 |
| 16:50:56 | 10 |
| 16:51:03 | 11 |
| 16:51:03 | 12 |
| 16:51:05 | 13 |
| 16:51:10 | 14 |
| 16:51:11 | 15 |
| 16:51:12 | 16 |
| 16:51:18 | 17 |
| 16:51:22 | 18 |
| 16:51:26 | 19 |
| 16:51:28 | 20 |
| 16:51:31 | 21 |
| 16:51:34 | 22 |
| 16:51:39 | 23 |
| 16:51:40 | 24 |
| 16:51:44 | 25 |

random selection contests; 9th caller for a stereo system

or concert tickets; entry to win CD at a station event;

online entry to randomly select one winner of a TV etc.,)

end paren, and that do not include any unusual mode of

entry/winning or large prize."   Right?

A     Yes.

Q     Did you have a sense that there was an unusual mode

of entry in winning this prize for this particular

contest?

A     An unusual mode of entry?  No there is not an

unusual mode of entry.

Q     And do you know what Mr. Geary's opinion is about

this contest as to whether it's a simple contest or a

nonsimple contest?

A     No, I don't.

Q     Now, on the releases, it says -- strike that.

As you sit here today, knowing -- having the contest

having been run, it was run in the fashion you thought it

was going to get run, essentially.   True?

A     Essentially.

Q     Do you think that you made a mistake, considering

this to be a simple contest, in retrospect?

A     In retrospect.

Q     Now, on "Releases," it says, second bullet point on

"Releases," says, "In any contest or promotional event --"

17:24:45  1    good.  And her stomach was distended.  She's a tiny, thin

17:24:50  2    thing, and her stomach was distended.

17:24:52  3         We understand that in the Piercing Plinko contest,

17:24:57  4    Ms. -- the legal told you, "Hey, get a nurse.  Have a

17:25:01  5    nurse available for piercing of ears or nose."  Right?

17:25:04  6    A    Yes.

17:25:04  7    Q    Did you ever think maybe we ought to have a nurse

17:25:10  8    here for this, where we're having people consuming great

17:25:15  9    volumes of water?

17:25:15  10   A    I didn't think so, no.

17:25:16  11   Q    Did anybody bring that up?

17:25:17  12   A    No, not that I recall.

17:25:18  13   Q    If someone had, would you have been able to make the

17:25:23  14   arrangements to have a nurse?

17:25:26  15   A    I don't know.

17:25:28  16   Q    Did you know anybody there that was medically

17:25:32  17   qualified or capable in first aid or anything at the

17:25:36  18   station, an employee?

17:25:38  19   A    I don't -- no.

17:25:39  20   Q    Has any name popped up, like, "Hey, I know Steve

17:25:43  21   Weed, he knows first aid; John Geary knows first aid,"

17:25:48  22   something of that nature?

17:25:48  23   A    I know first aid.

17:25:50  24   Q    Do you know the signs of water intoxication?

17:25:52  25   A    Until this event, I didn't know what water

316

1   STATE OF CALIFORNIA   )
                          )  ss.
2   COUNTY OF SACRAMENTO  )

3

4        I, SHERREE L. BLAKEMORE, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6        That the witness named in the foregoing deposition

7   was present at the time and place therein specified;

8        That the proceeding was taken before me at said time

9   and place, and was taken down in shorthand writing by me;

10       That the proceeding was thereafter, under my

11  direction, transcribed; and that the foregoing transcript

12  constitutes a full, true and correct record of the

13  proceedings which then and there took place;

14       That I am a disinterested person to the said action.

15       Dated this 31st day of July, 2007.

16

17

18

19

20       _____

21       SHERREE L. BLAKEMORE   C.S.R. #7144

22

23

24

25

386

# EXHIBIT 18

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA.

IN AND FOR THE COUNTY OF SACRAMENTO

---oOo---

WILLIAM STRANGE, individually,
And as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
Minors; RONALD SIMS, as Guardian
Ad Litem for KEEGAN SIMS, a  minor,

        Plaintiffs,

     v.                  No. 07AS00377

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED,
ROBIN PECHOTA, LIZ DIAZ,
ADAM COX, STEVE MANEY,
PATRICIA SWEET, MATT CARTER,
And DOES 1-40, inclusive,

        Defendants.



_____/

---oOo---

9:11 a.m.

July 12, 2007

**DEPOSITION OF STEVE WEED**

Reported by:  SHERREE L. BLAKEMORE, CSR No. 7144

---

*Royal*
REPORTING SERVICES

1333 Howe Avenue, Suite 228
Sacramento, California 95825
916.564.0100

| | | |
|---|---|---|
| 10:05:54 | 1 | Q    Can you answer the question? |
| 10:05:57 | 2 | A    I don't recall specific pressure. |
| 10:06:02 | 3 | Q    Did Mr. Gary review specific contests with you, |
| 10:06:07 | 4 | which occurred over a period of time, as part of your |
| 10:06:09 | 5 | performance review?  If you know. |
| 10:06:12 | 6 | A    Only in the most general terms. |
| 10:06:14 | 7 | Q    So, to your knowledge, he would never say to you, |
| 10:06:17 | 8 | for example, "Hey, Steve, what happened with regard to |
| 10:06:23 | 9 | piercing Plinko"? |
| 10:06:27 | 10 | A    What's the question? |
| 10:06:28 | 11 | Q    He never asked you specifically -- I use that as one |
| 10:06:32 | 12 | contest -- in which he would ask you "what happened to |
| 10:06:37 | 13 | Piercing Plinko?" |
| 10:06:37 | 14 | A    I don't recall any questions like that. |
| 10:06:37 | 15 | Q    Would your group, you, Ms. Pechota, to your |
| 10:06:40 | 16 | knowledge, submit the proposed contests to Mr. Geary for |
| 10:06:46 | 17 | review before it was presented on air? |
| 10:06:47 | 18 | A    No. |
| 10:06:48 | 19 | Q    So how would Mr. Geary, if you know, review your |
| 10:06:52 | 20 | performance evaluation to determine if you were pointing |
| 10:06:56 | 21 | out detrimental aspects of a particular contest, or |
| 10:07:01 | 22 | particular program, to any of your talent that you were |
| 10:07:03 | 23 | supervising? |
| 10:07:04 | 24 | A    Aside from listening to the radio station, I don't |
| 10:07:09 | 25 | know how he collected his data or impressions then. |

| | | |
|---|---|---|
| 10:40:07 | 1 | Q    Programming; you were going to supervise |
| 10:40:09 | 2 | programming? |
| 10:40:09 | 3 | A    The programming department. |
| 10:40:14 | 4 | Q    Yes. |
| 10:40:14 | 5 | A    Yes. |
| 10:40:14 | 6 | Q    And the programming department put on the Hold Your |
| 10:40:16 | 7 | Wee for a Wii contest.  Did it not? |
| 10:40:17 | 8 | A    It wasn't a specific department function; it was put |
| 10:40:21 | 9 | on by the radio station. |
| 10:40:27 | 10 | Q    Well, who was responsible for this contest?  Or was |
| 10:40:27 | 11 | there no one responsible for it in terms of supervision? |
| 10:40:34 | 12 | A    I don't understand the question. |
| 10:40:38 | 13 | Q    We're going to have a contest. |
| 10:40:40 | 14 | A    Yes. |
| 10:40:40 | 15 | Q    Who's going to supervise the formation and the |
| 10:40:46 | 16 | actual conduct of the contest, Hold Your Wee for a Wii? |
| 10:40:50 | 17 | A    Those are actually two separate things. |
| 10:40:53 | 18 | Q    Tell us what your role was going to be. |
| 10:40:58 | 19 | A    My role was in the discussion and preparation of the |
| 10:41:01 | 20 | contest, and determining what we were going to do and when |
| 10:41:07 | 21 | we were going do it. |
| 10:41:10 | 22 | And then it was turned over to the promotion |
| 10:41:13 | 23 | department to fully vet the promotion, work out the rules, |
| 10:41:19 | 24 | and then actually oversee the execution of the promotion. |
| 10:41:23 | 25 | Q    And how did this division of responsibility come |

10:41:27  1    about?

10:41:29  2    A    It's standard within the industry.

10:41:35  3    Q    So your understanding was that Ms. Pechota was going

10:41:37  4    to be in charge of this contest, supervise the contest,

10:41:41  5    after you discussed its preparation.

10:41:45  6    A    Yes.

10:41:45  7    Q    And did you consider yourself finished with any

10:41:49  8    responsibilities with regard to this contest after you had

10:41:53  9    discussed and prepared it?

10:41:56  10   A    Finished in what way?

10:41:58  11   Q    Now, it's Ms. Pechota's job?

10:42:02  12   A    As far as supervising the implementation of it, yes.

10:42:08  13   Q    You're the station manager.  Correct?

