1  SUSAN K. SULLIVAN (SBN 156418)
   SEDGWICK, DETERT, MORAN & ARNOLD LLP
2  801 South Figueroa Street, 18th Floor
   Los Angeles, CA 90017
3  Telephone: (213)-426-6900
   Facsimile: (213) 426-6921
4  E-mail: susan.sullivan@sdma.com

5

6  MARY P. McCURDY (SBN 116812)
   CHRISTINA M. LAVANIER (SBN 233335)
7  McCURDY & FULLER LLP
   4300 Bohannon Drive, Suite 240
8  Menlo Park, CA 94025
   Telephone: (650) 618-3500
9  Facsimile: (650) 618-3599
   E-mail: mary.mccurdy@mccurdylawyers.com
10          christina.lavanier@mccurdylawyers.com

11 Attorneys for Defendant
   AMERICAN HOME ASSURANCE COMPANY

12

13              UNITED STATES DISTRICT COURT

14    NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

15 ENTERCOM SACRAMENTO, LLC, a          CASE NO. CV 07-06493 JSW
   California Limited Liability Corporation;
16 ENTERCOM COMMUNICATIONS CORP., a     DECLARATION OF CHRISTINA M.
   Pennsylvania Corporation; and JOHN GEARY, LAVANIER IN SUPPORT OF
17 an individual,                       DEFENDANT AMERICAN HOME
                                        ASSURANCE COMPANY'S
18          Plaintiffs,                 OPPOSITION TO PLAINTIFFS'
                                        MOTION FOR SUMMARY
19     v.                               ADJUDICATION AND RULE 56(f)
                                        REQUEST
20 AMERICAN HOME ASSURANCE
   COMPANY, a New York Corporation,
21
            Defendant.
22

23

24 I, Christina M. Lavanier declare:

25     1.     I am an attorney licensed to practice before this Court and am a member of

26 McCurdy & Fuller, attorneys for defendant American Home Assurance Company ("American

27 Home"). I have personal knowledge of the following facts and could competently testify thereto if

28

McCURDY & FULLER LLP
4300 Bohannon Drive, Suite 240
Menlo Park, CA 94025
(650) 618-3500

27428                          - 1 -

1  SUSAN K. SULLIVAN (SBN 156418)
   SEDGWICK, DETERT, MORAN & ARNOLD LLP
2  801 South Figueroa Street, 18th Floor
   Los Angeles, CA  90017
3  Telephone:  (213)-426-6900
   Facsimile:  (213) 426-6921
4  E-mail:  susan.sullivan@sdma.com

5

6  MARY P. McCURDY (SBN 116812)
   CHRISTINA M. LAVANIER (SBN 233335)
7  McCURDY & FULLER LLP
   4300 Bohannon Drive, Suite 240
8  Menlo Park, CA 94025
   Telephone:  (650) 618-3500
9  Facsimile:  (650) 618-3599
   E-mail:  mary.mccurdy@mccurdylawyers.com
10          christina.lavanier@mccurdylawyers.com

11 Attorneys for Defendant
   AMERICAN HOME ASSURANCE COMPANY

12

13               UNITED STATES DISTRICT COURT

14    NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

15 ENTERCOM SACRAMENTO, LLC, a          CASE NO. CV 07-06493 JSW
   California Limited Liability Corporation;
16 ENTERCOM COMMUNICATIONS CORP., a     **DECLARATION OF CHRISTINA M.**
   Pennsylvania Corporation; and JOHN GEARY, **LAVANIER IN SUPPORT OF**
17 an individual,                       **DEFENDANT AMERICAN HOME**
                                        **ASSURANCE COMPANY'S**
18            Plaintiffs,               **OPPOSITION TO PLAINTIFFS'**
                                        **MOTION FOR SUMMARY**
19       v.                            **ADJUDICATION**

20 AMERICAN HOME ASSURANCE
   COMPANY, a New York Corporation,
21
              Defendant.
22

23

24 I, Christina M. Lavanier declare:

25       1.    I am an attorney licensed to practice before this Court and am a member of

26 McCurdy & Fuller, attorneys for defendant American Home Assurance Company ("American

27 Home").  I have personal knowledge of the following facts and could competently testify thereto if

28

*McCURDY & FULLER LLP*
*4300 Bohannon Drive, Suite 240*
*Menlo Park, CA  94025*
*(650) 618-3500*

27428                                    - 1 -

McCURDY & FULLER LLP
4300 Bohannon Drive, Suite 240
Menlo Park, CA 94025
(650) 618-3500

1  called upon to do so.  I declare under penalty of perjury under the laws of the State of California

2  that the foregoing is true and correct.

3        2.      Attached hereto are true and correct copies of selected deposition transcripts

4  provided to American Home by Entercom's counsel:

5          a.    excerpts from the deposition of Ellaheh Baghaei as **Exhibit A.**

6          b.    excerpts from the deposition of Adam Cox as **Exhibit B.**

7          c.    excerpts from the deposition of Donald Logsdon as **Exhibit C.**

8          d.    excerpts from the deposition of Vincent Lundgren as **Exhibit D.**

9          e.    excerpts from the deposition of Steve Maney as **Exhibit E.**

10          g.    excerpts from the deposition of Ronald Mendoza as **Exhibit F.**

11          h.    excerpts from the deposition of Patricia Eilene Sweet as **Exhibit G.**

12          j.    excerpts from the deposition of Jessica Venegas as **Exhibit H.**

13          k.    excerpts from the deposition of Kevin Williams as **Exhibit I.**

14        3.      American Home asked for copies of all deposition transcripts and has not been

15  provided depositions of individuals designated as experts in the *Strange* action.

16

17        I declare under penalty of perjury under the laws of the State of California and the United

18  States of America that the foregoing is true and correct.

19        Executed this 7th day of March 2008, in Menlo Park, California.

20

21

22                                           *Christine M. Lavanier*

23                                        CHRISTINA M. LAVANIER

24                                        Attorney for Defendant

25                                        AMERICAN HOME ASSURANCE
                                      COMPANY

26

27

28

27428                   - 2 -

# EXHIBIT A

*DEPOSITION OF ELLAHEH BAGHAEI aka LIZ DIAZ - STRANGE v ENTERCOM, et al.,*

---

**Page 1**

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SACRAMENTO

---oOo---

WILLIAM STRANGE, individually,
And as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
Minors; RONALD SIMS, as Guardian
Ad Litem for KEEGAN SIMS, a minor,

    Plaintiffs,

v.        No. 07AS00377

ENTERCOM SACRAMENTO, LLC.
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED,
ROBIN PECHOTA, LIZ DIAZ,
ADAM COX, STEVE MANEY,
PATRICIA SWEET, MATT CARTER,
And DOES 1-40, inclusive,

    Defendants.
_____/

---oOo---

9:00 a.m.

June 29, 2007

DEPOSITION OF ELLAHEH BAGHAEI

aka LIZ DIAZ

Reported by: SHERREE L. BLAKEMORE, CSR No. 7144

ROYAL REPORTING SERVICES (916) 564.0100

---

**Page 2**

A P P E A R A N C E S

For the Plaintiffs:

    DREYER, BABICH, BUCCOLA & CALLAHAM, LLP
    Attorneys at Law
    20 Bicentennial Circle
    Sacramento, California 95826
    BY: ROGER A. DREYER, ESQ.
    ROBERT BALE, ESQ.

For the Plaintiff Keegan Sims

    LEVINE, STEINBERG, MILLER
    & HUVER
    Attorneys at Law
    550 West C Street, Suite 1810
    San Diego, California 92101-8596
    BY: HARVEY R. LEVINE, ESQ.

For the Defendant Entercom Sacramento, LLC, and
John Geary

    FOLGER LEVEN & KAHN, LLP
    Attorneys at Law
    275 Battery Street, 23rd floor
    San Francisco, California 94111
    BY: DOUG SULLIVAN, ESQ.

For the Defendant Entercom Sacramento, LLC:

    CARLSON, CALLADINE & PETERSON, LLP
    Attorneys at Law
    353 Sacramento Street, 16th Floor
    San Francisco, California 94111
    BY: MONICA F. WILEY, ESQ.

For the Defendant Steve Weed:

    MASON & THOMAS
    Attorneys at Law
    2840 Fifth Street
    Davis, California 95818-7759
    BY: BRADLEY THOMAS, ESQ.

ROYAL REPORTING SERVICES (916) 564.0100

---

**Page 3**

A P P E A R A N C E S (Cont'd)

For the Defendant Robin Pechota:

    BORTON, PETRINI & CONRON, LLP
    Attorneys at Law
    1104 12th Street
    Modesto, California 95354
    BY: CRYSTAL SWANSON, ESQ.

For the Defendant Liz Diaz:

    LEWIS BRISBOIS BISGAARD & SMITH
    Attorneys at Law
    2500 Venture Oaks Way, Suite 200
    Sacramento, California 95833
    BY: ANDREW E. BENZINGER, ESQ.
    THOMAS NIELSEN, ESQ.

    TRYGSTAD, SCHWAB & TRYGSTAD
    Attorneys at Law
    1880 Century Park East, Suite 1104
    Los Angeles, California 90067
    BY: RICHARD J. SCHWAB, ESQ.

For the Defendant Adam Cox:

    ROPERS, MAJESKI, KOHN & BENTLEY
    Attorneys at Law
    515 S. Flower Street, 11th Floor
    Los Angeles, California 90071
    BY: TOMAS A. BURGOS, III, ESQ.

For the Defendant Steve Maney:

    GUICHARD, TENG & PORTELLO
    Attorneys at Law
    1800 Sutter Street, Suite 730
    Concord, California 94520
    BY: MATTHEW P. GUICHARD, ESQ.

For the Defendant Patricia Sweet:

    RUSHFORD & BONOTTO
    Attorneys at Law
    2277 Fair Oaks Boulevard, Suite 495
    Sacramento, California 95825
    BY: ANDREW GIBSON, ESQ.

ROYAL REPORTING SERVICES (916) 564.0100

---

**Page 4**

A P P E A R A N C E S (Cont'd)

For the Defendant Matt Carter:

    GLAZER & ASSOCIATES
    Attorney at Law
    660 J Street, Suite 380
    Sacramento, California 95814
    BY: GERALD GLAZER, ESQ.

Also Present:

Michael Dash, Esq.

Videographer:

    DB Ronk & Associates
    2600 X Street
    Sacramento, California
    By: Dennis Ronk

---oOo---

ROYAL REPORTING SERVICES (916) 564.0100

DEPOSITION OF ELLAHEH BAGHAEI aka LIZ DIAZ - STRANGE v ENTERCOM, et al.,

**Page 109**

11:32:54 1    Do you remember ever signing a verification form?

11:32:57 2    A    Yes, I do.

11:32:57 3    MR. DREYER:  So I assume, Tom, we can expect to get

4    that sometime soon?

5    MR. NIELSEN:  Yes.

11:33:04 6    Q    BY MR. DREYER:  In terms of these answers, did you

11:33:07 7    ever actually review -- and I don't want to have any

11:33:09 8    conversations you had with your attorneys, okay.  I'm just

11:33:12 9    asking you what you've done.

11:33:13 10    Did you ever look at the answers that were provided

11:33:16 11    on your behalf?

11:33:17 12    A    No.  Oh, yes, afterwards, I did.

11:33:21 13    Q    You saw some legal document that had Mr. Nielsen's

11:33:25 14    firm name on it, and it showed the question and the

11:33:28 15    answer.

11:33:38 16    A    I read through it.

11:33:29 17    Q    There is one question in particular that I'm curious

11:33:31 18    about.  The question is -- it's 15.1.  And it says:

11:33:38 19    "Identify each denial of a material allegation in each

11:33:41 20    special or affirmative defense in your pleading, and for

11:33:44 21    each --" and it has three categories, A, B and C.

11:33:49 22    Now, I'm assuming you don't know what an affirmative

11:33:53 23    defense is just in --

11:33:54 24    A    No.

11:33:54 25    Q    But when you gave the information out, you knew that

**Page 110**

1    you would be providing it to us, essentially, under oath,

11:34:02 2    just like we're doing here today.  True?

11:34:03 3    A    Yes.

11:34:04 4    Q    That we would be relying upon your answers.

11:34:06 5    A    Yes.

11:34:07 6    Q    And that means you wanted to make sure they were

11:34:11 7    correct.  True?

11:34:11 8    A    True.

11:34:11 9    Q    In response to that question, we got an answer, that

11:34:19 10    "no person who called into the contest or the station ever

11:34:25 11    identified themselves as a medical care professional."

11:34:31 12    Do you remember giving me that information?

11:34:32 13    A    Yes.

11:34:33 14    Q    Now, this is your recollection.  Is it your

11:34:40 15    testimony, Ms. Baghaei, that no person ever called into

11:34:42 16    the contest or station and identified themselves as a

11:34:45 17    medical care professional.

11:34:47 18    A    Nobody ever identified themselves as a medical

11:34:53 19    professional to me.

11:34:53 20    Q    So understanding only you or Lukas would be

11:34:54 21    answering the phones, you certainly would be the only

11:34:56 22    woman that was answering the phones.

23    A    Yes.

24    Q    So it's your testimony that no one ever called the

11:35:02 25    show saying I'm a nurse, and here's my comment.  Is that

**Page 111**

11:33:10 1    true?

11:35:10 2    A    Nobody ever called and said I'm a nurse and here's

11:35:13 3    my comment, no.

11:35:16 4    Q    From your perspective, did you -- when you liste-

11:35:19 5    to the broadcast the next day, Ms. Baghaei, did you he,

11:35:22 6    the contestant -- or rather the call-in individual by the

11:35:27 7    name of Eva, who indicated, "Hey, you know this is, what

11:35:30 8    you're asking these people to do, they can die of water

11:35:32 9    intoxication"?

11:35:33 10    Do you hear that the next day, or that Monday, when

11:35:38 11    you listened to the comments on -- the program?

11:35:44 12    MR. SULLIVAN:  Object.  It's out of context.  It's

11:35:44 13    not an accurate recitation of the record.

11:35:47 14    MR. DREYER:  Go ahead.

11:35:48 15    THE WITNESS:  Yes.

11:35:49 16    Q    BY MR. DREYER:  I guess it was accurate enough for

11:35:54 17    you to understand what I was asking you.

11:35:55 18    Do you recall getting that call as a screener?

11:35:59 19    A    Yes.

11:35:58 20    Q    And do you recall Eva calling you and saying

11:36:04 21    something to you such that you typed in something, and it

11:36:04 22    went to Lukas?

11:36:05 23    A    Yes.

11:36:05 24    Q    Our information indicates that that is at the very

11:36:12 25    beginning, probably even before the contest started, or

**Page 112**

11:36:14 1    shortly after the contest started.  Is that consistent

11:36:17 2    with your recollection?

11:36:21 3    A    Yes.

11:36:22 4    Q    Tell us, Ms. Baghaei, what you remember that person

11:36:27 5    saying to you when she first called in.

11:36:33 6    A    She called, and she said; "Hey, listen --" very

11:36:33 7    conversational "-- listen, do you know that it's dangerous

11:36:39 8    for them to be drinking this much water?  It's like --

11:36:42 9    it's like really bad for them to be drinking this much

11:36:42 10    water."  I'm like "really? I didn't know.  Hang on a

11:36:45 11    second."  I said, "What's your name?"  She said, "Eva."  I

11:36:46 12    typed in Eva, and I put "dangers of water drinking," and I

11:36:51 13    put it through to Lukas.

11:36:53 14    Q    And that's completely consistent with what you're

11:36:59 15    supposed to do.  True?

11:36:59 16    A    Yes.

11:36:59 17    Q    And were you listening when Lukas put her on air?

11:37:01 18    A    Not with great detail, no.  I was just doing my

11:37:06 19    work.

11:37:07 20    Q    Now, Ms. Baghaei, when you say she was very

11:37:15 21    conversational when she called you, and she said to you

11:37:15 22    the words that you've described for us, Liz Baghaei, is

11:37:23 23    that the first time you were ever made aware in your m

11:37:24 24    the risks of drinking too much water?

11:37:27 25    A    Yes.

