1   SUSAN K. SULLIVAN (SBN 156418)
    SEDGWICK, DETERT, MORAN & ARNOLD LLP
2   801 South Figueroa Street, 18th Floor
    Los Angeles, CA 90017
3   Telephone: (213)-426-6900
    Facsimile: (213) 426-6921
4   E-mail: susan.sullivan@sdma.com

5   MARY P. McCURDY (SBN 116812)
    CHRISTINA M. LAVANIER (SBN 233335)
6   McCURDY & FULLER LLP
    4300 Bohannon Drive, Suite 240
7   Menlo Park, CA 94025
    Telephone: (650) 618-3500
8   Facsimile: (650) 618-3599
    E-mail: mary.mccurdy@mccurdylawyers.com
9           christina.lavanier@mccurdylawyers.com

10  Attorneys for Defendant
    AMERICAN HOME ASSURANCE COMPANY

11

12              UNITED STATES DISTRICT COURT

13      NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

14  ENTERCOM SACRAMENTO, LLC, a          CASE NO. CV 07-06493 JSW
    Delaware Limited Liability Corporation;
15  ENTERCOM COMMUNICATIONS CORP., a     **AMERICAN HOME'S OBJECTIONS**
    Pennsylvania Corporation; and JOHN GEARY,  **TO DEPOSITIONS AND**
16  an individual,                        **DECLARATIONS SUBMITTED BY**
                                          **PLAINTIFFS**
17              Plaintiffs,
                                          **Hearing Date: April 25, 2008**
18      v.                                **Hearing Time: 9:00 a.m.**
                                          **Courtroom: 2, 17th Floor**
19  AMERICAN HOME ASSURANCE              **Hon. Judge Jeffrey S. White**
    COMPANY, a New York Corporation,
20
                Defendant.
21

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28
    27461                                    1

*(Left margin, vertical text):* McCURDY & FULLER LLP / 4300 Bohannon Drive, Suite 240 / Menlo Park, CA 94025 / (650) 618-3500

McCURDY & FULLER LLP
4300 Bohannon Drive, Suite 240
Menlo Park, CA 94025
(650) 618-3500

## Objections to the deposition of Carmela Masi:

American Home objects to the deposition of Carmela Masi as set forth in detail below. Attached, as Exhibit 1, are the deposition excerpts to which American Home objects.

| Reference in Plaintiffs' Motion for Summary Adjudication | Page and line of deposition testimony | Evidentiary objection and relevant Federal Rule of Evidence ("FRE") |
|---|---|---|
| Pages 7, 8, 17 and 21 | 348:7-8; 348:23-24; 349:8-11 | Testimony refers to an unidentified document that lacks a foundation, has not been authenticated, and constitutes hearsay in violation of FRE 802 and FRE 901. |

## Objections to the deposition of John Geary:

American Home objects to the deposition of John Geary as set forth in detail below. Attached, as Exhibit 2, are the deposition excerpts to which American Home objects.

| Reference in Plaintiffs' Motion for Summary Adjudication | Page and line of deposition testimony | Evidentiary objection and relevant Federal Rule of Evidence ("FRE") |
|---|---|---|
| Pages 18 (at Footnote 2), 21 | 97:21-25; 98:14 | Testimony is hearsay prohibited by FRE 802. |
| Pages 18 (at Footnote 2), 21 | 121:5-14 | Witness lacks personal knowledge and question calls for speculation prohibited by FRE 602. |

## Objections to the deposition of Ronald Mendoza:

American Home objects to the deposition of Ronald Mendoza as set forth in detail below. Attached, as Exhibit 3, are the deposition excerpts to which American Home objects.

| Reference in Plaintiffs' Motion for Summary Adjudication | Page and line of deposition testimony | Evidentiary objection and relevant Federal Rule of Evidence ("FRE") |
|---|---|---|
| Page 9 | 13:23-24 | Testimony is hearsay prohibited by FRE 802. |
| Pages 9, 17 | 33:23-25 | Testimony regards an unidentified photo, which lacks a foundation and authentication per FRE 901. |

## Objections to the deposition of Robin Ray (nee Pechota):

American Home objects to the deposition of Robin Ray (nee Pechota) as set forth in detail

below. Attached, as Exhibit 4, are the deposition excerpts to which American Home objects.

| Reference in Plaintiffs' Motion for Summary Adjudication | Page and line of deposition testimony | Evidentiary objection and relevant Federal Rule of Evidence ("FRE") |
|---|---|---|
| Page 8 | 79:22 | Testimony is hearsay prohibited by FRE 802. |
| Pages 10, 16, 17 | 224:20-24; 316:7-15 | Witness lacks personal knowledge and question calls for speculation prohibited by FRE 602 |
| Pages 8, 10, 16, 17 | 275:5-276:14; 283:10-284:6 | Testimony refers to an unidentified document, which lacks a foundation, is unauthenticated, and constitutes hearsay in contravention of FRE 901 and FRE 802. |

**Objections to the deposition of William Strange:**

American Home objects to the deposition of William Strange as set forth in detail below. Attached, as Exhibit 5, are the deposition excerpts to which American Home objects.

| Reference in Plaintiffs' Motion for Summary Adjudication | Page and line of deposition testimony | Evidentiary objection and relevant Federal Rule of Evidence ("FRE") |
|---|---|---|
| Pages 9, 17 | 128:24-129:2 | Testimony is hearsay prohibited by FRE 802. |

**Objections to the deposition of Patricia Sweet:**

American Home objects to the deposition of Patricia Sweet as set forth in detail below. Attached, as Exhibit 6, are the deposition excerpts to which American Home objects.

| Reference in Plaintiffs' Motion for Summary Adjudication | Page and line of deposition testimony | Evidentiary objection and relevant Federal Rule of Evidence ("FRE") |
|---|---|---|
| Pages 9, 17 | 300:2-301:15; 307:1-5 | Alleged content of an audio transcript that lacks a foundation, has not been authenticated, and constitutes hearsay in violation of both FRE 802 and FRE 901. |

**Objections to the deposition of Steve Weed:**

American Home objects to the deposition of Steve Weed as set forth in detail below.