10:42:10  14   A    Yes.

10:42:11  15   Q    This contest begins at -- very early in morning.

10:42:16  16   Right?

10:42:16  17   A    Yes.

10:42:16  18   Q    Who, to your understanding, is responsible for being

10:42:21  19   there to supervise this contest?

10:42:21  20   A    The promotions department.

10:42:23  21   Q    Do you know if anyone was there from the promotions

10:42:27  22   department the morning of the contest?

10:42:28  23   A    I do know now who was there.

10:42:29  24   Q    Did you know beforehand?

10:42:30  25   A    I knew that there would be staff members from the

| | | |
|---|---|---|
| 13:30:39 | 1 | Q    Do you have any indication that there was some |
| 13:30:42 | 2 | person, or title of position Mr. Geary was not able to |
| 13:30:46 | 3 | hire or fire in his capacity as market manager? |
| 13:30:49 | 4 | A    No specific information. |
| 13:30:51 | 5 | Q    So your belief would be, at the top of the food |
| 13:30:59 | 6 | chain there, John Geary. |
| 13:30:59 | 7 | A    Yes. |
| 13:30:59 | 8 | Q    And as far as you're concerned, if Mr. Geary made |
| 13:31:04 | 9 | some kind of a policy, your job was to follow and enforce |
| 13:31:08 | 10 | that policy. |
| 13:31:08 | 11 | A    Yes. |
| 13:31:09 | 12 | Q    Your job was to follow and enforce that policy as |
| 13:31:12 | 13 | though that policy came down from Entercom corporate as |
| 13:31:16 | 14 | far as you understand it? |
| 13:31:18 | 15 | MR. SULLIVAN:  Vague.  Well, lack of foundation. |
| 13:31:24 | 16 | THE WITNESS:  I'm not sure I understand the |
| 13:31:27 | 17 | question. |
| 13:31:27 | 18 | MR. BALE:  Sure.  I'll back up a little bit. |
| 13:31:29 | 19 | Q    From time to time, would it be that Entercom |
| 13:31:32 | 20 | corporate, and I mean Entercom Communications Corporation, |
| 13:31:38 | 21 | would communicate some policies they expected the stations |
| 13:31:39 | 22 | to follow? |
| 13:31:42 | 23 | A    I don't know if they ever communicated it directly |
| 13:31:45 | 24 | or if it was funneled through Mr. Geary. |
| 13:31:51 | 25 | Q    Okay.  So if a policy came from John Geary, as far |

13:31:56  1    as you're concerned, you wouldn't really have any specific

13:31:58  2    information whether it was a John Geary policy or a policy

13:32:01  3    John Geary was simply relating to all of you that came

13:32:05  4    from corporate.

13:32:09  5    A    Not necessarily.

13:32:09  6    Q    That is correct?  My understanding is correct?

13:32:10  7    A    Yes.

13:32:10  8    Q    Okay.

13:32:11  9         And Mr. Geary would not differentiate between the

13:32:19  10   two.

13:32:19  11   A    Oh, I think sometimes he would.

13:32:19  12   Q    He might say, "We got this from corporate, we have

13:32:21  13   to start doing this"?

13:32:21  14   A    Yes.

13:32:22  15   Q    Or sometimes he might say, "Here's a policy I want

13:32:25  16   you to follow," without saying something like that?

13:32:27  17   A    Yes.

13:32:29  18   Q    As far as you're concerned, they were one in the

13:32:36  19   same, because if Mr. Geary expressed it was a policy, as

13:32:36  20   far as you're concerned, it was a policy to be followed.

13:32:44  21   A    If it came from John Geary, and it was directed to

13:32:44  22   my role at the radio stations, I reported to him, so yes.

13:32:47  23   Q    Did you ever have a situation arise where you got

13:32:53  24   word of a conflicting policy, a policy that was expressed

13:32:57  25   one way by Mr. Geary and a different way by corporate?

14:58:10    1    A    I don't know if that is a hard, fast definition, but

14:58:14    2    it is spelling out what a simple contest might be.

14:58:17    3    Q    Who is Carmela Masi, as far as you know?

14:58:20    4    A    She's one of the staffers at Entercom legal

14:58:24    5    department.

14:58:24    6    Q    Did you have any understanding of what you were to

14:58:27    7    do if Ms. Masi communicated specific information to you

14:58:31    8    regarding the company policy?  I mean, did you have an

14:58:34    9    understanding that if Masi says I'm supposed to do this,

14:58:40   10    you are supposed to do it?

14:58:40   11    A    Yes.

14:58:40   12    Q    If Ms. Masi sent you something that defined a

14:58:42   13    policy, you would follow the policy.

14:58:44   14    A    Yes.

14:58:44   15    Q    And it would be -- and you would think John Geary

14:58:47   16    would expect you to follow that policy.

14:58:49   17    A    Yes.

14:58:49   18    Q    Did you understand this e-mail from Ms. Masi to be

14:58:54   19    articulating a policy to be followed?

14:58:56   20    A    Yes.

14:58:57   21    Q    And not only this e-mail, but she sent certain other

14:59:02   22    documents along with it.  Correct?

14:59:12   23    A    As I recall, yes.

14:59:12   24    Q    So if Ms. Masi says in here -- let's not use the

14:59:12   25    word "definition."  Let's say she references a simple

1    STATE OF CALIFORNIA   )
                           )  ss.
2    COUNTY OF SACRAMENTO  )

3

4         I, SHERREE L. BLAKEMORE, a Certified Shorthand

5    Reporter of the State of California, do hereby certify:

6         That the witness named in the foregoing deposition

7    was present at the time and place therein specified;

8         That the proceeding was taken before me at said time

9    and place, and was taken down in shorthand writing by me;

10        That the proceeding was thereafter, under my

11   direction, transcribed; and that the foregoing transcript

12   constitutes a full, true and correct record of the

13   proceedings which then and there took place;

14        That I am a disinterested person to the said action.

15        Dated this 14th day of August, 2007.

16

17

18

19

20        _____

21        SHERREE L. BLAKEMORE   C.S.R. #7144

22

23

24

25

# EXHIBIT 19

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

WILLIAM A. STRANGE, individually,
and as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
minors; RONALD E. SIMS, as
Guardian ad Litem for KEEGAN SIMS,
a minor,

        Plaintiffs,

    vs.                         No. 07AS00377

ENTERCOM SACRAMENTO, LLC.,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED, ROBIN
PECHOTA, LIZ DIAZ, ADAM COX,
STEVE MANEY, PATRICIA SWEET,
MATT CARTER, and DOES 1 through
40, inclusive,

        Defendants.
_____/



DEPOSITION OF RONALD MENDOZA

May 2, 2007

Reported by:  KATHRYN DAVIS, CSR No. 3808



555 University Avenue, Suite 116  Sacramento, California  95825  916.567.4211  www.kdareporting.com

DEPOSITION OF RONALD MENDOZA

1    in Sacramento at Valley High School in 1989.

2    Q        Okay.

3    A        I attended U. C. Davis as well as CSU

4    Sacramento, but I did not complete my degree.

5    Q        All right.  What do you do for the California

6    Franchise Tax Board?

7    A        I'm an assistant administrator, meaning I'm

8    responsible for large number of our Window servers

9    that provide applications for, et cetera.

10   Q        And you have been doing that for the last

11   14 years?

12   A        Probably for -- well, maybe not 14 but for

13   around eight years or so.

14   Q        Do you have a family?

15   A        Yes.

16   Q        You are married, right?

17   A        Yes.

18   Q        And you have children?

19   A        Yes.

20   Q        What ages?

21   A        Just one 13-year old son.

22   Q        At some point you got involved in a contest for

23   KDND, correct?

24   A        Yes.

25   Q        And the contest was *Hold Your Wee*, right?

DEPOSITION OF RONALD MENDOZA

1    A        Correct.

2    Q        Do you recall if that was on January 12, 2007?

3    A        Yes.

4    Q        How did you learn about the contest?

5    A        My family are frequent listeners of that

6    radio station.  And so we usually are aware of any

7    and all contests and promotions that they are

8    running.

9    Q        You say you are frequent listeners.  What do you

10   mean by that?

11   A        Usually listen to it on the drive to work,

12   sometimes on the drive home, on the weekends

13   occasionally, especially if there is a promotion

14   going on over the weekend.

15   Q        And had you participated in any promotions in

16   the past?  I'll call it the "station" rather than KDND.

17   A        Not actually at that location.  They've had

18   promotions off-site, like at a Home Depo in Folsom,

19   and I have participated in a promotion there.  And

20   then there are also promotions that are done on

21   their website.  And then you pick up your prizes at

22   the station, so I've -- we participated in those as

23   well.