DEPOSITION OF ELLAHEH BAGHAEI aka  LIZ DIAZ - STRANGE v ENTERCOM, et al.,

1 individual, who told you, "I am a registered nurse, and I
2 am telling you that people can die from water
3 intoxication; this contest you're doing it has the
4 potential of killing some of your contestants"?  Did
5 you -- as you sit here today, do you remember getting such
6 a call?
7    A   No, I don't.
8    Q   Is it -- is it in your mind -- Ms. Baghaei, is it
9 possible you got the call, and you don't remember getting
10 the call, or is it your believe you did not get that call?
11       MR. SULLIVAN:  Calls for speculation.
12       MR. NIELSEN:  Join.
13       THE WITNESS:  I remember getting the call.  But
14 there was no mention of somebody can die, it's really
15 dangerous.  It was like water drinking is dangerous, it's
16 bad for you.  You guys shouldn't do this.  That was more
17 of the context.  It was never vary -- it wasn't as strict
18 as, harsh as someone can die, it needs to stop now.
19    Q   BY MR. DREYER:  But it was:  It's dangerous, and you
20 shouldn't be doing it.
21    A   Yes.
22    Q   Now, before you got those calls, before January
23 12th, 2007, had anyone ever, from this radio station, ever
24 indicated to you that there is a culture within the
25 building that we will never -- meaning Entercom

117

1 Sacramento -- we will never put any of our listeners in
2 danger, or risk their safety?
3    A   No.
4    Q   Now, from your perspective, in terms of thinking
5 back -- and I appreciate your candor.  Obviously, within
6 the short period of time of Ms. Strange dying, you thought
7 about the fact that you had gotten these calls.  Correct?
8    A   Correct.
9    Q   And you thought about "I walked in, and I told The
10 Morning Rave about the content of the calls."  Correct?
11    A   Correct.
12    Q   And they had told you "it's okay, they have signed
13 releases."  Right?
14       MR. NIELSEN:  Misstates her testimony.
15    Q   BY MR. DREYER:  Did they tell you that?
16    A   They told me just tell them that they need to
17 sign -- that they have signed waivers.
18    Q   You -- in other words, you are to report to the
19 listeners that are calling in words to the effect it's all
20 right, because the contestants have signed waivers?
21       MR. SCHWAB:  Object to the word "okay."
22    Q   BY MR. DREYER:  Is that a fair characterization?
23    A   It's a fair characterization.
24    Q   Now, you, Liz Baghaei, when you heard that from
25 them, did that sound okay to you?

118

1    A   No.
2    Q   Why not?
3    A   I tend to disagree with a lot of things that The
4 Morning Rave wants to do.
5    Q   Why did you disagree with that?
6    A   Because people were complaining, and I don't like
7 people calling, listeners calling and telling me, you
8 know, don't do this, you shouldn't do that.  Obviously
9 it's just -- it's common sense, that if somebody is saying
10 that it's wrong, you know, I'm going to feel like um, is
11 it wrong.  It made me question what we were doing.
12    Q   And the fact that you were getting repeated calls,
13 was that heightening your level of concern?
14       MR. NIELSEN:  Object to the term "repeating calls."
15 I think she said a couple.
16    Q   BY MR. DREYER:  Okay.  Did that heighten your
17 concern?
18    A   It didn't heighten my concern.  I just kind of --
19 after the first couple of calls, I did go in, and I did
20 talk to them.  So yes, I was concerned.
21    Q   All right.
22       Now, did you think -- understanding we have already
23 talked about the fact that you didn't get any kind of
24 written direction or verbal direction about what to do in
25 this set of circumstances -- that is a fair

119

1 characterization?
2    A   Yes.
3    Q   By going in and talking to The Morning Rave, you
4 felt like you were doing the responsible thing.  True?
5    A   Yes.
6    Q   Did you think that there was anything else that you
7 could do after you told them this, and they telling you
8 just tell them they signed releases?
9       MR. NIELSEN:  Calls for speculation.
10       THE WITNESS:  I went to the break room, and I went
11 to see what was going on.
12    Q   What did you see in the break room?
13    A   A lot of people had dropped out.  It was towards the
14 end of the contest.  And I saw Jennifer and the winner.  I
15 can't remember her name.  They were there.  And there was
16 a few people that were standing around.  Fester and Carter
17 were there.  There was one girl who was -- I guess I heard
18 that she had gotten sick.  That is why I went into the
19 break room, somebody told me she had gotten sick.  I went
20 in there and just said, you know, if you guys don't want
21 to do this, just back out.  It's not a big deal; it's a
22 contest.  If you don't feel well, just go home.  It's not
23 that big of a deal.
24    Q   Did you say anything else?
25    A   No.

120

*DEPOSITION OF ELLAHEH BAGHAEI aka LIZ DIAZ - STRANGE v ENTERCOM, et al.,*

**Page 121**

11:46:42  1  Q    And by getting sick, you mean someone throwing up?

11:46:45  2  A    Yes.

11:46:46  3  Q    You knew these contestants were competing for a

11:46:49  4  prize.  Correct?

5  A    Correct.

11:46:50  6  Q    And you knew that this was a prize that was in

11:46:52  7  demand.  Correct?

11:46:57  8  A    Correct.

11:46:57  9  Q    Did you say to them:  We've been getting phone calls

11:47:00  10  from people that are saying there is a risk to doing what

11:47:03  11  you are doing, that you guys, you are in danger by doing

11:47:07  12  this?  Anything of that nature?

11:47:08  13  A    I didn't.  But that's because there's a radio there,

11:47:12  14  and they had already aired Eva's call.  There was a radio

11:47:15  15  in the break room.  So I assumed that everybody already

11:47:19  16  heard Eva calling and saying she's a nurse, and the whole

11:47:23  17  shebang.  I felt that that's what had happened.

11:47:23  18  Q    So you assumed that they had heard what had been

11:47:28  19  played in terms of the interview on the radio.

11:47:30  20  A    Yes.

11:47:29  21  Q    You understood that when this contest started there

11:47:32  22  were like 17, 20 people back there, contestants, in that

11:47:36  23  ballpark of people.  Right?

11:47:37  24  A    Yes.

11:47:39  25  Q    And Carter and Fester.  Right?

121

**Page 122**

1  A    Correct.

11:47:42  2  Q    It was loud.

11:47:42  3  A    Yes.

11:47:43  4  Q    Party atmosphere.

11:47:45  5  A    Not party atmosphere.

11:47:50  6  Q    Did you hear them yelling and going salud and things

11:47:51  7  of that nature?

11:47:51  8  A    Not when I went in there.

11:47:53  9  Q    From your perspective, Ms. Baghaei, other than going

11:47:56  10  in and making the comment that you've described, did you

11:48:06  11  go talk to Steve Weed?

11:48:06  12  A    Steve wasn't there.

11:48:06  13  Q    Where was Steve?

11:48:06  14  A    Not at work yet.

11:48:10  15  Q    Did you talk to Robin?

11:48:10  16  A    Robin wasn't there, either.

11:48:12  17  Q    Did you talk to Mr. Geary?

11:48:14  18  A    No.  But that's because Maney told me that John was

11:48:21  19  mad, because he said that people were making too much

11:48:21  20  noise in the break room.  So I didn't want -- he had

11:48:23  21  business people there or something.  So I just thought --

11:48:26  22  I had already told The Morning Rave what had happened..  I

23  mean, I didn't think it was as big of a deal at the time

24  to go to John Geary.  I never talk to John.  So I didn't

11:48  25  ever put that in my brain to go and talk to him about it

122

**Page 123**

11:48:42  1  when he was busy.

11:48:42  2  Q    You had gone to the people that you answer to.

11:48:46  3  Correct?

11:48:46  4  A    Correct.

11:48:47  5  Q    How did it come up that Maney said John is mad

11:48:55  6  already?  I mean, did you talk to Maney and say, "Listen,

11:49:00  7  maybe one of us should go talk to Geary"?

11:49:00  8  A    No.

11:49:00  9  Q    How did that come up?

11:49:01  10  A    Maney came in the studio when I was in there doing

11:49:06  11  traffic, and he said, "Oh, John is really mad because

11:49:06  12  there is so much noise going on in the break room.  They

11:49:12  13  gotta keep it down a bit."  Or whatever, kind of thing.

11:49:12  14  Q    Was that before or after Eva's comment?

11:49:16  15  A    It was after Eva's comment.

11:49:16  16  Q    Was it before or after you got the other comments?

11:49:19  17  A    I don't remember.

11:49:20  18  Q    Now, for Mr. Nielsen's benefit, and for mine, and

11:49:24  19  I'm sure you've thought about this, I want to figure out

11:49:28  20  as precise a number as you feel comfortable telling me; we

11:49:32  21  know you got the call from Eva.  Correct?

11:49:34  22  A    Yes.

11:49:34  23  Q    Did Eva identify herself as a nurse to you?

11:49:37  24  A    No.

11:49:38  25  Q    Then you've got another call.  Correct?

123

**Page 124**

11:49:40  1  A    I got two, back to backs.

11:49:42  2  Q    So consecutive calls?

11:49:43  3  A    Uh-huh.

11:49:44  4  Q    Is that a yes?

11:49:45  5  A    Yes.

11:49:45  6  Q    So now we have three.  True?

11:49:47  7  A    Yes.

11:49:48  8  Q    And you didn't patch those through to Lukas, because

11:49:53  9  they were repeaters.  Correct?

11:49:55  10  A    Yes.

11:49:55  11  Q    So you made the decision, I'm getting repeating

11:49:59  12  comments, and I'm not supposed to pass on repeating

11:50:05  13  comments, so I'm not going to put it in to you.  Correct?

11:50:05  14  A    Yes.

11:50:15  15  Q    But you felt it was important enough, that during

11:50:08  16  the interview with Timberlake (sic), you said, "I need to

11:50:11  17  do something, and I am going to tell The Morning Rave and

11:50:16  18  hope that they'll do something, or something will happen."

11:50:17  19  Right?

11:50:18  20  A    I just thought I would report it back to them.

11:50:26  21  Q    Did you feel by doing that, that if something needed

11:50:26  22  to be done, that they are the ones that decide that?

11:50:32  23  A    They are the ones that would tell me how to answer

11:50:32  24  phone calls; and that's why I went in there.

11:50:37  25  Q    So your expectation, then, was that was the group

124

# EXHIBIT B

Strange vs. Entercom 7/05/07        Adam Cox

**Page 1**

```
 1
 2        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 3            IN AND FOR THE COUNTY OF SACRAMENTO
 4                      ---oOo---
 5   WILLIAM STRANGE, individually,
     And as Guardian ad Litem for
 6   RYLAND STRANGE and JORIE STRANGE,
     Minors; RONALD SIHS, as Guardian
 7   Ad Litem for KEEGAN SIHS, a minor,
 8            Plaintiffs,
 9        v.                        No. 07AS00377
10   ENTERCOM SACRAMENTO, LLC,
     ENTERCOM COMMUNICATIONS, CORP.,
11   STEVE WEED, ROBIN PECHOTA, LIZ DIAZ,
     ADAM COX, STEVE MANEY,
12   PATRICIA SWEET, MATT CARTER,
     And DOES 1-40, inclusive,
13            Defendants.
14   _____/
15                      ---oOo---
16                   9:40 a.m.
17
18               July 5, 2007
19
20           DEPOSITION OF ADAM COX
21                  aka LUKAS
22
23   Reported by: SHERREE L. BLAKEMORE, CSR No. 7144
24
25
       ROYAL REPORTING SERVICES (916) 564.0100
                                                    1
```

**Page 2**

```
 1
 2        A P P E A R A N C E S
 3   For the Plaintiffs:
 4   DREYER, BABICH, BUCCOLA & CALLAHAM, LLP
     Attorneys at Law
 5   20 Bicentennial Circle
     Sacramento, California 95826
 6   BY: ROGER A. DREYER, ESQ.
         ROBERT BALE, ESQ.
 7
 8   For the Defendant Entercom Sacramento, LLC, and
     John Geary:
 9
     FOLGER LEVEN & KAHN, LLP
10   Attorneys at Law
     275 Battery Street, 23rd floor
11   San Francisco, California 94111
     BY: DOUG SULLIVAN, ESQ.
12       JAMES GOLDBERG, ESQ.
13   For the Defendant Entercom Sacramento, LLC:
14
     CARLSON, CALLADINE & PETERSON, LLP:
15   Attorneys at Law
     353 Sacramento Street, 16th Floor
16   San Francisco, California 94111
     BY: DONALD CARLSON, ESQ.
17
18   For the Defendant Matt Carter
19   DEMAS & ROSENTHAL
     Attorneys at Law
20   2331 Capitol Avenue
     Sacramento, California 95816
21   BY: STEVEN H. SCHULTZ, ESQ.
22
     For the Defendant Steve Weed:
23
24   MASON & THOMAS
     Attorneys at Law
     2840 Fifth Street
25   Davis, California 95618-7759
     BY: BRADLEY THOMAS, ESQ.
25   ROYAL REPORTING SERVICES (916) 564.0100
     BY: BRADLEY THOMAS, ESQ.
                                                    2
```

**Page 3**

```
 1
 2        A P P E A R A N C E S (Cont'd)
 3
 4   For the Defendant Robin Pechota:
 5   BORTON, PETRINI & CONRON, LLP
     Attorneys at Law
 6   1104 12th Street
     Modesto, California 95354
 7   BY: CRYSTAL SWANSON, ESQ.
 8   For the Defendant Liz Diaz:
 9   LEWIS BRISBOIS BISGAARD & SMITH
     Attorneys at Law
10   2500 Venture Oaks Way, Suite 200
     Sacramento, California 95833
11   BY: ANDREW E. BENZINGER, ESQ.
12
13   For the Defendant Adam Cox:
14   ROPERS, MAJESKI, KOHN & BENTLEY
     Attorneys at Law
15   515 S. Flower Street, 11th Floor
     Los Angeles, California 90071
16   BY: RICHARD CHARNLEY, ESQ.
17   For the Defendant Steve Maney:
18   GUICHARD, TENG & PORTELLO
     Attorneys at Law
19   1800 Sutter Street, Suite 730
     Concord, California 94520
20   BY: WILLIAM PORTELLO, ESQ.
21
22   For the Defendant Patricia Sweet:
23   RUSHFORD & BONOTTO
     Attorneys at Law
24   2277 Fair Oaks Boulevard, Suite 495
     Sacramento, California 95825
25   BY: PHILLIP BONOTTO, ESQ.
     ROYAL REPORTING SERVICES (916) 564.0100
                                                    3
```

**Page 4**

```
 1
 2        A P P E A R A N C E S (Cont'd)
 3
 4   Also present: Michael Dash, Esq.
                    Cristina Arenas
                    Steve Weed
 5
   ...
25
     ROYAL REPORTING SERVICES (916) 564.0100
                                                    4
```

1 (Pages 1 to 4)

DEPOSITION OF ADAM COX aka LUKAS - STRANGE v ENTERCOM, et al.,

1 to win a contest that are degrading to themselves?

2 Q  Yes.

3 A  Yes.

4 Q  Such as peeing on themselves?

5 A  Yes.

6 Q  Vomiting on themselves?

7 A  Yes.

8 Q  And that's a sense, Mr. Cox, you had before this

9 contest. True?

10 A  Yes.

11     MR. DREYER:  Now, what I'm going to do is I'm going

12 to play it, and then stop it, and I'll ask you questions.

13 Okay?

14     Okay.  I'm going to turn it on right now.

15

16     (Audio played. Reporter does not certify content.)

17

18     HANEY:  I'm not sure.

19     LUKAS:  We told 'em to be here by 6:00 a.m., and

20 then at 6:00 a.m., we're going to rally them all together.

21 Starting at 6:15, they're going to start their drinking

22 their water.

23     HANEY:  Yes, the water's here; Fester's here. He's

24 going to drink with them.

25     LUKAS:  Oh, good. Fester, did you drink?

                                                              221

1     HANEY:  And there's Fester at the WebCam.

2     LUKAS:  Yeah, how much water do you think you can

3 drink before you have to wee? They're going to be

4 drinking --

5     FESTER:  When I do my -- I did like two gallons one

6 day.

7     LUKAS/TRISH:  Two gallons.

8     LUKAS:  Oh, dude.

9     TRISH:  Can't you get like water poisoning and like

10 die?

11     FESTER:  Bottled water.

12     LUKAS:  Your body is like 98 percent water. Why

13 can't you take in as much water as you want?

14     TRISH:  I don't know.

15

16 Q  BY MR. DREYER:  Now, that last comment, "Your body

17 is like 98 percent water. Why can't you take in as much

18 water as you want?" That's you. True?

19 A  Yes.

20 Q  And the comment before, "Can't you get like water

21 poisoning and like die?" That's by Trish. True?

22 A  Yes.

23 Q  And as you sit here -- it's, you know, before six

24 o'clock in the morning, and Trish Sweet makes that

25 comment.

                                                              222

1 Q  As you sit here today, Mr. Cox, do you remember her

2 making that comment?

3 A  No.

4 Q  Now, having listened in on the radio, you clearly

5 know she did make it. True?

6 A  True.

7 Q  And you responded to it by talking about why can't

8 you take in as much water as you want. Right?

9 A  True.

10 Q  So clearly you would have heard it.

11 A  Yes.

12 Q  Did you know where Ms. Sweet had her source of

13 information, that you can get, quote, like water poisoning

14 and like die?

15 A  No.

16 Q  During the course of the broadcast, you guys have

17 breaks, where you go on advertise, they run commercial

18 spots and things of that nature. True?

19 A  Yes.

20 Q  Did you ever turn to Ms. Sweet and say, "What are

21 you talking about," words to that effect, "how can people

22 die from this"?