McCURDY & FULLER LLP
4300 Bohannon Drive, Suite 240
Menlo Park, CA 94025
(650) 618-3500

27461

3

Attached, as Exhibit 7, are the deposition excerpts to which American Home objects.

| Reference in Plaintiffs' Motion for Summary Adjudication | Page and line of deposition testimony | Evidentiary objection and relevant Federal Rule of Evidence ("FRE") |
|---|---|---|
| Pages 18 (at Footnote 2) | 143:8-17 | Witness lacks personal knowledge and question calls for speculation in violation of FRE 602. |
| Pages 18 (at Footnote 2) | 203:18-20 | Testimony refers to an unidentified document that lacks a foundation, has not been authenticated, and constitutes hearsay in violation of FRE 802 and FRE 901. |

**Objections to the declaration of Michael Dash:**

American Home objects to the declaration of Michael Dash as set forth in detail below. Attached, as Exhibit 8, are the declaration excerpts to which American Home objects.

| Reference in Plaintiffs' Motion for Summary Adjudication | Paragraph and line of declaration testimony | Evidentiary objection and relevant Federal Rule of Evidence ("FRE") |
|---|---|---|
| Pages 11, 14, 15, 20, 23 | ¶9:23-25; ¶10:27-3 (following page); ¶20:14-21 | Witness lacks personal knowledge and question calls for speculation in violation of FRE 602. |
| Pages 12, 13, 14, 15, 23, 25 | ¶11:8-11; ¶12:14-18; ¶16:11; ¶17:27-28; ¶19:6-8; ¶20:14-21 | Testimony is hearsay prohibited by FRE 802. |

**Objections to the declaration of Juan Carlos Ayus, M.D.:**

American Home objects to the declaration of Juan Carlos Ayus, M.D, as set forth in detail below. Attached, as Exhibit 9, are the declaration excerpts to which American Home objects.

| Reference in Plaintiffs' Motion for Summary Adjudication | Paragraph and line of declaration testimony | Evidentiary objection and relevant Federal Rule of Evidence ("FRE") |
|---|---|---|
| Page 17 | ¶12 | Improper expert testimony in violation of FRE 703, because no indication this is the type of inference reasonably relied on by similarly situated experts. |

McCURDY & FULLER LLP
4300 Bohannon Drive, Suite 240
Menlo Park, CA 94025
(650) 618-3500

27461

4

1

2    Dated: March 7, 2008                McCURDY & FULLER, LLP

3

4                                        

5                                        MARY P. McCURDY
                                         CHRISTINA M. LAVANIER
6                                        Attorneys for Defendant
                                         AMERICAN HOME ASSURANCE
7                                        COMPANY

8

9

10

11

McCURDY & FULLER LLP
4300 Bohannon Drive, Suite 240
Menlo Park, CA 94025
(650) 618-3500

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27461                                    5

# EXHIBIT 1

Carmela Masi
September 6, 2007

348

1    of Exhibit 30?

2       A.    (Deponent viewing document).   Yes,

3    it is.

4       Q.    Okay.   And what is the title of

5    the attachment?

6       A.    (Deponent viewing document).

7    "Entercom Communications Corp., General

8    Contest Guidelines."

9       Q.    Okay.   Now, did you actually --

10   Strike that.

11         Let's -- Let's look at the last

12   sentence on the first page.   Can you read

13   that?

14      A.    (Deponent viewing document).   "The

15   rule of thumb regarding when contests" --

16      Q.    On the -- Excuse me.   On the first

17   page of this e-mail.

18      A.    (Deponent viewing document).   What

19   did you ask me?

20      Q.    Could you read the last sentence on

21   the first page?

22      A.    (Deponent viewing document).

23   "Entercom's contest guidelines are attached

24   below for your reference."

Carmela Masi

September 6, 2007

349

1    Q.    Okay.  And did you provide that not

2    only to Ms. Pechota Ray as the promotions

3    director of The End, but also other

4    promotions directors?

5    A.    I did.

6    Q.    Okay.  Let's turn to the next page.

7    Can you read the first sentence?

8    A.    (Deponent viewing document).  "With

9    the exception of simple contests, contest

10   rules must be submitted for review by your

11   Entercom legal representative."

12   Q.    Okay.  So you were advising the

13   promotions directors and the program

14   directors that, except for simple contests,

15   contest rules had to be submitted to the

16   legal department.

17   A.    Yes.  That's correct.

18   Q.    Okay.  Now, in the next sentence,

19   do you describe what a simple contest is?

20   A.    (Deponent viewing document).  Two

21   sentences later.

22   Q.    Okay.  Can you read how you

23   describe the simple contest?

24   A.    (Deponent viewing document).  "A

# EXHIBIT 2

| | | |
|---|---|---|
| 11:24:23 | 1 | Q     That's after the contest is over? |
| 11:24:25 | 2 | A     Correct. |
| 11:24:26 | 3 | Q     Before 3:45 in the afternoon, you were unaware of |
| 11:24:30 | 4 | anything relative to this particular contest.   Fair? |
| 11:24:33 | 5 | A     That is true. |
| 11:24:34 | 6 | Q     Other than hearing some noise walking in, you didn't |
| 11:24:40 | 7 | even know that noise was associated with a contest. True? |
| 11:24:43 | 8 | A     I didn't know there was a contest going on. |
| 11:24:45 | 9 | Obviously I assumed something was happening in conjunction |
| 11:24:52 | 10 | with the morning show. |
| 11:24:52 | 11 | Q     Well, understanding you thought something was going |
| 11:24:52 | 12 | on in conjunction with the morning show, you didn't get |
| 11:24:55 | 13 | any information that there was a contest.   True? |
| 11:24:58 | 14 | A     Correct. |
| 11:24:58 | 15 | Q     Didn't stop and make any inquiry about what was |
| 11:25:01 | 16 | going on.   True? |
| 11:25:02 | 17 | A     Correct. |
| 11:25:02 | 18 | Q     Didn't articulate any concerns, criticisms, |
| 11:25:09 | 19 | observations about, let's say, the noise.   True? |
| 11:25:12 | 20 | A     There was one instance, it was probably in the nine |
| 11:25:16 | 21 | o'clock hour.   A salesperson came down and told me that no |
| 11:25:25 | 22 | one in the sales pit, which is adjacent to the kitchen |
| 11:25:30 | 23 | where the contest was going on -- that there was so much |
| 11:25:34 | 24 | noise from whatever was happening in the kitchen that they |
| 11:25:40 | 25 | couldn't hear on the phone. |

97

11:25:40  1        So I said okay.  And I walked down the hall and --

11:25:45  2   left my office, walked down the hall towards the kitchen,

11:25:46  3   and it's a long hallway, past our main conference room,

11:25:51  4   down to where the kitchen is.