24   Q        So let's talk about the contest or promotions

25   that you've participated in with respect to the station

DEPOSITION OF RONALD MENDOZA

1  Q       Okay.  Dancing would be one.  Any others that

2  you can think of?

3  A       Not too many that I can remember right now.

4  Q       Okay.  How did you hear about the *Hold Your Wee*

5  *Contest*?

6  A       That one was advertised, I believe, the entire

7  week.  It was advertised extensively in the morning by

8  the Morning Show, which we typically listen to on our

9  drive to work and getting ready for work.

10 Q       And what did you do to get into the contest?

11 A       The rules were to call in and give an example

12 of your worst Christmas gift that you'd received,

13 and so on.  On Thursday, January 11th, I called in.

14 I was able to get through.  And I gave them my story

15 of the worst chocolate -- I'd received a bottle of

16 gourmet chocolate with an expiration date of 2002 or

17 something like that.

18 Q       And you received it much after the fact?

19 A       Correct.

20 Q       Prior to entering into the contest, did you

21 discuss the contest with your family?

22 A       Again, my family listens to the radio station so

23 we might have discussed it just in terms of, "Oh, yeah,

24 that sounds like a silly contest."  Also, the main prize

25 was the Nintendo Wii, which I'd camped out with my son a

DEPOSITION OF RONALD MENDOZA

1    couple months earlier so that he could get his.

2         So we were just discussing the fact that it is

3    such a high demand item and here they have one to give

4    away.

5    Q      Prior to starting the contest on January 12th,

6    did you discuss the nature of the contest with your

7    family?

8    A      With my wife.  Actually, she is the one that

9    encouraged me to enter.

10   Q      And during the discussions with your wife, did

11   you discuss anything that there might be a potential to

12   get sick from drinking too much water?

13   A      No, we didn't discuss that.

14   Q      Did you discuss any potential physical risk as a

15   result of drinking water?

16   A      No, we did not.

17   Q      Did you discuss the contest with any workers,

18   co-workers, before you started the contest?

19   A      No, we did not.

20   Q      Did you discuss the contest with any friends

21   before you entered the contest?

22   A      Not at all.

23   Q      Did you joke about the contest with your wife

24   before you started?

25   A      Yes, we did.

DEPOSITION OF RONALD MENDOZA

1   Q       How did you joke about it?

2   A       We were kind of joking just from the fact

3   that it was a highly sought-after item.  We already

4   had one, and it felt kind of wrong to compete when

5   we already had one.  So it was kind of a frivolous

6   contest thing.  So it was more of that matter.

7   Q       Did you discuss what the rules of the contest

8   were with anybody?

9   A       Not with anyone, no.

10  Q       Did you understand what the rules were for the

11  contest in terms of how you would win the prize?

12  A       Yes.

13  Q       And what did you understand the rules were?

14  A       It was my understanding that we were -- that

15  all the contestants originally were going to meet

16  outside the station very early, 6:00 in the morning,

17  and we would have to drink bottles of water,

18  undisclosed amounts, at like 15-minute intervals.

19  And whoever would be able to drink the most water

20  without having to go to the restroom or quit would

21  win.

22  Q       So you understood that if you urinated, you

23  would drop out of the contest?

24  A       Yes.

25  Q       And did you understand that you could

DEPOSITION OF RONALD MENDOZA

1   voluntarily drop out at any time?

2   A       Yes.

3   Q       Did you understand that there was a possibility

4   you might vomit?

5   A       Yes.

6   Q       Where did you get that understanding?

7   A       I just thought it is outside, it is real

8   cold, it was real cold during that time of the year.

9   And anyone can get sick or anything when you are

10  trying to drink a lot of water and it is cold

11  outside.

12  Q       You showed up on January 12th at the station?

13  A       Yes.

14  Q       Approximately what time?

15  A       I showed up right around 6:00 a.m.

16  Q       Were the rules explained for the contest when

17  you showed up at the station?

18  A       The rules were explained, just kind of

19  informally.  It wasn't a real formal "here is every

20  single rule," but it was just kind of an informal

21  summary with everyone that was out there to a

22  general understanding of the rules.

23  Q       On the morning of January 12th, did station

24  personnel describe that if you urinated, you would be

25  out of the contest?

DEPOSITION OF RONALD MENDOZA

1   A     Yes.

2   Q     Did you learn that the contest was going to be

3   inside?

4   A     After we had arrived, yes.

5   Q     And was it explained to you that if you left the

6   room where the contest was being held, specifically the

7   kitchen, that you'd drop out of the contest?

8   A     Yes.

9   Q     Was it explained to you that if you vomited, you

10   would drop out of the contest?

11   A     Yes.

12   Q     Did you think that you might vomit if you drank

13   too much water?

14   A     I personally didn't think I would.  I just

15   thought that I would have to go to the restroom.

16   Q     Did you voluntarily enter the contest?

17   A     Yes, I did.

18   Q     When you showed up for the contest, was there

19   joking about the rules?

20   A     There was a little bit of joking and a little

21   bit of competitiveness mainly in terms of the

22   clothing that people were wearing.

23   Q     What do you mean by that?

24   A     When I entered in and was told I was in the

25   contest, I was told to wear a bathing suit, like

DEPOSITION OF RONALD MENDOZA

1  Q      You didn't ask any questions about whether you

2  would be at risk if you drank too much water?

3  A      No, I did not.

4  Q      When you signed the release, did you have any

5  discussions with anybody about the release?

6  A      No, I did not.

7  Q      Did you ask any questions?

8  A      No, I did not.

9  Q      Did you think it would be painful to not urinate

10  as you drank water?

11  A      I wasn't sure it would be painful.  I just

12  thought it might be -- I guess, okay -- painful,

13  sure.  I'll go with painful.

14  Q      And do you still regard the contest as being a

15  good-natured contest?

16  A      Yes.

17  Q      Did you always regard the contest as being a

18  good-natured contest until you heard of Jennifer

19  Strange's death?

20  A      Yes.

21  Q      Did anyone pressure you not to urinate?

22  A      Not in a serious manner.

23  Q      Did anyone pressure you to stay in the contest?

24  A      No.

25  Q      How long were you in the contest?

DEPOSITION OF RONALD MENDOZA

1  connection with the water intoxication?

2  A       I've read some articles since then.  Have a

3  little idea.

4  Q       Prior to January 12th, did you have any

5  understanding about what would medically be required in

6  order to have water intoxication?

7  A       No, I did not.

8  Q       Did you know medically why it was the Chico

9  person in the hazing incident died?

10  A       Not medically, no.

11  Q       Did you know any of the details of the Chico

12  hazing incident in terms of what the fraternity mates

13  did at Chico?

14  A       Just what was printed in the newspaper.

15  Q       What was your understanding?

16  A       Just a lot of excess water ingestion.  I

17  think he was stripped down to almost no clothing and

18  sat in a lot of water -- things like that.

19  Q       Did you have an understanding as to whether or

20  not anybody forced water down him?

21  A       I was under the impression that it was

22  forced.

23  Q       Now, you recognize Jennifer Strange as being the

24  person in the middle of Exhibit 17?

25  A       Yes.

DEPOSITION OF RONALD MENDOZA

1   Q     Did she smile during the course of the contest

2  while you were there?

3   A     Yes, she did.

4   Q     Did she seem to be in a joking mood?

5   A     She seemed to be in -- yeah, I would say an

6  upbeat mood.

7   Q     Was there anything that you saw about Jennifer

8  Strange that suggested to you that she was in any pain?

9   A     Not that I saw, no.

10   Q     Did she say anything about being in any sort of

11  discomfort?

12   A     Not while I was there, no.

13   Q     Did you talk to Jennifer Strange at all?

14   A     I didn't talk to her directly, no.

15   Q     Did you hear anything she said?

16   A     She was sitting across the room -- yeah, she

17  was across the room and everyone could hear

18  everyone's conversation, so I heard conversations

19  that she had with station personnel and things like

20  that.

21   Q     Can you tell me what you heard her say?

22   A     I recall Carter had made a comment about,

23  "You must be really young."  And Jennifer responded,

24  "No, I have three kids."  And he wanted -- he kind

25  of gave her a shocked look, so she produced some

DEPOSITION OF RONALD MENDOZA

1                        REPORTER'S CERTIFICATE

2    State of California      )
                             ) ss.
3    County of Sacramento     )

4

5          I certify that the witness in the foregoing

6    deposition,

7                        RONALD MENDOZA,

8    was by me duly sworn to testify in the within-entitled

9    cause; that said deposition was taken at the time and

10   place therein named; that the testimony of said witness

11   was reported by me, a duly Certified Shorthand Reporter

12   Of the State of California authorized to administer

13   oaths and affirmations, and said testimony was

14   thereafter transcribed into typewriting.

15         I further certify that I am not of counsel or

16   attorney for either or any of the parties to said

17   deposition, nor in any way interested in the outcome of

18   the cause named in said deposition.