23 A  No.

24 Q  You clearly did not know that people could die.

25 True?

                                                              223

1 A  True.

2 Q  Now, your comment, "Your body is like 98 percent

3 water, why can't you take in as much water as you want,"

4 you asked that question and laugh about it in response.

5     What did you base that statement on?

6 A  Probably just that I -- maybe I saw, you know,

7 something that your body is a lot of water; and so I was

8 just throwing out a number.

9 Q  It would be fair to say, Mr. Cox, you didn't have

10 any idea what you were talking about. Right?

11 A  True.

12 Q  But that's part of what you guys do; you pop off,

13 and make comments, and engage the listeners, and

14 everything from sarcasm to offensive statements to

15 endearing comments. All that sort of stuff. Right?

16 A  Right.

17     MR. DREYER:  I'm going to turn it back on for a

18 couple of clicks.

19     (Audio played. Reporter does not certify content.)

20

21     FESTER:  How much can you do though, since that poor

22 kid in college?

23     LUKAS:  I know.

24     TRISH:  That's what I was thinking.

25     LUKAS:  Well, he was doing other things too.

                                                              224

## DEPOSITION OF ADAM COX aka LUKAS - STRANGE v ENTERCOM, et al.,

1  TRISH:  Maybe we should have researched this before.

2

3  MR. DREYER:  Now, Fester made the comment about the
4  quote, unquote, poor kid in college.  And you say, "I
5  know."  And Trish says, "That's what I was thinking."  And
6  you made the comment, "Well, he was doing other things,
7  too."

8  Q  When this dialogue happened -- and obviously you
9  heard it, because you responded to it.  True?

10  A  True.

11  Q  Were you thinking about this incident we discussed
12  earlier about the kid who died from water intoxication in
13  2005?

14  A  Yes.

15  Q  When you made the comment, "Well, he was doing other
16  things, too," what did you mean?

17  A  Just my interpretation of what I had thought had
18  gone on in that contest, even though I really didn't know
19  what happened, with whatever happened to him.

20  I thought that it was a hazing.  And when I heard
21  about the incident, I don't know why, but it popped into
22  my brain as somebody holding somebody down, you know, and
23  that kind of thing.

24  Q  So, again, this is another example of you not
25  knowing what you were talking about?

225

ROYAL REPORTING SERVICES (916) 564.0100

1  A  Correct.

2  Q  Now, when Trish said, "Maybe we should have
3  researched this before," and laughs, did you know whether
4  anybody did any research on this?

5  A  No.

6  Q  Did that cause you -- as you sit here today, do you
7  think that any of that resonates, "Oh, my God, maybe we
8  should have," or anything like that hit the wall for you?

9  A  No.

10  MR. DREYER:  I'm going to turn it back on.  It's a
11  comment you make.

12  THE WITNESS:  Okay.

13  MR. DREYER:  Then I'll turn it back off, or stop it.

14

15  (Audio played.  Reporter does not certify content.)

16

17  FESTER:  Yeah, we never did this before I started
18  doing something.  Next thing you know, I break out in
19  hives and I'm in an ambulance.

20  LUKAS:  If it gets dangerous for somebody, their
21  body will automatically throw it up.  And if you throw up
22  the water, you're out of the contest.  So there you go.

23

24  Q  BY MR. DREYER:  That's Fester that made a comment,
25  and you responded.

226

ROYAL REPORTING SERVICES (916) 564.0100

1  A  Yes.

2  Q  So you said, "If it gets dangerous for somebody,
3  their body will automatically throw it up."  Right?

4  A  Right.

5  Q  Again, it sounds, Mr. Cox, like you also didn't have
6  any idea what you were talking about then.  True?

7  A  True.

8  Q  But that, again, is part of the contest, the
9  entertainment, where you're just popping off and saying
10  things.  Right?

11  A  Correct.

12  Q  Now, if someone had told you, in the production
13  meetings, or Mr. Weed had walked down the hall and said,
14  "Hey, this contest, you know, people can die from water
15  ingestion, and excessive water;  it can be lethal," do you
16  think that you would be making these kinds of comments?

17  A  No.

18  MR. DREYER:  I'm going to turn it on.

19

20  (Audio played.  Reporter does not certify content.)

21

22  FESTER:  What if you punch the person next to you?

23  LUKAS:  There's no punching.  No hitting.

24  FESTER:  Where's the rules?

25  TRISH:  Yeah, there's no violence in the studio.

227

ROYAL REPORTING SERVICES (916) 564.0100

1  LUKAS:  No violence in the rules.

2  FESTER:  'Cause I want to see some rules because
3  Carter always seems to bend whatever rules we don't have.

4

5  MR. DREYER:  Let's go to the next.

6  Q  Now, in an effort to be complete, and give you a
7  chance, Mr. Cox, when we play this segment, is there
8  anything about that that you think is out of context
9  relative to the dialogue and what you're trying to present
10  to your listeners?

11  MR. CHARNLEY:  You're talking about the segment you
12  just played?

13  MR. DREYER:  Yes.

14  THE WITNESS:  The stuff that we just played?

15  MR. DREYER:  Yes.

16  THE WITNESS:  Anything out of context up to that
17  point?

18  MR. DREYER:  Yes.

19  THE WITNESS:  Just normal show stuff.

20  Q  BY MR. DREYER:  So it's normal show stuff.  That's
21  the context to which you are presenting it.  True?

22  A  Right.  True.

23  Q  Now, understanding it's normal show stuff, and you
24  are trying to get the listener engaged, as you described
25  to us, just being a person, you know, who, you know, a

228

ROYAL REPORTING SERVICES (916) 564.0100

### DEPOSITION OF ADAM COX aka LUKAS - STRANGE v ENTERCOM, et al.,

**Page 229**

```
15:31:56   1   husband -- they describe you as being the family man on
15:32:02   2   the show.  Is that your role?
15:32:02   3   A   Yes.
15:32:02   4   Q   Family man to me means someone who's a concerned
           5   person, who thinks about others, and being family, you
15:32:07   6   have to be unselfish and things of that nature.
15:32:09   7       Is that consistent with the character that you had?
15:32:11   8   A   Yes.
15:32:12   9   Q   When you hear those things, if you had decided, as
15:32:17  10   the host of the show, I have not heard that before, I did
15:32:23  11   not know that, you know, that we didn't research this, I
15:32:27  12   just don't want to be involved in something that puts
15:32:29  13   people at risk of death; if you had thought that, do you
15:32:33  14   have the ability to stop the contest?
15:32:35  15   A   No.
15:32:36  16   Q   Why not?
15:32:37  17   A   I've never been in that position to stop a contest.
15:32:42  18   Q   Understanding --
15:32:43  19   A   But if I was to think about that, if I was to stop
15:32:49  20   the contest, what would be my -- what would happen?
15:32:52  21   Q   Yeah.
15:32:52  22   A   I would think that I would get fired.
15:32:54  23   Q   Well, Mr. Cox, if you heard this information -- the
15:33:01  24   contest hasn't even started.  If you -- do you have the
15:33:05  25   authority, as the host of The Morning Rave to, you know,
```

**Page 230**

```
15:33:14   1   tell Maney and Sweet, "You guys kind of carry this, I'm
15:33:14   2   going to go talk to Weed, or I'm going to go talk to
15:33:17   3   Geary, and say, 'Hey, listen, I have a bad feeling.  We're
15:33:21   4   putting people at risk here of dying.  I don't --' you
15:33:23   5   know, it might be embarrassing and everything else, 'but I
15:33:25   6   just don't think we should go forward with this.'"
15:33:27   7       Do you have the ability to do that?
15:33:28   8   A   Yes.  That's what I would do.
15:33:30   9   Q   Did you do that that morning?
15:33:32  10   A   No.
15:33:32  11       MR. DREYER:  Okay.
15:33:34  12       We're going to go to the next segment.  This is at
          13   6:07.
15:33:38  14       (Audio played.  Reporter does not certify content.)
          15
15:33:40  16       LUKAS:  We're going to start it at 6:20, and then
15:33:42  17   every ten minutes, you guys are going to drink ah -- I
15:33:44  18   think it's eight ounces of water.
          19       MANEY:  Yep.
          20       LUKAS:  Bottled water.
15:33:46  21       TRISH:  That's a lot of water.  Think you can do it?
15:33:48  22       VICTORIA:  I'm ready.  I know I can do it.
          23       TRISH:  All right, girl, that's what I'm talking
          24   about.
5:33:51   25       LUKAS:  And by the way if you get sick and you throw
```

**Page 231**

```
15:33:54   1   up 'cause sometimes you drink too much water your stomach
15:33:56   2   gets like -- and you got -- and that's -- then you'll be
15:33:58   3   out too.
15:34:00   4
15:34:00   5   Q   BY MR. DREYER:  Now, that was you that was sayin'
15:34:01   6   this is a contestant that's on the station you're
15:34:04   7   interviewing at the time.  Right?
15:34:05   8   A   I think so, yes.
15:34:06   9   Q   And you're telling her -- I mean, you're
15:34:10  10   acknowledging, hey, you could get sick and throw up.
15:34:11  11   Right?
15:34:12  12   A   Yes.
15:34:13  13   Q   And you indicate you can throw up sometimes when you
15:34:16  14   drink too much water.  Your stomach gets like -- and you
15:34:19  15   get -- and that's -- and then you'll be out of it too,
15:34:24  16   meaning out of the contest?
15:34:26  17   A   Yes.
15:34:26  18   Q   Did you let her know that there were any health
15:34:30  19   risks to this?
15:34:30  20   A   No.
15:34:33  21   Q   Did you consider -- knowing that the person could
15:34:35  22   throw up, as you described it, did you consider that there
15:34:39  23   was a health risk to this person that you were talking to?
15:34:42  24   A   That throwing up is a health risk?
15:34:46  25   Q   Yeah.  If you're drinking water to the point where
```

**Page 232**

```
15:34:51   1   you're throwing up, whether that was a health risk?
15:34:53   2   A   No.
15:34:54   3   Q   Did you think it was reasonable for them to believe
15:34:57   4   that there wasn't a health risk for them?
15:35:01   5   A   Yes.
15:35:01   6   Q   Okay.  Let's play the next segment, 6:19.
          7
15:35:06   8       (Audio played.  Reporter does not certify content.)
          9
15:35:08  10       LUKAS:  Well, we gotta take a break.  When we come
15:35:10  11   back from break, we'll kick off our -- the Wee contest.
15:35:14  12   People are going to be drinking water every ten minutes to
15:35:17  13   hold their wee.  The last person standing who doesn't have
15:35:20  14   to go to the bathroom wins the Wii.  And who knows, this
15:35:21  15   could go on 'til -- do you think people can hold their wee
15:35:22  16   for six hours?  This could be going on 'til noon today?
15:35:27  17       TRISH:  I don't know.  We're doing eight ounces
15:35:31  18   every ten minutes?
          19       LUKAS:  Yeah.
15:35:31  20       TRISH:  Wow, that's a lot.
          21       LUKAS:  They're going to --
15:35:31  22       TRISH:  That's like 48 ounces an hour.
15:35:35  23       LUKAS:  Yeah.  They're going to be drinking it, an
15:35:35  24   they're going to have to be weeing it.
          25       TRISH:  Wow.
```

DEPOSITION OF ADAM COX aka LUKAS - STRANGE v ENTERCOM, et al.,

1    are drinking all that water can get sick and possibly die
2    from water intoxication.
3        LUKAS:  Yeah, we're aware of that.
4
5        MR. DREYER:  Okay.
6    Q    Now, this is -- as far as you can recall, this is
7    the first call-in where someone was put on and talked
8    about the possibility of dying from water intoxication.
9    Right?
10   A    I believe so, yes.
11   Q    And it's you that says, "Yeah, we're aware of that."
12   True?
13   A    True.
14   Q    Now, you've told us consistently, throughout all
15   this time, Mr. Cox, that you were not aware of that.
16   Here's someone -- someone calling in and saying to you, "I
17   want to say that those people that are drinking all that
18   water can get sick and possibly die from water
19   intoxication," and you say, "Yeah, we're aware of that."
20   Why did you say, "Yeah, we're aware of that"?
21   A    Well, taken out of -- like we said, taken out of
22   context, when I'm running the show, I try to keep the show
23   going forward.  And as we have callers call in during
24   contests or topics or contests or anything, in this type
25   of a contest, it's happened before, where people would, of

245

1    the contest -- friends of the contestants would call in
2    and say things to get the other contestants out.  So in my
3    mind, as a process, when she said that, it's like, "Yeah,
4    whatever, thank you," try to move on to the next thing.
5    Q    I want to get this straight.  I want it in your
6    context, your state of mind.
7    A    Okay.
8    Q    Someone tells you that to drink all that water you
9    can get sick and possibly die from water intoxication.
10   When you made the comment, "Yeah, we're aware of that,"
11   you're operating under the assumption that maybe this is
12   some friend of one of the contestants whose trying to
13   scare the other contestants?
14   A    Possibly, yes.
15   Q    Did you -- when you said, "Well, yeah." words to the
16   effect, "Yeah, we are aware of that," were you
17   communicating to her that you knew that people could die
18   from water intoxication?
19   A    I didn't think about it like that.
20   Q    Now, you would agree, again, putting it into
21   context, Mr. Cox, that early on in the program, Trish had
22   brought up the issue of potentially people getting sick
23   and dying.  Right?
24   A    Yes, I heard that.
25   Q    And that there had been this reference to the young

246

1    man who died from consumption of water.  Right?
2    A    True.
3    Q    And you -- Trish had made the comment about we have
4    to keep track of how much water these people are drinking.
5    Right?
6    A    She did make that comment.
7    Q    So your context is, your state of mind is, you had
8    no idea that people could die from water intoxication.
9    True?
10   A    True.
11   Q    Did you go back after this comment and tell anybody,
12   the contestants, "Hey, I just want to make sure you guys
13   are aware, this is hazardous, you guys could die of water
14   intoxication," just for, you know, listening, and kind of,
15   you know, let them know, and have the listeners hear how
16   they reacted to that?  Did you consider doing that?
17   A    I don't remember doing that.
18   Q    You clearly are saying that on the air, I mean you
19   know the listeners are hearing this?
20   A    Correct.
21       MR. DREYER:  All right.  Back on.
22
23       (Audio played.  Reporter does not certify content.)
24
25       MANEY:  They signed releases so we're not

247

1    responsible.  It's okay.
2        LUKAS:  And if they get to the point where they have
3    to throw up, then they're gonna throw up and they're out
4    of the contest before they die, so that's good, right?
5        EVA:  Ah, that's mean.  I suppose so.
6        LUKAS:  All right, do you -- how come you guys
7    didn't do it?
8        TRISH:  'Cause we don't want to die.
9        LUKAS:  Oh, okay.  Let me ask Carter if anybody's
10   dying in there.
11       CONTESTANT:  Yo, we ain't' dying.
12       LUKAS:  Hey, Carter, is anybody, is anybody dying in
13   there?
14       MR. DREYER:  Okay.
15   Q    Now, that is the dialogue that immediately follows
16   this comment "Yeah we're aware of that."  Right?
17   A    Correct.
18   Q    This is you saying -- this is -- Maney says the
19   business about the releases, "we're not responsible."
20   Correct?
21   A    Correct.
22   Q    Bottom line, you have no idea what release does in
23   terms of affecting responsibility.  True?
24   A    True.
25   Q    You make the comment -- I mean, you -- strike that.

248

*DEPOSITION OF ADAM COX aka LUKAS - STRANGE v ENTERCOM, et al.,*

1  You heard her say -- you asked her "why didn't you
2  guys do it," and she says "because I don't want to die."
3  A   Right.
4  Q   And then you ask Carter if anybody is dying.  True?
5  A   True.
6  Q   That's all part of this gig that you're trying to
7  present to the radio listening audience?
8  A   The whole morning we're joking around, the whole
9  morning, from beginning to end.  Our show is a fun, and
10 upbeat show, and so all that in context to us joking
11 around with celebrities that called in, with anybody that
12 called in, with the contestants themselves.  That's the
13 state of mind that we're in.  We weren't taking anything
14 serious.  Because we knew it was a safe contest.
15 Q   When you said you knew it was a safe contest, what
16 did you base that on?
17 A   That we got -- the promotion was approved to go on
18 the air.  So we knew there was no way anybody could die.
19 That's why we joked around about it.
20 Q   That's the context that you would like to put on
21 this?
22 A   Correct.
23 Q   So from your perspective, you didn't think that
24 maybe someone somewhere else had made a mistake and hadn't
25 done the necessary research, or anything of that nature?