11:25:55  5        And as I approached it -- the wall kind of flares

11:25:56  6   out a little bit as you approach it -- and as I approached

11:25:59  7   it, I could see just people standing.  Obviously something

11:26:01  8   was going on in the kitchen.  I could see people standing

11:26:04  9   there.  And it was loud.  And as I approached it, and, you

11:26:09  10  know, probably got to about, I would say, ten feet of

11:26:14  11  where the entrance was, I believe it was Matt Carter,

11:26:16  12  because he's taller than the rest, and I -- it was either

11:26:21  13  him or Jessica.  I made eye contact with them, and yelled

11:26:24  14  at them, "You guys have got to hold it down," and then he

11:26:31  15  acknowledged with a nod, and then I turned around and went

11:26:31  16  back to my office.

11:26:32  17  Q     I appreciate you telling me that.  Again, this is

11:26:35  18  the best opportunity for you to be candid and complete

11:26:39  19  when we ask you these questions.

11:26:42  20        So let me do a chronology for us, here, and you

11:26:44  21  correct me if I'm wrong.

11:26:46  22        Get to work, 6:30, 6:45; you hear some noise,

11:26:53  23  because people are around.  And we'll characterize that

11:26:55  24  noise as out of the ordinary.  True?  Or was it ordinary?

11:27:02  25  A     To me it's ordinary, in the sense that this is a

11:54:30  1          You are the market manager of the radio station.

11:54:33  2     You told us that.  And you did an investigation.  And you

11:54:37  3     told us that.  And you told us you talked to a number of

11:54:39  4     people.

11:54:39  5          I want you to bring all that knowledge together,

11:54:42  6     along with your review in preparation for today, and I

11:54:47  7     want you to tell me in your capacity as a market manager,

11:54:47  8     Mr. Geary, when is it for the first time that the radio

11:54:51  9     station got any information from any source that Jennifer

11:54:55  10    Strange -- that something had happened to one of your

11:54:59  11    contestants?

11:54:59  12    A     It would have been at the point that Teresa

11:55:03  13    Cummings, our receptionist, received the phone call from

11:55:06  14    Jennifer Strange's employer.

11:55:08  15    Q     First time.  As far as you know?

11:55:11  16    A     As far as I know, yes.

11:55:12  17    Q     That would have been what time of day?

11:55:18  18    A     It probably would have been somewhere around 3:30,

11:55:18  19    based on the time I had my meeting with Steve and Robin.

11:55:21  20    Q     And based upon your reaction to it, as you've

11:55:26  21    already described for us, there was clearly an

11:55:31  22    understanding that the radio station may, in fact, have

11:55:33  23    played some role in Jennifer Strange dying.  True?

11:55:39  24    A     My reaction was disbelief, which is why I had asked

11:55:44  25    Steve and Robin to go back and make the phone call to

121

# EXHIBIT 3

Case 3:07-cv-06493-JSW    Document 127    Filed 02/21/2008    Page 14 of 40
Case 3:07-cv-06493-JSW    Document 142    Filed 02/07/2008    Page 58 of 105
DEPOSITION OF RONALD MENDOZA

1  Q       Okay.  Dancing would be one.  Any others that

2  you can think of?

3  A       Not too many that I can remember right now.

4  Q       Okay.  How did you hear about the *Hold Your Wee*

5  *Contest*?

6  A       That one was advertised, I believe, the entire

7  week.  It was advertised extensively in the morning by

8  the Morning Show, which we typically listen to on our

9  drive to work and getting ready for work.

10  Q       And what did you do to get into the contest?

11  A       The rules were to call in and give an example

12  of your worst Christmas gift that you'd received,

13  and so on.  On Thursday, January 11th, I called in.

14  I was able to get through.  And I gave them my story

15  of the worst chocolate -- I'd received a bottle of

16  gourmet chocolate with an expiration date of 2002 or

17  something like that.

18  Q       And you received it much after the fact?

19  A       Correct.

20  Q       Prior to entering into the contest, did you

21  discuss the contest with your family?

22  A       Again, my family listens to the radio station so

23  we might have discussed it just in terms of, "Oh, yeah,

24  that sounds like a silly contest."  Also, the main prize

25  was the Nintendo Wii, which I'd camped out with my son a

DEPOSITION OF RONALD MENDOZA

1    connection with the water intoxication?

2    A        I've read some articles since then.  Have a

3    little idea.

4    Q        Prior to January 12th, did you have any

5    understanding about what would medically be required in

6    order to have water intoxication?

7    A        No, I did not.

8    Q        Did you know medically why it was the Chico

9    person in the hazing incident died?

10   A        Not medically, no.

11   Q        Did you know any of the details of the Chico

12   hazing incident in terms of what the fraternity mates

13   did at Chico?

14   A        Just what was printed in the newspaper.

15   Q        What was your understanding?

16   A        Just a lot of excess water ingestion.  I

17   think he was stripped down to almost no clothing and

18   sat in a lot of water -- things like that.

19   Q        Did you have an understanding as to whether or

20   not anybody forced water down him?

21   A        I was under the impression that it was

22   forced.

23   Q        Now, you recognize Jennifer Strange as being the

24   person in the middle of Exhibit 17?

25   A        Yes.

# EXHIBIT 4

11:00:10  1    recommendations, if there were any, during that PowerPoint

11:00:13  2    presentation?

11:00:14  3    A    To the best of my ability, yes.

11:00:18  4        THE VIDEOGRAPHER:  This ends tape number one of

11:00:21  5    today's deposition.  We're going off the record at eleven

11:00:25  6    o'clock a.m.