19         IN WITNESS WHEREOF, I have hereunto set my hand

20   this 7th day of May 2007.

21   _____

22

23   KATHRYN DAVIS
     Certified Shorthand Reporter
24   Certificate No. 3808

25

# EXHIBIT 20

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

---oOo---

WILLIAM STRANGE, individually,
And as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
Minors; RONALD SIMS, as Guardian
Ad Litem for KEEGAN SIMS, a minor,

Plaintiffs,

v.                                    No. 07AS00377

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED,          
ROBIN PECHOTA, LIZ DIAZ,
ADAM COX, STEVE MANEY,
PATRICIA SWEET, MATT CARTER,
And DOES 1-40, inclusive,

Defendants.

_____/

---oOo---

9:19 a.m.

July 9, 2007

**DEPOSITION OF PATRICIA EILENE SWEET**

Reported by:  SHERREE L. BLAKEMORE, CSR No. 7144



Royal REPORTING SERVICES

1333 Howe Avenue, Suite 228
Sacramento, California 95825
916.564.0100

10:34:55    1    A    Yes.

10:34:55    2    Q    In those meetings, they had concept conversations

10:34:59    3    relative to contests and bits that were going to be done

10:35:02    4    on air.  Fair?

10:35:03    5    A    Yes.

10:35:03    6    Q    Did you ever participate in any kind of meeting like

10:35:05    7    that when you were working for Clear Channel down in Los

10:35:12    8    Angeles?

10:35:12    9    A    Yes.

10:35:12    10   Q    Now, in terms of the FCC requirements relative to

10:35:13    11   contests, did Clear Channel ever give you any training or

10:35:16    12   education on that?

10:35:19    13   A    I mean, I -- I don't believe so, because I was just

10:35:25    14   low on the totem pole, so I don't believe I -- they needed

10:35:29    15   to inform me of stuff like that.  I was just told what to

10:35:34    16   do, basically.

10:35:34    17   Q    Did they have any protocol down there if someone got

10:35:36    18   ill or sick during the course of a contest, or were you

10:35:41    19   too low on the protocol to get that information?

10:35:43    20   A    I believe that would be the case.

10:35:44    21   Q    You were a lowly intern, low end type -- not low

10:35:49    22   end -- but low position type of person, so they didn't

10:35:53    23   give you any training?

10:35:54    24   A    I mean, I guess.  I can't remember specifically.

10:35:57    25   Q    Let's see what you can remember as to Entercom.

63

10:36:02  1          Now, you started in March.  Correct?

10:36:04  2    A    Yes.

10:36:05  3    Q    First gig is an on-air talent.  Right?

10:36:08  4    A    Yes.

10:36:09  5    Q    Did you have an expectation that Entercom would

10:36:11  6    provide you training as to how to do your job?

10:36:14  7    A    Yes.

10:36:15  8    Q    And did Mr. Weed appear to be a professional?

10:36:21  9    A    Yes.

10:36:21  10   Q    Did he appear to be knowledgeable?

10:36:22  11   A    Yes.

10:36:22  12   Q    Did you get -- when you came up there initially in

10:36:25  13   February or March to interview for the job, did you get

10:36:27  14   the sense this was a professionally run organization?

10:36:30  15   A    Loosely professional, yes.

10:36:33  16   Q    Radio?

10:36:34  17   A    Yes.

10:36:35  18   Q    Did you meet John Geary?

10:36:37  19   A    I have met -- I worked with John Geary, yes.

10:36:41  20   Q    Did you feel that you had a relationship with him,

10:36:44  21   professional relationship, such that you could ask him

10:36:48  22   questions for direction?

10:36:48  23   A    Yes.

10:36:48  24   Q    Did he appear to be a professional-type guy?

10:36:51  25   A    Yes.

16:15:16    1    A    I didn't do that.

16:15:18    2         MR. DREYER:  Let's go to the next, which is at 9:16,

16:15:22    3    so just six minutes later.

           4

           5         **(Audio played.  Reporter does not certify content.)**

           6

16:15:28    7         *LUKAS:  Who is this, Jennifer?*

           8         *JENNIFER:  This is Jennifer.*

16:15:28    9         *LUKAS:  Jennifer, what's the situation out there*

16:15:30   10    *with Justin Timberlake tonight?*

16:15:31   11         *JENNIFER:  I don't want to -- I want the Wii.*

16:15:33   12         *LUKAS:  You do want the Wii?*

16:15:34   13         *JENNIFER:  I was tempted -- I was really, really*

16:15:36   14    *tempted; and everyone's going to hate me forever.*

16:15:41   15         *MANEY:  I got a pair of tickets, lower level, Justin*

16:15:42   16    *Timberlake, 2007 Future Sex Love Show live, Arco Arena,*

16:15:50   17    *tonight, and I will throw them away if you do not want to*

16:15:50   18    *take them.*

16:15:52   19         *JENNIFER:  Don't throw them away.*

16:15:54   20         *LUKAS:  Trust me, we're not going to throw them*

16:15:56   21    *away.*

16:15:58   22         *JENNIFER:  Uh -- I'm going to have to say --*

          23         *LUKAS:  Three, two --*

          24         *JENNIFER:  -- God this really sucks --*

          25         *LUKAS:  One --*

                                                                    300

16:16:02   1          *JENNIFER:  -- no deal.*

           2          *CROWD:  No deal --*

           3          *TRISH:  Did you hear that --*

           4          *LUKAS:  What about Lucy; does Lucy want that --*

16:16:10   5          *TRISH:  She turned Sexy Back down.*

           6          *LUKAS:  What about Lucy?*

16:16:12   7          *TRISH:  Lucy, what about you; do you want two*

16:16:14   8  *tickets to JT tonight?  She's cool as a cucumber, this is*

16:16:22   9  *ridiculous.*

16:16:22  10

16:16:23  11  Q      BY MR. DREYER:  You're back there.  Right?

16:16:24  12  A      Yes.

16:16:24  13  Q      So you have a recollection of the conversation and

16:16:26  14  the energy back there in that room?

16:16:27  15  A      Yes.

16:16:28  16  Q      This is trying to paint the picture for the

16:16:30  17  listening audience.  True?

16:16:36  18  A      Yes.

16:16:36  19          **(Audio played.  Reporter does not certify content.)**

          20

16:16:36  21          *LUKAS:  This is between Jennifer and Lucy, who is*

16:16:37  22  *going to hold their wee the longest to win the Nintendo*

          23  *Wii.*

16:16:41  24          *When do we hit another bottle, Trish?*

          25          *TRISH:  When do we hit another bottle?  Comin' up?*

| | | |
|---|---|---|
| 16:20:46 | 1 | *LUKAS: Two young ladies left. We have Jennifer and* |
| 16:20:56 | 2 | *Lucy. We offered Jennifer and Lucy both Justin Timberlake* |
| 16:20:56 | 3 | *tickets for tonight. And they were drinking -- they drank* |
| 16:20:56 | 4 | *another 16 since then, right?* |
| 16:20:56 | 5 | *CARTER: Yeah they've taken two bottles since then.* |
| 16:20:59 | 6 | *LUKAS: Two more 16-ounce bottles since then.* |
| | 7 | *TRISH: Wow.* |
| 16:21:01 | 8 | *LUKAS: Does Jennifer want to give in now for the* |
| 16:21:02 | 9 | *Justin Timberlake tickets?* |
| 16:21:04 | 10 | *CARTER: I think she may. You want to talk to her?* |
| 16:21:10 | 11 | *LUKAS: Yeah, put her on.* |
| 16:21:10 | 12 | *CARTER: Hang on.* |
| 16:21:10 | 13 | *JENNIFER: Hello.* |
| 16:21:10 | 14 | *LUKAS: Jennifer, I heard you -- it's not -- you're* |
| 16:21:11 | 15 | *not doing too well.* |
| 16:21:12 | 16 | *JENNIFER: My head hurts.* |
| 16:21:14 | 17 | |
| 16:21:14 | 18 | Q     BY MR. DREYER:  Do you remember her saying that? |
| 16:21:16 | 19 | A     I didn't. |
| 16:21:20 | 20 | MR. DREYER:  Back on. |
| | 21 | |
| 16:21:21 | 22 | **(Audio played.  Reporter does not certify content.)** |
| 16:21:21 | 23 | |
| | 24 | *TRISH: Awwww.* |
| | 25 | *///* |

307

16:35:15   1     2007.   This begins videocassette number five in the

16:35:16   2     deposition of Ms. Patricia Sweet in the matter of Strange

16:35:22   3     versus Entercom Sacramento, LLC.

16:35:25   4

16:35:27   5     Q     BY MR. DREYER:   Why no air check to Florida?