249

1  A   No.
2  Q   So you're completely reliant upon promotions having
3  done its job?
4  A   Correct.
5  Q   So the concept that people could actually die was
6  something you felt confident, boy, promotions would never
7  put us in the position of doing that.  True?
8  A   Exactly.
9  Q   So you were relying on promotions?
10 A   True.
11 Q   Relying on management?
12 A   True.
13 Q   So you're completely comfortable with contestants
14 also making the same reliance.  True?
15 A   Yes.
16 Q   So you're spoofing us; joking about this, because
17 you don't think people are going to die.
18 A   Absolutely.
19 Q   You don't think people can die?
20 A   Correct.
21 Q   You now know you're wrong.  Correct?
22 A   Correct.
23    MR. DREYER:  Let's turn it back on.
24
25    (Audio played. Reporter does not certify content.)

250

1     CARTER:  Ah, we got a guy that's just about to die.
2     LUKAS:  Oh, good.
3     MANEY:  Make sure he signed that release.
4     LUKAS:  I like that we laugh at that, yeah.
5
6  Q   BY MR. DREYER:  You're the one that says, "I like
7  that we laugh at that, yeah."  Right?
8  A   I don't know if I said that.  That might have been
9  Maney.  Can you play it back?
10    MR. DREYER:  Sure, we'll play it back.  Start from
11 the beginning.  Okay?
12
13    (Audio played. Reporter does not certify content.)
14
15    LUKAS:  Eva.  Eva?
16    EVA:  Yes.
17    LUKAS:  What do you want to say?
18    EVA:  I want to say that those people that are
19 drinking all that water can get sick and possibly die from
20 water intoxication.
21    LUKAS:  Yeah, we're aware of that.  That's why we
22 gave them a --
23    MANEY:  They signed releases so we're not
24 responsible.  It's okay.
25    LUKAS:  And if they get to the point where they have

251

1  to throw up, then they're gonna throw up and they're out
2  of the contest before they die, so that's good, right?
3     EVA:  Ah, that's mean.  I suppose so.
4     LUKAS:  All right.  Do you -- how come you didn't do
5  it?
6     TRISH:  Thanks for looking out, though.
7     EVA:  'Cause we don't want to die.
8     LUKAS:  Okay.  Let me ask Carter if anybody is
9  dying.
10    CARTER:  Hey, we ain't dying.
11    LUKAS:  Hey, Carter is anybody, is anybody dying in
12 there.
13    CARTER:  Ah, we got a guy that's just about to die.
14    LUKAS:  Oh, good.
15    MANEY:  Make sure he signed that release.
16    LUKAS:  I like that we laugh at that, yeah.
17
18    MR. DREYER:  Is that you?
19    THE WITNESS:  Yes.
20    MR. SULLIVAN:  Just so the record is clear, when you
21 say "is that you," what are you referring to?
22    MR. DREYER:  "I like that we laugh at that, yeah."
23    THE WITNESS:  Yeah, that was me.
24    MR. DREYER:  Okay.  Back on.
25    //

252

DEPOSITION OF ADAM COX aka LUKAS - STRANGE v ENTERCOM, et al.,

1  she was pregnant. Look at it, it's totally sticking out.
2
3      MR. DREYER: Now, as you sit here today, Mr. Cox, do
4  you remember that visual, looking at her stomach?
5  A   Yes.
6  Q   It was distended. Right?
7  A   Yes.
8  Q   Did that raise a concern in your mind, physically,
9  for her?
10  A   It really didn't. The reason is, is that I -- I
11  know, I've never seen anybody drink that much water, so I
12  don't know what, you know, if your stomach would pooch out
13  or not. I didn't see the other girl's stomach pooch out,
14  though.
15  Q   You knew that -- you already had the information
16  about water intoxication, and dying. Right?
17  A   That information that people were calling in --
18  Q   Yeah.
19  A   Yeah.
20  Q   You knew that she had told you she was hurting.
21  Right?
22  A   Yes.
23  Q   Her head hurt. Right?
24  A   I heard her say that, yeah.
25  Q   Lightheaded. Right?

281

1  A   She said she had a headache or something like that.
2  Q   Do you remember her also talking about being
3  lightheaded?
4  A   To that effect, yes, okay, yes, I guess.
5      MR. CHARNLEY: If you don't remember, just say you
6  don't remember.
7      THE WITNESS: I remember her about saying her head
8  hurt. I don't remember her saying about lightheaded.
9      BY MR. DREYER: People had been throwing up,
10  vomiting?
11  A   I heard that they did, yes.
12      MR. DREYER: Okay. Back on.
13
14      (Audio played. Reporter does not certify content.)
15
16      LUKAS: That's full of water.
17      TRISH: She looks like she's at least three months
18  pregnant.
19      LUKAS: Come on over here.
20      LUCY: She's a mother of three.
21      TRISH: I know, she's a little tiny thing, too.
22  That's so funny.
23      LUKAS: Come on over here, Jennifer. You okay? You
24  want a to lay down? What do you --
25      TRISH: She can't even walk.

282

1      LUKAS: You gonna pass out right now, you've had too
2  much water?
3      JENNIFER: I could drink -- I can probably drink
4  more if you guys could pick me up. Do you want me to?
5  What could I get for it, though?
6
7      BY MR. DREYER: Now, you guys gave her the tickets.
8  Right?
9  A   Correct.
10  Q   Let me see. If I can see that booklet in front of
11  you. Did you monitor whether they were putting these
12  pictures up?
13  A   Putting the pictures up?
14  Q   Did you know they were back there taking pictures?
15  A   I didn't see anybody taking pictures.
16  Q   Did you e-mail them about putting pictures up on the
17  Web site?
18  A   No.
19  Q   So if there is e-mails that talk about that with
20  you, you would think that that -- it wouldn't refresh your
21  recollection that you had been the one asking about
22  posting pictures?
23  A   That I did?
24  Q   Yeah?
25  A   That would be Maney's character, not mine. So I

283

1  wouldn't remember doing that.
2  Q   I'm going show you 16-I. And just for the record,
3  just to show that to the camera, as well, please. All
4  right. That's good.
5      That's you next to Trish?
6  A   Yes.
7  Q   What's the insignia of the two fingers? What's that
8  all about?
9  A   I don't know. Trish always does that in her
10  pictures, so we all make fun of her, and do that.
11  Q   That's you there with the polo shirt on?
12  A   Yes.
13  Q   So you were there with her, meaning Jennifer
14  Strange, at this stage. Correct?
15  A   Yes.
16  Q   You had the information we have already talked about
17  relative to the symptoms and the signs, and her stomach,
18  and things of that nature. Right?
19  A   Yes.
20  Q   Did you ask any interns or anybody to contact
21  paramedics or anything like that, relative to Ms. Strange?
22  A   No.
23  Q   Did anybody bring it up in the station?
24  A   Not that I know of.
25  Q   By this time, 9:30, Mr. Weed would be there.

284

07/27/2007 04:57:38 PM

# EXHIBIT C

DEPOSITION OF DONALD LOGSDON

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

WILLIAM A. STRANGE, individually,
and as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
minors; RONALD N. SIMS, as
Guardian ad Litem for KEEGAN SIMS,
a minor,

    Plaintiffs,

  vs.              No. 07AS00377

ENTERCOM SACRAMENTO, LLC.,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED, ROBIN
PECHOTA, LIZ DIAZ, ADAM COX,
STEVE MANEY, PATRICIA SWEET,
MATT CARTER, and DOES 1 through
40, inclusive,

    Defendants.
_____/

DEPOSITION OF DONALD LOGSDON

May 9, 2007

Reported by:  KATHRYN DAVIS, CSR No. 3808

---

**A P P E A R A N C E S**

1  For the Plaintiffs William Strange, et al:

  DREYER, BABICH, BUCCOLA & CALLAHAM
  By: ROBERT BALE
  Attorney at Law
  20 Bicentennial Circle
  Sacramento, California 95825FWILEY

For the Defendant Entercom Sacramento, LLC, Entercom
Communications Corporation and John Geary:

  FOLGER, LEVIN & KAHN
  By: JAMES GOLDBERG
  Attorney at Law
  275 Battery Street, 23rd Floor
  Embarcadero Center West
  San Francisco, California 94111

Co-counsel for the Defendant Entercom Sacramento, LLC,
Entercom Communications Corporation and John Geary:

  CARLSON, CALLADINE & PETERSON, LLP
  By: MONICA F. WILEY
  Attorney at Law
  353 Sacramento Street, 16th Floor
  San Francisco, California 94111

For the Defendant Patricia Sweet:

  RUSHFORD & BONOTTO
  By: ANDREW M. GIBSON
  Attorney at Law
  2277 Fair Oaks Boulevard, Suite 495
  Sacramento, California 95825

For the Defendant Steve Maney:

  GUICHARD, TENG & PORTELLO
  By: CHRISTOPHER K. TENG
  Attorney at Law
  1800 Sutter Street, Suite 730
  Concord, California 94520

KATHRYN DAVIS & ASSOCIATES 916.567.4211    2

---

**A P P E A R A N C E S  C O N T I N U E D**

For the Defendant Liz Diaz Baghael:

  LEWIS, BRISBOIS, BISGAARD & SMITH
  By: SCOTT D. COTE
  Attorney at Law
  2500 Venture Oaks Way, Suite 3200
  Sacramento, California 95833

For the Defendant Steve Weed:

  JACOBSEN & McELROY
  By: JENNIFER G. STOECKLEIN
  Attorney at Law
  2401 American River Drive, Suite 100
  Sacramento, California 95825

For the Defendant Robin Pechota Ray:

  BORTON, PETRINI & CONRON
  By: CRYSTAL S. SWANSON
  Attorney at Law
  1004 12th Street.
  Modesto, California 95354

For the Defendant Adam Cox:

  ROPERS, MAJESKI, KOHN & BENTLEY
  By: TOMAS A. BURGOS III
  Attorney at Law
  515 S. Flower Street, Suite 100
  Los Angeles, California 90071

For the Defendant Matt Carter:

  DEMAS & ROSENTHAL
  By: STEVEN H. SCHULTZ
  Attorney at Law
  2331 Capitol Avenue
  Sacramento, California 95816

KATHRYN DAVIS & ASSOCIATES 916.567.4211    3

---

**I N D E X  O F  E X A M I N A T I O N**

                             Page

Examination by Mr. Goldberg........................ 5

Examination by Mr. Schultz......................... 41

Examination by Mr. Teng ........................... 41

Examination by Mr. Burgos.......................... 42

Examination by Ms. Stoecklein...................... 43

Examination by Mr. Cote............................ 44

--oOo--

**E X H I B I T S**

Defendant's Exhibit No.                Page

26    Release For All Claims Including Personal

    Injury document, dated January 12, 2007..  16

--oOo--

KATHRYN DAVIS & ASSOCIATES 916.567.4211    4

DEPOSITION OF DONALD LOGSDON

01:25:37  1   A    ·I can't recall, no.

01:25:40  2   Q    Did you ever have a one-on-one conversation with

01:25:42  3   her?

·  4   A    No.

5   Q    Now I think you said that you dropped out after

01:25:53  6   you were handed the third large bottle?

01:25:55  7   A    It was right around -- it was right around

01:25:58  8   two hours, right around two hours.

01:26:01  9   Q    And what is your thought about when the contest

01:26:03 10   started?  When you say two hours --

01:26:06 11   A    It started around 6:30.  That is when the

01:26:09 12   contest got --

01:26:11 13   Q    That is when you drank the first bottle of

01:26:13 14   water?

01:26:14 15   A    Yes; right around there.

01:26:15 16·  Q    Were you in there until 8:30?

01:26:17 17   A    Yes.

01:26:17 18   Q    And what did you do when you left at 8:30?  Did

01:26:23 19   you go with the bathroom and urinate?

01:26:24 20   A    Yeah.  I ran to the nearest one which was

.01:26:27 21   locked, of course.  And they showed me where the

01:26:33 22   other one was -- the intern.  He walked me out to

01:26:33 23   the other one.  He was waiting for me after I was

01:26:37 24   done.  He walked me back to the DJs, and I went on

01:26:41 25   air for a couple minutes.  Then he walked me back to

KATHRYN DAVIS & ASSOCIATES 916.567.421129

01:26:48  1   where the contestants were.  I grabbed something to

01:26:48  2   eat out of the vending machine, some cookies.  And

01:26:51  3   then I was escorted out.

01:26:55  4   Q    How did you feel after you urinated and got

01:26:58  5   something to eat?.

01:26:59  6   A    I felt good for that moment to urinate.

01:27:01  7   There was still a little -- you know, my bladder was

01:27:05  8   still sore even after I urinated.

01:27:07  9   Q    Okay.  Other than a sore bladder, did you feel

01:27:10 10·  okay?

01:27:11 11   A    It was probably until about ten minutes

01:27:14 12   later, I was heading to my parents' house and I got

01:27:18 13   a pretty bad headache.

01:27:19 14   Q    Okay.

01:27:21 15   A    Almost like it was a hangover.

01:27:25 16   Q    And how long did that last?

01:27:28 17   A    I didn't feel good much the rest of the day.

01:27:30 18   The headache lasted a pretty long time.  I went to

01:27:33 19   my parents' house.  I talked to my mom.  And I asked

1:27:35 20   her, you know, why would I have such a bad headache.

1:27:39 21   I didn't do anything different today besides

drinking the water.

1:27:41 23         And we were kind of curious, like, you know,

1:27:44 24   if we were drinking that much water, would it give

1:27:45 25   you that bad a headache.  And we were both, you

KATHRYN DAVIS & ASSOCIATES 916.567.421130

01:27:47  1   know, had no clue that is why it was giving me the

01:27:50  2   headache but --

01:27:51  3   Q    Okay.

01:27:52  4   A    I was tired.  I went to a friend's house

01:27:57  5   shortly after and I fell asleep there on the couch.

01:28:00  6   Q    Okay.  I take it you hadn't discussed with your

01:28:02  7   mother beforehand that you were entering into the

01:28:05  8   contest?

01:28:06  9   A    She actually knew.  I'd forgotten.  I told

01:28:08 10   her — sorry.

01:28:10 11   Q    Okay.  And you basically told her what you told

01:28:13 12   the other folks about the contest?

01:28:13 13   A    Yes.

01:28:14 14   Q    Did she give you any indication that she was

01:28:18 15   aware of any health risks associated with the contest?

01:28:21 16   A    No.

01:28:22 17   Q    Let's go back then.  If you dropped out of the·

01:28:27 18   contest about 8:30, you then went to the bathroom,

01:28:32 19   on air for a few minutes, and then somebody accompanied

01:28:36 20   you out of the station.  What time do you think you left

01:28:40 21   the station?

01:28:41 22   A    It was close to 9:00 -- 8:45 or nine-ish.

01:28:44 23   Q    So did you hear any more of the contest after

01:28:49 24   you left the room, after you left the kitchen?

01:28:53 25   A    Yeah.  I listened to it on the way to my

KATHRYN DAVIS & ASSOCIATES 916.567.421131

01:28:56  1   parents' house.

01:28:57  2   Q    Okay.

01:28:58  3·  A    That was in Elk Grove.  It was about a half-hour

01:29:00  4   drive I listened to it.  I listened to it almost all the

01:29:03  5   way to who won.

01:29:04  6   Q    Okay.  Let's go back, and that reminds me.

01:29:13  7   Remind me if I already asked you what time you left the

01:29:18  8   house in the morning to go to the station.

01:29:18  9   A    Between 5:30 -- I would say 5:30 or 5:45, in

01:29:23 10   that range.

01:29:24 11   Q    And how long did it take you to get over to the

01:29:28 12   station from your house that morning?

01:29:28 13   A    Probably 10 to 12 minutes probably.

01:29:30 14   Q    Okay.  In your drive over in the morning before

01:29:33 15   6:00, did you hear an exchange in which there was a

01:29:42 16   discussion by the radio personalities that people might

01:29:45 17   be drinking as much as two gallons of water?

01:29:47 18   A    No.  I actually did not listen to the radio

01:29:50 19   station on the way in.

01:29:50 20   Q    Okay.

01:29:51 21   A    I was actually listening to 1140, sports

01:29:55 22   1140.

01:29:57 23   Q    On the way home or to your mother's house on the

01:30:01 24   way out, you were listening to the station?

01:30:03 25   A    Yes.