11:04:46  7

          8            (Short pause in the proceedings.)

          9

11:04:57 10        THE VIDEOGRAPHER:  We're on the record at 11:04 a.m.

11:05:00 11    This is the beginning of tape number two of the deposition

11:05:03 12    of Robin Pechota.

11:05:09 13    Q    BY MR. LEVINE:  So, Ms. Pechota -- am I pronouncing

11:05:20 14    the name right?

11:05:22 15    A    (Witness nodding.)

11:05:22 16    Q    Sorry if I mispronounced it this morning.

         17    A    Okay.

11:05:31 18    Q    When you were presented with this PowerPoint by Ms.

11:05:37 19    Masi, it was on your computer.

11:05:38 20    A    Uh-huh.  Yes.

11:05:40 21    Q    And did you download it?

11:05:43 22    A    No.  We were told it would be sent to us.

11:05:48 23    Q    Was it ever sent to you?

11:05:50 24    A    Yes.

11:05:51 25    Q    And where -- did you receive it?

                                                                    79

15:08:12   1      Q      That wasn't my question.

15:08:13   2             Did you think that contestants, listeners, loyal

15:08:17   3      listeners, who drive up ratings so that you guys can

15:08:20   4      charge more for your advertising dollar, did you ever

15:08:22   5      think that they're relying upon the station in the same

15:08:28   6      way you're relying upon your colleagues that this is a

15:08:29   7      safe contest?

15:08:30   8      A      If you're asking me if I had that thought, that

15:08:33   9      specific thought --

15:08:34  10      Q      Uh-huh.

15:08:34  11      A      I did not have that specific thought.

15:08:36  12      Q      But you did think that it was safe to do the

15:08:39  13      contest.

15:08:39  14      A      Yes.

15:08:40  15      Q      You didn't think you were putting anybody at risk.

15:08:44  16      Right?

15:08:44  17      A      Right.

15:08:44  18      Q      And no one told you to the contrary.  True?

15:08:46  19      A      True.

15:08:47  20      Q      And you would never put a contest on that would put

15:08:49  21      people at risk of dying?

15:08:54  22      A      Correct.

15:08:54  23      Q      Never, not even think about doing that.  True?

15:08:54  24      A      True.

15:08:54  25      Q      But you did.  Right?

| | | |
|---|---|---|
| 17:24:45 | 1 | good. And her stomach was distended. She's a tiny, thin |
| 17:24:50 | 2 | thing, and her stomach was distended. |
| 17:24:52 | 3 | We understand that in the Piercing Plinko contest, |
| 17:24:57 | 4 | Ms. -- the legal told you, "Hey, get a nurse. Have a |
| 17:25:01 | 5 | nurse available for piercing of ears or nose." Right? |
| 17:25:04 | 6 | A    Yes. |
| 17:25:04 | 7 | Q    Did you ever think maybe we ought to have a nurse |
| 17:25:10 | 8 | here for this, where we're having people consuming great |
| 17:25:15 | 9 | volumes of water? |
| 17:25:15 | 10 | A    I didn't think so, no. |
| 17:25:16 | 11 | Q    Did anybody bring that up? |
| 17:25:17 | 12 | A    No, not that I recall. |
| 17:25:18 | 13 | Q    If someone had, would you have been able to make the |
| 17:25:23 | 14 | arrangements to have a nurse? |
| 17:25:26 | 15 | A    I don't know. |
| 17:25:28 | 16 | Q    Did you know anybody there that was medically |
| 17:25:32 | 17 | qualified or capable in first aid or anything at the |
| 17:25:36 | 18 | station, an employee? |
| 17:25:38 | 19 | A    I don't -- no. |
| 17:25:39 | 20 | Q    Has any name popped up, like, "Hey, I know Steve |
| 17:25:43 | 21 | Weed, he knows first aid; John Geary knows first aid," |
| 17:25:48 | 22 | something of that nature? |
| 17:25:48 | 23 | A    I know first aid. |
| 17:25:50 | 24 | Q    Do you know the signs of water intoxication? |
| 17:25:52 | 25 | A    Until this event, I didn't know what water |

16:23:14  1    Q     And what you had been told by Entercom about how to

16:23:18  2    do your job.   Right?

16:23:19  3    A     Yes.

16:23:19  4    Q     Okay.

16:23:20  5          Now, let's turn to the section that says Material

16:23:23  6    Terms on this PowerPoint that you would have had in 2006.

16:23:27  7          clearly before November, when you guys first hatched

16:23:30  8    the plan to do the Hold Your Wee for a Wii.   True?   You

16:23:35  9    had already had the PowerPoint?

16:23:37 10    A     Yes.

16:23:37 11    Q     Material Terms, item G, says, "Material terms of the

16:23:45 12    contest must be disclosed on-air, including," G, "when and

16:23:50 13    how the prize can and will be won."   True?

16:23:52 14    A     Yes.

16:23:53 15    Q     That would be item number -- the second part of item

16:23:59 16    number 10 on Exhibit 9, which is entitled "This is how the

16:24:01 17    contest will work."   True?

16:24:03 18    A     Yes.

16:24:04 19    Q     Now, let's go to the next page.   You would have seen

16:24:10 20    this.   Right?

16:24:10 21    A     Yes.

16:24:11 22    Q     It says "Contest Limitations," with a big stop sign.

16:24:14 23    Right?

16:24:1( 24    A     Yes.