16:35:28   6     A     I sent them audio links.

16:35:30   7     Q     Oh, you did?

16:35:30   8     A     Yes.

16:35:31   9       MR. DREYER:   Well, that's literally my last

16:35:35  10    question.   I don't know whether any of these other folks

16:35:37  11    have any questions for you.   But I appreciate you flying

16:35:40  12    out.

16:35:40  13       THE WITNESS:   No problem.

16:35:47  14       MR. SULLIVAN:   I'll try to be very short, and try

16:35:49  15    not to prolong this if I can avoid that.

        16

        17               **EXAMINATION BY MR. SULLIVAN**

        18

16:35:53  19     Q     Jennifer Strange was given concert tickets that was

16:35:58  20    essentially a second prize, if you will.   Right?

16:36:00  21     A     Yes.

16:36:01  22     Q     And those were tickets to what concert?

16:36:04  23     A     Justin Timberlake.

16:36:09  24     Q     And they were for the evening of the contest itself?

16:36:09  25     A     Yeah.

| | | |
|---|---|---|
| 16:36:10 | 1 | Q    As I understood from your testimony, you actually |
| 16:36:13 | 2 | made arrangements with her to go to the concert, or meet |
| 16:36:19 | 3 | up with her at the concert? |
| 16:36:19 | 4 | A    Following the concert, yes. |
| 16:36:20 | 5 | Q    And did you discuss this on the way to the studio |
| 16:36:22 | 6 | before she was given the tickets, or at some point before |
| 16:36:28 | 7 | she left the building? |
| 16:36:28 | 8 | A    Yes, in the studio.  Right when we handed her the |
| 16:36:30 | 9 | tickets, I got her information for the VIP list. |
| 16:36:33 | 10 | Q    And did she seem excited about going to the concert? |
| 16:36:38 | 11 | A    Yes. |
| 16:36:38 | 12 | Q    And you expected to meet her, I take it. |
| 16:36:40 | 13 | A    Yes. |
| 16:36:40 | 14 | Q    Did Ms. Strange say at any point to you that she |
| 16:36:45 | 15 | thought she was too sick to go to the concert that |
| 16:36:47 | 16 | evening? |
| 16:36:47 | 17 | A    No. |
| 16:36:48 | 18 | Q    Did any of the other contestants say Ms. Strange is |
| 16:36:51 | 19 | really too sick to be able to go to the concert tonight? |
| 16:36:57 | 20 | A    No. |
| 16:36:57 | 21 | Q    Were there family members or friends of any of the |
| 16:36:59 | 22 | contestants that were in the kitchen area? |
| 16:37:03 | 23 | A    Of -- |
| 16:37:05 | 24 | Q    Were there family members of the contestants or |
| 16:37:08 | 25 | friends of the contestants who were also in the kitchen |

315

16:37:11  1    area during the contest?

16:37:13  2    A    That weren't a part of it?

16:37:16  3    Q    Yes.

16:37:17  4    A    I believe so.

16:37:22  5    Q    Did any of those people who were standing around

16:37:22  6    indicate that Jennifer Strange was too sick to go to the

16:37:23  7    concert?

16:37:24  8    A    No.

16:37:25  9    Q    I think you said that you don't recall anybody

16:37:28  10   suggesting that Jennifer Strange see a doctor.

16:37:31  11   A    No, I don't.

16:37:32  12   Q    Did any of the contestants who sat next to Jennifer

16:37:38  13   Strange, or stood next to her, or talked to her, suggest

16:37:39  14   that she see a doctor, to your knowledge?

16:37:41  15   A    Not to my knowledge.

16:37:45  16   Q    Did any of the other people who were there that were

16:37:48  17   the friends of the contestants, or family members of the

16:37:51  18   contestants, suggest that she go see a doctor?

16:37:53  19   A    Not that I'm aware of.

16:37:55  20   Q    Did you see Jennifer Strange with a cell phone at

16:37:58  21   all toward the end of the contest?

16:38:00  22   A    I don't remember.

16:38:01  23   Q    Do you know whether she talked to anybody on a cell

16:38:03  24   phone?

16:38:04  25   A    I have no idea.

316

| | | |
|---|---|---|
| 16:39:54 | 1 | Q      Why not? |
| 16:39:55 | 2 | A      I just -- when I envisioned what little information |
| 16:39:59 | 3 | I had from the Chico incident, it was that -- it was a |
| 16:40:03 | 4 | kid, with water being forced down, and then thrown in a |
| 16:40:13 | 5 | sleeping bag, and put up against the wall.  And that's all |
| 16:40:22 | 6 | I remember from that incident.  To me it was an entirely |
| 16:40:24 | 7 | different scenario, than someone drinking water at their |
| 16:40:24 | 8 | own will, and pace.  It just didn't seem the same to me. |
| 16:40:28 | 9 | Q      Did you understand the incident with Mr. Kerrington |
| 16:40:29 | 10 | at Chico involved a fraternity? |
| 16:40:30 | 11 | A      Yes. |
| 16:40:30 | 12 | Q      And involved a hazing incident? |
| 16:40:32 | 13 | A      Yes. |
| 16:40:32 | 14 | Q      Now, the contest involved people drinking water |
| 16:40:40 | 15 | about every ten minutes, approximately? |
| 16:40:46 | 16 | A      Yes. |
| 16:40:46 | 17 | Q      Could anybody drop out at any time? |
| 16:40:46 | 18 | A      Yes. |
| 16:40:46 | 19 | Q      And I think you said that at one point you went back |
| 16:40:48 | 20 | and told the group as a whole that if they weren't feeling |
| 16:40:51 | 21 | well, they could drop out.  Is that right? |
| 16:40:52 | 22 | A      Yes. |
| 16:40:53 | 23 | Q      Do you have any reason to believe that Jennifer |
| 16:40:56 | 24 | Strange didn't hear you when you made that announcement? |
| 16:41:02 | 25 |        MR. DREYER:  Calls for speculation. |

319

16:41:03  1          THE WITNESS:  Can you say that again?

16:41:04  2      Q      BY MR. SULLIVAN:  Well, you said you went back to

16:41:06  3      the kitchen area and you announced to the group there if

16:41:10  4      anybody wasn't feeling well, they should feel free to drop

16:41:13  5      out of the contest.  Right?

16:41:14  6      A      Yes.

16:41:15  7      Q      And your intention was to announce it to all the

16:41:18  8      contestants in the room.  Right?

16:41:20  9      A      Yes.

16:41:20  10     Q      Do you have any reason to believe that Jennifer

16:41:22  11     Strange didn't hear you when you said that?

16:41:26  12         MR. DREYER:  Same objection.

16:41:26  13         THE WITNESS:  No.

16:41:27  14     Q      BY MR. SULLIVAN:  Now, in terms of the contest, if

16:41:31  15     the contestants urinated, they would be out of the

16:41:34  16     contest.

16:41:34  17     A      Yes.

16:41:35  18     Q      Was there anything that was done to prevent any of

16:41:39  19     the contestants from urinating?

16:41:44  20     A      No.

16:41:44  21     Q      Was there anything -- if a contestant vomited, they

16:41:49  22     were also out of the contest?

16:41:49  23     A      Yes.

16:41:49  24     Q      We heard -- and I'm sorry, I didn't ask you this

16:41:51  25     question.  We heard the comment from Eva calling in, and

320

16:43:36  1    dangers of water drinking.

16:43:41  2         Is that consistent with what you've heard her

16:43:43  3    explain to Mr. -- explain to Lukas that day, that she had

16:43:50  4    actually gone back to the studio and explained to Maney

16:43:53  5    and Lukas and yourself that there was dangers of water

16:43:56  6    drinking?

16:43:57  7    A    I don't remember her coming in and saying that, no.

16:44:02  8    Q    Now, if you could turn to, I think it's Exhibit 9.

16:44:12  9    And these were referred to as the rules that were prepared

16:44:19  10   by Robin Ray.  And if you look down at paragraph 11 -- Mr.

16:44:24  11   Dreyer asked you a few questions about paragraph 11.

16:44:30  12        The testimony of Robin Ray was that paragraph 11,

16:44:33  13   which has the reference to "potentially hazardous," that

16:44:37  14   that was boiler plate language she simply lifted from

16:44:40  15   other contest rules, and that she did not believe that

16:44:44  16   this was potentially hazardous.

16:44:44  17        Did she ever explain to you that this was a

16:44:46  18   potentially hazardous contest?

16:44:52  19   A    No.

16:44:52  20   Q    Did you regard this as a potentially hazardous

16:44:52  21   contest at any time?

16:44:52  22   A    No.

16:44:53  23   Q    And you wouldn't have participated if you thought it

16:44:55  24   was.  Right?

16:44:55  25   A    Yes.