KATHRYN DAVIS & ASSOCIATES 916.567.421132

# EXHIBIT D

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

WILLIAM A. STRANGE, individually,
and as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
minors; RONALD E. SIMS, as
Guardian ad Litem for KEEGAN SIMS,
a minor,

        Plaintiffs,

    vs.            No. 07AS00377

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS CORP.,
JOHN GEARY, STEVE WEED, ROBIN
PECHOTA, LIZ DIAZ, ADAM COX,
STEVE MANEY, PATRICIA SWEET,
MATT CARTER, and DOES 1 through
40, inclusive,

        Defendants.
_____/

DEPOSITION OF VINCENT LANDGREN

May 10, 2007

Reported by: THRESHA SPENCER, CSR No. 11788

---

## A P P E A R A N C E S

For the Plaintiffs William Strange, et al.:

    DREYER, BABICH, BUCCOLA & CALLAHAM
    By: ROBERT BALE
    Attorney at Law
    20 Bicentennial Circle
    Sacramento, California 95825

For the Defendant Entercom Sacramento, LLC, and Entercom
Communications Corp., and John Geary:

    FOLGER, LEVIN & KAHN
    By: DAVID P. BARTON
    Attorney at Law
    Embarcadero Center West
    San Francisco, California 94111

Co-counsel for the Defendant Entercom Sacramento, LLC,
Entercom Communications Corporation and John Geary:

    CARLSON, CALLADINE & PETERSON, LLP
    By: MONICA F. WILEY
    Attorney at Law
    353 Sacramento Street, 16th Floor
    San Francisco, California 94111

For the Defendant Patricia Sweet:

    RUSHFORD & BONOTTO
    By: PHIL BONOTTO
    Attorney at Law
    2277 Fair Oaks Boulevard, Suite 495
    Sacramento, California 95825

For the Defendant Steve Maney:

    GUICHARD, TENG & PORTELLO
    By: THERESA BAUMGARTNER
    Attorney at Law
    1800 Sutter Street, Suite 730
    Concord, California 94520

---

    A P P E A R A N C E S  C O N T I N U E D

For the Defendant Matt Carter:

    LAW OFFICES OF GERALD GLAZER
    By: GERALD GLAZER
    Attorney at Law
    660 J Street
    Sacramento, California 95814

For the Defendant Liz Diaz Baghaei:

    LEWIS, BRISBOIS, BISGAARD & SMITH
    By: ANDREW BENZINGER
    Attorney at Law
    2500 Venture Oaks Way, Suite 3200
    Sacramento, California 95833

For the Defendant Steve Weed:

    BRADLEY & THOMAS
    By: BRADLEY S. THOMAS
    Attorney at Law
    2840 5th Street
    Davis, California 95618

For the Defendant Robin Pechota Ray:

    BORTON, PETRINI & CONRON
    By: CRYSTAL S. SWANSON
    Attorney at Law
    1004 12th Street
    Modesto, California 95354

For the Defendant Adam Cox:

    ROPERS, MAJESKI, KOHN & BENTLEY
    By: TOMAS A. BURGOS III
    Attorney at Law
    515 S. Flower Street, Suite 100
    Los Angeles, California 90071

    --oOo--

---

## INDEX OF EXAMINATION

                      Page

Examination by Mr. Barton.......................... 5

Examination by Mr. Benzinger....................... 40

Examination by Ms. Wiley........................... 42

Examination by Mr. Glazer.......................... 47

Examination by Mr. Bonotto......................... 57

    --oOo--

## E X H I B I T S

Deposition Exhibit No.                  Page

27    Release For All Claims Including Personal
        Injury.................... 13

**Page 29**

1 A   I pretty much wanted to go... saying, "I'll see you

2 later." I would have felt kind of weird just hanging out

3 there after the contest.

4 Q   So you got in your car?

5 A   Got in my car.

6 Q   Did you feel sick at that time?

7 A   Yes. Actually, I felt five minutes after I left, I

8 felt extremely sick.

9 Q   Were you in the car at that time?

10 A   Yes. Yeah. I just got to my girlfriend's house and

11 was feeling sick.

12 Q   Did you think you needed medical assistance at that

13 time?

14 A   I don't know. It came on like a normal sickness,

15 like a headache and just felt really tired, so I just

16 figured I was going to go to sleep.

17 Q   You didn't seek medical attention?

18 A   No.

19 Q   Did your girlfriend think you needed medical

20 attention?

21 A   She wasn't home. Just her mom was home. She said I

22 should go to sleep because I looked tired.

23 Q   She didn't say, "You should get medical attention"?

24 A   No.

25 Q   You said a moment ago that you knew about the Chico

**Page 30**

1 incident?

2 A   Yeah.

3 Q   Do you recall any discussion of the Chico incident

4 during the contest?

5 A   I don't recall.

6 Q   Do you recall any discussion of the risk of drinking

7 water during the contest?

8 A   Like I said, I thought it in my mind, but I'm not

9 sure if I discussed it or not.

10 Q   Did you overhear any discussions regarding the

11 Justin Timberlake tickets?

12 A   Yes.

13 Q   What did you hear?

14 A   Actually, my girlfriend wanted to go to that

15 concert, so I asked them if I dropped out, because I was

16 laying on the floor. I said, "Hey, can you just give me

17 those tickets if I drop out?"

18    And they said, "We're not going to give those

19 tickets out for the contest." And I just begged them. They

20 said "no." And it was funny because when I got to my car,

21 they offered -- I think they offered the person in second

22 place the Timberlake tickets. I was like, "Oh, great."

23 Q   When did you learn that the person who got second

24 place was offered the Justin Timberlake tickets?

25 A   I think right when I got in my car.

**Page 31**

1 Q   And you knew that person was Jennifer Strange?

2 A   I don't think so.

3 Q   You just heard that whoever the second place

4 finisher was was going to get the Justin Timberlake tickets?

5 A   Yeah.

6 Q   I don't want to put words in your mouth. I'm just

7 trying to understand what you knew about the Justin

8 Timberlake tickets.

9 A   I just remember it was two women that won, and I

10 couldn't differentiate from their voices who won. I was

11 like, "Oh, great. Someone won." That's all I remember from

12 that.

13 Q   You knew that someone actually won those tickets?

14 A   I think so.

15 Q   Does that suggest to you that if you maybe stayed

16 around the contest for a little while after you quit?

17 A   No. I heard it in my car.

18 Q   You heard it in the car?

19 A   I'm sorry.

20 Q   I understand.

21 A   Like I said, when I had left, the contest was pretty

22 much ending. So I figured if I would have just stayed

23 around a little bit longer, I could have been in the

24 contest.

25 Q   Do you listen to KDND 107.9 very often?

**Page 32**

1 A   No.

2 Q   But you learned about this contest...

3 A   From my girlfriend.

4 Q   Does she listen to the station?

5 A   Yeah.

6 Q   I'm going to ask you some questions about the

7 Entercom personnel, the station personnel who were there.

8 A   Okay.

9 Q   Do you recall anything in particular that station

10 personnel said during the contest? If you can't recall

11 anything, I'll try to narrow it down here in a second.

12 A   You know, I don't know any of their names. If you

13 showed me pictures, I could probably.

14 Q   Sure. Let me do that. We have Exhibit 17. Here's

15 Exhibit 17. It shows one, two, three, four, five, six

16 people. Do you recognize any of them?

17 A   This guy right here, the guy on the left in the

18 picture, he was pretty much monitoring us the whole time.

19 Q   Do you know his name?

20 A   No.

21 Q   I'll represent to you that he goes by the name of

22 Fester.

23 A   That sounds right.

24 Q   Do you recall anything in particular that Fester

25 said?

# EXHIBIT E

## DEPOSITION OF STEVE MANEY - STRANGE v ENTERCOM, et al.,

08:50:05

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SACRAMENTO
---oOo---

WILLIAM STRANGE, individually,
And as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
Minors; RONALD SIMS, as Guardian
Ad Litem for KEEGAN SIMS, a minor.

    Plaintiffs,

    v.            No. 07AS00377

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED,
ROBIN PECHOTA, LIZ DIAZ,
ADAM COX, STEVE MANEY,
PATRICIA SWEET, MATT CARTER,
And DOES 1-40, inclusive,

    Defendants.

_____/

9:00 a.m.

June 28, 2007

DEPOSITION OF STEVE MANEY

Reported by: SHERREE L. BLAKEMORE, CSR No. 7144

1

A P P E A R A N C E S

For the Plaintiffs:

  DREYER, BABICH, BUCCOLA & CALLAHAN, LLP
  Attorneys at Law
  20 Bicentennial Circle
  Sacramento, California 95826
    BY:  ROGER A. DREYER, ESQ.
        ROBERT BALE, ESQ.

For the Plaintiff: Keegan Sims

  LEVINE, STEINBERG, MILLER
  & HUVER
  Attorneys at Law
  550 West C Street, Suite 1810
  San Diego, California 92101-8596
    BY: HARVEY R. LEVINE, ESQ.

For the Defendant Entercom Sacramento, LLC, and
John Geary:

  FOLGER LEVEN & KAHN, LLP
  Attorneys at Law
  275 Battery Street, 23rd floor
  San Francisco, California 94111
    BY:  MICHAEL KAHN, ESQ.
        DOUG SULLIVAN, ESQ.

For the Defendant Entercom Sacramento, LLC:

  CARLSON, CALLADINE & PETERSON, LLP
  Attorneys at Law
  353 Sacramento Street, 16th Floor
  San Francisco, California 94111
    BY:  DONALD W. CARLSON, ESQ.

For the Defendant Steve Weed:

  JACOBSEN & McELROY
  Attorneys at Law
  2401 American River Drive, Suite 100
  Sacramento, California
    BY JULIE D. McELROY, ESQ.

2

A P P E A R A N C E S (Cont'd)

For the Defendant Robin Pechota:

  BORTON, PETRINI & CONRON, LLP
  Attorneys at Law
  1104 12th Street
  Modesto, California 95354
    BY:  CRYSTAL SWANSON, ESQ.

For the Defendant Liz Diaz:

  LEWIS BRISBOIS BISGAARD & SMITH
  Attorneys at Law
  2500 Venture Oaks Way, Suite 200
  Sacramento, California 95833
    BY:  THOMAS NIELSEN, ESQ.

For the Defendant Adam Cox:

  ROPERS, MAJESKI, KOHN & BENTLEY
  Attorneys at Law
  515 S. Flower Street, 11th Floor
  Los Angeles, California 90071
    BY: RICHARD CHARNLEY, ESQ.

For the Defendant Steve Maney:

  LAW OFFICES OF JAMES FARINARO
  Attorneys at Law
  852 East 14th Street
  San Leandro, California 94577
    BY:  JAMES FARINARO, ESQ.

  GUICHARD, TENG & PORTELLO
  Attorneys at Law
  430 D Street
  Davis, California 95616
    BY:  WILLIAM PORTELLO, ESQ.

3

A P P E A R A N C E S (Cont'd)

For the Defendant Patricia Sweet:

  RUSHFORD & BONOTTO
  Attorneys at Law
  2277 Fair Oaks Boulevard, Suite 495
  Sacramento, California 95825
    BY:  ANDREW GIBSON, ESQ.

For the Defendant Matt Carter:

  GERALD GLAZER
  Attorney at Law
  660 J Street, Suite 380
  Sacramento, California 95814

Also Present:  Steve Weed
             Michael Dash, Esq.

Also Present (briefly in a.m. session):

        Liz Diaz
        Richard Schwab
        Andrew Benzinger

VIDEOGRAPHER:

  DB Ronk & Associates
  2600 X Street
  Sacramento, California
  By:  Dennis Ronk

···oOo···

4

## DEPOSITION OF STEVE MANEY - STRANGE v ENTERCOM, et al.,

14:43:13   bar with a megaphone and impersonated all three American
14:43:13   Idol judges over the megaphone, recorded it, brought it in
14:43:15   and we played. It's kind of like the roving, part-time
14:43:18   guy. Again, available for contests like this. We like to
14:43:21   have a big presence. I hear Fester all the time. If
14:43:22   you're going to have 20, 25 listeners, you want them to be
14:43:30   present.
14:43:30   Q   Let's go to the next one. Put a C on the side
14:43:32   there. It shows it either way.
14:43:34   Show that to the camera, please.
14:43:38   All right.
14:43:39   Is that you?
14:43:39   A   Yes.
14:43:39   Q   Is that you?
14:43:39   A   With long hair.
14:43:40   Q   With a contestant?
14:43:41   A   Yes.
14:43:42   Q   Do you remember her name?
14:43:43   A   No.
14:43:43   Q   Let's go to the next picture. Let's put a D on
14:43:58   that. And let's look at C and D together.
14:44:02   Now, the woman that is with you in C, can you tell
14:44:07   us, based upon your knowledge of being in the -- present,
14:44:12   I take it you went back in the break room?
14:44:15   

205

14:44:20   Q   And what time were you back there?
14:44:20   A   Well, I believe I went back three times.
14:44:23   Q   Now, you see this woman on the phone?
14:44:25   A   Yes.
14:44:25   Q   Who is she talking to?
14:44:27   A   Lukas and Trish in the studio.
14:44:32   Q   She's smiling?
14:44:32   A   Yes.
14:44:32   Q   Do you remember that happening? Seeing how this was
14:44:33   the last day you were on the air.
14:44:34   A   I remember going back there, but I don't
14:44:37   specifically remember her.
14:44:38   Q   Why were you doing the thumbs up?
14:44:40   A   For the camera.
14:44:41   Q   Why were you smiling?
14:44:44   A   For the camera. For the Web site.
14:44:46   Q   And so this is a picture you would anticipate to
14:44:51   potentially be on the Web site?
14:44:53   A   Sure.
14:44:53   Q   Okay. What time of day do you think this picture
14:44:56   was shot?
14:45:00   A   7:30, 8:30.
14:45:05   Q   Early part of the morning?
14:45:06   A   Yeah.
14:45:06   Q   Now, photograph D, 16-D, same woman?

206

14:45:11   A   Yes.
14:45:13   Q   Okay.
14:45:13   Can I show you -- did I show you this one, a picture
14:45:19   obviously taken of her. It's now later in the day,
14:45:21   because we see the light in the windows. Correct?
14:45:24   A   Yes.
14:45:26   Q   Do you remember this happening, where she was
14:45:27   throwing up?
14:45:27   A   No.
14:45:28   Q   Did anyone tell you that the same woman that earlier
14:45:31   you were on camera with smiling was later throwing up in
14:45:37   public, in front of everybody?
14:45:37   A   I don't remember anybody saying that to me.
14:45:40   Q   Now, clearly there is people around while this woman
14:45:45   is on her knees puking in a waste basket. Right?
14:45:47   MR. FARINARO: Lacks foundation.
14:45:49   Q   BY MR. DREYER: Do you see legs right next to her?
14:45:51   A   Yes.
14:45:52   Q   Obviously there is a person with a camera taking a
14:45:56   picture. True?
14:45:56   A   That person?
14:45:57   Q   Well, there is someone shooting a camera.
14:46:00   A   This picture, yes.
14:46:02   Q   Is this the kind of picture you wanted on the Web
14:46:06   site?