16:24:15 25    Q     It says, "Contests which are illegal, dangerous,

| | | |
|---|---|---|
| 16:24:20 | 1 | misleading, rigged or in bad taste must be avoided." |
| 16:24:23 | 2 | Right? |
| 16:24:23 | 3 | A    Yes. |
| 16:24:24 | 4 | Q    Was that -- did you take that to heart? |
| 16:24:29 | 5 | A    Yes. |
| 16:24:30 | 6 | Q    Did you take everything they told you in this |
| 16:24:32 | 7 | PowerPoint to heart, that this is really a rule they |
| 16:24:35 | 8 | wanted you to follow? |
| 16:24:35 | 9 | A    Yes. |
| 16:24:36 | 10 | Q    Now, let's go to the next page.  Item B, "Contests |
| 16:24:43 | 11 | to be avoided include:  Contests that encourage people to |
| 16:24:46 | 12 | act in an unreasonably dangerous manner or place |
| 16:24:50 | 13 | themselves or others in extreme danger."  True? |
| 16:24:53 | 14 | A    Yes. |
| 16:24:53 | 15 | Q    Now, today, you know having people drink water in |
| 16:25:02 | 16 | the fashion described in your set of -- the thing you |
| 16:25:05 | 17 | whipped up on the 9th -- you know now that this contest |
| 16:25:11 | 18 | did put people in a situation where they were putting |
| 16:25:14 | 19 | themselves in extreme danger.  Right? |
| 16:25:16 | 20 | A    I know that now. |
| 16:25:18 | 21 | Q    There is nothing more extreme than having them die. |
| 16:25:21 | 22 | True? |
| 16:25:21 | 23 | A    True. |
| 16:25:22 | 24 | Q    And you say you know that now.  But is it fair -- is |
| 16:25:28 | 25 | it a fair statement -- I want you to listen carefully to |

276

| | | |
|---|---|---|
| 16:49:05 | 1 | contest? |
| 16:49:05 | 2 | A    Yes. |
| 16:49:05 | 3 | Q    And initially they talked about doing it outside? |
| 16:49:08 | 4 | A    Yes. |
| 16:49:08 | 5 | Q    Because of the number of people? |
| 16:49:10 | 6 | A    Yes. |
| 16:49:11 | 7 | Q    And you're telling us, based upon your experience, |
| 16:49:21 | 8 | that falls into the category of a simple contest? |
| 16:49:22 | 9 | A    In my world, yes. |
| 16:49:23 | 10 | Q    Now, let's look at Exhibit 4 really quickly.  It |
| 16:49:35 | 11 | says, the top paragraph, "With the exception of simple |
| 16:49:42 | 12 | contests, contest rules must be submitted for review by |
| 16:49:47 | 13 | your Entercom legal representative." |
| 16:49:48 | 14 | So you certainly knew that.  True? |
| 16:49:49 | 15 | A    Yes. |
| 16:49:50 | 16 | Q    Next line says, "This is especially true for any |
| 16:49:53 | 17 | unusual or complicated mode of entry, winning or any large |
| 16:49:57 | 18 | prize value."  Right? |
| 16:49:59 | 19 | A    Right. |
| 16:49:59 | 20 | Q    And then it says, "A simple contest is one in which |
| 16:50:03 | 21 | the form of rules have been approved before by Entercom |
| 16:50:06 | 22 | legal, that fall under the station's generic contest |
| 16:50:12 | 23 | rules, paren, (use only for simple one off --" |
| 16:50:14 | 24 | A    One off. |
| 16:50:15 | 25 | Q    "-- one-off, call-in, on-site or online simple |

283

16:50:25  1   random selection contests; 9th caller for a stereo system

16:50:30  2   or concert tickets; entry to win CD at a station event;

16:50:34  3   online entry to randomly select one winner of a TV etc.,)

16:50:47  4   end paren, and that do not include any unusual mode of

16:50:50  5   entry/winning or large prize."   Right?

16:50:50  6   A      Yes.

16:50:50  7   Q      Did you have a sense that there was an unusual mode

16:50:52  8   of entry in winning this prize for this particular

16:50:55  9   contest?

16:50:56  10  A      An unusual mode of entry?  No there is not an

16:51:03  11  unusual mode of entry.

16:51:03  12  Q      And do you know what Mr. Geary's opinion is about

16:51:05  13  this contest as to whether it's a simple contest or a

16:51:10  14  nonsimple contest?

16:51:11  15  A      No, I don't.

16:51:12  16  Q      Now, on the releases, it says -- strike that.

16:51:18  17         As you sit here today, knowing -- having the contest

16:51:22  18  having been run, it was run in the fashion you thought it

16:51:26  19  was going to get run, essentially.   True?

16:51:28  20  A      Essentially.

16:51:31  21  Q      Do you think that you made a mistake, considering

16:51:34  22  this to be a simple contest, in retrospect?

16:51:39  23  A      In retrospect.

16:51:40  24  Q      Now, on "Releases," it says, second bullet point on

16:51:44  25  "Releases," says, "In any contest or promotional event --"

# EXHIBIT 5

1   Q     If you called her, it would have been from your work

2   cell?

3   A     Correct.

4   Q     And if she called you, it would have been to your

5   work cell?

6   A     That's correct.

7   Q     And she called you either using her personal cell or

8   her work cell phone number?

9   A     I don't know for sure.

10   Q     You don't know what phone she used to call you?

11   A     Correct.

12   Q     Did she tell you where she was calling you from?

13   A     She just told me that she was in her car.

14   Q     So if she was in her car, she presumably was using

15   some cell phone.  Correct?

16   A     I would have guessed that would be correct.

17   Q     So she said -- she told you she was in her car, and

18   did she tell you where she was going?

19   A     She did say she was going home.

20   Q     Just tell me everything that you recall about that

21   conversation, what you said and what she said, in this

22   conversation that she had where one of you, you don't know

23   who called each other, she called you from her car.

24   A     All she said was that she had got the Timberlake

25   tickets, but she didn't feel well, and that she was going

1    to go home and lay down for a while.  She wasn't going to

2    go back to work.

3    Q    How long did that conversation last?

4    A    I don't really recall.  It wasn't more than, once

5    again, a couple of minutes.

6    Q    Did you say anything to her during this telephone

7    conversation?

8    A    I just acknowledged that she was feeling -- that she

9    wasn't feeling well, and I just told her to go home, get

10   some -- get some rest.  And I told her I loved her.

11   Q    Would you like to take a break, take a couple of

12   minutes?

13   A    Yeah.

14                    (Short break taken.)

15   MR. CARLSON:  Are you ready?

16   THE WITNESS:  Yes.

17   BY MR. CARLSON:  As I said at the beginning of the

18   deposition, tell me if you would like to stop.

19   Q    Did you ever call Jennifer's cell phone again that

20   day?