322

STATE OF CALIFORNIA   )
                  ss.   )
COUNTY OF SACRAMENTO )


    I, SHERREE L. BLAKEMORE, a Certified Shorthand

Reporter of the State of California, do hereby certify:

    That the witness named in the foregoing deposition

was present at the time and place therein specified;

    That the proceeding was taken before me at said time

and place, and was taken down in shorthand writing by me;

    That the proceeding was thereafter, under my

direction, transcribed; and that the foregoing transcript

constitutes a full, true and correct record of the

proceedings which then and there took place;

    That I am a disinterested person to the said action.

    Dated this 2nd day of August, 2007.




SHERREE L. BLAKEMORE   C.S.R. #7144


335

# EXHIBIT 21

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

---oOo---

WILLIAM STRANGE, individually,
And as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
Minors; RONALD SIMS, as Guardian
Ad Litem for KEEGAN SIMS, a minor,

        Plaintiffs,

    v.                    No. 07AS00377

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED,
Robin PECHOTA, LIZ DIAZ,
ADAM COX, STEVE MANEY,
PATRICIA SWEET, MATT CARTER,
And DOES 1-40, inclusive,



        Defendants.
_____/

---oOo---

**9:11 a.m.**

**September 14, 2007**

**<u>DEPOSITION OF WILLIAM STRANGE</u>**

Reported by:  SHERREE L. BLAKEMORE, CSR No. 7144

*Royal*
REPORTING SERVICES

1333 Howe Avenue, Suite 100, #5
Sacramento, California 95825
916.564.0100

1    Q     If you called her, it would have been from your work

2    cell?

3    A     Correct.

4    Q     And if she called you, it would have been to your

5    work cell?

6    A     That's correct.

7    Q     And she called you either using her personal cell or

8    her work cell phone number?

9    A     I don't know for sure.

10   Q     You don't know what phone she used to call you?

11   A     Correct.

12   Q     Did she tell you where she was calling you from?

13   A     She just told me that she was in her car.

14   Q     So if she was in her car, she presumably was using

15   some cell phone.  Correct?

16   A     I would have guessed that would be correct.

17   Q     So she said -- she told you she was in her car, and

18   did she tell you where she was going?

19   A     She did say she was going home.

20   Q     Just tell me everything that you recall about that

21   conversation, what you said and what she said, in this

22   conversation that she had where one of you, you don't know

23   who called each other, she called you from her car.

24   A     All she said was that she had got the Timberlake

25   tickets, but she didn't feel well, and that she was going

1    to go home and lay down for a while.  She wasn't going to

2    go back to work.

3    Q    How long did that conversation last?

4    A    I don't really recall.  It wasn't more than, once

5    again, a couple of minutes.

6    Q    Did you say anything to her during this telephone

7    conversation?

8    A    I just acknowledged that she was feeling -- that she

9    wasn't feeling well, and I just told her to go home, get

10   some -- get some rest.  And I told her I loved her.

11   Q    Would you like to take a break, take a couple of

12   minutes?

13   A    Yeah.

14                    (Short break taken.)

15        MR. CARLSON:  Are you ready?

16        THE WITNESS:  Yes.

17        BY MR. CARLSON:  As I said at the beginning of the

18   deposition, tell me if you would like to stop.

19   Q    Did you ever call Jennifer's cell phone again that

20   day?

21   A    Yes, I did.

22   Q    And how soon after this conversation that you had

23   with her where she said she was about home did you call

24   her?

25   A    All I remember is it was after lunch.

STATE OF CALIFORNIA    )
                       )  ss.
COUNTY OF SACRAMENTO   )

    I, SHERREE L. BLAKEMORE, a Certified Shorthand Reporter of the State of California, do hereby certify:

    That the witness named in the foregoing deposition was present at the time and place therein specified;

    That the proceeding was taken before me at said time and place, and was taken down in shorthand writing by me;

    That the proceeding was thereafter, under my direction, transcribed; and that the foregoing transcript constitutes a full, true and correct record of the proceedings which then and there took place;

    That I am a disinterested person to the said action.

    Dated this 3rd day of October, 2007.

SHERREE L. BLAKEMORE   C.S.R. #7144

# EXHIBIT 22

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

---oOo---

WILLIAM STRANGE, individually,
and as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
Minors; RONALD SIMS, as Guardian
Ad Litem for KEEGAN SIMS, a  minor,

        Plaintiffs,

     v.

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED,
ROBIN PECHOTA, LIZ DIAZ,
ADAM COX, STEVE MANEY,
PATRICIA SWEET, MATT CARTER,
And DOES 1-40, inclusive,

        Defendants.

_____/

No. 07AS00377



---oOo---

9:00 a.m.

June 27, 2007

**DEPOSITION OF JOHN GEARY**

Reported by:   SHERREE L. BLAKEMORE, CSR No. 7144

*Royal*
REPORTING SERVICES

1333 Howe Avenue, Suite 100, #5
Sacramento, California  95825
916.564.0100

| | | |
|---|---|---|
| 09:27:59 | 1 | Q    Is that a yes? |
| 09:28:00 | 2 | A    Yes. |
| 09:28:00 | 3 | Q    You've been doing great about making sure you answer |
| 09:28:04 | 4 | out loud.  I may occasionally ask you to repeat something |
| 09:28:08 | 5 | so that our court reporter gets the correct response as |
| 09:28:12 | 6 | opposed to a nod or a sound.  All right? |
| 09:28:13 | 7 | A    Yes. |
| 09:28:13 | 8 | Q    If at any point in time you need to take a break, |
| 09:28:16 | 9 | you let me know, but if I have a question pending, I would |
| 09:28:19 | 10 | like you to answer it.  Okay? |
| 09:28:21 | 11 | A    Yes. |
| 09:28:21 | 12 | Q    If you need to take a break, I would encourage you |
| 09:28:24 | 13 | to make that request before a question is posed.  Okay? |
| 09:28:30 | 14 | A    All right. |
| 09:28:30 | 15 | Q    Now, in terms of this case, and I want you to think |
| 09:28:36 | 16 | carefully about this when I ask you this question:  When |
| 09:28:40 | 17 | is it that you can tell us under oath that John Geary |
| 09:28:47 | 18 | first had any knowledge of the contest Hold Your Wee for a |
| 09:28:55 | 19 | Wii? |
| 09:28:55 | 20 | A    Probably approximately 3:45 to four o'clock in the |
| 09:29:02 | 21 | afternoon of Friday, January 12th. |
| 09:29:02 | 22 | Q    2007? |
| 09:29:02 | 23 | A    2007. |
| 09:29:03 | 24 | Q    And that, obviously, is five months ago, |
| 09:29:07 | 25 | approximately.  And as far as your testimony, in that |

14

09:30:17  1   July of 1998.

09:30:19  2   Q    And you started in '97?

09:30:23  3   A    First week in January in 1997.

09:30:26  4   Q    And were you the one that hired Steve Weed?

09:30:28  5   A    Yes, I am.

09:30:29  6   Q    And Steve Weed was hired as what?

09:30:32  7   A    Station manager/program director for KDND.

09:30:37  8   Q    And would you have been the one that interviewed

09:30:38  9   him?

09:30:39  10  A    Yes.

09:30:39  11  Q    You would have been the one that looked at his

09:30:44  12  background and qualifications?

09:30:44  13  A    Yes.

09:30:44  14  Q    You would have been the one that was given the

09:30:49  15  responsibility and authority to make a good hire.  True?

09:30:49  16  A    Yes.

09:30:52  17  Q    And you would be Mr. Weed's superior, so to speak,

09:30:54  18  in the hierarchy of your organization?

09:30:57  19  A    That's correct.

09:30:57  20  Q    And you would expect him to do the job that you

09:30:59  21  outlined for him.  True?

09:31:04  22  A    Yes.

09:31:04  23  Q    Now, is it your testimony, Mr. Geary, that Mr. Weed,

09:31:04  24  before January 12th at 3:45 in the afternoon -- Mr. Weed

09:31:08  25  never related to you anything at all about the subject

16

09:32:09  1    Mr. Weed, this person that you thought was an excellent

09:32:11  2    manager, was what?  What policy did he violate?

09:32:14  3    A      Our policy on contest guidelines, rules and

09:32:21  4    regulations.

09:32:21  5    Q      And, specifically, what aspect of that policy did

09:32:22  6    Mr. Weed violate?

09:32:24  7    A      We have, as a company, a process in place that we

09:32:27  8    have had for a number of years for any contests and

09:32:30  9    promotions that happen on any of the radio stations.  And

09:32:34 10    the purpose of the policy is to make sure that everything

09:32:36 11    is examined before anything is finalized, for a number of

09:32:41 12    issues.

09:32:43 13            In this case, this particular contest was not put

09:32:46 14    through that test.