207

14:46:06   A   Not me.
14:46:06   Q   But if it was taken, someone could put it on the Web
14:46:10   site. True?
14:46:10   A   Sure.
14:46:11   Q   Is this the kind of thing that you will see, in your
14:46:17   mind, that Entercom would want to put on the Web site,
14:46:19   this kind of picture, 16-D?
14:46:29   A   They wouldn't take it down if we put it up there.
14:46:32   Q   When you say you wouldn't want it on there, why
14:46:34   wouldn't you want it on there?
14:46:37   A   Well, it's clearly a picture -- if you are looking
14:46:41   at the Web site, you want it to be representative of
14:46:43   something going on. I would prefer to have more people
14:46:49   involved. I would get the legs out of it. Just wouldn't
14:46:49   be -- has nothing to do with her vomiting. It's the
14:46:53   picture in there is a half a garbage can in there. Not a
14:46:56   good picture, it's not a presentable picture to put on the
14:46:58   Web site.
14:46:58   Q   Do you know who took the picture?
14:47:01   A   My guess would be --
14:47:01   MR. FARINARO: Don't guess.
14:47:04   Q   BY MR. DREYER: Who had the camera?
14:47:05   A   I don't know.
14:47:06   Q   The fact that someone is taking a picture of another
14:47:09   person throwing up in the garbage can as a result of a

208

# EXHIBIT F

DEPOSITION OF RONALD MENDOZA

---

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

WILLIAM A. STRANGE, individually,
and as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
minors; RONALD E. SIMS, as
Guardian ad Litem for KEEGAN SIMS,
a minor,

    Plaintiffs,

vs.              No. 07AS00377

ENTERCOM SACRAMENTO, LLC.,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED, ROBIN
PECHOTA, LIZ DIAS, ADAM COX,
STEVE MANEY, PATRICIA SWEET,
MATT CARTER, and DOES 1 through
40, inclusive,

    Defendants.
_____/

DEPOSITION OF RONALD MENDOZA

May 2, 2007

Reported by: KATHRYN DAVIS, CSR No. 3808

---

## APPEARANCES

For the Plaintiffs William Strange, et al:

    DREYER, BABICH, BUCCOLA & CALLAHAM
    By: ROBERT BALE
    Attorney at Law
    20 Bicentennial Circle
    Sacramento, California 95825

For the Defendant Entercom Sacramento, LLC, Entercom
Communications Corporation and John Geary:

    FOLGER, LEVIN & KAHN
    By: DOUGLAS W. SULLIVAN
    Attorney at Law
    275 Battery Street, 23rd Floor
    Embarcadero Center West
    San Francisco, California 94111

Co-counsel for the Defendant Entercom Sacramento, LLC,
Entercom Communications Corporation and John Geary:

    CARLSON, CALLADINE & PETERSON, LLP
    By: MONICA F. WILEY
    Attorney at Law
    353 Sacramento Street, 16th Floor
    San Francisco, California 94111

For the Defendant Patricia Sweet:

    RUSHFORD & BONOTTO
    By: ANDREW M. GIBSON
    Attorney at Law
    2277 Fair Oaks Boulevard, Suite 495
    Sacramento, California 95825

For the Defendant Steve Maney:

    GUICHARD, TENT & PORTELLO
    By: CHRISTOPHER K. TENG
    Attorney at Law
    1800 Sutter Street, Suite 730
    Concord, California 94520

---

## A P P E A R A N C E S  C O N T I N U E D

For the Defendant Liz Diaz Baghael:

    LEWIS, BRISBOIS, BISGAARD & SMITH
    By: ANDREW BENZINGER, Esq.
    Attorney at Law
    2500 Venture Oaks Way, Suite 3200
    Sacramento, California 95833

For the Defendant Steve Weed:

    JACOBSEN & McELROY
    By: JULIE McELROY
    Attorney at Law
    2401 American River Drive, Suite 100
    Sacramento, California 95825

For the Defendant Robin Pechota Ray:

    BORTON, PETRINI & CONRON
    By: CRYSTAL S. SWANSON
    Attorney at Law
    1004 12th Street
    Modesto, California 95354

For the Defendant Adam Cox:

    ROPERS, MAJESKI, KOHN & BENTLEY
    By: TOMÁS A. BURGOS III
    Attorney at Law
    515 S. Flower Street, Suite 100
    Los Angeles, California 90071

For the Defendant Matt Carter:

    DEMAS & ROSENTHAL
    By: STEVEN H. SCHULTZ
    Attorney at Law
    2331 Capitol Avenue
    Sacramento, California 95816

---

## INDEX OF EXAMINATION

                      Page

Examination by Mr. Sullivan....................   7

Examination by Mr. Schultz.....................  39

Examination by Mr. Teng........................  41

Examination by Mr. Burgos......................  42

Examination by Mr. Benzinger...................  42

Continued Examination by Ms. McElroy...........  45

--oOo--

## E X H I B I T S

Defendant's Exhibit No.               Page

18    Typed notes presented by Mr. Mendoza.....  5

19    Release For All Claims Including Personal

        Injury form signed by Mr. Mendoza........ 19

--oOo--

---

DEPOSITION OF RONALD MENDOZA

1 Q    Okay.  Dancing would be one.  Any others that
2 you can think of?
3 A    Not too many that I can remember right now.
4 Q    Okay.  How did you hear about the Hold Your Wee
5 Contest?
6 A    That one was advertised, I believe, the entire
7 week.  It was advertised extensively in the morning by
8 the Morning Show, which we typically listen to on our
9 drive to work and getting ready for work.
10 Q    And what did you do to get into the contest?
11 A    The rules were to call in and give an example
12 of your worst Christmas gift that you'd received,
13 and so on.  On Thursday, January 11th, I called in.
14 I was able to get through.  And I gave them my story
15 of the worst chocolate -- I'd received a bottle of
16 gourmet chocolate with an expiration date of 2002 or
17 something like that.
18 Q    And you received it much after the fact?
19 A    Correct.
20 Q    Prior to entering into the contest, did you
21 discuss the contest with your family?
22 A    Again, my family listens to the radio station so
23 we might have discussed it just in terms of, "Oh, yeah,
24 that sounds like a silly contest."  Also, the main prize
25 was the Nintendo Wii, which I'd camped out with my son a

KATHRYN DAVIS & ASSOCIATES 916.567.4211 13

1 couple months earlier so that he could get his.
2 So we were just discussing the fact that it is
3 such a high demand item and here they have one to give
4 away.
5 Q    Prior to starting the contest on January 12th,
6 did you discuss the nature of the contest with your
7 family?
8 A    With my wife.  Actually, she is the one that
9 encouraged me to enter.
10 Q    And during the discussions with your wife, did
11 you discuss anything that there might be a potential to
12 get sick from drinking too much water?
13 A    No, we didn't discuss that.
14 Q    Did you discuss any potential physical risk as a
15 result of drinking water?
16 A    No, we did not.
17 Q    Did you discuss the contest with any workers,
18 co-workers, before you started the contest?
19 A    No, we did not.
20 Q    Did you discuss the contest with any friends
21 before you entered the contest?
22 A    Not at all.
23 Q    Did you joke about the contest with your wife
24 before you started?
25 A    Yes, we did.

KATHRYN DAVIS & ASSOCIATES 916.567.4211 14

1 Q    How did you joke about it?
2 A    We were kind of joking just from the fact
3 that it was a highly sought-after item.  We already
4 had one, and it felt kind of wrong to compete when
5 we already had one.  So it was kind of a frivolous
6 contest thing.  So it was more of that matter.
7 Q    Did you discuss what the rules of the contest
8 were with anybody?
9 A    Not with anyone, no.
10 Q    Did you understand what the rules were for the
11 contest in terms of how you would win the prize?
12 A    Yes.
13 Q    And what did you understand the rules were?
14 A    It was my understanding that we were -- that
15 all the contestants originally were going to meet
16 outside the station very early, 6:00 in the morning,
17 and we would have to drink bottles of water,
18 undisclosed amounts, at like 15-minute intervals.
19 And whoever would be able to drink the most water
20 without having to go to the restroom or quit would
21 win.
22 Q    So you understood that if you urinated, you
23 would drop out of the contest?
24 A    Yes.
25 Q    And did you understand that you could

KATHRYN DAVIS & ASSOCIATES 916.567.4211 15

1 voluntarily drop out at any time?
2 A    Yes.
3 Q    Did you understand that there was a possibility
4 you might vomit?
5 A    Yes.
6 Q    Where did you get that understanding?
7 A    I just thought it is outside, it is real
8 cold, it was real cold during that time of the year.
9 And anyone can get sick or anything when you are
10 trying to drink a lot of water and it is cold
11 outside.
12 Q    You showed up on January 12th at the station?
13 A    Yes.
14 Q    Approximately what time?
15 A    I showed up right around 6:00 a.m.
16 Q    Were the rules explained for the contest when
17 you showed up at the station?
18 A    The rules were explained, just kind of
19 informally.  It wasn't a real formal "here is every
20 single rule," but it was just kind of an informal
21 summary with everyone that was out there to a
22 general understanding of the rules.
23 Q    On the morning of January 12th, did station
24 personnel describe that if you urinated, you would be
25 out of the contest?

KATHRYN DAVIS & ASSOCIATES 916.567.4211 16

DEPOSITION OF RONALD MENDOZA

1  Q    Let me rephrase it.

2        What I'm asking you for is to tell me everything

3  that you recall station personnel saying during the

4  course of the contest.

5  A    There was a lot said. Like I said, it was

6  competitive but kind of a lighthearted mood in the

7  room. So, for example, typically Carter would keep

8  track of time of how soon to drink the next bottle

9  of water. And we would go through a toast, kind of

10 a lighthearted -- "three, two, one -- drink."

11       I remember those kinds of comments coming

12 from station personnel. Also, they were talking to

13 various contestants and just asking what they did or

14 where they came from or who the Wii was for if they

15 won. I remember those kinds of comments as well.

16 Q    You said that you lasted about two hours?

17 A    Yes.

18 Q    Did you stay around the station after you

19 dropped out?

20 A    Not -- not for the contest. We were still

21 around for another ten minutes or so picking up some

22 prizes we had run previously from the website.

23 Q    Was your family present at the contest?

24 A    My wife was.

25 Q    Do you know approximately what time you left?

KATHRYN DAVIS & ASSOCIATES 916.567.4211 29

---

1  A    It would have been just about 8:55.

2  Q    And as of the time you left, how many people

3  were left in the contest?

4  A    I didn't know how many people were left, but

5  I did see at least one other person that had left

6  after me but I did not know how many people were

7  actually left in the contest.

8  Q    Do you know whether it was more than five?

9  A    It would have been more than five.

10 Q    As of the time that you left, at any time before

11 you left, did anybody seem to be ill?

12 A    There were a couple individuals. There was

13 one contestant, a blond younger girl, that just

14 looked like she was ready to vomit. And then every

15 so many minutes she would look better. And then she

16 would kind of look sick again, and then look better.

17       There was another younger individual who

18 would roll around on the ground, kind of acting like

19 he was in pain. And then the next minute he would

20 be talking to one of the girls that were helping,

21 asking for concert tickets. So he didn't appear

22 like he was in pain.

23       So it was hard to tell whether he was

24 actually in pain or if he was just kind of joking

25 around, trying to make it look like he was ready to

KATHRYN DAVIS & ASSOCIATES 916.567.4211 30

---

1  quit.

2  Q    In your notes you say, "College age male rolling

3  on ground acting funny." Do you see that?

4  A    Yes.

5  Q    What did you mean by that?

6  A    That was the individual that I just described.

7  Q    So you thought he was acting funny?

8  A    Yes. It was hard to tell. Again, at first

9  we thought that maybe he was suffering in terms of

10 not being able to hold it any longer. But then all

11 of a sudden he would -- his mood and attitude would

12 change, so that it made you wonder whether it was an

13 act or whether it was for real.

14 Q    Did he indicate that he felt like he was going

15 to pee?

16 A    He did. He would go up to different

17 individuals and say, "Do you feel like you have to

18 go? Because I feel like I have to go." And again,

19 you couldn't tell if he was being competitive where

20 he was trying to make someone feel like they had to

21 go, or if he was really being serious because he

22 would do that going around the room.

23 Q    Did you hear him say he was in any pain?

24 A    I don't recall him saying that.

25 Q    Did you hear the younger woman that you

KATHRYN DAVIS & ASSOCIATES 916.567.4211 31

---

1  mentioned -- did you hear her say that she was in pain?

2  A    No. Actually, she was pretty quiet. It was

3  just her body language and her appearance.

4  Q    If I mention the name Victoria Myers, would you

5  know if that is the woman that you are referring to?

6  A    I remember seeing that name in some of the

7  news articles. And from the context of the

8  articles, I was pretty sure that was her but there

9  was no accompanying picture. But based on the

10 articles, I have reason to believe that was correct.

11 Q    Did you think anybody needed to go to any

12 doctor?

13 A    Not for anyone that I saw while I was there.

14 Q    Did you think anybody needed medical assistance?

15 A    No.

16 Q    Was everyone friendly during the contest?

17 A    For the most part everybody was friendly.

18 Again, there was some competitiveness around the

19 room, so to a certain degree.

20 Q    Prior to January 12th, had you ever heard the

21 term hyponatremia?

22 A    I'm sorry. What was that?

23 Q    Have you ever heard the word hyponatremia?

24 A    No, I've not.

25 Q    Do you know medically what is involved in

KATHRYN DAVIS & ASSOCIATES 916.567.4211 32

# EXHIBIT G

Sweet, Patricia  7/9/2007  9:19:00 AM

**Page 1**

1    THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
2        IN AND FOR THE COUNTY OF SACRAMENTO
3              ---oOo---
4
     WILLIAM STRANGE, individually,
5    And as Guardian ad Litem for
     RYLAND STRANGE and JORIE STRANGE,
6    Minors; RONALD SIMS, as Guardian
     Ad Litem for KEEGAN SIMS, a minor,
7
         Plaintiffs,
8
     v.                        No. 07AS00377
9
     ENTERCOM SACRAMENTO, LLC,
10   ENTERCOM COMMUNICATIONS, CORP.,
     JOHN GEARY, STEVE WEED,
11   ROBIN PECHOTA, LIZ DIAZ,
     ADAM COX, STEVE MANEY,
12   PATRICIA SWEET, MATT CARTER,
     And DOES 1-40, inclusive,
13
         Defendants.
14   _____/
15
              ---oOo---
16
           9:19 a.m.
17
18         July 9, 2007
19
     DEPOSITION OF PATRICIA EILENE SWEET
20
21
22
23   Reported by:  SHERREE L. BLAKEMORE, CSR No. 7144
24
25

**Page 2**

1
2        A P P E A R A N C E S
3
     For the Plaintiffs:
4        DREYER, BABICH, BUCCOLA & CALLAHAM, LLP
         Attorneys at Law
5        20 Bicentennial Circle
         Sacramento, California 95826
6        BY:  ROGER A. DREYER, ESQ.
              ROBERT BALE, ESQ.
7
     For the Plaintiff Keegan Sims:
8
         LEVINE, STEINBERG, MILLER & HUVER
9        Attorneys at Law
         550 West C. Street, Suite 1810
10       San Diego, California 92101
         BY:  HARVEY LEVINE, ESQ.
11
     For the Defendant Entercom Sacramento, LLC, and
12   John Geary:
13       FOLGER LEVEN & KAHN, LLP
         Attorneys at Law
14       275 Battery Street, 23rd floor
         San Francisco, California 94111
15       BY:  DOUG SULLIVAN, ESQ.
16   For the Defendant Entercom Sacramento, LLC:
17       CARLSON, CALLADINE & PETERSON, LLP:
         Attorneys at Law
18       353 Sacramento Street, 16th Floor
         San Francisco, California 94111
19       BY:  DONALD CARLSON, ESQ.
20
     For the Defendant Matt Carter
21
         GERALD GLAZER
22       Attorney at Law
         660 J Street, Suite 380
23       Sacramento, California 95814
24
25

**Page 3**

1
         A P P E A R A N C E S (Cont'd)
2
3    For the Defendant Steve Weed:
4        JACOBSEN & McELROY
         Attorneys at Law
5        2401 American river Drive, Suite 100
         Sacramento, California 95825
6        BY:  JULIE D. McELROY, ESQ.
7    For the Defendant Robin Pechota:
8        BORTON, PETRINI & CONRON, LLP
         Attorneys at Law
9        1104 12th Street
         Modesto, California 95354
10       BY:  CRYSTAL SWANSON, ESQ.
11
12   For the Defendant Liz Diaz:
13       LEWIS BRISBOIS BISGAARD & SMITH
         Attorneys at Law
14       2500 Venture Oaks Way, Suite 200
         Sacramento, California 95833
15       BY:  KIM WATERS, ESQ.
16
17   For the Defendant Adam Cox:
18       ROPERS, MAJESKI, KOHN & BENTLEY
         Attorneys at Law
19       515 S. Flower Street, 11th Floor
         Los Angeles, California 90071
20       BY:  RICHARD CHARNLEY, ESQ.
21
     For the Defendant Steve Maney:
22       GUICHARD, TENG & PORTELLO
         Attorneys at Law
23       1800 Sutter Street, Suite 730
         Concord, California 94520
24       BY:  WILLIAM PORTELLO, ESQ.
25

**Page 4**

1
         A P P E A R A N C E S (Cont'd)
2
3    For the Defendant Patricia Sweet:
4        RUSHFORD & BONOTTO
         Attorneys at Law
5        2277 Fair Oaks Boulevard, Suite 495
         Sacramento, California 95825
6        BY:  PHILLIP BONOTTO, ESQ.
              ANDREW GIBSON
7
8
     Also present:  Michael Dash
9
     Videographer:
10
     D.B. Ronk & Associates
11   2600 X Street
     Sacramento, California
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Sweet, Patricia  7/9/2007  9:19:00 AM

281

1   A   No. She just told me that she stuck to the facts.

2   Q   Did she text you, I've been deposed, I stuck with

3   the facts, words to that effect?

4   A   Yes.

5   Q   Do you have that still on your phone?

6   A   No.

7   Q   Was this before or after Nichole had told you she

8   had thrown you, quote, unquote, under the bus?

9   A   After.

10  Q   Had you text messaged her and confronted her about

11  what Nichole had said?

12  A   Yes.

13  Q   So you text'd her. True?

14  A   Yes.

15  Q   And what did you say in your text?

16  A   I texted her that I heard she burned a few bridges

17  today.

18  Q   All right. And that was the extent of your message?

19  A   Yes.

20  Q   And her response was?

21  A   Was basically two text messages long, that she stuck

22  to the facts as best she could, and blah, blah, blah. "I

23  will always respect you."

24  Q   Did she give you any specifics?

25  A   No.

282

1   Q   Had you given her any specifics, like what you meant

2   by "I understand you burned some bridges"?

3   A   No.

4   Q   Okay.

5       Is that the extent of the communication by text?

6   A   Yes.

7   Q   And because I'm not a text messager, now I have to

8   ask you that.

9       Did you have text message exchanges with Lukas about

10  his testimony?

11  A   No.

12  Q   With Maney?

13  A   No.

14  Q   John Geary?

15  A   I don't think he knows how to text.

16  Q   I wouldn't be surprised. And that is not a shot at

17  him. Neither do I.