21   A    Yes, I did.

22   Q    And how soon after this conversation that you had

23   with her where she said she was about home did you call

24   her?

25   A    All I remember is it was after lunch.

# EXHIBIT 6

16:15:16  1    A    I didn't do that.

16:15:18  2         MR. DREYER:  Let's go to the next, which is at 9:16,

16:15:22  3    so just six minutes later.

          4

          5         **(Audio played.  Reporter does not certify content.)**

          6

16:15:28  7         *LUKAS:  Who is this, Jennifer?*

          8         *JENNIFER:  This is Jennifer.*

16:15:28  9         *LUKAS:  Jennifer, what's the situation out there*

16:15:30  10   *with Justin Timberlake tonight?*

16:15:31  11        *JENNIFER:  I don't want to -- I want the Wii.*

16:15:33  12        *LUKAS:  You do want the Wii?*

16:15:34  13        *JENNIFER:  I was tempted -- I was really, really*

16:15:36  14   *tempted; and everyone's going to hate me forever.*

16:15:41  15        *MANEY:  I got a pair of tickets, lower level, Justin*

16:15:42  16   *Timberlake, 2007 Future Sex Love Show live, Arco Arena,*

16:15:50  17   *tonight, and I will throw them away if you do not want to*

16:15:50  18   *take them.*

16:15:52  19        *JENNIFER:  Don't throw them away.*

16:15:54  20        *LUKAS:  Trust me, we're not going to throw them*

16:15:56  21   *away.*

16:15:58  22        *JENNIFER:  Uh -- I'm going to have to say --*

          23        *LUKAS:  Three, two --*

          24        *JENNIFER:  -- God this really sucks --*

          25        *LUKAS:  One --*

                                                                    300

16:16:02  1          JENNIFER:  -- no deal.

        2          CROWD:  No deal --

        3          TRISH:  Did you hear that --

        4          LUKAS:  What about Lucy; does Lucy want that --

16:16:10  5          TRISH:  She turned Sexy Back down.

        6          LUKAS:  What about Lucy?

16:16:12  7          TRISH:  Lucy, what about you; do you want two

16:16:14  8   tickets to JT tonight?  She's cool as a cucumber, this is

16:16:22  9   ridiculous.

16:16:22  10

16:16:23  11   Q     BY MR. DREYER:  You're back there.  Right?

16:16:24  12   A     Yes.

16:16:24  13   Q     So you have a recollection of the conversation and

16:16:26  14   the energy back there in that room?

16:16:27  15   A     Yes.

16:16:28  16   Q     This is trying to paint the picture for the

16:16:30  17   listening audience.  True?

16:16:36  18   A     Yes.

16:16:36  19          (Audio played.  Reporter does not certify content.)

        20

16:16:36  21          LUKAS:  This is between Jennifer and Lucy, who is

16:16:37  22   going to hold their wee the longest to win the Nintendo

        23   Wii.

16:16:41  24          When do we hit another bottle, Trish?

        25          TRISH:  When do we hit another bottle?  Comin' up?

| | | |
|---|---|---|
| 16:20:46 | 1 | LUKAS: Two young ladies left. We have Jennifer and |
| 16:20:56 | 2 | Lucy. We offered Jennifer and Lucy both Justin Timberlake |
| 16:20:56 | 3 | tickets for tonight. And they were drinking -- they drank |
| 16:20:56 | 4 | another 16 since then, right? |
| 16:20:56 | 5 | CARTER: Yeah they've taken two bottles since then. |
| 16:20:59 | 6 | LUKAS: Two more 16-ounce bottles since then. |
| | 7 | TRISH: Wow. |
| 16:21:01 | 8 | LUKAS: Does Jennifer want to give in now for the |
| 16:21:02 | 9 | Justin Timberlake tickets? |
| 16:21:04 | 10 | CARTER: I think she may. You want to talk to her? |
| 16:21:10 | 11 | LUKAS: Yeah, put her on. |
| 16:21:10 | 12 | CARTER: Hang on. |
| 16:21:10 | 13 | JENNIFER: Hello. |
| 16:21:10 | 14 | LUKAS: Jennifer, I heard you -- it's not -- you're |
| 16:21:11 | 15 | not doing too well. |
| 16:21:12 | 16 | JENNIFER: My head hurts. |
| 16:21:14 | 17 | |
| 16:21:14 | 18 | Q    BY MR. DREYER: Do you remember her saying that? |
| 16:21:16 | 19 | A    I didn't. |
| 16:21:20 | 20 | MR. DREYER: Back on. |
| | 21 | |
| 16:21:21 | 22 | (Audio played. Reporter does not certify content.) |
| 16:21:21 | 23 | |
| | 24 | TRISH: Awwww. |
| | 25 | /// |

307

# EXHIBIT 7

13:31:56  1    as you're concerned, you wouldn't really have any specific

13:31:58  2    information whether it was a John Geary policy or a policy

13:32:01  3    John Geary was simply relating to all of you that came

13:32:05  4    from corporate.

13:32:09  5    A    Not necessarily.

13:32:09  6    Q    That is correct?  My understanding is correct?

13:32:10  7    A    Yes.

13:32:10  8    Q    Okay.

13:32:11  9         And Mr. Geary would not differentiate between the

13:32:19 10    two.

13:32:19 11    A    Oh, I think sometimes he would.

13:32:19 12    Q    He might say, "We got this from corporate, we have

13:32:21 13    to start doing this"?

13:32:21 14    A    Yes.

13:32:22 15    Q    Or sometimes he might say, "Here's a policy I want

13:32:25 16    you to follow," without saying something like that?

13:32:27 17    A    Yes.

13:32:29 18    Q    As far as you're concerned, they were one in the

13:32:36 19    same, because if Mr. Geary expressed it was a policy, as

13:32:36 20    far as you're concerned, it was a policy to be followed.

13:32:44 21    A    If it came from John Geary, and it was directed to

13:32:44 22    my role at the radio stations, I reported to him, so yes.

13:32:47 23    Q    Did you ever have a situation arise where you got

13:32:53 24    word of a conflicting policy, a policy that was expressed

13:32:57 25    one way by Mr. Geary and a different way by corporate?