09:32:51 15    Q      And so when we talk about "the test," you are

09:32:53 16    talking about the Entercom policies and procedures to be

09:32:58 17    followed to evaluate whether the contest should be

09:33:02 18    permitted?

09:33:02 19    A      Yes.  It would have gone through our in-house

09:33:05 20    counsel.  And at that point, if there were any issues or

09:33:08 21    questions, I would have gotten involved in it.

09:33:10 22    Q      Now, in terms of Mr. Weed and Mr. Geary, the two of

09:33:19 23    you, he obviously answers to you.  True?

09:33:25 24    A      Correct.

09:33:25 25    Q      And your position with Entercom; why don't you

09:33:28  1    define that for us.

09:33:29  2    A    My position is vice president and market manager.

09:33:35  3    I oversee all six radio stations for the company.  I

09:33:37  4    direct oversight over three of those stations, one of

09:33:40  5    which is KDND.

09:33:41  6    Q    And is that Entercom Sacramento, or are you with the

09:33:47  7    parent company?

09:33:47  8    A    Entercom Sacramento, LLC.

09:33:49  9    Q    And what affiliation is Entercom Sacramento, LLC

09:33:54  10   with the parent company?

09:33:54  11   A    I believe in a strict legal sense it's a holding of

09:33:57  12   the parent company.

09:33:58  13   Q    Now, you describe yourself as a market manager.

09:34:03  14   Correct?

09:34:03  15   A    Correct.

09:34:03  16   Q    And as you understand the term "market manager" in

09:34:06  17   your industry, define that for us.

09:34:09  18   A    It's general manager; it's historically what general

09:34:15  19   manager has been, but it came into use when the industry

09:34:16  20   consolidated in, and someone in my role, who may have

09:34:22  21   formally overseen one or possibly two stations, now

09:34:25  22   oversees multiple stations.

09:34:26  23   Q    And as a market manager, is your performance judged

09:34:30  24   by the performance of the stations that you oversee?

09:34:33  25   A    Yes, it is.

10:17:20  1    Q    And would Robin do the same?

10:17:22  2    A    Yes.

10:17:23  3    Q    Would you prefer I or use Ray or Pechota; we've

10:17:29  4    named her as Pechota.

10:17:29  5    A    She goes by Robin Ray, so --

10:17:29  6    Q    We're going to call her Ray.

10:17:31  7    A    Okay.

10:17:31  8    Q    Now, in terms of these responsibilities you had

10:17:36  9    protecting the license, the business plan, and making

10:17:41 10    certain that the stations contribute to the community as a

10:17:44 11    whole, would these also be responsibilities that Mr. Weed

10:17:48 12    would have that he would share with you?

10:17:53 13    A    Indirectly he would have those responsibilities.  In

10:17:54 14    his role as station manager/program director, I would

10:17:59 15    interact with him on any one of those three areas as

10:18:02 16    related to KDND.

10:18:02 17    Q    Did he ever have, from your perspective -- in making

10:18:05 18    certain that these goals are accomplished, did he exercise

10:18:09 19    independent authority of you; he made decisions and things

10:18:16 20    of that nature?

10:18:17 21    A    He could make decisions within the realm of areas

10:18:24 22    that he had the capability to do so.  He couldn't make

10:18:24 23    policy, obviously.

10:18:25 24    Q    I understand he's not to make policy.  You couldn't

10:18:27 25    make policy.    True?

```
10:25:22  1    she would bring it to me.  But she would be discussing
10:25:24  2    those same things with the station manager and promotion
10:25:31  3    director.
10:25:31  4    Q    What was the issue with Breast Christmas Ever?
10:25:32  5    A    From my point of view, I had a couple of issues with
10:25:38  6    it.  How would it appear.  Is this something we want to do
          7    given who we target to.
10:25:38  8         The other issue is one of -- just one of safety, in
10:25:46  9    making sure that if we were going do this that it was
10:25:46  10   probably administered and everything was okay.
10:25:48  11   Q    Let me stop you.  Is that something that Ms. Masi
10:25:52  12   brought to your attention or something that you already
10:25:55  13   had questions on before she ever talked to you about it?
10:25:57  14   A    I wasn't aware of the promotion until she brought it
10:26:01  15   to my attention.
10:26:02  16        When she brought it to my attention and explained
10:26:04  17   the thing, that's when I had the concerns I had.
10:26:06  18   Q    You weren't in the initial conversations when this
10:26:11  19   brainstorm hit?
10:26:11  20   A    No, I'm never involved in those meetings.
10:26:14  21   Q    Never?
10:26:14  22   A    Never.  I can't remember one brainstorming promotion
10:26:17  23   meeting I've had with the stations in the ten years I've
10:26:20  24   been with the company.
10:26:20  25   Q    Do you remember anybody ever coming to you out of
```

64

11:23:17  1          And did you stop and investigate at all?

11:23:23  2    A     No, I did not.

11:23:23  3    Q     Did you make an inquiry of anybody?

11:23:26  4    A     No.

11:23:26  5    Q     And you are confident about that.  True?

11:23:26  6    A     Yes, I am confident of that.

11:23:29  7    Q     And you proceeded down the hallway to your office.

11:23:35  8    A     That is true.

11:23:35  9    Q     And you set about your day doing your job.  Right?

11:23:36 10    A     Correct.

11:23:37 11    Q     And the first time after you're walking by and

11:23:42 12    hearing the noise, the next time you became aware of any

11:23:45 13    issue relative to this contest was when Mr. Weed and Ms.

11:23:51 14    Pechota came in and told you about this tragic loss of

11:23:55 15    Mrs. Strange.  Is that true?

11:23:55 16    A     Let me make sure I'm understanding your question.

11:23:58 17    Q     Sure.

11:23:58 18    A     Is the question the first time I became aware that

11:24:03 19    there was a contest going on was at 3:45?

11:24:09 20    Q     No.  My question -- and I appreciate -- any time you

11:24:09 21    don't understand something, let me know.

11:24:11 22          Is the first time that you, Mr. Geary, understood

11:24:14 23    that this particular contest, Hold Your Wee for a Wii, was

11:24:19 24    taking place is at 3:45 that afternoon?

11:24:22 25    A     That is correct.

11:24:23  1    Q     That's after the contest is over?

11:24:25  2    A     Correct.

11:24:26  3    Q     Before 3:45 in the afternoon, you were unaware of

11:24:30  4    anything relative to this particular contest.  Fair?

11:24:33  5    A     That is true.

11:24:34  6    Q     Other than hearing some noise walking in, you didn't

11:24:40  7    even know that noise was associated with a contest. True?

11:24:43  8    A     I didn't know there was a contest going on.

11:24:45  9    Obviously I assumed something was happening in conjunction

11:24:52  10   with the morning show.

11:24:52  11   Q     Well, understanding you thought something was going

11:24:52  12   on in conjunction with the morning show, you didn't get

11:24:55  13   any information that there was a contest.  True?

11:24:58  14   A     Correct.

11:24:58  15   Q     Didn't stop and make any inquiry about what was

11:25:01  16   going on.  True?

11:25:02  17   A     Correct.

11:25:02  18   Q     Didn't articulate any concerns, criticisms,

11:25:09  19   observations about, let's say, the noise.  True?

11:25:12  20   A     There was one instance, it was probably in the nine

11:25:16  21   o'clock hour.  A salesperson came down and told me that no

11:25:25  22   one in the sales pit, which is adjacent to the kitchen

11:25:30  23   where the contest was going on -- that there was so much

11:25:34  24   noise from whatever was happening in the kitchen that they

11:25:40  25   couldn't hear on the phone.

11:25:40  1          So I said okay.  And I walked down the hall and --

11:25:45  2     left my office, walked down the hall towards the kitchen,

11:25:46  3     and it's a long hallway, past our main conference room,

11:25:51  4     down to where the kitchen is.

11:25:55  5          And as I approached it -- the wall kind of flares

11:25:56  6     out a little bit as you approach it -- and as I approached

11:25:59  7     it, I could see just people standing.  Obviously something

11:26:01  8     was going on in the kitchen.  I could see people standing

11:26:04  9     there.  And it was loud.  And as I approached it, and, you

11:26:09 10     know, probably got to about, I would say, ten feet of

11:26:14 11     where the entrance was, I believe it was Matt Carter,

11:26:16 12     because he's taller than the rest, and I -- it was either

11:26:21 13     him or Jessica.  I made eye contact with them, and yelled

11:26:24 14     at them, "You guys have got to hold it down," and then he

11:26:31 15     acknowledged with a nod, and then I turned around and went

11:26:31 16     back to my office.

11:26:32 17     Q    I appreciate you telling me that.  Again, this is

11:26:35 18     the best opportunity for you to be candid and complete

11:26:39 19     when we ask you these questions.

11:26:42 20          So let me do a chronology for us, here, and you

11:26:44 21     correct me if I'm wrong.