18      We're going to go to 8:18. Now, this is the tough

19  one. All right. This is the one on the call-in. Just

20  giving you a heads up. You ready?

21  A   Uh-huh.

22

23      (Audio played. Reporter does not certify content.)

24

25      LUKAS: Eva. Eva?

283

1       EVA: Yes.

2       LUKAS: What do you want to say?

3       EVA: I want to say that — um, that those people

4   that are drinking all that water can get sick and possibly

5   die from water intoxication.

6       LUKAS: Yeah, we're aware of that. That's why we

7   gave them a —

8       MANEY: They signed releases so we not responsible.

9

10      MR. DREYER: I'm stopping it because Mr. Maney makes

11  this comment, "they've signed releases, we're not

12  responsible, it's okay."

13  Q   Now, you recall this exchange happening. Right?

14  A   Yes.

15  Q   And this tape -- if you listen to the tape, you're

16  laughing after Maney makes this comment.

17      Is that Maney in his character, so to speak?

18  A   Yes, it is.

19  Q   You're going to -- if you die, it's okay, because

20  you signed a release.

21  A   He would have never said that if he knew that would

22  have been the case.

23  Q   Nor would you.

24  A   Right.

25  Q   That would be wholly callous and inappropriate.

284

1   Fair?

2   A   Yes.

3   Q   And was that something that you folks had talked

4   about doing before the bit, you know, you can say this, I

5   can say this. Anything of that nature?

6   A   No. It's just that with our respective roles, we

7   generally know where our boundaries are, and what we say,

8   and what to expect.

9   Q   Did you believe, Ms. Sweet, that this was a

10  legitimate call; that the caller was a real caller, saying

11  this is a real issue?

12  A   Did I believe it was a real caller?

13  Q   Yes.

14  A   Yes.

15  Q   So it never crossed your mind that this was some

16  phoney call that was just a setup to create drama. Right?

17  A   No, I didn't think that.

18      MR. DREYER: Okay. I'm going to go back on.

19

20      (Audio played. Reporter does not certify content.)

21

22      LUKAS: And if they get to the point where they have

23  to throw up, then they're gonna throw up and they're out

24  of the contest before they die, so that's good, right.

25      TRISH: (Laughing)

293

1  Q    That's not something that you're expressing out of
2  concern; you're painting the picture?
3  A    Yes.
4      MR. DREYER: Okay. Back on.
5
6      (Audio played. Reporter does not certify content.)
7
8      LUKAS: What do you think is better, sitting down or
9  standing up when you have to go.
10     TRISH: I don't know, 'cause I just feel like my
11 whole body would be in so much pain that I would curl into
12 a little ball and cry about it for a little while.
13     LUKAS: Yeah, well, there's going to be one person
14 standing for this Wii.
15     MANEY: Hey.
16     LUKAS: Yeah, you made it back there?
17     MANEY: Yeah, I'm down here.
18     TRISH: Wow, that's fast.
19     MANEY: Okay, um, we got people sittin. Basically
20 it looks like a prayer circle.
21     TRISH: Ah, ha, ha.
22     LUKAS: Are you serious?
23     MANEY: I mean, some people are sitting. Uh our
24 stripper friend, the girl who got the stripper outfit,
25 what's her name. Hey, Fester the blond-haired girl.

294

1  Bring her over here, please. I forget her name.
2      FESTER: She's gonna throw up.
3      MANEY: Come over here for a second, come talk --
4      TRISH: She's gonna throw up. Did you hear him?
5      MANEY: Lukas and Trish want to talk to you.
6      LUKAS: Throw up on Maney.
7      TRISH: Oh, my gosh.
8      MANEY: What, what, Victoria, right? Come here for
9  a second, talk to the guys, tell 'em how you feel.
10     VICTORIA: I'm gonna pass out or puke.
11     LUKAS: Are you -- are you done?
12     VICTORIA: Uh, no.
13     LUKAS: Well, we don't want you to die.
14
15 Q  BY MR. DREYER: That's, again, part of this
16 entertainment, painting a picture?
17 A    Yes.
18 Q    So at this point in time, you would be mindful of --
19 by 8:49, you would be mindful that someone was sick,
20 feeling sick.
21 A    Sounds that way, yes. I don't remember it
22 specifically, but --
23 Q    Clearly, when you listen to the voice, it clearly
24 sounds like she's not doing very well. Right?
25 A    Yes.

295

1  Q    Is this when you went back there?
2  A    I don't remember.
3  Q    And when you went back there, did you go back there
4  because you were concerned at that point in time, or was
5  it after you got back there that you first reached your
6  level of concern?
7  A    I wasn't concerned until there was a reason to be.
8  Q    When was there with a reason to be concerned?
9  A    In just those two specific cases that I said before.
10 Q    You had to be back there, though. Right?
11 A    Yes.
12 Q    Do you know why it was you went back?
13 A    Just because I kept checking in.
14 Q    We're going to play the next section at 9:10 in the
15 morning. So 9:10 would be -- you guys are approaching
16 three hours of consuming water every ten minutes; or at
17 least the contestants are consuming water every ten
18 minutes. Right?
19 A    Okay.
20
21     (Audio played. Reporter does not certify content.)
22
23     LUKAS: This is 107.9 The End, in the middle of
24 Freaky Friday. You're hanging with The Morning Rave as we
25 continue our contest, Hold Your Wee, to win a brand new

296

1  Nintendo Wii. We started at 6:30 this morning with like
2  20 people. We're down to the final four people. And
3  let's check in with Carter, make sure --
4      MANEY: Wow, we were down to seven a minute ago.
5      LUKAS: Yeah, they're drinking this big -- the
6  16-ounce water bottle.
7      MANEY: Now we're playing ball.
8      LUKAS: Yeah, and some people are claiming they
9  could be there all day.
10     Carter --
11     CARTER: Yeah.
12     LUKAS: Okay, so where are we at?
13     CARTER: Oh, within the last two seconds of talking
14 to you, we've had the girl puke; we had a guy that was
15 going strong, he just left to puke. So now we're --
16
17 Q  BY MR. DREYER: So by this time you clearly knew
18 that people were throwing up. Right?
19 A    I believe I was there with Carter in the kitchen.
20 Q    So you're back there while he's making that report.
21 A    I believe I was, yes.
22 Q    So this report would have been after you had already
23 had contact with these two women?
24 A    Yes.
25 Q    All right. And I take it just by your reaction you

Sweet, Patricia  7/9/2007  9:19:00 AM

317

1  Q  Did it come to your attention that any family member
2  or friend that she talked to, or co-worker she talked to,
3  suggest that she see a doctor?
4  A  I --
5     MR. DREYER:  That assumes that that ever happened.
6  There's no foundation for this witness.
7     THE WITNESS:  Can you repeat the question?
8     MR. SULLIVAN:  Yeah.
9  Q  Did it come to your attention that anybody that
10  Jennifer Strange may have talked to on a cell phone had
11  called in and suggested that she go see a doctor?
12     MR. DREYER:  Same objection.  Lack of foundation,
13  and speculative.
14     MR. CARLSON:  Don't the stipulations go both ways?
15     MR. DREYER:  I didn't accept the stipulation, just
16  to answer your question, Mr. Carlson.
17     But thanks for your clarification.
18     THE WITNESS:  I don't mean to make you repeat
19  yourself again but I need you to repeat yourself.
20  Q  BY MR. SULLIVAN:  Did it come to your attention that
21  anybody that Jennifer Strange may have talked to on her
22  cell phone called into the station and said, you know, she
23  should go see a doctor?
24     MR. DREYER:  Same objections.  Lack of foundation.
25     THE WITNESS:  Not that I'm aware of.

318

1  Q  BY MR. SULLIVAN:  Now, I think you mentioned that
2  you'd heard of the Chico hazing incident before the
3  contest on January 12th.  Right?
4  A  Briefly, yes.
5  Q  And I think Mr. Dreyer referred to the Chico hazing
6  incident as the Mr. Kerrington incident.
7     Do you remember that?
8  A  Yes.
9  Q  Did you understand that that was a fraternity hazing
10  incident?
11  A  Yes.
12  Q  I think in response to one of his questions, you
13  said it sounds familiar that it may have been brought up
14  in either the Friday or Monday morning meetings.
15     Are you sure about that?
16  A  I'm not a hundred percent sure.
17  Q  Do you know if it was ever discussed in the Monday
18  morning meetings, I'm talking about the Chico hazing
19  incident?
20  A  I can't say specifically.  I don't remember.  It
21  just sounded familiar.
22  Q  Did you regard the Chico fraternity hazing incident
23  as similar to the contest you were running on January
24  12th? .
25  A  Not at all.

319

1  Q  Why not?
2  A  I just -- when I envisioned what little information
3  I had from the Chico incident, it was that -- it was a
4  kid, with water being forced down, and then thrown in a
5  sleeping bag, and put up against the wall.  And that's all
6  I remember from that incident.  To me it was an entirely
7  different scenario, than someone drinking water at their
8  own will, and pace.  It just didn't seem the same to me.
9  Q  Did you understand the incident with Mr. Kerrington
10  at Chico involved a fraternity?
11  A  Yes.
12  Q  And involved a hazing incident?
13  A  Yes.
14  Q  Now, the contest involved people drinking water
15  about every ten minutes, approximately?
16  A  Yes.
17  Q  Could anybody drop out at any time?
18  A  Yes.
19  Q  And I think you said that at one point you went back
20  and told the group as a whole that if they weren't feeling
21  well, they could drop out.  Is that right?
22  A  Yes.
23  Q  Do you have any reason to believe that Jennifer
24  Strange didn't hear you when you made that announcement?
25     MR. DREYER:  Calls for speculation.

320

1     THE WITNESS:  Can you say that again?
2  Q  BY MR. SULLIVAN:  Well, you said you went back to
3  the kitchen area and you announced to the group there if
4  anybody wasn't feeling well, they should feel free to drop
5  out of the contest.  Right?
6  A  Yes.
7  Q  And your intention was to announce it to all the
8  contestants in the room.  Right?
9  A  Yes.
10  Q  Do you have any reason to believe that Jennifer
11  Strange didn't hear you when you said that?
12     MR. DREYER:  Same objection.
13     THE WITNESS:  No.
14  Q  BY MR. SULLIVAN:  Now, in terms of the contest, if
15  the contestants urinated, they would be out of the
16  contest.
17  A  Yes.
18  Q  Was there anything that was done to prevent any of
19  the contestants from urinating?
20  A  No.
21  Q  Was there anything -- if a contestant vomited, they
22  were also out of the contest?
23  A  Yes.
24  Q  We heard -- and I'm sorry, I didn't ask you this
25  question.  We heard the comment from Eva calling in, and

# EXHIBIT H

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SACRAMENTO
---oOo---

WILLIAM STRANGE, individually,
and as Guardian ad Litem for
RYLAND STRANGE and JORIE STRANGE,
minors; RONALD SIMS, as Guardian
Ad Litem for KEEGAN SIMS, a minor,

    Plaintiffs,

v.              No. 07AS00377

ENTERCOM SACRAMENTO, LLC,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED,
ROBIN PECHOTA, LIZ DIAZ,
ADAM COX, STEVE MANEY,
PATRICIA SWEET, MATT CARTER,
and DOES 1-40, inclusive,

    Defendants.
_____/

---oOo---

10:00 a.m.

February 5, 2008

DEPOSITION OF JESSICA VENEGAS

Reported by:  SHERREE L. BLAKEMORE, CSR No. 7144

ROYAL REPORTING SERVICES (916) 564.0100    1

---

A P P E A R A N C E S

For the Plaintiffs:

DREYER, BABICH, BUCCOLA & CALLAHAM, LLP
Attorneys at Law
20 Bicentennial Circle
Sacramento, California 95826
BY: ROBERT BALE, ESQ.

For the Defendants Entercom Sacramento, LLC, and
John Geary:

FOLGER LEVEN & KAHN, LLP
Attorneys at Law
275 Battery Street, 23rd floor
San Francisco, California 94111
BY: DAVID P. BARTON, ESQ.

For the Defendant Entercom Sacramento, LLC:

CARLSON, CALLADINE & PETERSON, LLP:
Attorneys at Law
353 Sacramento Street, 16th Floor
San Francisco, California 94111
BY: MONICA WILEY, ESQ.

For the Defendant Matt Carter

GERALD GLAZER
Attorney at Law
660 J Street, Suite 380
Sacramento, California 95814
BY: GERALD GLAZER, ESQ.
JULIUS CHERRY, ESQ.

For the Defendant Steve Weed:

JACOBSEN & McELROY
Attorneys at Law
2401 American River Drive, Suite 100
Sacramento, California 95864
BY: JENNIFER STOECKLEIN, ESQ.

ROYAL REPORTING SERVICES (916) 564.0100    2

---

A P P E A R A N C E S (Cont'd.)

For the Defendant Robin Pechota:

BORTON, PETRINI & CONRON, LLP
Attorneys at Law
1104 12th Street
Modesto, California 95354
BY: CRYSTAL SWANSON, ESQ.

For the Defendant Adam Cox:

ROPERS, MAJESKI, KOHN & BENTLEY
Attorneys at Law
515 S. Flower Street, 11th Floor
Los Angeles, California 90071
BY: TOMAS A. BURGOS, III, ESQ.

For the Defendant Steve Maney:

GUICHARD, TENG & PORTELLO
Attorneys at Law
1800 Sutter Street, Suite 730
Concord, California 94520
BY: MATTHEW P. GUICHARD, ESQ.

For the Defendant Patricia Sweet:

RUSHFORD & BONOTTO
Attorneys at Law
2277 Fair Oaks Boulevard, Suite 495
Sacramento, California 95825
BY: ANDREW GIBSON, ESQ.

For the Defendant Peter Inzerillo:

ERICKSON, ARBUTHNOT, KILDUFF,
DAY & LINOSTROM, INC.
Attorneys at Law
100 Howe Avenue, Suite 110S
Sacramento, California 95825
BY: CHARLES S. PAINTER, ESQ.

ROYAL REPORTING SERVICES (916) 564.0100    3

---

A P P E A R A N C E S (cont.'d)

On Behalf of Ms. Venegas:

WEINTRAUB, GENSHLEA & CHEDIAK
Attorneys at Law
400 Capitol Mall, Eleventh Floor
Sacramento, California 95814
BY: JAMES KACHMAR

VIDEOGRAPHER:  DB Ronk & Company
2600 X Street
Sacramento, California
BY: DENNIS RONK