14:58:10  1    A    I don't know if that is a hard, fast definition, but

14:58:14  2    it is spelling out what a simple contest might be.

14:58:17  3    Q    Who is Carmela Masi, as far as you know?

14:58:20  4    A    She's one of the staffers at Entercom legal

14:58:24  5    department.

14:58:24  6    Q    Did you have any understanding of what you were to

14:58:27  7    do if Ms. Masi communicated specific information to you

14:58:31  8    regarding the company policy?  I mean, did you have an

14:58:34  9    understanding that if Masi says I'm supposed to do this,

14:58:40 10    you are supposed to do it?

14:58:40 11    A    Yes.

14:58:40 12    Q    If Ms. Masi sent you something that defined a

14:58:42 13    policy, you would follow the policy.

14:58:44 14    A    Yes.

14:58:44 15    Q    And it would be -- and you would think John Geary

14:58:47 16    would expect you to follow that policy.

14:58:49 17    A    Yes.

14:58:49 18    Q    Did you understand this e-mail from Ms. Masi to be

14:58:54 19    articulating a policy to be followed?

14:58:56 20    A    Yes.

14:58:57 21    Q    And not only this e-mail, but she sent certain other

14:59:02 22    documents along with it.  Correct?

14:59:12 23    A    As I recall, yes.

14:59:12 24    Q    So if Ms. Masi says in here -- let's not use the

14:59:12 25    word "definition."  Let's say she references a simple

# EXHIBIT 8

1    Corp.), and John Geary (as the Vice President and Market Manager of Entercom Sacramento,

2    LLC), is an insured under the terms of the Chubb Primary Policy. The Chubb Primary Policy has

3    policy limits of $1 million per occurrence, which is in addition to any costs of defense covered by

4    Chubb.

5        5.    Exhibit 6 is a true copy (with premium information redacted from the declarations

6    page) of an excess insurance policy ("the Excess Policy"), Policy No. BE 6849213, effective from

7    March 7, 2006 to March 7, 2007 issued by Defendant American Home Assurance Company

8    (hereinafter "American Home"). Each of the Entercom Parties is an insured under the terms of

9    the Excess Policy as reflected in the declarations page, Endorsement No. 7 at page 5, Section R.2,

10   and at page 18, Section M.2.d. The Excess Policy has policy limits of $25 million per

11   occurrence.

12       6.    As Associate Counsel with the Legal Department of Entercom Communications

13   Corp., I am aware that the premiums for the Chubb Primary Policy and the Excess Policy were

14   paid.

15       7.    Following the death of Jennifer Strange, which is the subject of the *Strange*

16   lawsuit, the Entercom Parties obtained a copy of the Sacramento County Coroner Final Report of

17   Investigation (dated June 10, 2007), a true copy of which is Exhibit 10.

18       8.    The Complaint in the *Strange* lawsuit was filed on January 25, 2007, and a true

19   copy of the Complaint is Exhibit 7. Chubb and American Home were notified of the lawsuit, and

20   provided with a copy of the Complaint.

21       9.    By letter of March 2, 2007 (a true copy of which is Exhibit 11), Chubb confirmed

22   its acceptance of the tender and its duty to defend the *Strange* lawsuit, without any reservation of

23   rights relating to coverage. Chubb has never sent a reservation of rights letter related to the

24   *Strange* lawsuit. After accepting the tender of defense, Chubb has spent hundreds of thousands of

25   dollars in defending the Entercom Parties in the *Strange* lawsuit.

26       10.   After tender of the *Strange* lawsuit, American Home appointed a claims

27   representative named Leonard Romeo. On March 7, 2007, I spoke with Mr. Romeo who advised

28   that while American Home would soon issue a reservation of rights letter, that letter should not be

DECL. OF MICHAEL E. DASH IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION; CASE NO. CV 07 6493 JSW

1   taken as a sign that American Home was taking an adversarial position over coverage.

2   Mr. Romeo further advised that he would seek to settle the *Strange* lawsuit with the Stranges'

3   counsel, with whom he had dealt previously on at least one other case.  By letter of March 22,

4   2007 (true copy of which is Exhibit 12), American Home formally acknowledged the tender of

5   defense and advised that American Home was handling the *Strange* lawsuit under a reservation of

6   rights.

7       11.     Between March, 2007 and July, 2007, I had various conversations with American

8   Home's claims representative (Mr. Romeo).  In the course of those conversations, Mr. Romeo

9   advised that he would be meeting with the Stranges' counsel (Mr. Roger Dreyer) to discuss

10  settlement.  Mr. Romeo also advised that he had in fact met with the Stranges' counsel

11  (Mr. Dreyer) in a meeting in Las Vegas to discuss settlement.  The settlement discussions

12  between Mr. Romeo and the Stranges' counsel occurred in private, without the participation of

13  the Entercom Parties or their counsel.

14      12.     On July 11, 2007, Mr. Romeo advised in a meeting that I attended that any

15  settlement of the *Strange* lawsuit would be with "my [American Home's] money," and that

16  American Home would pay "100% of any settlement."  On July 11, 2007, Mr. Romeo also

17  advised that it was not his practice, or the practice of others at AIG when handling American

18  Home claims, to consult with defense counsel concerning the reasonableness of any settlements.

19  Mr. Romeo had made similar comments to me previously.

20      13.     Prior to July 12, 2007, there had been significant discovery in the *Strange* lawsuit,

21  including productions of documents by the Entercom Parties and the Strange Plaintiffs, responses

22  to numerous interrogatories by the Entercom Parties and other thirty (30) depositions.  Based on

23  my interactions with Mr. Romeo as the claims representative for American Home and with

24  counsel appointed by American Home to assist in the defense, I am aware that the discovery

25  responses, the documents produced and the transcripts of the depositions were available to

26  American Home.

27      14.     On July 12, 2007, the Stranges' counsel served the Entercom Parties with an

28  "Offer to Compromise" together with a cover letter (hereinafter "the Settlement Demand"), a true

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

DECL. OF MICHAEL E. DASH IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION; CASE NO. CV 07 6493 JSW

1    copy of which is Exhibit 13.  The Settlement Demand makes clear that it was for $13 million and

2    was open for thirty (30) days.  On July 13, 2007, the Settlement Demand was forwarded to

3    Mr. Romeo, as the claims representative for American Home.  The Settlement Demand was also

4    forwarded to the Chubb claims representative.  The next week, Entercom reminded both Chubb

5    and American Home of the Settlement Demand and sought a response from the insurers.