11:26:46 22          Get to work, 6:30, 6:45; you hear some noise,

11:26:53 23     because people are around.  And we'll characterize that

11:26:55 24     noise as out of the ordinary.  True?  Or was it ordinary?

11:27:02 25     A    To me it's ordinary, in the sense that this is a

| | | |
|---|---|---|
| 11:54:30 | 1 | You are the market manager of the radio station. |
| 11:54:33 | 2 | You told us that.  And you did an investigation.  And you |
| 11:54:37 | 3 | told us that.  And you told us you talked to a number of |
| 11:54:39 | 4 | people. |
| 11:54:39 | 5 | I want you to bring all that knowledge together, |
| 11:54:42 | 6 | along with your review in preparation for today, and I |
| 11:54:47 | 7 | want you to tell me in your capacity as a market manager, |
| 11:54:47 | 8 | Mr. Geary, when is it for the first time that the radio |
| 11:54:51 | 9 | station got any information from any source that Jennifer |
| 11:54:55 | 10 | Strange -- that something had happened to one of your |
| 11:54:59 | 11 | contestants? |
| 11:54:59 | 12 | A    It would have been at the point that Teresa |
| 11:55:03 | 13 | Cummings, our receptionist, received the phone call from |
| 11:55:08 | 14 | Jennifer Strange's employer. |
| 11:55:08 | 15 | Q    First time.  As far as you know? |
| 11:55:11 | 16 | A    As far as I know, yes. |
| 11:55:12 | 17 | Q    That would have been what time of day? |
| 11:55:18 | 18 | A    It probably would have been somewhere around 3:30, |
| 11:55:18 | 19 | based on the time I had my meeting with Steve and Robin. |
| 11:55:21 | 20 | Q    And based upon your reaction to it, as you've |
| 11:55:26 | 21 | already described for us, there was clearly an |
| 11:55:31 | 22 | understanding that the radio station may, in fact, have |
| 11:55:33 | 23 | played some role in Jennifer Strange dying.  True? |
| 11:55:39 | 24 | A    My reaction was disbelief, which is why I had asked |
| 11:55:44 | 25 | Steve and Robin to go back and make the phone call to |

121

1  State of California   )
                         )      ss.
2  County of Sacramento  )

3

4      I, SHERREE L. BLAKEMORE, a Certified Shorthand

5  Reporter of the State of California, do hereby certify:

6      That the witness named in the foregoing deposition

7  was present at the time and place therein specified;

8      That the proceeding was taken before me at said time

9  and place, and was taken down in shorthand writing by me;

10     That the proceeding was thereafter, under my

11  direction, transcribed; and that the foregoing transcript

12  constitutes a full, true and correct record of the

13  proceedings which then and there took place;

14     That I am a disinterested person to the said action.

15     Dated this 15th day of July, 2007.

16

17

18

19

20            *Sherree L. Blakemore*

21     SHERREE L. BLAKEMORE   C.S.R. #7144

22

23

24

25

# EXHIBIT 23

THE SUPERIOR COURT OF THE STATE OF

CALIFORNIA IN AND FOR THE COUNTY OF SACRAMENTO

---oOo---

WILLIAM STRANGE, individually,
And as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
Minors; RONALD SIMS, as Guardian
Ad Litem for KEEGAN SIMS, a  minor,

        Plaintiffs,

     v.                    No. 07AS00377

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED,
Robin PECHOTA, LIZ DIAZ,
ADAM COX, STEVE MANEY,
PATRICIA SWEET, MATT CARTER,
And DOES 1-40, inclusive,

        Defendants.

_____/



---oOo---

**9:55 a.m.**

**September 27, 2007**

**DEPOSITION OF NINA HULST**

Reported by:  SHERREE L. BLAKEMORE, CSR No. 7144

*Royal* REPORTING SERVICES

1333 Howe Avenue, Suite 100, #5
Sacramento, California  95825
916.564.0100

1    A    Corvallis Senior High.

2    Q    And did you go to college?

3    A    No.

4    Q    And then when did you get married the first time?

5    A    The first time was in February of 1978.

6    Q    And that was to whom?

7    A    Michael Decker.

8    Q    And it was with Mr. Decker that you had Jennifer?

9    A    That is correct.

10   Q    And then you and Mr. Decker eventually got divorced.

11   A    That is correct.

12   Q    How old was Jennifer at the time?

13   A    Five.

14   Q    And Mr. Decker moved back to Maine.  Is that right?

15   A    That is correct.

16   Q    And then did you raise Jennifer as a single mom?

17   A    For a portion of the time, yes, I did, off and on.
He was out of the picture prior to the divorce.  So yes,
we were alone quite a bit together.

20   Q    So from the age when Jennifer is about four years
old he was out of the picture?

22   A    Pretty much, yeah.

23   Q    Then did you then get remarried?

24   A    Yes.

25   Q    When was that?

1    A    That was in - excuse me, I have to think about it.

2    '84 -- 1984

3    Q    So a year or two after you got divorced from Mr.

4    Decker?

5    A    That is correct.

6    Q    And --

7    A    After we separated.  Correct.

8    Q    And the person that you got married to in 1984, his

9    name was --

10   A    Mark Hulst.

11   Q    Mark Hulst?

12   A    Uh -- huh - yes.

13   Q    That's the name that you have now, Hulst?

14   A    That is correct.

15   Q    Are the two of you still married?

16   A    Yes, we are.

17        MR. DREYER:  Don, let me interrupt you for a minute.

18        Slow down just a little bit.  Because you're

19   apparently a little nervous, and as soon as -- Don is soft

20   spoken, too, so you're soft spoken, and no one is going to

21   hear you.  And also you're a little anticipatory and

22   answering right at the end of his question --

23        THE WITNESS:  Okay.

24        MR. DREYER:  -- while you're anticipating, like you

25   just did with me.  And it's tougher on Sherree, too.  We

1    A    I don't recall if I had tried after that again, and

2    kept trying to call her.  I don't know.  I do not

3    remember.

4    Q    Did you call anybody else to have them check up on

5    Jennifer?

6    A    Did I call anybody else?

7    Q    Before you went over to the house.

8    A    I do not remember calling anybody else.

9    Q    And how long does it take for you to get from RAS --

10   that's where you were working --

11   A    Correct.

12   Q    -- back to Jennifer's house?

13   A    Approximately, maybe, 15 minutes.

14   Q    And during this 15 minutes, while you were driving

15   over there, you didn't try to contact anybody?

16   A    I don't remember.

17   Q    And do you know what time you arrived at the house?

18   A    I don't remember.

19   Q    Tell me what happened when you arrived at the house.

20   A    I first stopped at -- in her driveway.  And I saw

21   her car there.  So I thought, okay, she's here.  And I

22   have a house key for her house, as well as she has one for

23   mine.   I rang the doorbell; nobody answered.  And so I

24   put my key in the door, and I walked through the entrance

25   way, and I called out her name.  I said, "Jen," and there

1  was no answer.  I stepped further into the house, and the

2  bedrooms and the bathrooms are to the right, down the

3  hallway; and I turned and I saw her lying on the bathroom

4  floor.  She wasn't moving.  I screamed out her name.  And

5  I ran down the hallway.  I grabbed her.  Her hair was

6  covering her face.  I brushed the hair away from her

7  face.  And she was -- she was gone.  She was cold and she

8  was lifeless, and she was gone.

9        MR. DREYER:  You've answered.  Okay.  Just relax.

10       MR. CARLSON:  Mr. Dreyer told me I don't have to

11  apologize for these questions, but I still feel that I

12  have to, Ms. Hulst.  I do apologize for asking you to

13  relive this.

14  Q    You believe that by the time that you got there that

15  Jennifer was already dead; is that correct?

16  A    Yes.

17  Q    And I take it after that you called the paramedics.

18  Correct?

19  A    Yes.

20  Q    And did you call Billy to come over, too?

21  A    I don't remember.

22  Q    And after you went there, where your daughter was on

23  the floor, you took the hair out of her face, and you went

24  to call 911, did you ever go back into that bathroom?

25  A    No.

STATE OF CALIFORNIA    )
                       ss.  )
COUNTY OF SACRAMENTO   )


    I, SHERREE L. BLAKEMORE, a Certified Shorthand

Reporter of the State of California, do hereby certify:

    That the witness named in the foregoing deposition

was present at the time and place therein specified;

    That the proceeding was taken before me at said time

and place, and was taken down in shorthand writing by me;

    That the proceeding was thereafter, under my

direction, transcribed; and that the foregoing transcript

constitutes a full, true and correct record of the

proceedings which then and there took place;

    That I am a disinterested person to the said action.

    Dated this 22nd day of October, 2007.




SHERREE L. BLAKEMORE  C.S.R. #7144