---oOo---

ROYAL REPORTING SERVICES (916) 564.0100    4

```
14:06:47   1   Q   You would tell Mr. Pusiteri?
14:06:49   2   A   Yes.
14:06:49   3   Q   You would tell Ms. Pechota?
14:06:50   4   A   Yes.
           5   Q   And when this young woman, who you've identified in
14:07:07   6   Plaintiff's 48, was vomiting, were you concerned at all
14:07:12   7   about her well-being?
14:07:15   8   A   Yes.
14:07:16   9   Q   Would you -- did you -- did you form an impression,
14:07:23  10   or did you have an idea as to why she was vomiting?
14:07:26  11   A   No.
14:07:27  12   Q   Did you think it was just coincidental to the
14:07:32  13   contest?
14:07:32  14   A   No, I wasn't sure what was going on.
14:07:34  15   Q   Did you think in any way that it might be related to
14:07:37  16   her consumption of water?
14:07:39  17   A   Yes.
14:07:40  18   Q   So, in your mind, you thought, "Well, she's been
14:07:46  19   drinking a lot of water, and now she's throwing up."
14:07:49  20   A   Yes.
14:07:50  21   Q   But that did not trigger any warning bells in
14:07:59  22   Jessica Venegas that caused you to go and let Ms. Pechota
14:08:03  23   know that specifically, you sent Ms. Michel to do this?
14:08:06  24   A   Yes.
14:08:08  25   Q   Did you have any particular expectations as to what
                                                              145
```

```
           1   Ms. Pechota might do once she learned that a contestant
14:08:16   2   was throwing up, based on your background with her?
14:08:19   3   A   Just that she would take care of it, and talk to
14:08:21   4   her, and see what she needed.
14:08:24   5   Q   Now, in that vein, are you aware of any steps that
14:08:27   6   Ms. Pechota took, relative to this young woman that was
14:08:30   7   throwing up?
14:08:32   8   A   No.
14:08:32   9   Q   Did you ever see her interact with that person?
14:08:34  10   A   No.
14:08:35  11   Q   Did you ever overhear any conversation between Ms.
14:08:38  12   Pechota and this young woman?
14:08:39  13   A   No.
14:08:39  14   Q   Did Ms. Pechota ever approach you and say, I've
14:08:42  15   talked to her, and she's okay, and we're sending her home,
14:08:45  16   or anything like that?
14:08:46  17   A   No.
14:08:47  18   Q   Did you follow up with Ms. Pechota later to find out
14:08:50  19   what was going on with this young woman?
14:08:53  20   A   No.
14:08:53  21   Q   Did you consider calling 911 or any kind of
14:08:59  22   emergency personnel when this woman started to vomit?
          23   A   No.
          24   Q   Did you ask her if she wanted you to contact
14:09:06  25   emergency medical personnel?
                                                              146
```

```
14:09:07   1   A   No.
14:09:08   2   Q   Did you ask anyone at the station if they thought
14:09:12   3   you should contact emergency medical personnel?
14:09:15   4   A   No.
14:09:15   5   Q   Did you overhear -- or strike that.
14:09:24   6       In listening to the radio that morning -- I
14:09:26   7   understand you said you didn't listen to it that much --
14:09:29   8   did you overhear Lukas telling any callers not to worry
14:09:32   9   about it, the participants had all signed releases?
14:09:36  10   A   No.
14:09:37  11   Q   Can you remember any particular thing you heard any
14:09:44  12   of the on-air talent say, and by on-air talent, I mean The
14:09:49  13   Morning Rave team, say during the contest?
14:09:51  14   A   No.
14:10:01  15   Q   At some point we have a winner.  Correct?
14:10:04  16   A   Yes.
14:10:04  17       MR. BALE:  I'm going to hand you what we'll mark as
14:10:17  18   Plaintiff's 49.
          19
          20             (Exhibit 49 marked.)
          21
14:10:18  22   BY MR. BALE:  Do you recognize that photograph?
14:10:19  23   A   Yes.
14:10:20  24   Q   And is that the lady who won the contest?
14:10:21  25   A   Yes.
                                                              147
```

```
14:10:22   1   Q   Do you recall her name?
14:10:23   2   A   No.
14:10:24   3   Q   If I said Lucy Davidson, does that help strike a
14:10:27   4   recollection?
14:10:28   5   A   Yes.
14:10:28   6   Q   Can you identify the folks for us in that
14:10:32   7   photograph?  And we're going to ask you to move from left
14:10:35   8   to right.
14:10:35   9   A   Okay.  Fester, then Lukas, Carter, Lucy, Maney, and
14:10:43  10   Trish.
14:10:44  11   Q   And did you take this photograph?
14:10:46  12   A   Yes.
14:10:46  13   Q   And this was a photograph taken after the prizes
14:10:50  14   were awarded?
14:10:51  15   A   Yes.
14:10:51  16   Q   Kind of a group-hug photo?
14:10:53  17   A   Yes.
14:10:54  18   Q   And this was designed to be posted on the
14:10:57  19   Entercom -- the Rave's Web site?
14:11:01  20   A   Yes.
14:11:42  21   Q   I think we previously marked this, but I can't find
14:11:45  22   it, and I don't want to take the time, so I'll mark this
14:11:48  23   as Plaintiff's 50, and ask you if you recognize that
14:11:52  24   photograph?
14:11:52  25   A   Yes.
                                                              148
```

# EXHIBIT I

DEPOSITION OF KEVIN WILLIAMS

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

WILLIAM A. STRANGE, individually,
and as Guardian ad Litem for
RYLAND STRANGE and JONIE STRANGE,
minors; RONALD E. SIMS, as
Guardian ad Litem for KEEGAN SIMS,
a minor.

      Plaintiffs.

      vs.          No. 07AS00377

ENTERCOM SACRAMENTO, LLC.,
ENTERCOM COMMUNICATIONS, CORP.,
JOHN GEARY, STEVE WEED, ROBIN
PECHOTA, LIZ DIAZ, ADAM COX,
STEVE MANBY, PATRICIA SWEET,
MATT CARTER, and DOES 1 through
40, inclusive,

      Defendants.

_____/

DEPOSITION OF KEVIN WILLIAMS

May 9, 2007

Reported by:  KATHRYN DAVIS, CSR No. J808

---

1      A P P E A R A N C E S

2

3  For the Plaintiffs William Strange, et al:

4    DREYER, BABICH, BUCCOLA & CALLAHAM
     By: ROBERT BALE
5     Attorney at Law
     20 Bicentennial Circle
6     Sacramento, California 95825

7  For the Defendant Entercom Sacramento, LLC, Entercom
   Communications Corporation and John Geary:
8

9    FOLGER, LEVIN & KAHN
     By: JAMES GOLDBERG
10    Attorney at Law
     275 Battery Street, 23rd Floor
11    Embarcadero Center West
     San Francisco, California 94111

12

13  Co-counsel for the Defendant Entercom Sacramento, LLC,
   Entercom Communications Corporation and John Geary:

14    CARLSON, CALLADINE & PETERSON, LLP
     By: MONICA F. WILEY
15    Attorney at Law
     353 Sacramento Street, 16th Floor
16    San Francisco, California 94111

17

18  For the Defendant Patricia Sweet:

19    RUSHFORD & BONOTTO
     By: ANDREW M. GIBSON
20    Attorney at Law
     2277 Fair Oaks Boulevard, Suite 495
21    Sacramento, California 95825

22  For the Defendant Steve Manby:

23    GUICHARD, TENG & PORTELLO
24     By: CHRISTOPHER K. TENG
     Attorney at Law
25     1800 Sutter Street, Suite 730
     Concord, California 94520

---

1  A P P E A R A N C E S   C O N T I N U E D

2

3  For the Defendant Liz Diaz Baghaei:

4    LEWIS, BRISBOIS, BISGAARD & SMITH
     By: SCOTT D. COTE
5    Attorney at Law
     2500 Venture Oaks Way, Suite 3200
6    Sacramento, California 95833

7

8  For the Defendant Steve Weed:

9    JACOBSEN & McELROY
     By: JENNIFER STOECKLEIN
10    Attorney at Law
     2401 American River Drive, Suite 100
11    Sacramento, California 95825

12  For the Defendant Robin Pechota Ray:

13    BORTON, PETRINI & CONRON
     By: CRYSTAL S. SWANSON
14    Attorney at Law
     1004 12th Street
15    Modesto, California 95354

16

17  For the Defendant Adam Cox:

18    ROPERS, MAJESKI, KOHN & BENTLEY
     By: TOMÁS A. BURGOS III
19    Attorney at Law
     515 S. Flower Street, Suite 100
20    Los Angeles, California 90071

21  For the Defendant Matt Carter:

22    DEMAS & ROSENTHAL
     By: STEVEN H. SCHULTZ
23    Attorney at Law
     2331 Capitol Avenue
24    Sacramento, California 95816

25

---

1    I N D E X   O F   E X A M I N A T I O N

2                            Page

3  Examination by Mr. Goldberg....................  7

4  Examination by Mr. Schultz....................  86

5  Examination by Ms. Swanson....................  88

6  Examination by Mr. Teng.......................  88

7  Examination by Mr. Burgos.....................  89

8  Examination by Ms. Stoecklein.................  89

9  Examination by Mr. Cote.......................  91

10  Continued Examination by Mr. Goldberg.........  98

11  Continued Examination by Mr. Cote.............  101

12

13          --oOo--

14

15       E X H I B I T S

16  Defendant's Exhibit No.        Page

17  25   Release For All Claims Including Personal

18      Injury document, dated January 12, 2007..  42

19

20

21

22

23

24

25          --oOo--

DEPOSITION OF KEVIN WILLIAMS

1  Q    While you were at the contest, was there any
2  joking about vomiting?
3  A    There were the interns and Fester were joking
4  around about throwing up. There was a lot of
5  discussion between all of us contestants about
6  throwing up.
7  Q    In a joking nature?
8  A    Yes.
9  Q    And was there joking among the contestants about
10  not urinating?
11  A    There were. There were some people that were
12  laughing at certain contestants for not going to the
13  bathroom. They were doing a little dance and trying
14  not to go. There was a lot of joking about that,
15  yes.
16  Q    While you were there, were there any comments
17  made about dying?
18  A    No.
19  Q    Did you ever hear any of the DJs say something
20  to the effect that, yeah, we got people dying back here?
21  A    No.
22  Q    During the contest did you hear anyone call in
23  and talk about any potential injury or death that if you
24  drank too much water?
25  A    I didn't.

KATHRYN DAVIS & ASSOCIATES 916.567.4211 57

1  Q    During the contest did you hear any of the
2  contestants talk about any potential for serious injury
3  or death?
4  A    There were a couple of contestants that
5  actually heard on the radio hearsay. I didn't hear
6  it. I don't have grounds for it -- but there were
7  contestants that were stating that they heard that a
8  nurse had come on the station and talked about the
9  effect of water intoxication.
10  Q    Do you recall hearing a contestant say during
11  the contest that they had heard a nurse call in and talk
12  about the effects of water intoxication?
13  A    It was during the contest that they had
14  actually talked about this.
15  Q    And during the contest, a contestant told you
16  that they had heard this?
17  A    I did. And I just brushed it off as hearsay
18  because I didn't hear it, and I listened to the
19  station for most of the morning.
20  Q    What do you mean for most of the morning?
21  A    During commercials, I'd switch over. And
22  like I said at the beginning, when you start from a
23  commercial, you go to another station and they have
24  songs on. And you might not come back right at the
25  time when the DJs are talking.

KATHRYN DAVIS & ASSOCIATES 916.567.4211 58

1  Q    Did you talk to any of the contestants after the
2  contest?
3  A    There was one lady, one girl, that was
4  really, really sick. She was throwing up. I
5  asked -- verified if she was okay. Her boyfriend
6  came and hung out with her. I asked her if she was
7  okay, and she stated she was. That was all the
8  conversation that I had.
9  Q    Was that the lady with the blond hair?
10  A    Yes.
11  Q    And you spoke to her at the contest that day?
12  A    Yes.
13  Q    After she dropped out?
14  A    Yes.
15  To go back for a second.
16  What I'm trying to figure out is while you were
17  at the station on Friday, did one of the contestants
18  actually tell you, then, that they had heard that
19  someone had called into the station to warn about the
20  dangers of water intoxication?
21  A    Yes.
22  Q    And do you recall which contestant told you
23  this?
24  A    I know that it was a female, though.
25  Q    Do you know how she had heard that or learned

KATHRYN DAVIS & ASSOCIATES 916.567.4211 59

1  that?
2  MR. BALE: Objection. Speculation.
3  Q  BY MR. GOLDBERG: Did she tell you how she had
4  heard or learned that?
5  A    She stated that one of her family members had
6  heard it and called her on her cell phone.
7  Q    Can you tell me, as best you recall, what -- let
8  me start again. Can you tell me, as best as you can,
9  what you recall that woman, that contestant, telling you
10  about what she learned through her family member?
11  A    Basically a nurse called in and stated that
12  there was a chance of water intoxication and asked
13  if there was anybody that knew the effects of water
14  intoxication. And that is all I can really recall
15  is that she had just heard about the possibility of
16  water intoxication.
17  Q    Okay. And who did she talk to about this or who
18  did she report this to? You heard it?
19  MR. BALE: Speculation.
20  Q  BY MR. GOLDBERG: Let me ask you: Was there
21  somebody else in the area of this woman when she
22  explained that a family member had told her that a nurse
23  had called in and said there was a chance of water
24  intoxication?
25  A    We were all talking.

KATHRYN DAVIS & ASSOCIATES 916.567.4211 60

DEPOSITION OF KEVIN WILLIAMS

| | |
|---|---|
| 10:36:04 1 Q     What do you mean, "we were all talking"? | 10:49:50 1 herself. |
| 10:36:06 2 A     All of the contestants were discussing ten | 10:49:52 2 Q     So you may have learned after the contest that |
| 10:36:10 3 different things at one time. It was a pretty long | 10:49:57 3 it was a nurse that had called in? |
| 4 room. I caught it out of the corner of my eye. | 10:49:58 4 A     Possibly, yes. |
| 5 Q     Can you recall what that lady looks like? | 10:50:00 5 Q     Just one moment. I'll show you what we have |
| 10:36:19 6 A     I can. | 10:50:06 6 marked as Exhibit 16. It has got a picture of Jennifer |
| 10:36:20 7 Q     If we showed you pictures of the contestants, do | 10:50:10 7 Strange. Was that the woman who reported that a family |
| 10:36:22 8 you think you could pick her out? | 10:50:14 8 member had called in to say that someone had mentioned |
| 10:36:24 9 A     It has been so long. I've had many things on | 10:50:17 9 the possibility of water intoxication? |
| 10:36:28 10 my mind. I can't say if I could or not. | 10:50:19 10 A     I'm not sure. |
| 10:36:31 11 Q     Maybe we'll give it a shot and see if you can. | 10:50:20 11 Q     Did you overhear anybody reacting to the |
| 10:36:45 12 We'll have to take a break to pull that out because I | 10:50:47 12 contestant saying that her family member had called in |
| 10:36:48 13 don't have it easily available. | 10:50:51 13 and reported that there was a chance of water |
| 10:37:04 14     And you heard her say something to the effect | 10:50:55 14 intoxication? |
| 10:37:08 15 that there was a chance of water intoxication, and did | 10:50:56 15 A     I'm not sure if I heard anything about that. |
| 10:37:09 16 anybody know what the effects of water intoxication | 10:50:59 16 Q     Okay. Do you recall any discussions during the |
| 10:37:12 17 were? | 10:51:04 17 contest at all, other than what you've just told us, |
| 10:37:12 18 A     I didn't hear anything to that aspect, no. | 10:51:14 18 about the family member calling in about the potential |
| 10:37:16 19 Q     About what -- she didn't ask what the effects | 10:51:18 19 risks associated with the contest? |
| 10:37:19 20 are? | 10:51:20 20 A     I don't recall anything. |
| 10:37:19 21 A     No. | 10:51:22 21 Q     Was there any discussion among the contestants |
| 10:37:19 22 Q     So did you respond to her after hearing her | 10:51:28 22 that you overheard about any possibility of death |
| 10:37:24 23 comments? | 10:51:32 23 associated with the contest? |
| 10:37:24 24 A     No. I just heard what she said. | 10:51:33 24 A     No. |
| 10:37:28 25 Q     Did you hear anybody respond to her? | 10:51:34 25 Q     Did you hear anybody just express any surprise |

| | |
|---|---|
| 10:xx:xx 1 A     I didn't. | 10:51:52 1 in response to the comment by the contestant that her |
| 10:37:31 2     MR. GOLDBERG: Okay. Why don't we take a | 10:51:55 2 family member had called in to say that someone had |
| 10:37:38 3 quick break. We'll go off the record. I'll see if | 10:51:59 3 called into the station to talk about the possibility of |
| 10:37:39 4 I can find the photographs and continue. | 10:52:01 4 water intoxication? |
| 10:40:00 5     (Whereupon, a recess was then taken.) | 10:52:04 5 A     There was a lot of rumors going on in there, |
| 10:40:00 6     MR. GOLDBERG: Back on the record. | 10:52:07 6 a lot of conversation. I can't really recollect |
| 10:40:01 7 Q     I believe that you said that a family member of | 10:52:10 7 anything. |
| 10:40:06 8 one of the contestants had called into the contest | 10:52:10 8 Q     Okay. After you heard that the family member |
| 10:40:10 9 during the contest and reported that a nurse had called | 10:52:18 9 had called in to one of the contestants and said there |
| 10:40:13 10 into the station and said there was a chance of water | 10:52:25 10 was a chance of water intoxication, did you foresee that |
| 10:40:16 11 intoxication. | 10:52:25 11 there was any possibility of serious injury or death |
| 10:40:17 12 A     Yes. | 10:52:29 12 actually occurring in this contest? |
| 10:40:17 13 Q     Did you learn later that day or the next day | 10:52:32 13 A     Not really, no. |
| 10:40:22 14 that the person who called in was a nurse or do you | 10:52:32 14 Q     Had you ever heard the term "hyponatremia" |
| 10:40:25 15 actually recall the contestant saying that it was a | 10:52:36 15 before the contest? |
| 10:40:28 16 nurse during the contest? | 10:52:37 16 A     Nope. |
| 10:40:30 17 A     I don't recall that. | 10:52:38 17 Q     You'd heard the word "water poisoning" from your |
| 10:40:31 18 Q     You don't recall one way or the other? | 10:52:41 18 dad, correct? |
| 10:40:33 19 A     Either way. | 10:52:41 19 A     Yes. |
| 10:40:34 20 Q     So it could have been the next day that you | 10:52:44 20 Q     And did he explain what medical factors would |
| 10:40:37 21 learned in the news report that a nurse had called in? | 10:52:45 21 cause water poisoning? |
| 10:40:?? 22 A     I do recall that it was a contestant that | 10:52:48 22 A     Medical factors being -- |
| 10:40:43 23 told me about it. But in answer to your question, I | 10:52:50 23 Q     Well, other than the fact that if you drink too |
| 10:40:45 24 don't recall if it was a contestant that told me, | 10:52:54 24 much water maybe you can get water poisoning, did he |
| 10:40:47 25 that she had heard it, or it was a nurse or just | 10:52:57 25 explain anything about what the chemistry of that might |