6        15.    On July 24, 2007, Chubb responded to the Settlement Demand, agreeing to

7    contribute its policy limits of $1 million towards settlement.

8        16.    Not having obtained a response from American Home to the Settlement Demand,

9    on August 6, 2007, counsel for the Entercom Parties sent an e-mail requesting American Home to

10   respond to the Settlement Demand.  In making this request, American Home's claims

11   representative (Mr. Romeo) was advised that counsel for the Entercom Parties was prepared to

12   meet or have a conference call if necessary.  As the Associate Counsel for Entercom

13   Communications Corp. with oversight over the *Strange* lawsuit for the Entercom Parties, I relied

14   on American Home to timely acknowledge and respond to the Settlement Demand, in particular

15   since Mr. Romeo had previously insisted that he be involved in the settlement discussions.

16       17.    At no time prior to the expiration of the Settlement Demand (which was expressly

17   open for thirty (30) days) did the Entercom Parties receive any substantive oral or written

18   response to the Settlement Demand from American Home.  Had American Home responded, I

19   would have been made aware of the response.  Instead, by letter of August 17, 2007 (a true copy

20   of which is Exhibit 14, redacted to eliminate privileged information relating to the *Strange*

21   lawsuit), American Home responded, suggesting that the death of Jennifer Strange was not an

22   "occurrence" (as that term is used in the Excess Policy) so as to trigger coverage.  The August 17,

23   2007 letter was authored by Mr. Patrick Fredette (identified as coverage counsel for American

24   Home).  Prior to receipt of the August 17, 2007 letter, I (and to my knowledge no one else

25   representing the Entercom Parties) had spoken with Mr. Fredette or been advised that

26   Mr. Fredette had any involvement with the *Strange* lawsuit or any issues relating to coverage

27   under the *Strange* lawsuit.  In August, 2007, I was also advised that Mr. Romeo would no longer

28   be the claims representative handling the *Strange* lawsuit for American Home.

18.     American Home did not offer any explanation for not responding to the Entercom Parties prior to the expiration of the Settlement Demand. Nor did American Home offer an explanation for not meeting to discuss the Settlement Demand with counsel for the Entercom Parties before it expired. Nor did American Home describe what investigation American Home had conducted in reaching the positions expressed in the August 17 letter.

19.     Thereafter, American Home was asked by counsel for the Entercom Parties to confirm that American Home was disclaiming coverage and that the Entercom Parties could control settle negotiations and seek to settle the *Strange* lawsuit on its own. By letter of September 4, 2007 (a true copy of which is Exhibit 15), counsel for American Home advised that "American Home has not declined coverage," but rather was "proceeding under a reservation of rights." In the letter, American Home also advised that it "has not and will not waive any provision under the policy, including the voluntary payments provision."

20.     Thereafter, in September, 2007, I was part of a conference call with counsel for American Home (Mr. Fredette). In that conference, it was requested that American Home itself take action to try to settle the *Strange* lawsuit or to allow the Entercom Parties to do so. American Home's counsel (Mr. Fredette) advised that American Home would not take action on its own to settle the *Strange* lawsuit and that it was American Home's position that the death of Ms. Strange was not an "occurrence" so as to trigger coverage under the Excess Policy. Mr. Fredette also advised that American Home would not waive any policy provision (including the "no voluntary payment" provision under the Policy) in the event that that Entercom Parties tried to settle the *Strange* lawsuit on their own. Since the August 17 letter, American Home has failed and refused to take action on its own to try to settle the *Strange* lawsuit.

Under penalty of perjury under the laws of the State of California and the United States of America, I declare that the foregoing is true and correct.

Executed this 20ᵗʰ day of February, 2008 at Bala Cynwyd, Pennsylvania.

Michael E. Dash, Jr.

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

54007\2009\584772.2

# EXHIBIT 9

1    cerebral edema and the cerebral edema will cause increased inter-cranial pressure, which will in

2    turn cause non-cardiogenic pulmonary edema. If not treated, this can lead to death.

3         10.    Several factors may inhibit the brain's ability to respond to hyponatremia.

4    Estrogen impairs the brain's adaptive response to hyponotremia, in part because estrogen impairs

5    the exit of sodium from brain cells. Estrogen levels vary from person to person. A woman's

6    estrogen level will also vary with age; and at any given age, a given woman's own estrogen level

7    will vary with the time of the month, as her estrogen level rises and falls in a cycle. Hypoxia also

8    inhibits the brain's ability to adapt to hyponatremia. Additionally, research shows that nausea is

9    itself a stimulus for the release of ADH.

10         11.    Whether hyponatremia develops in a person is dependent not just on how much

11   fluid they intake, but on a number of factors, including, among others, the person's weight, the

12   person's body mass, the person's blood volume, the sodium content in the person's blood plasma

13   and circulatory system, the amount and timing of water (or other liquid) the person intakes, how

14   the person's brain regulates his or her ADH level, the person's gender, the person's age, the

15   person's estrogen level, and the person's ADH level.

16         12.    There is no post mortem test for ADH levels. However, the fact that Jennifer

17   Strange's urine osmolality was 467 mOsm/kg indicates that her ADH level must have been

18   elevated. Had her ADH level been suppressed, her urine osmolality would have been under 100

19   mOsm/kg. Thus, Jennifer Strange's urine osmolality indicates that her kidneys did not eliminate

20   the excess water in her body as rapidly as they would have had her ADH level been suppressed.

21         I declare under penalty of perjury under the laws of the State of California and the United

22   States of America that the foregoing is true and correct.

23         Executed this 21 day of February, in Houston, Texas.

24

25                                                   Juan Carlos Ayus, M.D.

26

27   54007\2009\584905.1

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-4-

DECLARATION OF JUAN CARLOS AYUS, M.D. IN
SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION; CASE NO. CV 07 6493 JCS